**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| IN RE: GLOBAL CORD BLOOD CORPORATION SECURITIES LITIGATION | Case No. 1:24-cv-03071-PKC<br><br>Hon. P. Kevin Castel |
| --- | --- |

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS**

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................. 1

FACTUAL BACKGROUND .................................................................. 3

      A.    The Defendants ................................................................ 3

      B.    GCBC Purported To Stockpile $1 Billion In Cash While Defendants Ignored U.S. Investors' Calls To Distribute Earnings ............ 4

      C.    During 2015-2022 Defendants Secretly Misappropriated Hundreds Of Millions Of Dollars From GCBC To Golden Meditech And Its Affiliates ................................................................ 5

      D.    In 2022 Defendants Attempted To Carry Out The Sham Cellenkos Transaction To Conceal The Theft Of GCBC's Funds ...................... 6

      E.    GCBC's Stock Price Declined Significantly As The Risks Concealed By Defendants' Fraud Began To Materialize ...................... 7

PROCEDURAL HISTORY ................................................................ 7

LEGAL STANDARDS .................................................................... 8

ARGUMENT ............................................................................ 9

    I.    Plaintiffs Have Sufficiently Alleged Their Exchange Act Section 10(b) Claims Against All Defendants ................................................ 9

      A.    Defendants Do Not Dispute That The Alleged Misstatements Were Materially Misleading ................................................... 10

      B.    The Complaint Pleads Defendants' Deceptive Acts ................................ 10

            1.    Director Defendants ..................................................... 13

            2.    Cellenkos ................................................................ 14

            3.    Golden Meditech ......................................................... 17

      C.    The Complaint Pleads A Strong Inference Of Defendants' Scienter ....... 19

            1.    Director Defendants ..................................................... 19

            2.    Cellenkos ................................................................ 22

            3.    Golden Meditech ......................................................... 24

D.      The Complaint Pleads Loss Causation ...................................... 25

E.      The Complaint Pleads Reliance .............................................. 28

F.      Defendants' Fraud Was Carried Out In Connection With The
        Purchase Or Sale Of Securities .............................................. 30

II.     Plaintiffs Have Sufficiently Alleged Their Control Person Claims ...................... 31

        1.      Director Defendants .................................................... 32

        2.      Golden Meditech ...................................................... 33

III.    The Court Has Personal Jurisdiction Over Defendants .......................... 33

        A.      Defendants Have Requisite Minimum Contacts With The United
                States ............................................................................ 34

                1.      Mark Chen ...................................................... 38

                2.      Defendant Kam ................................................ 40

                3.      Golden Meditech .............................................. 42

        B.      Exercising Personal Jurisdiction Over Defendants Is Reasonable ........... 43

                1.      Officer Defendants ............................................ 45

                2.      Defendant Kam ................................................ 47

                3.      Mark Chen and Golden Meditech ........................... 48

        C.      The Court Also Has Personal Jurisdiction Under Conspiracy And
                Alter Ego Theories ......................................................... 49

                1.      Conspiracy ...................................................... 49

                2.      Alter Ego ........................................................ 50

IV.     The Court Should Exercise Its Discretion To Deem Timely The Already
        Completed Alternative Service ........................................................ 52

        A.      The Flexible Due Diligence Standard For Service Pursuant To
                Rule 4(f) Applies Here ..................................................... 53

        B.      Plaintiffs Have Acted Diligently .......................................... 56

        C.      The Relevant Rule 4(m) Factors Favor A Discretionary Extension ......... 57

    1.    The Statute Of Limitations Would Likely Bar A Refiled Action...................................................................... 60

    2.    Defendants Promptly Had Actual Notice Of This Case ............. 61

    3.    Defendants Would Not Be Prejudiced By An Extension ............ 61

    4.    Additional Considerations Further Weigh In Favor Of An Extension................................................................................... 63

V.    The Amended Complaint Is Not Time Barred.................................................... 66

    1.    This Action Remains Timely Filed If The Court Grants An Extension For Service .................................................................. 66

    2.    The Amended Complaint Was Filed Before The Two-Year Limitations Period Expired ........................................................ 67

VI.    Plaintiffs Request Leave To Amend, If Necessary ............................................... 69

CONCLUSION.................................................................................................................... 70

## TABLE OF AUTHORITIES

### CASES

*Acticon AG v. China North East Petroleum Holdings Ltd.*,
  615 F. App'x 44 (2d Cir. 2015) .............................................................................. 22

*AIG Managed Mkt. Neutral Fund v. Askin Cap. Mgmt., L.P.*,
  197 F.R.D. 104 (S.D.N.Y. 2000) ............................................................ 58, 61, 62, 67

*Aqua Shield, Inc. v. Inter Pool Cover Team*,
  2007 WL 4326793 (E.D.N.Y. Dec. 7, 2007) ......................................................... 53

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ................................................................................................ 8

*Base Metal Trading Ltd. v. Russian Aluminum*,
  98 F. App'x 47 (2d Cir. 2004) ........................................................................... 47, 48

*Basic Inc. v. Levinson*,
  485 U.S. 224 (1988) .............................................................................................. 28

*Boluka Garment Co., Ltd. v. Canaan Inc.*,
  547 F. Supp. 3d 439 (S.D.N.Y. 2021) ................................................................... 27

*Bristol Myers Squibb Co. Sec. Litig.*,
  586 F. Supp. 2d 148 (S.D.N.Y. 2008) ................................................................... 26

*Brown v. China Integrated Energy, Inc.*,
  875 F. Supp.  (C.D. Cal. 2012) .......................................................................... 21

*Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*,
  750 F.3d 227 (2d Cir. 2014) ............................................................................ 25, 26

*Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*,
  511 U.S. 164 (1994) .............................................................................................. 16

*Chen Lin v. Dolar Shop Rest. Grp., LLC*,
  2021 WL 681075 (E.D.N.Y. Feb. 22, 2021) ......................................................... 59

*Chill v. Gen. Elec. Co.*,
  101 F.3d 263 (2d Cir. 1996) .................................................................................. 23

*Chloé v. Queen Bee of Beverly Hills, LLC*,
  616 F.3d 158 (2d Cir. 2010) .................................................................................. 44

*City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*,
   399 F.3d 651 (6th Cir. 2005) ................................................................. 45

*City of Pontiac Gen. Employees' Ret. Sys. v. MBIA, Inc.*,
   637 F.3d 169 (2d Cir. 2011)................................................................... 68

*City of Sterling Heights Police & Fire Ret. Sys. v. Reckitt Benckiser Grp. PLC*,
   587 F. Supp. 3d 56 (S.D.N.Y. 2022)...................................................... 25

*Cody v. Mello*,
   59 F.3d 13 (2d Cir. 1995)....................................................................... 58

*CompuDyne Corp. v. Shane*,
   453 F. Supp. 2d 807 (S.D.N.Y. 2006).................................................... 32

*Converse, Inc. v. Norwood Venture Corp.*,
   1997 WL 742534 (S.D.N.Y. Dec. 1, 1997) ........................................... 32

*Das v. Rio Tinto PLC*,
   332 F. Supp. 3d 786 (S.D.N.Y. 2018)............................................... 21, 22

*De La Rosa v. New York City 33 Precinct*,
   2010 WL 1737108 (S.D.N.Y. Apr. 27, 2010)................................... 60, 62

*DEF v. ABC*,
   366 F. App'x 250 (2d Cir. 2010) ........................................................... 55

*Dinsmore v. Squadron, Ellenoff, Plesent, Sheinfeld & Sorkin*,
   135 F.3d 837 (2d Cir. 1998)................................................................... 49

*Dura Pharm., Inc. v. Broudo*,
   544 U.S. 336 (2005)................................................................................ 25

*Eades v. Kennedy, PC Law Offices*,
   799 F.3d 161 (2d Cir. 2015)................................................................... 44

*ECA, Loc. 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*,
   553 F.3d 187 (2d Cir. 2009)................................................................... 23

*Emps.' Ret. Sys. of Gov't of the Virgin Islands v. Blanford*,
   794 F.3d 297 (2d Cir. 2015)............................................................... 9, 19

*Everlast World's Boxing Headquarters Corp. v. Ringside, Inc.*,
   928 F. Supp. 2d 735 ............................................................................... 34

v

*Exch. Comm'n v. China Energy Sav. Tech., Inc.*,
    2007 WL 9711174 (E.D.N.Y. Mar. 19, 2007) ................................................................. 43, 45

*Exch. Comm'n v. CKB168 Holdings, Ltd.*,
    210 F. Supp. 3d 421 (E.D.N.Y. 2016) ............................................................................. 12, 19

*Exch. Comm'n v. Hurgin*,
    484 F. Supp. 3d 98 (S.D.N.Y. 2020) .................................................................................... 40

*Exch. Comm'n v. Hwang*,
    692 F. Supp. 3d 362 (S.D.N.Y. 2023) .................................................................................. 30

*Exch. Comm'n v. Rio Tinto plc*,
    41 F.4th 47 (2d Cir. 2022) ............................................................................................. 16, 18

*Exch. Comm'n v. Sullivan*,
    68 F. Supp. 3d 1367 (D. Colo. 2014) .................................................................................... 12

*Fajardo v. Arise News, Inc.*,
    2016 WL 2851339 (S.D.N.Y. May 13, 2016) ...................................................................... 56

*Fantozzi v. City of New York*,
    343 F.R.D. 19 (S.D.N.Y. 2022) ............................................................................................ 59

*Ferreira v. Carranza*,
    2022 WL 34610 (E.D.N.Y. Jan. 4, 2022) ............................................................................ 60

*Fire & Police Pension Ass'n of Colorado v. Bank of Montreal*,
    368 F. Supp. 3d 681 (S.D.N.Y. 2019) .................................................................................. 50

*Frasca v. United States*,
    921 F.2d 450 (2d Cir. 1990) ........................................................................................... 66, 67

*Ganino v. Citizens Utilities Co.*,
    228 F.3d 154 (2d Cir. 2000) ................................................................................................. 31

*Goldstein v. Laurent*,
    2010 WL 4237582 (S.D.N.Y. Oct. 15, 2010) .................................................................. 58, 61

*Gucci America, Inc. v. Weixing Li*,
    768 F.3d 122 (2d Cir. 2014) ................................................................................................. 34

*Harris v. AmTrust Fin. Servs., Inc.*,
    135 F. Supp. 3d 155 (S.D.N.Y. 2015) .................................................................................. 27

*Hayes v. Dep't of Educ. of City of New York*,
    20 F. Supp. 3d 438 ............................................................................................. 67

*Henderson v. United States*,
    517 U.S. 654 (1996) ........................................................................................... 67

*Hollomon v. City of New York*,
    2006 WL 2135800 (E.D.N.Y. July 31, 2006) ................................................... 62

*IBEW Loc. 90 Pension Fund v. Deutsche Bank AG*,
    2013 WL 1223844 (S.D.N.Y. Mar. 27, 2013) ................................................... 25

*In re Alibaba Grp. Holding Ltd. Sec. Litig.*,
    2023 WL 2601472 (S.D.N.Y. Mar. 22, 2023) ............................................. 42, 43

*In re AOL Time Warner Inc. Sec. and ERISA Litig.*,
    381 F. Supp. 2d 192 (S.D.N.Y. 2004) ............................................................... 19

*In re Banco Bradesco S.A. Sec. Litig.*,
    277 F. Supp. 3d 600 (S.D.N.Y. 2017) ............................................... 35, 37, 43, 44

*In re Braskem S.A. Sec. Litig.*,
    246 F. Supp. 3d 731 (S.D.N.Y. 2017) ............................................................... 43

*In re CarLotz, Inc. SEC. Litig.*,
    2024 WL 3924708 (S.D.N.Y. Aug. 23, 2024) ................................................... 18

*In re Comverse Tech., Inc. Sec. Litig.*,
    543 F. Supp. 2d 134 (E.D.N.Y. 2008) ............................................................... 65

*In re EHang Holdings Ltd. Sec. Litig.*,
    646 F. Supp. 3d 443 (S.D.N.Y. 2022) ............................................................... 39

*In re Eletrobras Sec. Litig.*,
    245 F. Supp. 3d 450 (S.D.N.Y. 2017) ............................................................... 29

*In re Fairfield Sentry Ltd.*,
    662 B.R. 74 (Bankr. S.D.N.Y. 2024) ....................................................... 44, 45, 54

*In re Glob. Cord Blood Corp.*,
    2022 WL 17478530 (Bankr. S.D.N.Y. Dec. 5, 2022) ......................................... 8

*In re Hi-Crush Partners L.P. Sec. Litig.*,
    2013 WL 6233561 (S.D.N.Y. Dec. 2, 2013) ..................................................... 21

*In re JWP Inc. Sec. Litig.*,
   928 F. Supp. 1239 (S.D.N.Y. 1996) ........................................................... 32

*In re Lernout & Hauspie Sec. Litig.*,
   236 F. Supp. 2d 161 (D. Mass. 2003) ........................................................ 12

*In re Liberty Tax, Inc. Sec. Litig.*,
   435 F. Supp. 3d 457 (E.D.N.Y.) ............................................................... 27

*In re Livent, Inc. Noteholders Sec. Litig.*,
   151 F. Supp. 2d 371 (S.D.N.Y. 2001) ...................................................... 32

*In re Longfin Corp. Sec. Class Action Litig.*,
   2019 WL 1569792 (S.D.N.Y. Apr. 11, 2019) .................................... *passim*

*In re Parmalat Sec. Litig.*,
   376 F. Supp. 2d 472 (S.D.N.Y. 2005) .............................................. *passim*

*In re Peabody Energy Corp. Sec. Litig.*,
   2022 WL 671222 (S.D.N.Y. Mar. 7, 2022) ............................................... 69

*In re Philip Servs. Corp. Sec. Litig.*,
   383 F. Supp. 2d 463 (S.D.N.Y. 2004) ...................................................... 32

*In re Platinum & Palladium Antitrust Litig.*,
   61 F.4th 242 (2d Cir. 2023) ........................................................... 49, 50, 51

*In re Refco, Inc. Sec. Litig.*,
   609 F. Supp. 2d 304 (S.D.N.Y. 2009) ...................................................... 29

*In re S1 Corp. Sec. Litig.*,
   173 F. Supp. 2d 1334 (N.D. Ga. 2001) ................................................ 55, 56

*In re Satyam Computer Servs. Ltd. Sec. Litig.*,
   915 F. Supp. 2d 450 (S.D.N.Y. 2013) ...................................................... 50

*In re Scholastic Corp. Sec. Litig.*,
   252 F.3d 63 (2d Cir. 2001) ......................................................................... 9

*In re Scot. Re Grp. Sec. Litig.*,
   524 F. Supp. 2d 370 (S.D.N.Y. 2007) ...................................................... 31

*In re Smith Barney Transfer Agent Litig.*,
   884 F. Supp. 2d 152 (S.D.N.Y. 2012) ...................................................... 33

*In re Steward*,
    2017 WL 4457406 (Bankr. D.D.C. Sept. 29, 2017) ............................................................ 66

*In re Tenaris S.A. Sec. Litig.*,
    493 F. Supp. 3d 143 (E.D.N.Y. 2020) ..................................................... 32, 33, 51, 52

*In re Turquoise Hill Res. Ltd. Sec. Litig.*,
    625 F. Supp. 3d 164 (S.D.N.Y. 2022).......................................................... 9, 10, 29

*In re Vivendi, S.A. Sec. Litig.*,
    838 F.3d 223 (2d Cir. 2016).......................................................................... 27

*In re Veon Ltd. Sec. Litig.*,
    2018 WL 4168958 (S.D.N.Y. Aug. 30, 2018) .................................................... 56, 67

*Intesa Sanpaolo, S.p.A. v. Credit Agricole Corp. & Inv. Bank*,
    924 F. Supp. 2d 528 (S.D.N.Y. 2013).......................................................... 69

*Int'l Controls & Measurements Corp. v. Watsco, Inc.*,
    853 F. Supp. 585 (N.D.N.Y. 1994)................................................................ 51

*Jordan v. Forfeiture Support Assocs.*,
    928 F. Supp. 2d 588 (E.D.N.Y. 2013) .......................................................... 58

*Kogan v. Facebook, Inc.*,
    334 F.R.D. 393 (S.D.N.Y. 2020) ................................................................ 59

*Kriss v. Bayrock Grp. LLC*,
    2016 WL 7046816 (S.D.N.Y. Dec. 2, 2016) .................................................... 59

*Kuriakose v. Fed. Home Loan Mortg. Corp.*,
    897 F. Supp. 2d 168 (S.D.N.Y. 2012).......................................................... 27

*LBBW Luxemburg S.A. v. Wells Fargo Sec. LLC*,
    10 F. Supp. 3d 504 (S.D.N.Y. 2014).......................................................... 25

*Lea v. TAL Educ. Grp.*,
    837 F. App'x 20 (2d Cir. 2020) ................................................................ 20

*Leykin v. AT & T Corp.*,
    423 F. Supp. 2d 229 (S.D.N.Y. 2006).......................................................... 31

*Liberty Highrise Pvt. Ltd. v. Praxis Energy Agents DMCC*,
    632 F. Supp. 3d 562 (S.D.N.Y. 2022).......................................................... 52

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC,*
 797 F.3d 160 (2d Cir. 2015) ........................................................................ 70

*Lorenzo v. Sec. & Exch. Comm'n,*
 587 U.S. 71 ............................................................................................. 10, 16

*Maso Cap. Inv. Ltd. v. E-House (China) Holdings Ltd.,*
 2024 WL 2890968 n.5 (2d Cir. June 10, 2024) ............................................ 18

*Mateo v. Bristow,*
 2013 WL 3863865 (S.D.N.Y. July 16, 2013) ............................................... 10

*Matrixx Initiatives, Inc. v. Siracusano,*
 563 U.S. 27 (2011)....................................................................................... 9, 19

*Menaldi v. Och-Ziff Cap. Mgmt. Grp. LLC,*
 277 F. Supp. 3d 500 (S.D.N.Y. 2017).............................................................. 31

*Mentor Ins. Co. (U.K.) v. Brannkasse,*
 996 F.2d 506 (2d Cir. 1993).............................................................................. 55

*Merck & Co. v. Reynolds,*
 559 U.S. 633 (2010) ................................................................................ 67, 68

*Montalbano v. Easco Hand Tools, Inc.,*
 766 F.2d 737 (2d Cir. 1985).............................................................................. 55

*Mucha v. Volkswagen Aktiengesellschaft,*
 540 F. Supp. 3d 269 (E.D.N.Y. 2021) ..................................................... 35, 39, 45

*Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Barney Assocs.,*
 130 F.R.D. 291 (S.D.N.Y. 1990) ....................................................................... 61

*NCA Holding Corp. v. Ernestus,*
 1998 WL 388562 (S.D.N.Y. July 13, 1998) ...................................................... 39

*New Orleans Emps. Ret. Sys. v. Celestica, Inc.,*
 455 F. App'x 10 (2d Cir. 2011) ......................................................................... 21

*New York State Elec. and Gas Corp. v. FirstEnergy Corp.,*
 766 F.3d 212 (2d Cir. 2014)............................................................................... 51

*Pac. Inv. Mgmt. Co. LLC v. Mayer Brown LLP,*
 603 F.3d 144 (2d Cir. 2010)............................................................................... 29

*Pearlstein v. BlackBerry Ltd.*,
    2021 WL 253453 (S.D.N.Y. Jan. 26, 2021) ................................................ 27

*Plumber & Steamfitters Loc. 773 Pension Fund v. Danske Bank A/S*,
    11 F.4th 90 (2d Cir. 2021) ........................................................................ 18

*Rana v. Islam*,
    305 F.R.D. 53 (S.D.N.Y. 2015) ................................................................ 58

*Romandette v. Weetabix Co., Inc.*,
    807 F.2d 309 (1986) ........................................................................ 57, 58

*RSM Prod. Corp. v. Fridman*,
    2007 WL 2295907 .................................................................................. 54

*S.E.C. v. Familant*,
    910 F. Supp. 2d 83 ................................................................................ 14

*S.E.C. v. Gottlieb*,
    88 F. App'x 476 (2d Cir. 2004) .............................................................. 53

*S.E.C. v. Kelly*,
    817 F. Supp. 2d 340 (S.D.N.Y. 2011) .................................................... 14

*S.E.C. v. PlexCorps*,
    2018 WL 4299983 (E.D.N.Y. Aug. 9, 2018) .......................................... 44

*S.E.C. v. Shehyn*,
    2008 WL 6150322 (S.D.N.Y. Nov. 26, 2008) ........................................ 53

*S.E.C. v. Softpoint, Inc.*,
    2001 WL 43611 (S.D.N.Y. Jan. 18, 2001) ............................................ 34

*S.E.C. v. Straub*,
    2013 WL 4399042 (S.D.N.Y. Aug. 5, 2013) .......................................... 35

*S.E.C.* v. Straub,
    921 F. Supp. 2d 244 (S.D.N.Y. 2013) ............................... 36, 37, 38, 40

*S.E.C. v. Unifund SAL*,
    910 F.2d 1028 (2d Cir. 1990) .......................................................... 34, 54

*S.E.C. v. Zandford*,
    535 U.S. 813 (2002) .............................................................................. 31

*Schnall v. Annuity & Life RE Holdings, Ltd.*,
    2003 WL 23100326 (D. Conn. Dec. 13, 2003) ................................................. 58

*Se. Pennsylvania Transportation Auth. v. Orrstown Fin. Servs. Inc.*,
    12 F.4th 337 (3d Cir. 2021) ............................................................................. 63

*SEC v. First Jersey Secs., Inc.*,
    101 F.3d 1450 (2d Cir. 1996) .......................................................................... 32

*SEC v. Sharef*,
    924 F. Supp. 2d 539 (S.D.N.Y. 2013) ................................................. 35, 45, 48

*Setzer v. Omega Healthcare Invs., Inc.*,
    968 F.3d 204 (2d Cir. 2020) ............................................................................ 19

*Shanawaz v. Intellipharmaceutics Int'l Inc.*,
    348 F. Supp. 3d 313 (S.D.N.Y. 2018) ............................................................. 23

*Shaw v. Rolex Watch U.S.A., Inc.*,
    745 F. Supp. 982 (S.D.N.Y. 1990) .................................................................. 60

*Simpson v. AOL Time Warner Inc.*,
    452 F.3d 1040 (9th Cir. 2006) ......................................................................... 15

*Skiadas v. Acer Therapeutics Inc.*,
    2020 WL 3268495 (S.D.N.Y. June 16, 2020) ................................................. 23

*Skiadas v. Acer Therapeutics Inc.*,
    2020 WL 4208442 (S.D.N.Y. July 21, 2020) .................................................. 23

*Sonterra Cap. Master Fund Ltd. v. Credit Suisse Grp. AG*,
    277 F. Supp. 3d 521 (S.D.N.Y. 2017) ............................................................. 42

*Stoneridge Inv. Partners, LLC v. Sci.-Atlanta*,
    552 U.S. 148 (2008) ......................................................................................... 28

*Stream SICAV v. Wang*,
    989 F. Supp. 2d 264 (S.D.N.Y. 2013) ............................................................. 57

*Suez Equity Investors, L.P. v. Toronto–Dominion Bank*,
    250 F.3d 87 (2d Cir. 2001) .............................................................................. 25

*Taormina v. Thrifty Car Rental*,
    2016 WL 7392214 n.6 (S.D.N.Y. Dec. 21, 2016) ........................................... 34

*Tastefairy Corp. v. Kumar*,
   2019 WL 13220974 (E.D.N.Y. Oct. 31, 2019) ........................................... 53, 58, 62

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
   551 U.S. 308 (2007) ...................................................................................... 8, 19

*Ting Qiu Qiu v. Shanghai Cuisine, Inc.*,
   2021 WL 185040 (S.D.N.Y. Jan. 19, 2021) ................................................... 59

*Tishman v. Associated Press*,
   2005 WL 3466022 (S.D.N.Y. Dec. 16, 2005) ................................................ 57

*United States Sec. & Exch. Comm'n v. Passos*,
   2024 WL 5203022 (S.D.N.Y. Dec. 21, 2024) ...................................... 30, 37, 43, 44

*United States Sec. & Exch. Comm'n v. Wey*,
   246 F. Supp. 3d 894 (S.D.N.Y. 2017) ........................................................... 11

*United States v. Koehler Oberkirch GmbH*,
   728 F. Supp. 3d 1322 (Ct. Int'l Trade) .......................................................... 54

*United States v. Peters*,
   732 F.3d 93 (2d Cir. 2013) ............................................................................ 51

*USHA (India), Ltd. v. Honeywell Int'l, Inc.*,
   421 F.3d 129 (2d Cir. 2005) .......................................................................... 55

*Vaher v. Town of Orangetown*, N.Y.,
   916 F. Supp. 2d 404 (S.D.N.Y. 2013) ........................................................... 59

*Valentini v. Citigroup, Inc.*,
   837 F. Supp. 2d 304 (S.D.N.Y. 2011) ........................................................... 69

*Volkswagenwerk Aktiengesellschaft v. Schlunk*,
   486 U.S. 694 ................................................................................................... 54

*Wang Yan v. ReWalk Robotics Ltd.*,
   2018 WL 1041541 (D. Mass. Feb. 23, 2018) ................................................ 65

*Washington State Inv. Bd. v. Odebrecht S.A.*,
   2018 WL 6253877 (S.D.N.Y. Sept. 21, 2018) ............................................... 54

*Zapata v. City of New York*,
   502 F.3d 192 (2d Cir. 2007) .................................................................... 60, 66

## STATUTES

15 U.S.C. §78aa ........................................................................................................... 34

15 U.S.C. §78t(a) ......................................................................................................... 32

15 U.S.C. § 78u–4(a)(3)(A)(i) ...................................................................................... 64

15 U.S.C. § 78u–4(a)(3)(B) .......................................................................................... 64

15 U.S.C. §§ 78j(b) ........................................................................................................ 9

28 U.S.C. § 1658(b) ................................................................................................ 60, 67

## RULES

Fed. R. Civ. P. 4(c)(2)(C)(ii) and (d)(3) ..................................................................... 55

Fed. R. Civ. P. 4(i) ................................................................................................. 54, 55

Fed. R. Civ. P. 4(m) .............................................................................................. *passim*

Fed. R. Civ. P. 15(a)(2) ................................................................................................ 69

Federal Rule of Civil Procedure 4 ......................................................................... 52, 57

Rule 4(f) ................................................................................................................ *passim*

Rule 4(f)(3) ............................................................................................... 54, 55, 56, 65

Rule 4(j) ........................................................................................................................ 55

## PRELIMINARY STATEMENT

Defendants engaged in securities fraud by: (i) secretly misappropriating hundreds of millions of dollars from NYSE-listed Global Cord Blood Corporation ("GCBC")[1] to affiliates of Defendants Yuen Kam and Golden Meditech Holdings Limited over 2015-2022; (ii) falsely representing that GCBC still retained the stolen funds; and (iii) then orchestrating the sham Cellenkos transaction in 2022 to cover up the theft. As set forth in the Amended Complaint, the basic structure of these fraudulent transactions is illustrated by the following simplified chart:



---

[1] Capitalized terms used but not defined herein have the same meanings as in the Amended Class Action Complaint For Violations Of The Federal Securities Laws (ECF No. 60) ("Amended Complaint"). Citations to "¶__" are to the Amended Complaint's paragraphs, unless otherwise specified. Citations to the "Spencer Decl." and "PX __" are to the Declaration of Garth Spencer and its exhibits, filed herewith. Unless otherwise indicated, all emphasis has been added and all internal quote marks and citations have been omitted throughout this brief.

While some Defendants contest the sufficiency of the Amended Complaint's securities fraud allegations as to themselves, their arguments are without merit because each Defendant knowingly participated in the fraud, which caused substantial losses to investors. Tellingly, other Defendants including GCBC's former CEO and CFO, and the fraudulent scheme's principal Mr. Kam, do not argue that the Complaint fails to state a claim. Nor could they reasonably do so. The findings of GCBC's Joint Provisional Liquidators ("JPLs"), appointed by the Grand Court of the Cayman Islands to replace the Company's corrupt former management, strongly support a finding of Defendants' liability and corroborate Plaintiffs' claims, revealing $606 million of undisclosed payments from GCBC to entities affiliated with Defendant Golden Meditech.

The foreign-resident Defendants unpersuasively seek to escape liability on various non-merits grounds. However, the Court has personal jurisdiction over each foreign Defendant because they either signed U.S. Securities and Exchange Commission ("SEC") filings containing false statements, or participated in the sham Cellenkos transaction that was intended to deceive investors in the United States. While some foreign Defendants contend that the service already completed pursuant to the Court's order granting Plaintiffs' motion for alternative service was untimely under Fed. R. Civ. P. 4(m), the Court can and should exercise its discretion to deem that service timely. Those Defendants have had actual notice of this case since shortly after it began, and they would suffer no prejudice from retroactively extending the time to serve, whereas a dismissal would severely prejudice Plaintiffs, likely barring their claims under the applicable statute of limitations.

Defendants carried out an egregious fraud against U.S. investors. Their arguments do not warrant dismissal. Their motions should be denied.

## FACTUAL BACKGROUND

### A.    The Defendants

Defendant Global Cord Blood Corporation ("GCBC" or the "Company") is a Cayman Islands corporation. ¶17. During the Class Period it had principal executive offices in Hong Kong, and its primary business activity was processing and storing umbilical cord blood for expectant parents in Mainland China, for potential use in future medical treatments. *Id.* During the Class Period GCBC's ordinary shares were listed and traded on the NYSE under the ticker symbol "CO", and the Company filed periodic public reports with the SEC. ¶¶17, 174.

Defendant Golden Meditech Holdings Limited ("Golden Meditech") is incorporated in the Cayman Islands. ¶18. During the Class Period Golden Meditech maintained its principal executive offices in Hong Kong, at the exact same address and floor as GCBC. ¶¶17-18. Golden Meditech is a healthcare industry conglomerate in Mainland China that operates various business including hospital management, medical insurance services, genetic testing, and medical device sales. ¶18. Prior to the Class Period Golden Meditech was the controlling shareholder of GCBC. *Id.*

Defendant Yuen Kam is the founder, chairman, controlling shareholder, and CEO of Golden Meditech. ¶20. Prior to the Class Period, he was also the chairman of GCBC. *Id.* Throughout the Class Period, Defendant Kam controlled Golden Meditech, and secretly controlled GCBC although purportedly no longer involved in GCBC's management. *Id.* Defendant Kam is married to and has two children with Defendant Zheng, which Defendants concealed from investors during the Class Period. *Id.* Kam's counsel has provided Plaintiffs' counsel a service address for him in Beijing, China. ECF No. 83 at ¶3.

Defendant Ting (a/k/a Tina) Zheng was GCBC's CEO and chairperson throughout the Class Period. ¶22. Prior to the Class Period, Zheng served as a director of Golden Meditech. *Id.* Zheng's counsel has provided Plaintiffs' counsel a service address for her in Beijing, China. ECF

No. 83 at ¶4. Defendant Bing Chuen (a/k/a Albert) Chen was GCBC's CFO and director throughout the Class Period. ¶23. Prior to the Class Period, he officially served as corporate finance vice president of Golden Meditech. *Id.* During the Class Period, Albert Chen remained deeply involved in Golden Meditech's financial operations, but had no official title and concealed his identity when working for Golden Meditech. *Id.* Albert Chen's counsel has provided Plaintiffs' counsel a service address for him in Shenzhen, China. ECF No. 83 at ¶4. Defendants Zheng and Albert Chen are herein referred to as the "Officer Defendants."

Defendants Jennifer Weng and Mark Da-Jian Chen were directors of GCBC during the Class Period. ¶¶24-25. They attempted to attend the Extraordinary General Meeting in New York called by a GCBC shareholder to prevent the Cellenkos transaction. *Id.* Defendants Weng and Mark Chen are married and have children together. *Id.* Mark Chen's counsel has provided Plaintiffs' counsel a service address for him in Xiamen, China. ECF No. 83 at ¶5. Defendant Weng resides in New York. *See* ECF No. 36. Defendants Weng and Mark Chen are herein referred to as the "Director Defendants."

Defendant Cellenkos, Inc. ("Cellenkos") is incorporated in Delaware. ¶19. During the Class Period Cellenkos maintained its principal executive offices in Houston, Texas. *Id.* Cellenkos is a clinical stage biotechnology company that is seeking to develop drug product candidates to treat autoimmune diseases and inflammatory disorders. *Id.* During the Class Period Golden Meditech was the controlling shareholder of Cellenkos. *Id.*

### B.    GCBC Purported To Stockpile $1 Billion In Cash While Defendants Ignored U.S. Investors' Calls To Distribute Earnings

According to GCBC's public filings with the SEC, the Company was extremely profitable. ¶42. As GCBC explained, under PRC regulations at most one license to conduct cord blood banking activities was granted per region. *Id.* GCBC held the licenses for Beijing, Guangdong and

Zhejiang, effectively giving its business a monopoly in those regions. *Id.* GCBC reported consistently growing revenues, net income, and cash. ¶43. GCBC's balance sheets reported cash rising from $393 million at March 31, 2015, to over $1 billion as of March 31, 2022. *Id.* U.S. investors and securities analysts repeatedly advocated for GCBC to distribute its earnings, and inquired why the Company was "hoard[ing]" capital. ¶¶45-47. Despite such consistent requests, Defendants never returned any significant amount of earnings to shareholders. ¶48.

### C.    During 2015-2022 Defendants Secretly Misappropriated Hundreds Of Millions Of Dollars From GCBC To Golden Meditech And Its Affiliates

As revealed by GCBC's majority shareholder Blue Ocean Structure Investment Company Limited ("Blue Ocean"), and confirmed by the JPLs, from 2015 through 2022 GCBC and its subsidiaries made undisclosed transfers of hundreds of millions of dollars to companies controlled by Defendant Kam, including Golden Meditech subsidiaries. ¶4.

In an Amended Winding Up Petition filed with the Grand Court of the Cayman Islands on September 22, 2022, Blue Ocean revealed that it had "obtained evidence indicating that the Company [GCBC] without lawful excuse or justification has paid RMB3,557,616,000 to JingJing [Beijing Jingjing Medical Equipment Co., Ltd] (which is owned by Kam) between 1 April 2017 and 31 May 2022," and that these "[u]nlawful [p]ayments are not recorded in any of the published financial statements of the Company for the relevant period." ¶55.[2]

Shortly after the Cayman Grand Court appointed the JPLs to take over GCBC's affairs, they corroborated Blue Ocean's claims and revealed further details of Defendants' fraud in their First Report to Court, dated October 20, 2022. ¶57. The JPLs had identified "Payments totalling

---

[2] During 2017-2022 the Chinese renminbi traded in a range of approximately $0.14 to $0.16 per one renminbi, so 3,557,616,000 renminbi was roughly equal to $533 million U.S. dollars (at an assumed exchange rate of $0.15).

RMB4,261 million (the equivalent of approximately US$606 million) from Chen Hong [GCBC subsidiary Beijing Jiachenhong Biological Technologies Co., Ltd] to entities controlled by Yuen Kam between 2015 and 2022." *Id.* More specifically, "the JPLs have prepared an analysis of transactions shown in extracts of bank account information produced in the proceedings leading to the JPL's appointment" and "[t]hat analysis shows that Chen Hong (an indirect subsidiary of the Company) appears to have generated sufficient cash inflows to fund total payments of approximately US$606 million in 74 transactions during the period from September 2015 to May 2022 to entities related to GMHL [Golden Meditech]." *Id.*

### D.    In 2022 Defendants Attempted To Carry Out The Sham Cellenkos Transaction To Conceal The Theft Of GCBC's Funds

To conceal from GCBC's investors the misappropriation of its assets, the Defendants attempted to carry out a sham transaction in which GCBC would purportedly pay $664 million to a Golden Meditech subsidiary. ¶5. The vehicle for this sham transaction was to be Cellenkos, a tiny, Texas-based biotech startup with no revenue and its product candidates still years away from potential regulatory approval, that had obtained only $15 million in its most recent fundraising round. *Id.* Cellenkos participated in the sham transaction because it was majority owned by persons affiliated with Defendant Kam and Golden Meditech, and controlled by Golden Meditech executive director Kim Chuan ("Jackie") Leong. *Id.*

On April 29, 2022, GCBC announced the Cellenkos transaction, in which: (i) in exchange for most of the stock in Cellenkos, GCBC would issue millions of shares of its own stock to persons affiliated with or controlled by Defendant Kam and Golden Meditech, sufficient to give them an effective controlling stake in GCBC; and (ii) GCBC would pay $664 million to a Golden Meditech subsidiary for a license to market a certain (as yet unmarketable due to lack of regulatory approval)

Cellenkos product. ¶¶63-68. However, due to Blue Ocean's efforts to oppose the Cellenkos transaction in the Cayman Grand Court, the transaction was never completed. ¶69.

That the sham transaction was effectively enjoined by the Cayman Grand Court did not stop Defendants from attempting to cover up the misappropriation of GCBC's assets. In the Cayman litigation GCBC produced documents to Blue Ocean to show that a GCBC subsidiary paid the $664 million to a Golden Meditech subsidiary on April 29, 2022. ¶70. Blue Ocean later showed those documents to be forgeries, which Defendants belatedly admitted. *Id.*; ¶77.

> **E.    GCBC's Stock Price Declined Significantly As The Risks Concealed By Defendants' Fraud Began To Materialize**

GCBC announced the Cellenkos transaction after the close of stock market trading on the NYSE on April 29, 2022. ¶79. On the next trading day, GCBC's stock price fell by 28.6%, as the risks concealed by Defendants' fraud began to materialize. ¶80. On May 5, 2022, Blue Ocean filed its original Winding Up Petition in the Cayman Grand Court, revealing serious problems with the process and valuation of the Cellenkos transaction. ¶81. On this news, GCBC's share price fell another 9.1%, as the as the risks concealed by Defendants' fraud continued to materialize.

## PROCEDURAL HISTORY

This action was commenced by initial plaintiff MW Gestion on April 22, 2024, naming defendants including GCBC, Golden Meditech, Kam, Zheng, Albert Chen, Mark Chen, and Weng. ECF No. 1. Weng was served in New York on May 7, 2024, and GCBC was served in the Cayman Islands on May 16, 2024. ECF Nos. 36, 37. On July 9, 2024, the Court granted Alessandro Somansino's motion for appointment as lead plaintiff, and for appointment of his counsel as lead counsel. ECF No. 56. On September 20, 2024, Somansino and additional plaintiff Mark Lewko (together, "Plaintiffs") filed the operative Amended Complaint against the Defendants, naming Cellenkos as a party for the first time. ECF No. 60.

On September 24, 2024, Plaintiffs filed a pre-motion letter concerning their planned motion for alternative service pursuant to Rule 4(f)(3) on Defendants Golden Meditech, Kam, Zheng, Albert Chen, Mark Chen (the "Alternative Service Defendants"). ECF No. 78. On October 1, 2024, Cellenkos was served in Texas. ECF No. 80. After contested briefing (ECF Nos. 82, 84, 87, 89), the Court granted Plaintiffs' motion for alternative service, and Plaintiffs served the Alternative Service Defendants on October 23, 2024. ECF Nos. 90, 91.

After the parties filed pre-motion letters concerning Defendants' planned motions to dismiss (ECF Nos. 94, 95, 109, 110, 111, 112), on January 31, 2025 Defendants filed five motions to dismiss and briefs in support. ECF No. 121 ("Officers' Br."); ECF No. 126 ("Golden Meditech Br."); ECF No. 128 ("Cellenkos Br."); ECF No. 131 ("Directors' Br."); ECF No. 133 ("Kam Br.").

Defendant GCBC has not moved to dismiss. In their most recent report to the Grand Court of the Cayman Islands, the JPLs state that "[d]ue to a lack of funding, the JPLs have to date been unable to take any substantive steps in the Class Action Complaint proceedings." PX A at §4.1.4.[3]

## LEGAL STANDARDS

A complaint need only "contain sufficient factual matter . . . to state a claim that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Plaintiff must plead facts "that allow[] the court to draw the reasonable inference that the defendant is liable." *Id.* at 678. The Court "must consider the complaint in its entirety." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308,

---

[3] Plaintiffs may move for entry of a default judgment against GCBC at a later appropriate time. Counsel for GCBC's Joint Provisional Liquidators ("JPLs") has asserted in correspondence that the September 22, 2022 Cayman Islands court order appointing the JPLs prohibits Plaintiffs from pursuing this action against GCBC. Plaintiffs dispute that assertion. When the JPLs sought a U.S. court order staying litigation against GCBC based on the appointment order, the United States Bankruptcy Court for the Southern District of New York denied the requested relief. *See In re Glob. Cord Blood Corp.*, 2022 WL 17478530, at *13 (Bankr. S.D.N.Y. Dec. 5, 2022). Regardless, the JPLs intend to seek discharge from their roles due to inability to obtain payment for their ongoing fees, effectively mooting their argument. *See* PX A at §§4.2.3-4.2.6, 6.1.10-6.1.14, 7.1.1.

310 (2007). On a motion to dismiss the court "accept[s] all factual claims in the complaint as true and draw[s] all reasonable inferences in the plaintiff's favor." *Emps.' Ret. Sys. of Gov't of the Virgin Islands v. Blanford*, 794 F.3d 297, 307 (2d Cir. 2015). Even under the PSLRA and Rule 9(b), complaints do not need to plead "detailed evidentiary matter." *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 72 (2d Cir. 2001). While the pleading of scienter is subject to a strong inference standard, every other element of a securities fraud claim is subject to a plausibility standard. *See Blanford* at 304, 307 (applying plausibility standard to falsity).

## ARGUMENT

I.  **Plaintiffs Have Sufficiently Alleged Their Exchange Act Section 10(b) Claims Against All Defendants**

To state a claim for misrepresentations under Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") (15 U.S.C. §§ 78j(b)) and SEC Rule 10b-5(b) (17 C.F.R. § 240.10b-5(b)), a plaintiff must allege: (1) a material misrepresentation or omission; (2) scienter; (3) a connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation. *See Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37-38 (2011).

To plead a "scheme liability" claim under SEC Rules 10b-5(a) and (c), a plaintiff must allege "(1) that the defendant committed a deceptive or manipulative act, (2) in furtherance of the alleged scheme to defraud, (3) with scienter, and (4) reliance." *In re Turquoise Hill Res. Ltd. Sec. Litig.*, 625 F. Supp. 3d 164, 247 (S.D.N.Y. 2022). Plaintiffs must also allege loss causation (*see In re Parmalat Sec. Litig.*, 376 F. Supp. 2d 472, 510 (S.D.N.Y. 2005)), and the scheme must be "in connection with the purchase or sale of any security" (17 C.F.R. § 240.10b-5).

The Amended Complaint sufficiently pleads each element of Plaintiffs' misrepresentation and scheme liability claims under Section 10(b) of the Exchange Act.

## A.    Defendants Do Not Dispute That The Alleged Misstatements Were Materially Misleading

Plaintiffs allege that GCBC and the Officer Defendants made false and misleading statements in violation of Rule 10b-5(b). ¶¶127-62; ¶¶181-83. The Amended Complaint more than plausibly pleads the falsity of the challenged statements regarding GCBC's cash balances and related party transactions (¶¶128-57), and regarding the Cellenkos transaction (¶¶158-62). Defendants misappropriated hundreds of millions of dollars from GCBC to related parties in undisclosed transactions while reporting falsely inflated cash balances for GCBC (¶¶54-61), and the Cellenkos transaction was a sham intended to conceal the theft (¶¶62-78).

GCBC has not moved to dismiss, and the Officer Defendants do not dispute that they made materially false and misleading statements, nor do they contest any other element of Plaintiffs' Exchange Act claims. *See generally* Officers' Br. As such, no Defendant has contested falsity for Plaintiffs' Rule 10b-5(b) claims. Defendants waive any argument not raised in their opening papers. *See Mateo v. Bristow*, 2013 WL 3863865, at *8 (S.D.N.Y. July 16, 2013) ("a court should not consider arguments that are raised for the first time in a reply brief").

## B.    The Complaint Pleads Defendants' Deceptive Acts

Consistent with the Exchange Act's basic purpose "to substitute a philosophy of full disclosure for the philosophy of *caveat emptor* and thus to achieve a high standard of business ethics in the securities industry," Rules 10b-5(a) and (c) "capture a wide range of conduct," in order to "root out all manner of fraud in the securities industry." *Lorenzo v. Sec. & Exch. Comm'n*, 587 U.S. 71, 79, 81 and 85 (2019). Among the types of conduct that can constitute a "deceptive or manipulative act" to establish scheme liability are "sham agreements, sham transactions, [or] sham companies." *Turquoise Hill*, 625 F. Supp. 3d at 253; *see id.* at 250 (collecting cases). In other words, "Defendants must have participated in an illegitimate, sham or inherently deceptive

10

transaction where their conduct or role had the purpose and effect of creating a false appearance." *see also United States Sec. & Exch. Comm'n v. Wey*, 246 F. Supp. 3d 894, 918 (S.D.N.Y. 2017); *e.g.*, *id.* at 918 (defendant lawyer developed a plan to "conceal[] the identities of the shareholders" of companies utilized in the fraudulent scheme).

Here, Defendants engaged in deceptive or manipulative acts by attempting to cover up the theft of GCBC's funds via the 2022 Cellenkos transaction. The Cellenkos transaction was inherently deceptive because it was a sham. One of the key aspects of the Cellenkos transaction was that GCBC agreed to pay $664 million to a Golden Meditech subsidiary in exchange for a ten-year license to market one of Cellenkos's product candidates in Asia (¶67), but this was a fiction—GCBC no longer had the funds to make that payment because they had already been stolen (¶55-57). In fact, while GCBC and Albert Chen claimed in the course of litigation in the Cayman Islands that the funds were paid on April 29, 2022, Blue Ocean showed the bank records supplied by Defendants were forged. *See* ¶¶70-72. As the Cayman Court stated, "the best available evidence strongly suggests that the Chief Financial Officer of the Company has misled the Court and put before the Court a false bank statement," and "the key amounts that were relied on by the Company as having been paid on or about 29 April 2022 to consummate this Transaction simply were not in the relevant bank account, let alone paid out of it." ¶¶74, 78.

Other aspects of the Cellenkos transaction support the conclusion that it was an inherently deceptive sham. Cellenkos is a small startup that had no revenue, no approved products, and 11 employees, and its most recent fundraising round had raised only $15 million. ¶¶49-51, 81. Yet, in order to acquire Cellenkos GCBC, a company that reported tens of millions of dollars in annual income and $1 billion of cash on hand (¶43), agreed to issue stock that would nearly double its share count and effectively give away a controlling interest in the Company (¶¶63-68). As Blue

11

Ocean later revealed, the transaction was extremely rushed, with Blue Ocean's representative on GCBC's Board only receiving emailed notice of the proposed transaction three days before it was announced as having already been agreed to. ¶81. As the Cayman court stated, "it is impossible at this stage to discern any easily comprehensible commercial rationale for the Company, especially being a listed company, consummating and implementing an arrangement which was so financially and strategically significant with such a breath-taking combination of speed and stealth." ¶94.

Devices like the Cellenkos transaction that lack a genuine business purpose and are intended to deceive investors give rise to scheme liability. For example, in *Parmalat*, the court held that the defendant banks' "arrangements involving the regular factoring and securitization of worthless invoices were deceptive devices or contrivances for purposes of Section 10(b)." 376 F. Supp. 2d at 504. "These were inventions, projects, or schemes with the tendency to deceive because they created the appearance of a conventional factoring or securitization operation when, in fact," the defendant "knew when it paid Parmalat for the invoices that they were worth nothing and were in fact a trick to disguise its loan to Parmalat." *Id.* Other courts have similarly found sham companies or transactions to satisfy the deceptive act element of scheme liability. *E.g.*, *Sec. & Exch. Comm'n v. CKB168 Holdings, Ltd.*, 210 F. Supp. 3d 421, 445 (E.D.N.Y. 2016) (promoting pyramid scheme as a "legitimate company"); *Sec. & Exch. Comm'n v. Sullivan*, 68 F. Supp. 3d 1367, 1378 (D. Colo. 2014) ("the underlying transaction was not a legitimate sale of promissory notes . . . note-holders' payments were being diverted to pay other investors and to cover Mr. Turnock's business and personal expenses."); *In re Lernout & Hauspie Sec. Litig.*, 236 F. Supp. 2d 161, 173 (D. Mass. 2003) (the "formation and operation of the sham shell companies and the bogus licensing transactions" were deceptive).

Neither the Officer Defendants nor Defendant Kam challenge the pleading of Plaintiffs' claims under Exchange Act Section 10(b). While the Director Defendants, Golden Meditech, and Cellenkos, contend that their participation in the Cellenkos transaction is not sufficiently alleged to satisfy the deceptive act element, each of them participated in this sham transaction, the purpose of which was to mislead investors.

### 1. Director Defendants

Defendants Mark Chen and Jennifer Weng were directors of GCBC. ¶38. GCBC's Board first learned of the proposed Cellenkos transaction on April 26, 2022, when it was provided with a PowerPoint presentation and execution versions of the transaction documents. ¶99. On April 28, 2022 the Board was sent a fully drafted and complete set of Board minutes for the meeting to be held on April 29, which minutes resolved that the Cellenkos transaction was in GCBC's best interests. *Id.* The Cellenkos transaction was announced on April 29, 2022. ¶63.

While the Director Defendants argue that they may not have approved the Cellenkos transaction, that is directly refuted by the Winding Up Petition. *See* ECF No. 132-3 at §§42.3-42.6 ("The Board approved the Transaction"). And those allegations are corroborated by GCBC's memorandum of association, which gave the Board the authority to approve stock issuances, such as the near doubling of GCBC's share count that was to be part of the Cellenkos transaction. ECF No. 132-2 at §12 ("the unissued shares of the Company . . . shall be at the disposal of the Board, which may offer, allot, grant options over or otherwise dispose of them . . . upon such terms and conditions as the Board may in its absolute discretion determine"). That the Board, including the Director Defendants, approved the transaction is further shown by GCBC's April 29, 2022 press release stating "[t]he Board of Directors of the Company [GCBC] believes that CLNK is a perfect fit for the Company and that its products can have distinct synergies with the Company's existing

line of business." ¶161. Moreover, it is simply not plausible that such a major corporate transaction in relation to GCBC's size (*see* ¶43) could occur without Board approval.

Therefore, when GCBC's Board, including Weng and Mark Chen, approved the Cellenkos transaction in only three days and with apparently little or no deliberation, even though it required GCBC to pay $664 million and nearly double its share count, just to acquire a tiny, unproven biotech startup with no revenue and no approved drugs, the Director Defendants' acts were deceptive because the transaction was a sham. *See* ¶¶49-51, 62-68, 161.

While the Director Defendants rely on *S.E.C. v. Kelly*, 817 F. Supp. 2d 340 (S.D.N.Y. 2011) to argue that there was nothing "inherently deceptive" about the Board's approval of the Cellenkos transaction, that case is readily distinguished. In *Kelly*, there was "nothing inherently deceptive about structuring a transaction with a counterparty so that the counterparty purchases advertising," and the alleged deception only occurred when AOL adopted misleading accounting for the transactions. *Id.* at 344. Here, in stark contrast, the Cellenkos transaction was *itself* deceptive because it lacked reality—the purported $664 million payment at its heart was never going to happen because that money had already been stolen. *See S.E.C. v. Familant*, 910 F. Supp. 2d 83, 86 and 93 (D.D.C. 2012) (where defendants "ran a scheme to conceal InPhonic's deteriorating financial state" using sham transactions, the court found scheme liability alleged and distinguished *Kelly* because "[u]nlike in other cases, no innocent business dealings could explain this conduct away. No matter how accountants recorded them, these transactions would mislead.").

## 2.    Cellenkos

Cellenkos was also a key participant in the cover-up. As part of the transaction, multiple Cellenkos shareholders accounting for 95% of its ownership entered into Stock Purchase Agreements ("SPAs") (to which Cellenkos was a party and a signatory) to sell their Cellenkos shares to GCBC. ¶¶63-65. Another part of the Cellenkos transaction was the Framework

Agreement under which GCBC agreed to pay $664 million to a Golden Meditech subsidiary in exchange for a license on a hypothetical, future Cellenkos product, which required the Golden Meditech subsidiary to provide GCBC with an assignment agreement executed by Cellenkos. ¶67. Cellenkos also stood to directly benefit from the transaction, as GCBC would be required to provide Cellenkos with over $29 million in funding during the year following the transaction's completion. *See* ¶102. Cellenkos's participation in the transaction was deceptive and manipulative because the transaction was a sham carried out to mislead investors.

While Cellenkos relies on *Parmalat* to argue that the Cellenkos transaction is like the legitimate "financings and investments" that the court in that case found not to be inherently deceptive, the Cellenkos transaction is more analogous to the "securitization of worthless invoices" that the court *did* find to constitute a deceptive device. 376 F. Supp. 2d at 504-05. A central part of the Cellenkos transaction—the $664 million that GCBC was to pay to a Golden Meditech affiliate for a license on a Cellenkos product under the Framework Agreement—was a fiction. And Cellenkos cannot argue that it was not involved in that part of the transaction, because the Framework Agreement required the Golden Meditech subsidiary to provide GCBC with an assignment agreement executed *by Cellenkos*. ¶67.

Cellenkos's reliance on *Simpson v. AOL Time Warner Inc.*, 452 F.3d 1040 (9th Cir. 2006), is similarly misplaced. There the court agreed that "engaging in a transaction, the principal purpose and effect of which is to create the false appearance of fact, constitutes a 'deceptive act'," but found that requirement was not met where AOL had not "engaged in deceptive conduct as part of illegitimate transactions." *Id.* at 1048, 1052. Rather, the "transactions involving AOL did not create a false appearance until they were viewed in conjunction" with another company's misleading accounting, whereas here the Cellenkos transaction was *itself* deceptive. *Id.* at 1053.

Cellenkos argues that Plaintiffs merely allege its aiding and abetting. Cellenkos Br. at 14-17.[4] However, Plaintiffs bring only scheme liability claims against Cellenkos, which focus on Cellenkos's own violations of Rule 10b-5(a) and (c), not its aiding and abetting of other parties' violations. *See Lorenzo*, 587 U.S. at 83-84 (distinguishing primary liability under Rules 10b-5(a) and (c) from secondary aiding and abetting liability); *see also Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 191 (1994) ("Any person or entity . . . who employs a manipulative device . . . on which a purchaser or seller of securities relies may be liable as a primary violator under 10b–5 . . . [i]n any complex securities fraud, moreover, there are likely to be multiple violators").

The court in *Parmalat*, undertook an in-depth analysis of the defendants' arguments, much like those raised now by Cellenkos, that "they merely structured or participated in transactions that Parmalat misdescribed, that they did not make any misrepresentations, and that they therefore at worst were aiders and abettors of Parmalat's fraud and thus not subject to private civil liability." 376 F. Supp. 2d at 493. As the court recognized, "The basic question here . . . is not whether the banks' actions made them aiders and abettors—even if they were, it would be immaterial—but rather whether the banks are subject to private civil liability as primary violators of Rule 10b–5." *Id.*; *see also Lorenzo*, 587 U.S. at 83 ("it is hardly unusual for the same conduct to be a primary violation with respect to one offense and aiding and abetting with respect to another."). After an extensive review of *Cent. Bank of Denver* and other authorities also relied on by Cellenkos, the court in *Parmalat* reasoned that:

---

[4] To the extent Cellenkos is arguing that it must have made a misstatement to be held liable under Section 10(b) as a primary violator, that is not the case. *See Sec. & Exch. Comm'n v. Rio Tinto plc*, 41 F.4th 47, 55 (2d Cir. 2022) ("claims brought under Rule 10b-5(a) and (c) . . . do not require that a misstatement be made").

> The defendants' argument that they were at most aiders and abettors of a program pursuant to which Parmalat made misrepresentations on its financial statements misses the mark. The transactions in which the defendants engaged were by nature deceptive. They depended on a fiction, namely that the invoices had value. It is impossible to separate the deceptive nature of the transactions from the deception actually practiced upon Parmalat's investors.

*Id.* at 504. So too here, it is impossible to separate the deceptive nature of the Cellenkos transaction from the deception actually practiced upon GCBC's investors.

### 3. Golden Meditech

Golden Meditech argues that it did not directly participate in the sham Cellenkos transaction, merely that its subsidiaries did, and therefore claims to escape scheme liability. Golden Meditech Br. at 15. But on the facts alleged, these Golden Meditech subsidiaries were little more than shells, used by Golden Meditech to carry out the fraud. In the transaction, Golden Meditech (BVI) Company Limited, a subsidiary of Golden Meditech, was to receive 34.1 million GCBC shares under an SPA. ¶65. Under the transaction's Framework Agreement between GCBC and Golden Meditech subsidiary GM Precision Medicine (BVI) Limited ("GMPM"), in exchange for a license on a Cellenkos product and ownership of another Golden Meditech subsidiary, GCBC was to provide $664 million and over 12.3 million of its shares to GMPM, *or its affiliates*. ¶67. That is, the transaction treated Golden Meditech and its subsidiaries as one, with $664 million and 12.3 million shares of GCBC stock to be paid not to the legal entity that purportedly owned the assets being acquired, but rather to *any* entity of Golden Meditech's choosing. GMPM had received the license at issue from another Golden Meditech subsidiary, Golden Meditech Precision Medicine Limited, which had obtained the license in an October 2021 agreement with Cellenkos, in each instance with no public indication that any consideration was paid. *Id.* Further showing that the Cellenkos transaction was centrally orchestrated by Golden Meditech, and not independently engaged in by its subsidiaries, the Framework Agreement was signed on behalf of

GMPM by Defendant Kam, Golden Meditech's CEO, and notices pursuant to that agreement for GMPM were to be to Kam's attention. *Id.*

Golden Meditech heavily relies on *Plumber & Steamfitters Loc. 773 Pension Fund v. Danske Bank A/S*, 11 F.4th 90 (2d Cir. 2021), but that case bears little resemblance to the facts here. In *Danske Bank* the plaintiffs' claims focused on misrepresentations, and their scheme claim was evidently a mere afterthought. *See id.* at 105 (plaintiffs failed to allege "the contours of an alleged scheme to defraud investors, or which specific acts were conducted in furtherance of it. Instead, the claim rests upon the incorporation of the previous 140 pages of the pleading paired with the conclusory assertion that 'Defendants carried out a common plan, scheme, and unlawful course of conduct'."). Moreover, the misconduct at issue there, "[m]oney-laundering at a single branch in Estonia" (*id.*), failed to establish a scheme to defraud investors, unlike here where the very purpose of the Cellenkos transaction was to deceive investors.

Golden Meditech's reliance on *In re CarLotz, Inc. SEC. Litig.*, 2024 WL 3924708, at *1 (S.D.N.Y. Aug. 23, 2024) is similarly unpersuasive. *See id.* at *5 (scheme liability claim that consisted solely of defendants' dissemination of the allegedly misleading statements "was pleaded as an afterthought and fails to satisfy the applicable rules of pleading, even after three successive attempts"); *see also Maso Cap. Inv. Ltd. v. E-House (China) Holdings Ltd.*, 2024 WL 2890968, at *5 n.5 (2d Cir. June 10, 2024) (scheme liability claim did not "identify any deceptive acts distinct from the alleged (inactionable) misstatements"). And while Golden Meditech cites *SEC v. Rio Tinto plc*, 41 F.4th 47, 49 (2d Cir. 2022) for the undisputed proposition that "an actionable scheme liability claim also requires something beyond misstatements and omissions," Plaintiffs here have alleged precisely that, through the inherently deceptive Cellenkos transaction.

### C.    The Complaint Pleads A Strong Inference Of Defendants' Scienter

Plaintiffs may plead a strong inference of scienter by "alleging facts (1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness." *Setzer v. Omega Healthcare Invs., Inc.*, 968 F.3d 204, 212 (2d Cir. 2020). This inquiry considers "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs*, 551 U.S. at 322-23. The strong inference standard, "[w]hile robust . . . does not involve applying the more probing test used at the summary judgment or judgment as a matter of law stage of litigation, as the court is unaided by discovery at the motion to dismiss stage." *Blanford*, 794 F.3d at 297; *In re AOL Time Warner Inc. Sec. and ERISA Litig.*, 381 F. Supp. 2d 192, 215 (S.D.N.Y. 2004) (cautioning against interpretation of PSLRA and Rule 9(b) that "would require securities plaintiffs to produce information at the pleading stage to which they have no access because of the PSLRA's mandatory discovery stay"). Scienter allegations need not be "irrefutable" or "of the 'smoking-gun' genre, or even the most plausible of competing inferences." *Tellabs*, 551 U.S. at 324. Instead, scienter is adequately pled "if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Matrixx Initiatives*, 563 U.S. at 48.

#### 1.    Director Defendants

Defendants Weng and Mark Chen were at a minimum consciously reckless when they approved GCBC's acquisition of Cellenkos, a major transaction that would require GCBC to pay $664 million and issue vast amounts of stock, on only three days notice and with little to no Board deliberation, to acquire a tiny, zero-revenue startup. *See* ¶¶49-51, 63-68, 99, 161. *See CKB168 Holdings*, 210 F. Supp. 3d at 446 (scienter may be established by "willful blindness, *i.e.*, a

deliberate refusal to acquire information"). While the Director Defendants argue that their scienter is negated because "the Board was provided with multiple documents supporting the Cellenkos transaction," this only shows that Defendants sought to paper the file in an effort to provide a veneer of legitimacy to the Cellenkos transaction.

Moreover, the Director Defendants' subsequent actions in furtherance of the fraud add to the already strong inference of their knowing participation in the scheme. After Blue Ocean raised serious problems with the process and valuation of the Cellenkos transaction (*see* ¶81), the Director Defendants attempted to attend a June 16, 2022 shareholder meeting called by Blue Ocean in New York were refused entry to the meeting after an "argy bargy" and accused of "inappropriate conduct" (*see* ¶¶24-25, 91). According to Blue Ocean, "[t]he clear intention" of the Director Defendants "was to prevent [Blue Ocean] from voting and thereby prevent the resolutions from being passed." ¶103.

Even after Blue Ocean revealed that the bank statement relied on by Defendant Albert Chen to show GCBC's payment of $664 million was forged, the Director Defendants continued to work in the interests of GCBC's corrupt management, and sought to frustrate the efforts of Blue Ocean. The Cayman Grand Court noted the "seeming silence, or paralysis, on the part of the independent directors in the face of these shocking allegations about forgery." ¶75.

Even after the JPLs were appointed to oversee GCBC, and on October 20, 2022 revealed its $606 million of undisclosed payments to entities affiliated with Defendant Kam (*see* ¶57), the Director Defendants refused to cooperate with the JPLs and continued to serve the interests of Kam and GCBC's former management (*see* ¶¶59, 61, 77, 85-86, 104-06, 109). On these facts, by far the strongest inference is that Weng and Mark Chen knew of the fraud all along. *See Lea v. TAL Educ. Grp.*, 837 F. App'x 20, 27 (2d Cir. 2020) (finding executives' scienter sufficiently

alleged for sham transactions). While the Director Defendants argue that their work on GCBC's self-styled "Litigation Steering Committee" does not add to the inference of their scienter, that is plainly contradicted by the observations of the Cayman Court. *E.g.*, ¶104 ("I felt entirely justified in viewing the LSC's attempts, actively supported by Mr Kam himself, . . . with a leery eye"); *id.* (Justice Kawaley noting the LSC's "latest iteration of delaying tactics quite transparently in service of the commercial interests of Mr Kam (advanced by a former management which seemed to consider it unnecessary to make plausible attempts to advance bona fide shareholder interests)."); ¶106 ("The LSC was by the date of the 15-16 August 2023 hearing arguably the most ill-suited party to be purporting to uphold corporate propriety and the interests of the majority of the shareholders"); ¶109 ("it is impossible to discern what legitimate interests the LSC's opposition to the present application was designed to serve").

Furthermore, the importance to GCBC and sheer size of the Cellenkos transaction supports the inference of the Director Defendants' scienter. The Second Circuit has found support for the argument that "allegations of a company's core operations . . . can provide supplemental support for allegations of scienter." *New Orleans Emps. Ret. Sys. v. Celestica, Inc.*, 455 F. App'x 10, 14 n.3 (2d Cir. 2011). "Core operations include matters critical to the long term viability of the company and events affecting a significant source of income." *In re Hi-Crush Partners L.P. Sec. Litig.*, 2013 WL 6233561, at *26 (S.D.N.Y. Dec. 2, 2013); *e.g.*, *Brown v. China Integrated Energy, Inc.*, 875 F. Supp. 25 1096, 1122-23 (C.D. Cal. 2012) ("[i]t strains credulity to believe that China Integrated's directors and officers did not know that a factory that was purportedly so critical to the company's business that it generated 20% of total company sales was not functioning").

The Director Defendants rely on *Das v. Rio Tinto PLC*, 332 F. Supp. 3d 786 (S.D.N.Y. 2018) to argue that mere approval of an illegal payment does not show scienter if the defendant

did not know the payment was unlawful. But in that case the defendants' communications about the alleged bribe payment "appear[ed] to discuss legitimate consulting practices." *Id.* at 814. Here, in contrast, no facts surrounding the rushed approval of the economically irrational Cellenkos transaction resemble "legitimate" business practices, further supporting the Director Defendants' scienter. Moreover, the Director Defendants' later conduct in continuing to support Kam's interests *after* the true nature of the Cellenkos transaction was revealed, give rise to a strong inference that they had known the truth all along.

### 2. Cellenkos

Cellenkos had both motive and opportunity to commit fraud. By participating in the sham transaction with GCBC, Cellenkos stood to receive $29 million in funding from GCBC during the year following the transaction's completion. *See* ¶102. Furthermore, Cellenkos was controlled by Golden Meditech executive director Kim Chuan Leong, who also served as CFO, Chairman, and one of only two directors for Cellenkos, and his scienter is imputed to Cellenkos. *See* ¶52; *Acticon AG v. China North East Petroleum Holdings Ltd.*, 615 F. App'x 44, 45 (2d Cir. 2015) (imputing executive's scienter to company).

Leong was one of only a few Golden Meditech senior executives alongside Defendant Kam. *See* ¶¶29-30, 33. It would be absurd to suggest that a top Golden Meditech executive did not know that GCBC had failed to pay Golden Meditech $664 million despite purporting to and being contractually required to do so, or that Golden Meditech's affiliates had stolen hundreds of millions of dollars from GCBC. Tellingly, there is no public indication that Leong or anyone else at Golden Meditech ever attempted to obtain actual payment of the $664 million consideration for the Cellenkos transaction. Leong also had a powerful personal motive—he stood to receive 7.3 million GCBC shares in the Cellenkos transaction. ¶65. The strongest inference is that Leong, and

therefore Cellenkos, knew that GCBC's assets had already been misappropriated to Golden Meditech, and that the Cellenkos transaction was a sham.

Cellenkos argues that it lacked any motive supporting scienter because every company desires "its stock to be priced highly by the market." Cellenkos Br. at 9 (quoting *Chill v. Gen. Elec. Co.*, 101 F.3d 263, 268 (2d Cir. 1996)). But *Chill* recognized that motive is alleged by "concrete benefits that could be realized" through the fraud, and merely stated that "[t]he motive to maintain the appearance of corporate profitability, or of the success of an investment, will naturally involve benefit to a corporation, but does not 'entail concrete benefits'." 101 F.3d at 268. Cellenkos's citation to *ECA, Loc. 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*, is similarly inapposite. 553 F.3d 187, 198 (2d Cir. 2009) ("the desire for the corporation to appear profitable and the desire to keep stock prices high to increase officer compensation"). Plaintiffs here allege no such generic motives, but rather that Cellenkos stood to obtain concrete benefits of millions of dollars in funding by participating in the sham Cellenkos transaction. Moreover, Cellenkos badly needed those funds because it was years away from generating any revenue.

Fundraising by a company is properly considered as part of the holistic scienter inquiry. *See Skiadas v. Acer Therapeutics Inc.*, 2020 WL 4208442, at *5 (S.D.N.Y. July 21, 2020) ("the argument that a company's financial position is irrelevant to the scienter inquiry deviates from *Tellabs*, which held that a court must consider 'whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter'."). "[C]ourts have found allegations of motive adequate where the company[] needed to fundraise to survive." *Skiadas v. Acer Therapeutics Inc.*, 2020 WL 3268495, at *11 (S.D.N.Y. June 16, 2020); *see also Shanawaz v. Intellipharmaceutics Int'l Inc.*, 348 F. Supp. 3d 313, 326 (S.D.N.Y. 2018) (motive alleged where the complaint "describes [the company's] dependence on sales of its stock to cover its operating losses.").

23

### 3.    Golden Meditech

Golden Meditech asserts that Plaintiffs' scienter arguments rely on improper group pleading, but the Amended Complaint contains numerous allegations of direct involvement in the fraud by Golden Meditech's executives whose scienter is imputed to it. Golden Meditech had both motive and opportunity sufficient to support a strong inference of scienter. By using the control of its CEO, Defendant Kam, over GCBC (*see* ¶¶81, 84, 100-01, 107, 123-25), Golden Meditech was able to misappropriate hundreds of millions of dollars from GCBC to itself and its subsidiaries (*see* ¶¶57, 60).

Golden Meditech's knowledge of the sham nature of the Cellenkos transaction is shown by the fact that its *de facto* CFO, Defendant Albert Chen (whose role at Golden Meditech was concealed from the public, *see* ¶¶23, 84, 95, 111, 123) presented forged evidence of a $664 million payment from a GCBC subsidiary to a Golden Meditech subsidiary in connection with the Cellenkos transaction (*see* ¶¶71-74, 77). As the CFO of GCBC and the *de facto* CFO of Golden Meditech, Chen knew that no such payment had been made, and therefore that the Cellenkos transaction was a sham. As a senior, albeit clandestine, officer of Golden Meditech, Albert Chen's scienter is imputed to the company.

In addition to Albert Chen's scienter, there is a strong inference that other high level executives of Golden Meditech, including Defendant Kam and Mr. Leong, knew that Golden Meditech had not received the promised $664 million payment, given the enormous value of the transaction. That Golden Meditech and its executives evidently made no attempt to obtain the payment shows that they knew the payment was fictitious all along. The strongest inference on these facts is that Golden Meditech, through its senior executives, knew that it had stolen hundreds of millions of dollars from GCBC, and that the Cellenkos transaction was merely a sham meant to conceal the theft.

###    D.    The Complaint Pleads Loss Causation

"Loss causation is the causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff." *City of Sterling Heights Police & Fire Ret. Sys. v. Reckitt Benckiser Grp. PLC*, 587 F. Supp. 3d 56, 100 (S.D.N.Y. 2022). To plead loss causation, plaintiffs must allege "that the subject of the fraudulent statement or omission was the cause of the actual loss suffered." *Suez Equity Investors, L.P. v. Toronto–Dominion Bank*, 250 F.3d 87, 95 (2d Cir. 2001). They may do so either by alleging (a) "the existence of cause-in-fact on the ground that the market reacted negatively to a corrective disclosure of the fraud;" or (b) that "that the loss was foreseeable and caused by the materialization of the risk concealed by the fraudulent statement." *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 232–33 (2d Cir. 2014). In the scheme liability context, "the loss causation requirement will be satisfied if such [deceptive or manipulative] conduct had the effect of concealing the circumstances that bore on the ultimate loss." *Parmalat*, 376 F. Supp. 2d at 510.

Loss causation only needs to be plausibly alleged, to give defendants "some indication" of the causal connection between the misrepresentation and the loss. *See Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 347 (2005). As such, "[p]leading loss causation is . . . not meant to impose a great burden on plaintiffs." *IBEW Loc. 90 Pension Fund v. Deutsche Bank AG*, 2013 WL 1223844, at *12 (S.D.N.Y. Mar. 27, 2013). "Loss causation is a fact-based inquiry" that generally "is a matter of proof at trial and not to be decided on a . . . motion to dismiss." *LBBW Luxemburg S.A. v. Wells Fargo Sec. LLC*, 10 F. Supp. 3d 504, 519 (S.D.N.Y. 2014).

On April 29, 2022, after the close of stock market trading, GCBC announced the proposed Cellenkos transaction, and the following trading day its share price fell 28.6%. ¶¶79-80. On May 5, 2022, Blue Ocean filed its original Winding Up Petition in the Cayman Islands Grand Court, revealing, *inter alia*, serious problems with the rushed and deficient process leading to the GCBC

Board's approval of the Cellenkos transaction, that GCBC agreed to pay a grossly inflated valuation for Cellenkos, and that Defendant Kam was apparently controlling not only Golden Meditech but also GCBC (despite having no official role at the Company) in the highly conflicted transaction. ¶81. On this news GCBC's share price fell an additional 9.1%. ¶82.[5] Price declines of similar or lesser magnitude following corrective disclosures or materialization of risks are routinely found to satisfy loss causation. *See Barclays*, 750 F.3d at 233 (corrective disclosure pled for 12% price decline, collecting cases with price declines of 4.5%, 7.5%, and 18%); *e.g.*, *Bristol Myers Squibb Co. Sec. Litig.*, 586 F. Supp. 2d 148, 165 (S.D.N.Y. 2008) (2.0% price decline).

These announcements were causally linked to Defendants' fraudulent scheme, and Defendants' deceptive conduct "bore on the ultimate loss" because the Cellenkos transaction was Defendants' attempt to cover up the hundreds of millions of dollars they had already stolen from GCBC. That GCBC would enter into a highly disadvantageous acquisition like the Cellenkos transaction (to eliminate non-existent cash from its balance sheet) was a material risk created and concealed by Defendants' fraudulent scheme to misappropriate GCBC's assets. GCBC's stock plummeted in response to the materialization of that risk as reflected in the announcement of the Cellenkos transaction on April 29, 2022, and fell further as that risk continued to materialize on May 5, 2022, as additional details of the Cellenkos transaction emerged. *See Parmalat*, 376 F.

---

[5] Golden Meditech argues that loss causation is insufficiently plead for May 5, 2022, on the grounds that Plaintiffs did not allege the time of day that Blue Ocean's Winding Up Petition was filed. Although it is illegible on the version of the Winding Up Petition filed by the Director Defendants as their Exhibit 3 (ECF No. 132-3), when magnified it is apparent that the petition bears a date and time stamp reading "Date: 2022.05 05 10:44:50 -05:00". *See* PX B. That is, the petition was filed on May 5, 2022 at 10:44 a.m. The reference to "-05:00" appears to refer to the Cayman Islands being five hours behind Greenwich Mean Time (*i.e.* Eastern Standard Time). As such, the petition was filed during regular stock market trading hours in the United States.

Supp. 2d at 510 (loss causation alleged where deceptive transactions concealed risks to defendant's finances, which materialized in a liquidity crisis).

Defendants argue that these events cannot give rise to loss causation because proof of Defendants' theft was not revealed until after the end of the Class Period. However, "[t]here is no requirement that the corrective disclosure take a particular form or be of a particular quality, such that it be a mirror image tantamount to a confession of fraud." *Pearlstein v. BlackBerry Ltd.*, 2021 WL 253453, at *18 (S.D.N.Y. Jan. 26, 2021). Rather, "to show loss causation, it is enough that the loss caused by the alleged fraud results from the relevant truth . . . leak[ing] out." *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 261 (2d Cir. 2016). That not all aspects of Defendants' fraud emerged during the Class Period is irrelevant to Plaintiffs' loss causation theory that the concealed risks began to materialize, and the truth began to leak out, with the announcement of the Cellenkos transaction and Blue Ocean's filing of its original Winding Up Petition.

Defendants' cited cases arose on inapposite facts and fail to rebut Plaintiffs' showing of loss causation. *E.g.*, *Kuriakose v. Fed. Home Loan Mortg. Corp.*, 897 F. Supp. 2d 168, 177 (S.D.N.Y. 2012) (articles "merely synthesized information that was already known to investors" and defendant "made detailed disclosures" such that "all relevant information was already available to investors"); *In re Liberty Tax, Inc. Sec. Litig.*, 435 F. Supp. 3d 457, 471 (E.D.N.Y.) (no loss causation where defendants concealed CEO's personal misconduct and "ethical lapses," whereas alleged corrective disclosures related to "diminished productivity and increased losses"); *Harris v. AmTrust Fin. Servs., Inc.*, 135 F. Supp. 3d 155, 171 (S.D.N.Y. 2015) (corrective disclosure theory insufficiently pled based on deficiencies in the short seller report at issue); *Boluka Garment Co., Ltd. v. Canaan Inc.*, 547 F. Supp. 3d 439, 446 (S.D.N.Y. 2021) (similar).

### E.    The Complaint Pleads Reliance

No Defendant challenges reliance as it relates to Plaintiffs' misrepresentation claims under Rule 10b-5(b). Where a company's stock trades in an efficient market, investors are presumed to rely on the stock's price as incorporating publicly available information about the company. *See Basic Inc. v. Levinson*, 485 U.S. 224, 248-49 (1988). Here, GCBC's stock was actively traded on the NYSE, millions of GCBC shares were traded publicly during the Class Period, and GCBC's stock was followed by securities analysts. *See* ¶¶45, 166, 174. Therefore, the market for GCBC stock was efficient and investors are entitled to the *Basic* presumption of reliance on such a market. Reliance for Plaintiffs' misrepresentation claims is satisfied.

Golden Meditech and Cellenkos argue that their deceptive acts were unknown to the public, and so Plaintiffs cannot plead reliance for their scheme liability claims, citing to *Stoneridge Inv. Partners, LLC v. Sci.-Atlanta*, 552 U.S. 148, 154 (2008) and other cases applying it. Golden Meditech Br. at 20-22; Cellenkos Br. at 8. While it is true that Golden Meditech's theft from GCBC was not publicly known during the Class Period, that theft is distinguishable from the third-parties' business transactions at issue in *Stoneridge* that were "too remote" from the company's filing of fraudulent financial statements, where "nothing respondents did made it necessary or inevitable for Charter to record the transactions as it did." *Stoneridge*, 552 U.S. 148, 149 (2008). Regardless, even if *Stoneridge* would preclude reliance for Plaintiffs' scheme liability claims based on the concealed theft of GCBC's assets *standing alone*, that conclusion does not apply to the cover up Cellenkos transaction in which both Golden Meditech and Cellenkos participated, and which was an integral part of Defendants' scheme. Unlike the theft, the Cellenkos transaction was publicly disclosed. Indeed, the point of the Cellenkos transaction was to mislead investors into believing

that GCBC had paid Golden Meditech $664 million in a legitimate business transaction. The Cellenkos transaction was announced on April 29, 2022, within the Class Period.[6]

Therefore, this case is unlike Defendants' authorities in which no scheme-related conduct of the defendants became known to investors during the class periods at issue. *See Turquoise Hill*, 625 F. Supp. 3d at 254 (defendant's conduct was not known to investors); *In re Refco, Inc. Sec. Litig.*, 609 F. Supp. 2d 304, 315 (S.D.N.Y. 2009) (similar); *Pac. Inv. Mgmt. Co. LLC v. Mayer Brown LLP*, 603 F.3d 144, 159 (2d Cir. 2010) ("*PIMCO*") (similar). Furthermore, in both *Stoneridge* and *PIMCO*, the only way deceptive information was disseminated to investors was through financial statements of the issuer. In this case, misleading information was disseminated to the market not only through GCBC's financial statements, but also through the announcement of the sham Cellenkos transaction.

In contrast to Golden Meditech's cases, in an opinion that analyzed both *Stoneridge* and *PIMCO*, reliance on a deceptive scheme was found to be sufficiently pled where the defendant attempted to "cover up" allegations of bribery, making it "necessary or inevitable" that falsehoods would result. *See In re Eletrobras Sec. Litig.*, 245 F. Supp. 3d 450, 472 (S.D.N.Y. 2017) (reliance for scheme liability claim alleged where defendant "organized an illegal kickback scheme with contractors that resulted in misleadingly overstated PP & E, [and] attempted to collude with Eletronuclear's former CEO to cover up and deny allegations of bribery"). So too here. The cover up Cellenkos transaction resulted in necessary and inevitable falsehoods, giving rise to reliance.

---

[6] While the announcement of the Cellenkos transaction resulted in a decline in GCBC's share price, that decline likely would have been much worse if the truth had been disclosed—that Golden Meditech had already taken the funds for no consideration—thereby leaving investors with a false impression after April 29, 2022 and leaving artificial inflation in GCBC's share price.

**F.    Defendants' Fraud Was Carried Out In Connection With The Purchase Or Sale Of Securities**

"The Supreme Court has espoused a broad interpretation of Section 10(b) and Rule 10b-5's 'in connection with' language," under which "it is enough that the fraud alleged 'coincide' with a securities transaction." *Sec. & Exch. Comm'n v. Hwang*, 692 F. Supp. 3d 362, 387 (S.D.N.Y. 2023). "The requisite showing, in other words, is deception in connection with the purchase or sale of any security, not deception of an identifiable purchaser or seller." *United States Sec. & Exch. Comm'n v. Passos*, 2024 WL 5203022, at *16 (S.D.N.Y. Dec. 21, 2024).

Here, Defendants' fraud coincides with the purchase or sale of GCBC stock listed on the NYSE, because their concealed scheme to steal hundreds of millions of dollars from GCBC dramatically affected the true value of the stock, and the price that investors would have been willing to pay if the truth had been disclosed. The concealment of this theft, and Defendants' attempt to cover it up with the sham Cellenkos transaction, induced purchases of GCBC stock that otherwise would not have taken place. GCBC's purported cash stockpile was a key focus of U.S. investors and analysts during the Class Period, and so Defendants' fraudulent scheme relating to this very subject readily meets the "in connection with" requirement. *See* ¶¶44-47.

While the in connection with requirement is easily met for Plaintiffs' misrepresentation claims (which Plaintiffs do not understand Golden Meditech, or any other Defendant, to dispute), it is also satisfied for Plaintiffs' scheme claims. *See Passos*, 2024 WL 5203022, at *16 ("in connection with" element met for scheme claim where "U.S. investors purchased shares of IRB stock while the false . . . information was in the public domain and had not yet been corrected"); *Parmalat*, 376 F. Supp. 2d at 505–06 ("A plaintiff makes out a sufficient nexus with the purchase or sale of securities when the defendants' deceptive conduct affects a market for securities. The

alleged factoring and securitization schemes would have created the appearance of revenue or assets where there was none and thus distorted the prices of Parmalat's securities.").

Golden Meditech argues that Defendants' fraud at issue in Plaintiffs' scheme liability claims was not in connection with the purchase or sale of any security (Golden Meditech Br. at 17-19), but ignores that the purpose of the sham Cellenkos transaction was to mislead investors, satisfying that requirement. As such, Golden Meditech's cited authorities do not warrant dismissal on this ground. *See Leykin v. AT & T Corp.*, 423 F. Supp. 2d 229, 242 (S.D.N.Y. 2006), aff'd, 216 F. App'x 14 (2d Cir. 2007) ("an otherwise legitimate stock transaction that is antecedent, but not integral, to the alleged fraud does not meet the 'in connection with' requirement."); *Menaldi v. Och-Ziff Cap. Mgmt. Grp. LLC*, 277 F. Supp. 3d 500, 518 (S.D.N.Y. 2017) (bribery that "occurred years before the class period, and is far too remote to be "in connection with the purchase or sale of any security"). Golden Meditech's citation to *S.E.C. v. Zandford*, 535 U.S. 813 (2002) in fact supports Plaintiffs. *Id.* at 814 ("Neither the SEC nor this Court has ever held that there must be a misrepresentation about a particular security's value in order to run afoul of the Act. This Court disagrees with respondent's claim that his misappropriation of the proceeds, though fraudulent, does not have the requisite connection with the sales").

## II.    Plaintiffs Have Sufficiently Alleged Their Control Person Claims

"To make out a prima facie case under § 20(a) of the Exchange Act, a plaintiff must show a primary violation . . . by the controlled person . . . and control of the primary violator by the targeted defendant . . . and show that the controlling person was in some meaningful sense a culpable participant in the fraud perpetrated by the controlled person." *Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 170 (2d Cir. 2000). "Allegations of control are not averments of fraud and therefore need not be pleaded with particularity." *In re Scot. Re Grp. Sec. Litig.*, 524 F. Supp. 2d 370, 386 (S.D.N.Y. 2007).

Control is "broadly construed" as the control person provisions were "meant to expand the scope of liability under the securities laws." *CompuDyne Corp. v. Shane*, 453 F. Supp. 2d 807, 829 (S.D.N.Y. 2006). Control may be direct or indirect (*see* 15 U.S.C. §78t(a)), and "may be established by showing that the defendant possessed the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise." *SEC v. First Jersey Secs., Inc.*, 101 F.3d 1450, 1472-73 (2d Cir. 1996). The analysis is focused on the alleged control person's "practical ability to direct the actions of the controlled person." *In re JWP Inc. Sec. Litig.*, 928 F. Supp. 1239, 1259 (S.D.N.Y. 1996).

### 1.    Director Defendants

Defendants Weng and Mark Chen argue that they cannot be control persons of GCBC because they are purportedly "independent" directors. But Plaintiffs do not allege their control over GCBC's violations of Section 10(b) based only on their positions. As GCBC Board members, Weng and Mark Chen had the power to, and did, approve the sham Cellenkos transaction. *See supra* Part I.B.1. Analogously, courts in this District have held that directors have the requisite "control" over a company where they have the power to approve its alleged fraudulent statements. *See, e.g.*, *In re Philip Servs. Corp. Sec. Litig.*, 383 F. Supp. 2d 463, 485 (S.D.N.Y. 2004); *In re Livent, Inc. Noteholders Sec. Litig.*, 151 F. Supp. 2d 371, 437 (S.D.N.Y. 2001). Because Weng and Mark Chen approved the sham Cellenkos transaction with scienter (*see supra* Part I.C.1), they are "culpable participant[s] in the fraud," and liable as control persons of GCBC. *See In re Tenaris S.A. Sec. Litig.*, 493 F. Supp. 3d 143, 166 (E.D.N.Y. 2020) ("[A]llegations of scienter necessarily satisfy the [culpable participation] requirement.").

The Director Defendants' citation to *Converse, Inc. v. Norwood Venture Corp.*, 1997 WL 742534 (S.D.N.Y. Dec. 1, 1997) is unavailing, because unlike here the plaintiff did not allege the defendant's involvement in approving the misleading agreement at issue. *Id.* at *4 ("Converse does

not allege that Norwood . . . had any role in preparing or approving the allegedly misleading SPA.”). Likewise, in *In re Smith Barney Transfer Agent Litig.*, 884 F. Supp. 2d 152 (S.D.N.Y. 2012), the plaintiffs failed to allege that the defendant “signed, drafted, approved, or confirmed a misleading statement,” whereas here the Director Defendants approved the sham Cellenkos transaction. *Id.* at 167. The Director Defendants are liable as GCBC’s control persons.

### 2.    Golden Meditech

Defendant Kam and Golden Meditech controlled GCBC and Cellenkos within the meaning of Exchange Act Section 20(a).[7] This is most clearly demonstrated by Golden Meditech, together with its CEO Defendant Kam, causing GCBC to make hundreds of millions of dollars of improper payments to Golden Meditech affiliates (¶¶55-57), and then causing GCBC and Cellenkos to enter into the Cellenkos transaction to cover up those payments (¶¶62-78). There is no plausible reason for GCBC to give away hundreds of millions of dollars, or for GCBC and Cellenkos to participate in a sham transaction, unless they were under the control of those who stood to benefit— Defendants Kam and Golden Meditech. Because Golden Meditech participated in the theft and the cover-up with scienter (*see supra* Part I.C.3.), it was a culpable participant in the primary violations by GCBC and Cellenkos. *See Tenaris*, 493 F. Supp. 3d at 166.

## III.    The Court Has Personal Jurisdiction Over Defendants

“In order to survive a motion to dismiss for lack of personal jurisdiction, a plaintiff must make a prima facie showing that jurisdiction exists.” *In re Longfin Corp. Sec. Class Action Litig.*, 2019 WL 1569792, at *9 (S.D.N.Y. Apr. 11, 2019). “In evaluating whether the requisite showing has been made, [a court must] construe the pleadings and any supporting materials in the light

---

[7] While Defendant Kam argues that his control over the corporate defendants does not give rise to personal jurisdiction over him, he does not dispute his liability as a control person under Exchange Act Section 20(a).

most favorable to the plaintiff[ ]." *Id.* "On a motion to dismiss for lack of personal jurisdiction . . . the Court may look beyond the four corners of the complaint and consider all pleadings and accompanying affidavits and declarations, while still resolving all doubts in plaintiff's favor." *Everlast World's Boxing Headquarters Corp. v. Ringside, Inc.*, 928 F. Supp. 2d 735, 737 n. 1 (S.D.N.Y. 2013). In addition, "the Court may take judicial notice of public records for the purposes of evaluating personal jurisdiction" on a motion to dismiss. *Taormina v. Thrifty Car Rental*, 2016 WL 7392214, at *5 n.6 (S.D.N.Y. Dec. 21, 2016).

Section 27 of the Exchange Act, 15 U.S.C. §78aa, "authorizes service of process 'wherever the defendant may be found'," and the "Exchange Act permits the exercise of personal jurisdiction to the limit of the Due Process Clause of the Fifth Amendment." *S.E.C. v. Unifund SAL*, 910 F.2d 1028, 1033 (2d Cir. 1990). In cases arising under the Exchange Act courts consider whether the defendant has sufficient "minimum contacts" with the United States to satisfy due process, and whether assertion of personal jurisdiction would be "reasonable" under the circumstances. *Longfin*, 2019 WL 1569792, at *9. Both requirements are met here as to each Defendant.[8]

## A.    Defendants Have Requisite Minimum Contacts With The United States

In evaluating minimum contacts, the court asks whether "the defendant 'has purposefully directed [its] activities at the forum and the litigation arises out of or relates to those activities'." *Longfin*, 2019 WL 1569792, at *9 (quoting *Gucci America, Inc. v. Weixing Li*, 768 F.3d 122, 136 (2d Cir. 2014)). A plaintiff may establish minimum contacts by showing that a defendant's actions abroad caused a foreseeable effect in the United States. *See, e.g.*, *S.E.C. v. Softpoint, Inc.*, 2001 WL 43611, at *5 (S.D.N.Y. Jan. 18, 2001) ("[A] district court may exercise its personal jurisdiction

---

[8] Defendant Weng resides in the U.S. and Cellenkos's operations are in the U.S. Neither contests personal jurisdiction.

in a securities action so long as the defendant's activities had an unmistakably foreseeable affect within the United States, and could reasonably be expected to be visited upon United States shareholders.").[9]

It is "well-established that signing or directly manipulating financial statements to cover up illegal foreign action, with knowledge that those statements will be relied upon by United States investors satisfies" the minimum contacts test. *In re Banco Bradesco S.A. Sec. Litig.*, 277 F. Supp. 3d 600, 643 (S.D.N.Y. 2017); *see also S.E.C. v. Stanard*, Case No. 06-cv-7736 (S.D.N.Y. May 16, 2007) (hearing transcript) at 3:7-10, filed herewith as PX K ("SEC regulations would be meaningless as applied to foreign issuers of U.S.-traded securities if the United States courts lacked jurisdiction over executives abroad who violate those regulations."). Because Defendants GCBC, Zheng, and Albert Chen issued false statements to U.S. investors concealing the theft of GCBC's assets, they have the requisite minimum contacts with the United States, which the Officer Defendants do not dispute. *See* ¶¶128-62; *see generally* Officers' Br.

In addition, minimum contacts are present where defendants "intend[ed] to reach American investors" with their fraudulent conduct. *Mucha v. Volkswagen Aktiengesellschaft*, 540 F. Supp. 3d 269, 284–85 (E.D.N.Y. 2021); *see also Banco Bradesco*, 277 F. Supp. 3d at 643 ("where an

---

[9] While Defendants argue that Plaintiffs must show they "expressly aimed" their conduct at the United States to satisfy minimum contacts, there is disagreement over whether that is in fact a requirement. *See S.E.C. v. Straub*, 2013 WL 4399042, at *4 (S.D.N.Y. Aug. 5, 2013) (disagreeing with defendants' argument that they must have " 'expressly aimed' conduct at the United States to sustain jurisdiction"); *SEC v. Sharef*, 924 F. Supp. 2d 539, 545 n.57 (S.D.N.Y. 2013) ("while 'express aim' is certainly sufficient to confer jurisdiction, it has not generally been found to be a requirement, particularly in the securities context."). Regardless, Defendants here did expressly aim their conduct by issuing false statements to U.S. investors and engaging in the Cellenkos transaction designed to deceive U.S. investors. *See Straub*, 2013 WL 4399042, at *4 ("expressly aimed" standard was satisfied where "Defendants knew that the certifications made to auditors would be incorporated into the reports filed with the SEC in violation of United States securities regulations").

executive of a foreign securities issuer, wherever located, participates in a fraud *directed to* deceiving United States shareholders"). As such, Courts in this Circuit have held that foreign defendants are subject to personal jurisdiction when they participate in a scheme to defraud U.S. investors. For example, in *S.E.C. v. Straub*, the court found minimum contacts where the foreign defendants "engaged in a cover-up" likely to influence prospective securities purchasers in the United States. 921 F. Supp. 2d 244, 256 (S.D.N.Y. 2013); *id.* at 257–58 ("Although Defendants' alleged bribes may have taken place outside of the United States . . . their concealment of those bribes, in conjunction with Magyar's SEC filings, was allegedly directed toward the United States.").

Here, the Cellenkos transaction was a key part of Defendants' fraudulent scheme and was intended to conceal the theft of GCBC's assets from its public shareholders (*see* ¶¶5-7, 62, 76), *i.e.* investors who purchased GCBC shares on the New York Stock Exchange (*see* ¶¶166), including many U.S. investors. Throughout the Class Period U.S. investors and securities analysts pressed GCBC's management to return its supposedly immense cash holdings to shareholders. *See* ¶¶44-48. One notable such U.S. investor in GCBC was Kent McCarthy, along with his firm Jayhawk Capital Management, L.L.C., and related entities. *See* PX D at 9 (noting McCarthy's U.S. citizenship and U.S. formation of his entities). During GCBC's Q4 2019 earnings call held on June 19, 2019, Kent McCarthy stated, "[w]e and every other shareholder had asked for 10 years for a share repurchase and a special dividend." ¶45.b. On GCBC's Q2 2020 earnings call held on November 27, 2019, Michael Schmitz, also from Jayhawk Capital, stated "the most important issue that continues to be ignored by the company is how you plan to utilize the cash resources that are now and have been for some time greater than the market cap of the company." ¶47.

As Defendants knew, McCarthy and Jayhawk were substantial shareholders of GCBC. As reported on GCBC's Form 20-F for the year ended March 31, 2021, filed with the SEC on July 29, 2021, at that time McCarthy and his related entities were deemed to beneficially own 9.9% of GCBC's outstanding ordinary shares, making them GCBC's second largest shareholder. *See* PX E at 113-14.[10] As was also reported in that Form 20-F, McCarthy's companies had brought an (ultimately unsuccessful) suit against GCBC and the Director Defendants in the Grand Court of the Cayman Islands on June 26, 2019, to challenge a pending merger proposal as offering inadequate consideration. *See id.* at 50. As of December 31, 2021, McCarthy and his companies still owned approximately 6.27% of GCBC's outstanding shares. *See* PX D at 8.

Therefore, Defendants knew that U.S. investors were keenly focused on GCBC's reported $1 billion in cash. As such, when Defendants conceived and attempted to implement the Cellenkos transaction to deceive shareholders by covering up the theft of GCBC's assets, that deceit was directed at McCarthy, Jayhawk, and other U.S. shareholders and analysts like them. *See* ¶¶44-48. And "even if Defendants' alleged *primary* intent was not to cause a tangible injury in the United States, it was nonetheless their intent, which is sufficient to confer jurisdiction." *Straub*, 921 F. Supp. 2d at 256; *Banco Bradesco*, 277 F. Supp. 3d at 644 ("even if the allegedly false or misleading press release signed by Abreu was not *principally* directed toward the United States . . . knowledge that it would be filed with the SEC and be given to prospective American purchasers and sellers . . . is enough to establish minimum contacts.").

---

[10] *See Passos*, 2024 WL 5203022, at *7 (S.D.N.Y. Dec. 21, 2024), (minimum contacts satisfied because, *inter alia*, "[w]hen Defendant allegedly planted and disseminated the False Berkshire Story in the media, he allegedly knew, having received IRB's most recent shareholder list, that U.S. shareholders held significant investments in IRB stock").

News of the proposed Cellenkos transaction was disseminated to U.S. investors through SEC filings, which Defendants knew would reach U.S. investors. *See* ¶¶63-64; *Straub*, 921 F. Supp. 2d at 255 (where companies regularly filed SEC reports and had securities listed on the NYSE, the defendants "knew or had reason to know that any false or misleading financial reports would be given to prospective American purchasers of those securities"). Because all Defendants participated in the scheme to deceive U.S. investors via the Cellenkos transaction, they have the requisite minimum contacts. *See Longfin Corp.*, 2019 WL 1569792, at *10 (defendants "were associated with Longfin or a related entity and received Longfin shares . . . as part of a market manipulation scheme," and so their "knowing participation in a securities fraud in the United States justifies the exercise of jurisdiction over them").

### 1. Mark Chen

Mark Chen, as a director of GCBC, approved the Cellenkos transaction, which was designed to deceive U.S. investors, giving him minimum contacts with the United States. *See supra* Part I.B.1. In addition, when Blue Ocean convened a GCBC shareholder meeting in New York on June 16, 2022 to prevent the Cellenkos transaction from closing, Mark Chen attempted to attend the meeting in New York "to prevent [Blue Ocean] from voting and thereby prevent the resolutions from being passed." ¶103; *see also* ¶¶24, 91, 103. Because he was acting *in the United States* to further Defendants' fraudulent scheme (in an apparent effort to allow the Cellenkos transaction to close, at a time before Defendants' theft had been revealed to the public), he has the requisite minimum contacts. Attempting to attend a shareholder meeting in New York in order to perpetuate a fraud by preventing a shareholder vote from taking place, which results in an "argy bargy" and

accusations of "inappropriate conduct" (*see* ¶¶24-25, 91), is precisely the type of activity for which one should reasonably expect to be haled into court in the United States.[11]

In addition, Mark Chen has minimum contacts because he signed false statements filed with the SEC. On September 20, 2019, GCBC filed a Form F-3 Registration Statement with the SEC to register up to $100 million of securities. *See* PX C. The registration statement states that "[w]e incorporate by reference the filed documents listed below," including "our Annual Report on Form 20-F for the fiscal year ended March 31, 2019, filed with the SEC on July 23, 2019." *See id.* at 21. As alleged in the Amended Complaint, that Form 20-F contained materially false and misleading statements concerning GCBC's cash balances and related party transactions. ¶¶132-39. The registration statement was signed by Mark Chen as Director of GCBC, under the statement "[p]ursuant to the requirements of the Securities Act of 1933, this registration statement has been signed by the following persons in the capacities and on the dates indicated." *See id.* at II-5; *Mucha*, 540 F. Supp. 3d at 283 ("Courts in this Circuit regularly have exercised personal jurisdiction over foreign persons who signed allegedly false or misleading statements filed with the Securities and Exchange Commission.").

While Mark Chen relies on *In re EHang Holdings Ltd. Sec. Litig.*, 646 F. Supp. 3d 443 (S.D.N.Y. 2022), that case is inapposite because there the plaintiffs failed to allege that the defendant "played any role in making, proposing, editing, or approving EHang's SEC filings, or the press releases that they challenge as containing false or misleading statements" (*id.* at 458),

---

[11] The dramatic facts surrounding this meeting stand in stark contrast to the "insubstantial" meeting in *NCA Holding Corp. v. Ernestus*, 1998 WL 388562, at *6 (S.D.N.Y. July 13, 1998) at which all that was discussed was that various business would *not* be transacted, which was insufficient to create minimum contacts.

whereas here Mark Chen signed a misleading SEC filing, and approved the sham Cellenkos transaction designed to deceive U.S. investors.

### 2. Defendant Kam

Defendant Kam himself signed the Framework Agreement for the deceptive Cellenkos transaction, which included GCBC's fictitious obligation to pay $664 million. ¶¶63-67. The Framework Agreement was filed with the SEC. ¶63. Because Defendant Kam served as Board Chair of GCBC from 2013 to 2018 while it was a public SEC reporting company (¶38), and because Kam had previously signed SEC filings including in 2017 and 2018 (*see* PX H; PX I), he would have known that contracts like the Framework Agreement, governing a major corporate transaction for a SEC reporting company like GCBC's Cellenkos transaction, have to be filed with the SEC. By signing a deceptive document he knew would be filed with the SEC and made available to U.S. investors, Defendant Kam had the requisite minimum contacts.

On point with these facts is *Sec. & Exch. Comm'n v. Hurgin*, 484 F. Supp. 3d 98 (S.D.N.Y. 2020), where the SEC alleged fraud in connection with the merger of an Israeli company, named Ability, and a U.S. company. The court found personal jurisdiction over a resident of Israel, because "[b]y participating in the merger, Aurovsky availed himself of the privilege of doing business here." *Id.* at 114. The SEC alleged that "as a fifty-percent owner of Ability, Aurovsky's consent was necessary for the merger to proceed and that he expressly consented to the merger by signing the Merger Agreement." *Id.* Significant to the Court's analysis was that Aurovsky had signed a form consenting to use of his name in the misleading proxy materials, and had also signed the merger agreement, both of which were filed with the SEC. *Id.*

Defendant Kam also signed other misleading SEC filings relating to GCBC and the Cellenkos transaction. *See* PX F; PX G. For example, on May 23, 2022, Kam and his related entities filed a Schedule 13D report of beneficial ownership with respect to Global Cord Blood

Corporation securities. *See* PX F at 3. The form claimed beneficial ownership of 64.9% of GCBC's ordinary shares, and claimed they were obtained by executing a security interest under a loan agreement with Blue Ocean. *See id.* at 3-4. That is, as part of Kam's then-ongoing effort to thwart Blue Ocean's litigation in the Cayman Islands and proceed with the Cellenkos transaction, Kam was claiming that he and his companies beneficially owned Blue Ocean's shares (which, if true, would likely end the Cayman litigation and allow the Cellenkos transaction to close). On May 31, 2022, Kam and his related parties filed an amended beneficial ownership report with the SEC, reiterating their purported ownership of 64.9% of GCBC's shares, and responding to certain of Blue Ocean's claims regarding their ongoing litigation. *See* PX G at 4-5. In 2023, after contested litigation the British Virgin Islands High Court of Justice determined signatures on documents proffered by Kam to prove the existence of the security interest were forged. ¶¶110-14; 113 (Justice Walbank concluded that "[t]his evidence is so strong that there is no real prospect of a claim succeeding that these signatures and the chop were genuine" and "[t]he Claimants [Blue Ocean] are thus entitled to summary judgment on this, the forgery issue.").

Moreover, the entire purpose of the Cellenkos transaction was to benefit Kam and Golden Meditech by concealing the theft of GCBC's assets. *See* ¶¶54-57. As the principal and mastermind of a fraudulent scheme directed at U.S. investors, Kam has minimum contacts. *See S.E.C. v. Stanard*, Case No. 06-cv-7736 (S.D.N.Y. May 16, 2007) (hearing transcript) at 3:11-18, filed herewith as PX K (finding personal jurisdiction over defendant who "conceived and implemented a strategy for entering a sham transaction and specifically intended that his work would result in false statements by RenRe in its publicly-filed financial statements in the United States").

Kam argues that merely "knowing information would be disseminated worldwide, including to the United States, is not enough to establish personal jurisdiction." Kam Br. at 11

(citing *Sonterra Cap. Master Fund Ltd. v. Credit Suisse Grp. AG*, 277 F. Supp. 3d 521, 590 (S.D.N.Y. 2017)). But that is not what Plaintiffs allege. As in *Sonterra*, "plaintiffs do not allege merely that dissemination . . . into the United States and its effects . . . in the United States were foreseeable; they claim that those effects were the purpose of defendants' manipulation," which *Sonterra* found to constitute "purposeful availment." *Sonterra*, 277 F. Supp. 3d at 591.

The facts here do not resemble Kam's authority of *In re Alibaba Grp. Holding Ltd. Sec. Litig.*, 2023 WL 2601472 (S.D.N.Y. Mar. 22, 2023). There, the alleged controlling defendant did not "play[] any role in making, proposing, editing or approving Alibaba's public filings in the United States," and the plaintiffs merely alleged unremarkable facts including that he could appoint board members. *Id.* at *6. In stark contrast to *Alibaba*, here Defendant Kam personally signed the misleading Framework Agreement filed with the SEC (among other documents), and litigation has revealed his total domination of GCBC and its directors and officers (*see* ¶¶83-125).

### 3. Golden Meditech

As shown above in Part I.B.3, Golden Meditech subsidiaries Golden Meditech (BVI) Company Limited and GM Precision Medicine (BVI) Limited directly participated in the Cellenkos transaction, and were little more than shells used by Golden Meditech to carry out the fraud. GM Precision Medicine (BVI) Limited was a party to the deceptive Framework Agreement, filed with the SEC, that contained GCBC's fictitious $664 million payment obligation. ¶64, 67. Golden Meditech (BVI) Company Limited was a party to an SPA forming part of the Cellenkos transaction, that was filed with the SEC. ¶¶64-65. Because these subsidiaries were mere shells used by Golden Meditech to carry out the fraud, the minimum contacts arising from their deceptive documents filed with the SEC should be attributed to Golden Meditech. Because GCBC was a Golden Meditech subsidiary while it was a SEC reporting company from 2009-2018 (*see* ¶¶37-39), and because Golden Meditech has itself signed SEC filings relating to GCBC (*see* PX H; PX

I), it knew that the deceptive Cellenkos transaction documents would be filed with the SEC and made available to U.S. investors.

Golden Meditech relies heavily on *In re Braskem S.A. Sec. Litig.*, 246 F. Supp. 3d 731 (S.D.N.Y. 2017) to argue that it lacks minimum contacts, but that case in inapposite. There the plaintiffs alleged defendant Odebrecht's general control over defendant Braskem through corporate formalities such as voting power, director and officer appointments, and ability to approve its business plan. *Id.* at 769. *Braskem* featured no allegations comparable to those at issue here regarding Golden Meditech and its subsidiaries misappropriating hundreds of millions of dollars from GCBC, showing Golden Meditech's total domination of GCBC and disregard of its separate corporate identity. Critical to the *Braskem* court's finding that it lacked personal jurisdiction was that the plaintiffs failed to allege the defendant company "played any role in" the conduct that was alleged to be fraudulent in that case, *i.e.*, "making, proposing, editing or approving Braskem's public filings in the United States." *Id.* at *770. However, here Golden Meditech, through its subsidiaries, participated in fraudulent Cellenkos transaction, the purpose of which was to mislead U.S. investors.

### B.    Exercising Personal Jurisdiction Over Defendants Is Reasonable

"If the defendant's contacts with the forum rise to the level of 'minimum contacts,' a defendant may defeat jurisdiction only by presenting a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Banco Bradesco*, 277 F. Supp. 3d at 642–43. "This prong of the inquiry rarely defeats jurisdiction where a defendant has sufficient forum contacts, and is largely academic in non-diversity cases." *Sec. & Exch. Comm'n v. China Energy Sav. Tech., Inc.*, 2007 WL 9711174, at *3 (E.D.N.Y. Mar. 19, 2007); *see also Passos*, 2024 WL 5203022, at *8 ("This case is not the rare case where the reasonableness analysis [under the Due Process Clause] defeats the exercise of personal jurisdiction"). As such, "few [courts] have

ever declined jurisdiction, on fairness grounds, in [securities] cases." *S.E.C. v. PlexCorps*, 2018 WL 4299983, at *19 (E.D.N.Y. Aug. 9, 2018). This case should be no different, as Defendants present no compelling reason why the Court's exercise of personal jurisdiction over them would be unreasonable.

> Factors in determining whether exercising jurisdiction is reasonable include:
>
> (1) the burden that the exercise of jurisdiction will impose on the defendant; (2) the interests of the forum state in adjudicating the case; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of the controversy; and (5) the shared interest of the states in furthering substantive social policies.

*Longfin*, 2019 WL 1569792, at *10 (citing *Eades v. Kennedy, PC Law Offices*, 799 F.3d 161, 169 (2d Cir. 2015)). Here, these factors weigh strongly in favor of finding reasonableness.

First, "[e]ven if forcing the defendant to litigate in a forum relatively distant from its home base were found to be a burden, the argument would provide defendant only weak support, if any, because the conveniences of modern communication and transportation ease what would have been a serious burden only a few decades ago." *In re Fairfield Sentry Ltd.*, 662 B.R. 74, 102 (Bankr. S.D.N.Y. 2024) (quoting *Chloé v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 173 (2d Cir. 2010)); *see also Passos*, 2024 WL 5203022, at *8 (that defendant "speaks English sparingly, lives in Brazil, and has no ties to the United States . . . provides him "only weak support, if any, because the conveniences of modern communication and transportation ease whatever burdens Defendant's native language and residence might have presented decades ago").

Second, "because this is a case brought under U.S. federal law, the judicial system has a strong interest in resolving it here." *Banco Bradesco*, 277 F. Supp. 3d at 645; *Passos*, 2024 WL 5203022, at *8 ("[t]he federal interest in adjudicating the dispute is clear and substantial because the SEC's claims are brought under the federal securities laws, an area of strong federal concern

that falls at the center of Congress' commerce power."); *Fairfield Sentry*, 662 B.R. at 102 ("the United States has a strong interest in ensuring the integrity of its financial systems.").

Therefore, the factors weigh in favor of exercising jurisdiction,[12] and the strong interests of the United States in "ensuring that investors who purchase securities in the United States are not defrauded" far outweighs any burden on Defendants from having to defend an action outside of their home countries. *Mucha*, 540 F. Supp. 3d at 285; *see also China Energy*, 2007 WL 9711174, at *4 (for China-based defendants, "[t]he inconvenience of litigating in a distant forum, standing alone, is insufficient to defeat jurisdiction when balanced against the strong interest the United States has in enforcing its securities laws. This is particularly true considering . . . that the Relief Defendants have New York Counsel.").

### 1.    Officer Defendants

The Officer Defendants cite a handful of opinions arising on idiosyncratic facts to argue that exercising jurisdiction over them is unreasonable merely because they live abroad, but those decisions were motivated by concerns such as the defendants' advanced age that are not applicable here. *E.g.*, *S.E.C. v. Sharef*, 924 F. Supp. 2d 539, 548-49 (S.D.N.Y. 2013) ("it would be a heavy burden on this seventy-four year old defendant to journey to the United States to defend against this suit."); *City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 666 (6th Cir. 2005) ("Kaizaki is living in Japan, and is a retired senior citizen").

The Officer Defendants argue that personal jurisdiction would not be reasonable because other lawsuits exist relating to the same facts (*i.e.*, Defendants' theft from GCBC and the sham

---

[12] Plaintiffs have a strong interest in obtaining convenient and effective relief in this forum. There is no reason to believe this controversy could be more efficiently resolved in another forum. Defendants fail to identify any social policies that would be negatively affected by this Court's exercise of jurisdiction.

Cellenkos transaction). Officers' Br. at 17. But that argument disregards the fundamentally different nature of those lawsuits and the instant action. This action is brought on behalf of "a class, consisting of all persons and entities who purchased the publicly traded ordinary shares of GCBC between June 18, 2019 and May 9, 2022." ¶165. The actions that the Officer Defendants cite as purported substitutes for the instant action are: (i) a lawsuit in the British Virgin Islands in which Blue Ocean sought to have two alleged security agreements over its GCBC shares declared invalid (*see* ¶110-114); (ii) a lawsuit in the Cayman Islands in which Blue Ocean sought to block the Cellenkos transaction, and later sought and obtained the appointment of the JPLs (*see* ¶88-109); (iii) a lawsuit in Hong Kong in which the JPLs attempted to take control of certain assets of GCBC in Hong Kong and Mainland China (*see* ¶115-125); and (iv) the Derivative Action, brought by a shareholder on behalf of GCBC, pending in the Supreme Court for the County of New York.

These other actions bring different claims, on behalf of different plaintiffs, and seek different relief, than the claims advanced in the instant action. The JPLs have recently indicated that they intend to seek discharge from their roles due to inability to obtain payment for their ongoing fees, so any litigation that depends on their efforts cannot be an effective substitute. *See* PX A at §§4.2.3-4.2.6, 6.1.10-6.1.14, 7.1.1. Furthermore, the JPLs have indicated that they cannot further pursue litigation due to lack of funding. *See id.* at §§5.5.6, 5.6.3, 5.7.5, 5.7.9, 5.8.5. Any recovery in the Derivative Action will accrue to GCBC,[13] and therefore indirectly to its *current* shareholders, which may have limited overlap with the investor class here (who purchased shares in 2019-2022, and may no longer hold their shares in light of the recent events surrounding GCBC

---

[13] The Officer Defendants' speculation about a conflict of interest for MW Gestion, the initial plaintiff in the instant action, based on its participation in the Derivative Action (Officers' Br. at 18) is irrelevant, as MW Gestion was not appointed lead plaintiff and is not a named plaintiff in the operative Amended Complaint.

and its dismal stock price performance). In no way does the existence of these other actions render this Court's exercise of personal jurisdiction over Zheng and Chen "unreasonable."

Nor does the fact that some evidence is located abroad, as frequently happens in litigation in federal court involving multinational companies, render personal jurisdiction over the Officer Defendants unreasonable. Their argument also overlooks that substantial evidence exists in the United States, including evidence in the possession of Cellenkos and Jennifer Weng. Finally, the Officer Defendants' invocation of "procedural and substantive policies" of other countries that *might* be "implicate[d]" by the instant action is entitled to no weight, where they do not specify what any of those policies are.[14]

### 2.    Defendant Kam

Defendant Kam also argues that personal jurisdiction over him would be unreasonable because "multiple cases involving the transaction at issue are pending in other jurisdictions" (Kam Br. at 20), citing to *Base Metal Trading Ltd. v. Russian Aluminum*, 98 F. App'x 47, 49–51 (2d Cir. 2004). This argument fails for multiple reasons. First, *Base Metal Trading* considered *forum non conveniens*, not personal jurisdiction. Second, while Kam does not specify the "multiple cases" that he is referring to, the existence of the Derivative Action in New York state court makes exercising jurisdiction over Kam in this action *more* reasonable as he is already defending related claims in the United States, represented by the same U.S. counsel. *See Longfin*, 2019 WL 1569792, at *10 ("While both reside far from the United States, both defendants are already parties to the related SEC action, which is also before this Court. Participation in this class action will not add any substantial burden.).

---

[14] The Officer Defendants also argue that personal jurisdiction is improper because service was not timely. Officers' Br. at 19. If the Court exercises its discretion to deem the already completed service timely (*see infra* Part IV), this argument is moot.

As discussed above, any litigation undertaken by the JPLs appears likely to be discontinued. Unlike in *Base Metal Trading* where the litigation lacked U.S. connections, the plaintiffs were "forum shopping," and Russia provided a suitable alternative forum to adjudicate the claims, here the United States is the only logical place to litigate Plaintiffs' claims arising under the Exchange Act on behalf of investors in GCBC's U.S.-listed securities. *See id.* at *49-50.

### 3.    Mark Chen and Golden Meditech

Mark Chen and Golden Meditech scarcely develop their arguments that personal jurisdiction would be unreasonable. While arguing that "great care and reserve" should be exercised when asserting personal jurisdiction over foreign defendants, as the cases cited above show, personal jurisdiction is frequently found to be reasonable with respect to foreign defendants, especially so in cases arising under the federal securities laws, and any such care and reserve is insufficient to outweigh the strong interest of the United States in enforcing those laws. While both Mark Chen and Golden Meditech cite *Sharef*, as discussed above that case was motivated by concerns not present here such as the individual defendant's advanced age. *Sharef*, 924 F. Supp. 2d at 548-49. Such burden arguments have no applicability to Golden Meditech, a large and sophisticated multinational conglomerate. Nor do they apply to Mark Chen given his evidently strong U.S. connections, including his marriage to Defendant Weng who resides in the U.S. with their children (¶¶24-25), and his travel to New York on behalf of GCBC in connection with the aftermath of the Cellenkos transaction (¶¶24-25, 91, 103).

**C.    The Court Also Has Personal Jurisdiction Under Conspiracy And Alter Ego Theories**

**1.    Conspiracy**

"[C]onspiracy jurisdiction is based on the time-honored notion that the acts of a conspirator in furtherance of a conspiracy may be attributed to the other members of the conspiracy." *In re Platinum & Palladium Antitrust Litig.*, 61 F.4th 242, 269–70 (2d Cir. 2023). "Under that theory, one conspirator's minimum contacts allow for personal jurisdiction over a co-conspirator, even when the co-conspirator lacks such contacts itself." *Id.* Because all Defendants conspired in the fraudulent scheme at issue here, each Defendant's overt acts based in or directed toward the United States in furtherance of the conspiracy (*e.g.*, U.S.-based Cellenkos's participation in the Cellenkos transaction, and U.S.-based Defendant Weng's approval of the Cellenkos transaction) are attributed to and confer jurisdiction over each co-conspirator.

In order to "imput[e] the minimum contacts of one co-conspirator to another: the plaintiff must allege that (1) a conspiracy existed; (2) the defendant participated in the conspiracy; and (3) a co-conspirator's overt acts in furtherance of the conspiracy had sufficient contacts with a state to subject that co-conspirator to jurisdiction in that state." *Id.* at 270.

Here, a conspiracy existed, in which each Defendant participated, to carry out the sham Cellenkos transaction. *See supra* Part I.B. Defendant Kam argues that there can be no conspiracy jurisdiction here because Plaintiffs' "claims arise under the Exchange Act." Kam Br. at 17 (citing *Dinsmore v. Squadron, Ellenoff, Plesent, Sheinfeld & Sorkin*, 135 F.3d 837, 844 (2d Cir. 1998)). But *Dinsmore* only concerned conspiracy *liability* for Exchange Act Section 10(b) claims, it has nothing to do with personal jurisdiction, and Defendants cite no case holding that conspiracy jurisdiction cannot apply to claims brought under Section 10(b). To the extent that Kam or any other Defendants are arguing that Plaintiffs are required to use the word "conspiracy" in the

Amended Complaint, and that detailing conduct constituting a conspiracy is insufficient, that argument also fails. *See In re Satyam Computer Servs. Ltd. Sec. Litig.*, 915 F. Supp. 2d 450, 484 (S.D.N.Y. 2013) (rejecting defendants' argument that use of the word "conspiracy" in the complaint was necessary to support conspiracy jurisdiction).

The requirement that "a co-conspirator's overt acts in furtherance of the conspiracy had sufficient contacts with a state to subject that co-conspirator to jurisdiction in that state . . . is not a difficult requirement to meet: [a]n overt act is any act performed by any conspirator for the purpose of accomplishing the objectives of the conspiracy." *Platinum*, 61 F.4th at 271. Not only did Defendants Weng and Cellenkos participate in the conspiracy from within the United States, but as shown above (*see supra* Part III.A), all of the Defendants performed overt acts that had minimum contacts with the United States.

Defendant Kam's citation to *Fire & Police Pension Ass'n of Colorado v. Bank of Montreal*, 368 F. Supp. 3d 681 (S.D.N.Y. 2019), fails to defeat conspiracy jurisdiction, as in that case the plaintiffs simply failed to allege a sufficient connection between activity in the United States and the purposes of the conspiracy. *Id.* at *700. Here, as shown above, the point of Defendants' conspiracy was to deceive U.S. investors, a more than sufficient connection.

### 2. Alter Ego

Because Golden Meditech dominated GCBC and Cellenkos as its mere instrumentalities (*see supra* Part II.2; ¶126), personal jurisdiction over either of those companies gives rise to personal jurisdiction over Golden Meditech. ""[t]he crux of the alter-ego theory of personal jurisdiction" is that "courts are to look for two entities acting as one." *Platinum*, 61 F.4th at 274–75. Under the alter ego theory, one party may be subject to jurisdiction based on the acts of another. To evaluate whether parties are alter egos for jurisdictional purposes, courts consider the following factors:

(1) the absence of the formalities and paraphernalia that are part and parcel of the corporate existence, *i.e.*, issuance of stock, election of directors, keeping of corporate records and the like; (2) inadequate capitalization; (3) whether funds are put in and taken out of the corporation for personal rather than corporate purposes; (4) overlap in ownership, officers, directors, and personnel; (5) common office space, address and telephone numbers of corporate entities; (6) the amount of business discretion displayed by the allegedly dominated corporation; (7) whether the related corporations deal with the dominated corporation at arms length; (8) whether the corporations are treated as independent profit centers; (9) the payment or guarantee of debts of the dominated corporation by other corporations in the group; and (10) whether the corporation in question had property that was used by other of the corporations as if it were its own.

*Tenaris*, 493 F. Supp. 3d at 155 (citing *New York State Elec. and Gas Corp. v. FirstEnergy Corp.*, 766 F.3d 212, 224 (2d Cir. 2014)).[15] "Not every factor need be satisfied to find domination." *Id.*

Here, multiple factors show that Cellenkos and GCBC were dominated by Golden Meditech as its "mere instrumentalities," key among them being "whether the related corporations deal with the dominated corporation at arms length." Cellenkos and GCBC entered into a non-arms' length sham transaction with Golden Meditech subsidiaries. Cellenkos and Golden Meditech had overlapping ownership because persons affiliated with Kam and Golden Meditech owned a majority interest in Cellenkos. *See* ¶¶53, 65, 96-97. Golden Meditech and Cellenkos share a key overlapping officer and director, Kim Chuan Leong. *See* ¶¶29-30, 33, 52. Golden Meditech and

---

[15] Defendants argue that Delaware or other state laws govern the alter ego analysis, however federal common law appears to govern. *See Platinum*, 61 F.4th at 275 n.11 ("In diversity cases, we look to the choice-of-law rules of the forum state to determine the veil-piercing law to apply . . . This case, however, arises under federal law. Other courts have held that federal common law governs alter-ego theories "when a federal interest is implicated"); *United States v. Peters*, 732 F.3d 93, 103 n.4 (2d Cir. 2013) ("because this case arises under federal question jurisdiction and involves a federal statute that demands national uniformity, federal common law, not New York State law, presumably controls the question of whether the corporate veil should be pierced."); *Int'l Controls & Measurements Corp. v. Watsco, Inc.*, 853 F. Supp. 585, 590 (N.D.N.Y. 1994) ("while choice of law principles in cases arising under federal question jurisdiction have not always been applied with precision, . . . invocation of those principles determines that federal common law, not Florida law, governs whether the veil should be pierced"). Regardless, Golden Meditech's domination of Cellenkos and GCBC was so pronounced that it would satisfy both Defendants' proposed standard and federal common law.

GCBC shared a key overlapping officer in Albert Chen, GCBC's official CFO and Golden Meditech's *de facto* CFO. ¶¶23, 84, 95, 111, 123. Golden Meditech and GCBC share the space for their principal executive offices on the same floor of the same office building. ¶¶17-18. Golden Meditech used GCBC's property as it if were Golden Meditech's, stealing hundreds of millions of dollars. ¶¶54-57. Golden Meditech used Cellenkos's property as if it were Golden Meditech's, causing Cellenkos to assign a license to a Golden Meditech subsidiary in October 2021, apparently for no consideration, which the Golden Meditech subsidiary would ostensibly sell to GCBC in the 2022 Cellenkos transaction for $664 million. *See* ¶67. Golden Meditech exploited its control over GCBC by misappropriating its assets, and exploited its control over both GCBC and Cellenkos by causing them to enter the sham Cellenkos transaction, in both instances committing fraud causing unjust injury to Plaintiffs and the investor class.

Similarly, in *Tenaris* alter ego status was sufficiently alleged for purposes of personal jurisdiction as to purportedly separate companies based primarily on their commingling of funds, "common personnel and office space," and the parent company executives' participation in a bribery scheme for the benefit of their subsidiaries. *Id.* at 155-56; *see also Liberty Highrise Pvt. Ltd. v. Praxis Energy Agents DMCC*, 632 F. Supp. 3d 562, 569 (S.D.N.Y. 2022) (finding alter ego relationship among companies based on "overlap in staff, officers, and directors, absence of arms-length dealing, blurred lines of corporate control, and intermingled financial transactions.").

## IV.    The Court Should Exercise Its Discretion To Deem Timely The Already Completed Alternative Service

Federal Rule of Civil Procedure 4 provides in relevant part:

> If a defendant is not served within 90 days after the complaint is filed, the court . . . must dismiss the action without prejudice against that defendant or order that service be made within a specified time. But if the plaintiff shows good cause for the failure, the court must extend the time for service for an appropriate period. This subdivision (m) does not apply to service in a foreign country under Rule 4(f), [or] 4(h)(2).

Even where the good cause and foreign country exceptions are not met, "this Court retains discretion to grant an extension of time for plaintiff to serve defendant." *Tastefairy Corp. v. Kumar*, 2019 WL 13220974, at *5 (E.D.N.Y. Oct. 31, 2019).

### A.    The Flexible Due Diligence Standard For Service Pursuant To Rule 4(f) Applies Here

"[T]he 120-day time limit of Rule 4(m) does not apply to service of process made pursuant to Rule 4(f). Instead, courts have used a 'flexible due diligence standard' in determining whether service of process under Rule 4(f) is timely." *Aqua Shield, Inc. v. Inter Pool Cover Team*, 2007 WL 4326793, at *2 (E.D.N.Y. Dec. 7, 2007) (collecting cases); *S.E.C. v. Shehyn*, 2008 WL 6150322, at *4 (S.D.N.Y. Nov. 26, 2008) ("there is no time limit by which service must be effected on a defendant in a foreign country pursuant to Rule 4(f). Instead, courts have used a 'flexible due diligence standard' in determining whether service of process under Rule 4(f) is timely."). For example, in *S.E.C. v. Gottlieb*, 88 F. App'x 476 (2d Cir. 2004), where the defendant was served 22 months after the filing of the complaint, the Second Circuit held that "the district court did not abuse its discretion in deeming the service of process to have been timely effected pursuant to Rule 4(f), which specifies no specific time limit and appears to be subject to a flexible due-diligence standard." *Id.* at 477.

The Officer Defendants argue that Plaintiffs are estopped from arguing that the Rule 4(f) exception to Rule 4(m)'s 90-day period applies (Officers' Br. at 6), but their argument simply ignores the distinction, already articulated by Plaintiffs, between: "(i) whether defendants are 'served at a place not within any judicial district of the United States' within the meaning of Rule 4(f); and (ii) whether 'there is occasion to transmit a judicial or extrajudicial document for service abroad' under Article I of the Hague Service Convention." ECF No. 89 at 7 ("Alternative Service Reply"). That two different questions have different answers is not grounds for estoppel,

notwithstanding the Officer Defendants' conflation of those distinct inquiries. *See Fairfield Sentry*, 662 B.R. at 88 ("By arguing in the District Court that the redemption transfers were foreign for purposes of extraterritoriality, Plaintiffs did not preclude arguing that there were contacts with the forum for purposes of personal jurisdiction").

As Plaintiffs explained in the Alternative Service Reply, for purposes of Rule 4(f)(3), "the relevant circumstance is where the defendant is, and not the location of the intermediary," such as the defendants' U.S. counsel. *Washington State Inv. Bd. v. Odebrecht S.A.*, 2018 WL 6253877, at *4 (S.D.N.Y. Sept. 21, 2018); *United States v. Koehler Oberkirch GmbH*, 728 F. Supp. 3d 1322, 1331 (Ct. Int'l Trade) ("service through U.S. counsel is not service on U.S. counsel: the recipient of service is the defendant"); *c.f. Unifund*, 910 F.2d at 1034 (service was valid under prior Fed. R. Civ. P. 4(i) regarding service upon parties "in a foreign country" where plaintiff transmitted the papers to foreign defendant's broker in New York). For the Hague Service Convention, the relevant consideration is whether the transmission of documents that completes service takes place domestically or abroad. *See Volkswagenwerk Aktiengesellschaft v. Schlunk*, 486 U.S. 694, 707 ("Whatever internal, private communications take place between the agent and a foreign principal are beyond the concerns of this case"). In contrast to the focus of the Hague Service Convention, "Rule 4(f)(3) does not limit" the means of service under that Rule "to the foreign transmittal of documents." *RSM Prod. Corp. v. Fridman*, 2007 WL 2295907, at *5; *see id.* at *3 (discussing *Schlunk*'s focus on transmittal of documents abroad).

The Officer Defendants claim that Rule 4(m)'s exception for service under Rule 4(f) does not apply because they were served pursuant to Rule 4(f)(3) via email to their U.S. counsel. Officers' Br. at 6-7. However, the Second Circuit cases they cite, while at times using broad language, do not address the facts at issue here, as none of those courts had no occasion to consider

54

whether service on a foreign defendant pursuant to Rule 4(f)(3) (or its predecessor in Rule 4(i)) via a U.S. agent was subject to Rule 4(m)'s (previously Rule 4(j)) exception. In *USHA (India), Ltd. v. Honeywell Int'l, Inc.*, 421 F.3d 129, 134 (2d Cir. 2005), the plaintiffs never attempted service on the dismissed defendant, and the opinion does not address service attempts outside of the Rule 4(m) time limit. Similarly in *Mentor Ins. Co. (U.K.) v. Brannkasse*, 996 F.2d 506, 512 (2d Cir. 1993), the dismissed defendants were never served, and the plaintiffs in fact requested their dismissal in order to preserve diversity jurisdiction.

In *Montalbano v. Easco Hand Tools, Inc.*, 766 F.2d 737, 738-40 (2d Cir. 1985) the only attempted service at issue was on a domestic corporation "[p]ursuant to Fed. R. Civ. P. 4(c)(2)(C)(ii) and (d)(3)," and so did not come within Fed. R. Civ. P. 4(j)'s exception for "service in a foreign country pursuant to subdivision (i)." *Montalbano* did not announce a categorical rule, but noted the "broad discretion" of courts in such matters and that the appellant "has not exactly bent over backward to effect service." *Id.* at 740. Similarly, the court in *DEF v. ABC*, 366 F. App'x 250, 253 (2d Cir. 2010) cited *Montalbano* and did "not find that the district court abused its discretion here where defendants waited two and a half years to attempt service, [and] never effected service." None of Defendants' authorities compel the conclusion that service under Rule 4(f) must be attempted within 90 days to qualify for the exception to Rule 4(m),[16] nor would such

---

[16] Courts in other jurisdictions have held that service with a given period is not required to come within the exception. *See In re S1 Corp. Sec. Litig.*, 173 F. Supp. 2d 1334, 1343 (N.D. Ga. 2001) ("Courts and commentators have . . . found that service pursuant to Rule 4(f) is not subject to the 120 day period of Rule 4(m) and the trend of courts is to find that the 120 day period does not apply even if the plaintiff makes no attempt to serve within the period."); 4B Charles Alan Wright & Arther R. Miller, *Federal Practice & Procedure* § 1137 (4th ed. 2024) ("Rule 4(m)'s deadline for serving process does not apply to service in a foreign country, even if there has been no attempt at service of the summons and complaint within the Rule 4(m) period.").

a conclusion be compatible with the plain text of Rule 4(m), the flexible due diligence standard applicable to service under Rule 4(f), or the broad discretion of the court as to service of process.

The Officer Defendants' district court authorities also do not support their argument. The court in *In re Veon Ltd. Sec. Litig.*, reasoned that the exception to Rule 4(m) did not apply because "Plaintiffs ha[d] not exactly bent over backward to effect service," where the lead plaintiff did not attempt service on the defendants until more than 300 days after its appointment, and the defendants were not served until nearly 600 days after the lead plaintiff's appointment. 2018 WL 4168958, at *9-10 (S.D.N.Y. Aug. 30, 2018). The Officer Defendants cite this Court's opinion in *Fajardo v. Arise News, Inc.*, 2016 WL 2851339 (S.D.N.Y. May 13, 2016), but there the Court ordered the plaintiffs to show cause why "the action against Arise Media UK Ltd. ought not be dismissed without prejudice," because "[m]ore than eight months have passed since plaintiffs initiated this case, and there is no indication that Arise Media UK Ltd. has been served with process." *Id.* at *4. The Court in *Fajardo*, like Defendants' other authorities, had no occasion to consider whether alternative service on a foreign defendant via its U.S. agent pursuant to Rule 4(f)(3) is subject to Rule 4(m)'s 90-day period.

### B.    Plaintiffs Have Acted Diligently

While this action was initiated on April 22, 2024, the original complaint was filed by different plaintiffs and different counsel. The Court appointed Plaintiff Somansino and his counsel to lead the action on July 9, 2024. *See* ECF No. 56. Plaintiffs' counsel promptly requested that the Alternative Service Defendants waive service on July 31, 2024. *See* ECF No. 85-1. Plaintiffs filed the amended complaint (the only complaint filed by Plaintiffs to date) on September 20, 2024. *See* ECF No. 60. Four days later, on September 24, 2024, Plaintiffs filed their pre-motion letter for alternative service. *See* ECF No. 78. The Court granted Plaintiffs' motion for alternative service, and Plaintiffs served the Alternative Service Defendants on October 23, 2024. ECF Nos. 90, 91.

Under the circumstances of this case, this sequence of events was reasonable and diligent. Hague Convention service in China takes approximately 5-12 months to complete. *See* ECF No. 83 at ¶8. As such, it would have been pointless to initiate Hague Service Convention procedures in China that take several months, when Plaintiffs were planning to file their amended complaint and amended summonses. *Stream SICAV v. Wang*, 989 F. Supp. 2d 264, 280 (S.D.N.Y. 2013) (Hague service in China "has been said to take anywhere from four to six months, six to eight months, or six to 18 months," so any attempt by the lead plaintiff to serve earlier complaints "would have been rendered useless by the need to re-serve amended pleadings").

Furthermore, given the several month delay for Hague service in China, the service perfected here on October 23, 2024, was likely faster, at least as to the China-resident Defendants, than if counsel had immediately begun Hague service attempts upon the appointment of the lead plaintiff on July 9, 2024. Notably in this regard, Defendants Kam and Albert Chen declined to provide addresses for service of process until after Plaintiffs had filed their pre-motion letter for alternative service on September 24, 2024 (*see* ECF No. 83 at ¶¶3-4), so it is doubtful that any earlier-initiated service attempts on them would have been successful.

## C.    The Relevant Rule 4(m) Factors Favor A Discretionary Extension

"By authorizing the Court to grant additional time as an alternative to dismissal, providing that any dismissal shall be without prejudice, and affirmatively requiring such extensions where good cause for the dereliction is shown, the Rule [4(m)] provides trial courts with considerable flexibility, and reflects a healthy distaste for dismissing an action based on technical defects in service." *Tishman v. Associated Press*, 2005 WL 3466022, at *1 (S.D.N.Y. Dec. 16, 2005) (extending time to serve to January 17, 2006 where original complaint was filed April 29, 2005, because defendants had actual notice and would not be prejudiced). "As the Second Circuit observed in *Romandette v. Weetabix Co., Inc.*, 807 F.2d 309, 311 (1986), 'Rule 4 of the Federal

Rules is to be construed liberally to further the purpose of finding personal jurisdiction in cases in which the party has received actual notice'." *Rana v. Islam*, 305 F.R.D. 53, 65 (S.D.N.Y. 2015). "Furthermore, '[i]ncomplete or improper service will lead the court to dismiss the action *unless it appears that proper service may still be obtained*'." *Id.* (quoting *Romandette*, 807 F.2d at 311). Discretionary extension "comports with the Second Circuit's clearly expressed preference that litigation disputes be resolved on the merits." *AIG Managed Mkt. Neutral Fund v. Askin Cap. Mgmt., L.P.*, 197 F.R.D. 104, 112 (S.D.N.Y. 2000) (citing *Cody v. Mello*, 59 F.3d 13, 15 (2d Cir. 1995)); *accord Schnall v. Annuity & Life RE Holdings, Ltd.*, 2003 WL 23100326, at *3 (D. Conn. Dec. 13, 2003) (granting extension in securities class action).

In considering whether to exercise discretion to grant an extension of time to serve under Rule 4(m), courts typically consider factors including:

> (1) whether the applicable statute of limitations would bar the refiled action; (2) whether the defendant had actual notice of the claims asserted in the complaint; (3) whether the defendant had attempted to conceal the defect in service; and (4) whether the defendant would be prejudiced by the granting of plaintiff's request for relief from the provision.

*Tastefairy Corp. v. Kumar*, 2019 WL 13220974, at *5 (E.D.N.Y. Oct. 31, 2019); *see also Goldstein v. Laurent*, 2010 WL 4237582, at *4 (S.D.N.Y. Oct. 15, 2010) (analyzing similar factors and granting extension of time to serve). These factors strongly support a finding that alternative service on the foreign-resident defendants was timely.[17] Therefore, the Court should exercise its discretion to retroactively extend Plaintiffs' deadline to serve the Alternative Service Defendants

---

[17] While Defendants have not concealed any service defects, this factor is accordingly neutral and does not weigh against granting an extension. *See Jordan v. Forfeiture Support Assocs.*, 928 F. Supp. 2d 588, 599 (E.D.N.Y. 2013) (lack of concealment merely renders this factor "inapplicable").

to October 23, 2024. *See* ECF No. 91 (October 23, 2024 certificate of service on the alternative service defendants).

While Defendant Kam argues that the time in which to serve cannot be extended retroactively to validate already completed service (Kam Br. at 24), cases holding the contrary abound. *E.g.*, *Ting Qiu Qiu v. Shanghai Cuisine, Inc.*, 2021 WL 185040, at *5 (S.D.N.Y. Jan. 19, 2021) ("Plaintiffs, however, request that the Court accept this service retroactively. Such requests for *nunc pro tunc* extension of service deadlines and acceptance of late service are subject to the same Rule 4(m) standard as other requests to extend a service deadline."); *Chen Lin v. Dolar Shop Rest. Grp., LLC*, 2021 WL 681075, at *3-4 (E.D.N.Y. Feb. 22, 2021) ("Extensions may be granted *nunc pro tunc* . . . I exercise my discretion to extend the time to serve Mr. Li and Shanghai Shenzhuang, *nunc pro tunc*, to December 6, 2019—the date on which service was completed."); *Kriss v. Bayrock Grp. LLC*, 2016 WL 7046816, at *12 (S.D.N.Y. Dec. 2, 2016) (retroactively extending time for service to 90 days after filing of second amended complaint).

In arguing that a discretionary extension is not warranted here, Defendants rely on inapposite cases where the plaintiffs' lengthy delays or outright failures of service bear no resemblance to the reasonable and diligent efforts undertaken by Plaintiffs in the instant action. *E.g.*, *Vaher v. Town of Orangetown*, N.Y., 916 F. Supp. 2d 404, 420 n.11 (S.D.N.Y. 2013) ("there is no record of Plaintiff using any method to serve Hoffman or Sullivan at any point during the two-year period since the Amended Complaint was filed, or of Plaintiff making any effort to even locate or identify the unserved Defendants after receiving a second extension of time to serve"); *Kogan v. Facebook, Inc.*, 334 F.R.D. 393, 398 (S.D.N.Y. 2020) ("Kogan did not serve the Complaint on defendants by" the service deadline, "or, in fact, at any point thereafter"); *Fantozzi v. City of New York*, 343 F.R.D. 19, 30 (S.D.N.Y. 2022) ("Plaintiff's counsel here made no effort

to achieve service (or to seek an extension or waiver) until 205 days after the service deadline for Sclafani, and 213 days after the deadline for Figueroa, Jr. And as detailed above, the Court does not find his excuse for failing to serve convincing."); *Zapata v. City of New York*, 502 F.3d 192, 199 (2d Cir. 2007) (defendant officer had no notice of claims and was served three months after limitations period would have expired, and the plaintiff's explanation to the court for delay was "flatly contradicted by the record"); *Shaw v. Rolex Watch U.S.A., Inc.*, 745 F. Supp. 982, 986 (S.D.N.Y. 1990) (service three years after filing of complaint); *Ferreira v. Carranza*, 2022 WL 34610, at *3 (E.D.N.Y. Jan. 4, 2022) ("the Court is not concerned about Plaintiff being deprived of 'her day in court' on meritorious claims" where "the instant action represents plaintiff's fourth attempt to present an issue that has been denied by the Court three times. This is unacceptable.").

### 1.    The Statute Of Limitations Would Likely Bar A Refiled Action

If the Court were to dismiss without prejudice and Plaintiffs had to re-file this action and begin service again, the subsequently filed action would likely be time-barred. Plaintiffs' securities fraud claims must be brought within "2 years after the discovery of the facts constituting the violation." 28 U.S.C. § 1658(b). On September 22, 2022 Blue Ocean revealed unlawful payments from GCBC to a company affiliated with Defendant Kam and Golden Meditech (*see* ¶55), and the Cayman Grand Court detailed evidence that the bank statement relied on by Defendant Albert Chen to show GCBC's payment of $664 million in the Cellenkos transaction was forged (*see* ¶¶71-75). *See infra* Part V.2. As this Court has noted, the statute of limitations would bar a re-filed action "is substantial prejudice to the plaintiff, and courts generally prefer to resolve disputes on their merits." *De La Rosa v. New York City 33 Precinct*, 2010 WL 1737108, at *7 (S.D.N.Y. Apr. 27, 2010); *see also* 4B Charles Alan Wright & Arther R. Miller, *Federal Practice & Procedure* § 1137 (4th ed. 2024) ("Of these factors, courts place the most emphasis on a statute of limitations

bar."); Fed. R. Civ. P. 4(m) advisory committee's note to 1993 amendment ("Relief may be justified, for example, if the applicable statute of limitations would bar the refiled action").

"Courts have consistently considered the fact that the statute of limitations has run on a plaintiff's claim as a factor favoring the plaintiff in a Rule 4(m) analysis," because "dismissal under these circumstances would extinguish potentially meritorious claims without there being an opportunity to have them adjudicated on the merits." *AIG*, 197 F.R.D. at 109–10.

### 2.    Defendants Promptly Had Actual Notice Of This Case

"The fact that [defendant] had actual notice that an action was filed against it militates against a finding of prejudice since the 'core function' of service is to supply notice in a manner and at a time that afford the defendant a fair opportunity to answer the complaint and present defenses and objections." *Id.* at 111. Here, the foreign Defendants had actual notice of this action no later than June 17, 2024 (56 days after this action was initiated by different plaintiffs with different counsel, *see* ECF No. 1), when the Director Defendants filed a letter about this action in the related derivative action. *See MW Gestion v. Cellenkos Inc.*, Index No. 653598/2023, NYSCEF Doc. No. 323 (Sup. Ct. N.Y. Cnty) (the "Derivative Action"). Any possible prejudice to Defendants is thus minimized, because they promptly had notice of this action and have been represented by at all times by U.S. counsel. *Goldstein*, 2010 WL 4237582, at *4 ("the prejudice to the defendant here is slight, as he is represented by counsel and appears to have had actual notice of the complaint.").

### 3.    Defendants Would Not Be Prejudiced By An Extension

An extension will not prejudice Defendants. Prejudice for purposes of Rule 4(m) "involves impairment of the defendant's ability to defend on the merits, rather than merely foregoing such a procedural or technical advantage." *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Barney Assocs.*, 130 F.R.D. 291, 294 (S.D.N.Y. 1990). The mere "obligation to defend this lawsuit if the extension

is granted . . . does not rise to the level of prejudice." *Tastefairy Corp.*, 2019 WL 13220974, at *6; *AIG*, 197 F.R.D. at 111 ("If DLJ is purporting to assert that not permitting it to take advantage of an expired statute of limitations is itself a form of prejudice, that contention is erroneous"); *Hollomon v. City of New York*, 2006 WL 2135800, at *4 (E.D.N.Y. July 31, 2006) ("A court should not refuse to extend the time of service simply so that the defendant can benefit from the time-bar.").

The Officer Defendants argue that they would be prejudiced by extending the time that they have to collect evidence beyond the expiration of the statute of limitations (Officers' Br. at 12), but that is incorrect for two reasons. First, as shown below in Part V.2, the statute of limitations did not expire here until, at the earliest, September 22, 2024, whereas Defendants had actual notice of this action since no later than June 17, 2024. Second, the facts at issue in this case have been the subject of multiple lawsuits around the world involving the Defendants since almost immediately after the announcement of the Cellenkos transaction in April 2022. As this Court observed in *De La Rosa*, while the passage of time from accrual may prejudice defendants because "evidence may be lost and recollections can grow weak," the circumstances of that case (involving a DEA agent's discharge of a firearm during an attempted arrest, which was "likely to leave a lasting impression in the minds of the individuals involved" and "bound to leave a paper trail") diminished the potential for such prejudice. 2010 WL 1737108, at *7. So too here, stealing over $600 million and attempting to cover up the theft in a sham transaction are memorable events that are "bound to leave a paper trail." Because these events have been the subject of ongoing litigation for more than two years, document evidence and witness recollections have presumably already been collected and preserved, alleviating any potential prejudice.

While the Officer Defendants argue that they would be prejudiced because their right to repose with respect to the alleged false statements from 2019 would be violated by an extension of time to serve (Officers' Br. at 12-13), "relation back does not offend the Rules Enabling Act when a plaintiff merely seeks to amend a timely filed complaint without adding entirely new claims or parties. This is because a defendant does not have a vested right to repose as to a plaintiff who sues before the deadline so long as the plaintiff's action is pending." *Se. Pennsylvania Transportation Auth. v. Orrstown Fin. Servs. Inc.*, 12 F.4th 337, 352 (3d Cir. 2021). Regardless, even if the 2019 false statements were barred by the 5-year statute of repose (they are not), the remedy would be to dismiss claims with respect to those particular statements, not to effectively dismiss the entire case for failure to timely serve.

### 4.     Additional Considerations Further Weigh In Favor Of An Extension

Other factors weigh in favor of a discretionary extension here. First, as shown above (*see supra* Part IV.B), Plaintiffs have acted reasonably and diligently under the circumstances of this case. Second, as shown below in Part V.2, the Amended Complaint would have been timely-filed under the statute of limitations even if it had been the initial complaint, and service of the Amended Complaint was perfected 33 days after its filing. While the filing of an amended complaint does not restart the 90-day period of Rule 4(m), the combination of the Amended Complaint's timeliness and prompt service should favor a discretionary extension. Third, as stated in the Fed. R. Civ. P. 4(m) advisory committee's note to the 2015 amendment, which reduced the time to serve from 120 to 90 days, "[s]hortening the presumptive time for service will increase the frequency of occasions to extend the time. More time may be needed, for example, when a request to waive service fails, [or] a defendant is difficult to serve." Both of those conditions are present here where Plaintiffs requested but were refused service waivers, and the foreign-resident Defendants would be difficult to serve through Hague Service Convention procedures.

Fourth, the delay and uncertainty inherent in the PSLRA lead plaintiff appointment process has been found to weigh in favor of extending the time for service under Rule 4(m).[18] The case of *In re Comverse Technology, Inc. Securities Litigation* is instructive. There, in a report and recommendation, Judge Reyes considered the interplay between Rule 4(m)'s then 120-day limit and the PSLRA, reasoning that the length of the lead plaintiff appointment process, and the fact that the lead plaintiff "inherited the original complaints' defective service," weighed in favor of extending the time to serve. *In re Comverse Tech., Inc. Sec. Litig.*, 1:06-cv-01825, ECF No. 135 at 24 (E.D.N.Y. Oct. 31, 2007), filed herewith as PX J; *see also id.* at 32.[19]

Judge Reyes recommended authorizing and accepting as timely re-service to correct the attempted service on the foreign-resident defendant Alexander, although it had occurred on June 12, 2007, or 102 days after appointment of the lead plaintiff on March 2, 2007. *Id.* at 22-30; *id.* at 14 n.8; *id.* at 17. Judge Reyes also recommended treating as timely the plaintiffs' service on the U.S.-resident defendants Sorin (40 days after lead plaintiff appointment) and Kreinberg (103 days after lead plaintiff appointment). *Id.* at 30-35; *id.* at 16-17; *see also id.* at 35 ("In similar settings to this case, where plaintiffs in a consolidated Rule 10b-5 action had failed to serve process within Rule 4(m)'s 120-day service window, courts have exercised their discretion and declined to dismiss the complaint.").

---

[18] Under the PSLRA, the initial plaintiff is to publish, "not later than 20 days after the date on which the complaint is filed," notice to the class of the action's pendency and that "not later than 60 days after the date on which the notice is published, any member of the purported class may move the court to serve as lead plaintiff." 15 U.S.C. § 78u–4(a)(3)(A)(i). Then, "[n]ot later than 90 days after the date on which a notice is published," the court shall consider any such motions and appoint a lead plaintiff. 15 U.S.C. § 78u–4(a)(3)(B).

[19] Although the time to serve had already expired when the *Comverse* lead plaintiff was appointed, its reasoning remains applicable to the facts of the instant case where the Court appointed the Lead Plaintiff with 12 days remaining in the original Rule 4(m) period. In the instant case Plaintiffs served the Alternative Service Defendants on October 23, 2024, or 106 days after the Court issued its lead plaintiff order on July 9, 2024, a length of time similar to that approved in *Comverse*.

When the *Comverse* defendants objected to Judge Reyes' report and recommendation, Judge Garaufis in large part upheld its conclusions as to service. *In re Comverse Tech., Inc. Sec. Litig.*, 543 F. Supp. 2d 134 (E.D.N.Y. 2008). Specifically, the court held that discretionary extensions of the service deadline were warranted as to each of Kreinberg, Sorin, and Alexander, reasoning that much of the plaintiffs' claims would be time-barred if dismissed, defendants did not dispute having actual notice, and an extension would not prejudice defendants. *Id.* at 146-48. Judge Garaufis likewise found that the delay and uncertainty of the PSLRA lead plaintiff appointment process "weigh[ed] in favor of granting discretionary relief." *Id.* at 147. The court approved as timely the plaintiffs' re-service of defendant Alexander pursuant to Rule 4(f)(3) that was "made in November, 2007," *i.e.*, at least 244 days after the appointment of the lead plaintiff. *Id.* at 148.

Similarly, in *Wang Yan v. ReWalk Robotics Ltd.*, 2018 WL 1041541 (D. Mass. Feb. 23, 2018) the court noted "some tension between the requirements of Fed. R. Civ. P. 4(m) (which requires that service be made within 90 days) and those of the PSLRA (which provides a relatively lengthy period of time for appointment of a lead plaintiff)," and granted an extension where "[s]ervice of the individual domestic defendants was finally accomplished . . . 203 days after the filing of the complaint," and 74 days after the lead plaintiff was appointed. *Id.* at *2-3.

In light of the traditional factors for exercise of the court's discretion under Rule 4(m), as well as the foregoing additional considerations, all of which favor extension, Plaintiffs respectfully request that the Court exercise its discretion to retroactively extend their deadline to serve the Alternative Service Defendants to October 23, 2024.

**V.    The Amended Complaint Is Not Time Barred**

**1.    This Action Remains Timely Filed If The Court Grants An Extension For Service**

Golden Meditech argues that the Amended Complaint is not timely because "Plaintiffs' failure to serve the original complaint on Golden Meditech means that the filing of the original complaint in April 2024 did not toll the two-year statute of limitations for their claims." Golden Meditech Br. at 7. But this argument can only apply if the Court declines to grant an extension of time to serve. If the Court grants an extension, this defeats Golden Meditech's argument. Golden Meditech cites to *Zapata*, but that case supports Plaintiffs, as it held that "if the plaintiff's action is *dismissed* for a failure to serve within 120 days, the governing statute of limitations again becomes applicable." 502 F.3d at 194.

Golden Meditech relies on *Frasca v. United States*, 921 F.2d 450 (2d Cir. 1990), but that case does not hold that a complaint must be dismissed on statute of limitation grounds even if an extension of the time to serve is granted. Rather, *Frasca* found that dismissal was required because an extension of time to serve was not warranted, not because the statute of limitations had run. *Id.* at 453. In *In re Steward*, 2017 WL 4457406, at *1 (Bankr. D.D.C. Sept. 29, 2017), as here, "[t]he defendant contend[ed] that failure to have made service within the 90–day period of Fed. R. Civ. P. 4(m) made pursuit of the complaint untimely once that 90–day period expired, citing *Frasca*." The court in *Steward* rejected that argument, reasoning that "*Frasca* does not support that argument, but only stands for the proposition that if dismissal is mandated under Rule 4(m), then the statute of limitations becomes applicable again, upon dismissal of the action, as though no action had been filed," and that "[b]ecause dismissal under Rule 4(m) is not warranted here, the holding in *Frasca* has no applicability."

Golden Meditech also cites *Veon*, 2018 WL 4168958, at *11, which itself quotes *Frasca*, but in *Veon* the court only went on to analyze whether the statute of limitations had run *after* determining that an extension of time to serve was not warranted. *See id.* at *7-11. Like *Frasca*, the court in *Veon* did not hold that a complaint must be dismissed on statute of limitations grounds even if an extension of the time to serve is granted.

As the Supreme Court has held, "[i]n a suit on a right created by federal law, filing a complaint suffices to satisfy the statute of limitations." *Henderson v. United States*, 517 U.S. 654, 657 n.2 (1996). "The Federal Rules thus convey a clear message: Complaints are not to be dismissed if served within 120 days, *or within such additional time as the court may allow*." *Id.* at 663. Other courts have held the same. *E.g.*, *AIG*, 197 F.R.D. at 112 ("Because the AIG Plaintiffs' motion will be granted, the DLJ's motion to dismiss is moot to the extent that it contends that the AIG Plaintiffs, if forced to refile, would be barred from proceeding based on a six-year statute of limitations."); *Hayes v. Dep't of Educ. of City of New York*, 20 F. Supp. 3d 438, 440 and 445 (S.D.N.Y. 2014) (where the court granted "an extension to serve Defendant, as is permitted by Rule 4(m)," through April 22, 2013, "the statute of limitations was tolled from the time Plaintiff first filed her qui tam complaint until April 22, 2013," and "no claim actually pleaded in the Amended Complaint would be time-barred, if timely when the original sealed complaint was filed").

## 2. The Amended Complaint Was Filed Before The Two-Year Limitations Period Expired

For claims under Exchange Act Section 10(b), the applicable statute of limitations is supplied by 28 U.S.C. § 1658(b). For such claims "a cause of action accrues (1) when the plaintiff did in fact discover, or (2) when a reasonably diligent plaintiff would have discovered, 'the facts constituting the violation'—whichever comes first." *Merck & Co. v. Reynolds*, 559 U.S. 633, 637

(2010). "[T]he "facts constituting the violation" include the fact of scienter." *Id.* "[U]nless a §

10(b) plaintiff can set forth facts in the complaint showing that it is 'at least as likely as' not that

the defendant acted with the relevant knowledge or intent, the claim will fail," so the limitations

period does not begin running until plaintiffs can make such a showing. *Id.* at 649. As such, the

limitations period does not run from "a time when the facts would have prompted a reasonably

diligent plaintiff to begin investigating," but only when "a reasonably diligent plaintiff would have

discovered 'the facts constituting the violation,' including scienter." *Id.* at 653.

Applying *Merck*, the Second Circuit has held that "the limitations period commences not

when a reasonable investor would have begun investigating, but when such a reasonable investor

conducting such a timely investigation would have uncovered the facts constituting a violation."

*City of Pontiac Gen. Employees' Ret. Sys. v. MBIA, Inc.*, 637 F.3d 169, 174 (2d Cir. 2011). As

such, "a securities fraud statute of limitations cannot begin to run until the plaintiff discovers—or

a reasonably diligent plaintiff would have discovered—the facts constituting scienter." *Id.*

Therefore, "a fact is not deemed 'discovered' until a reasonably diligent plaintiff would have

sufficient information about that fact to adequately plead it in a complaint. In other words, the

reasonably diligent plaintiff has not 'discovered' one of the facts constituting a securities fraud

violation until he can plead that fact with sufficient detail and particularity to survive a 12(b)(6)

motion to dismiss." *Id.* at 175.

Here, a reasonably diligent plaintiff would not have had sufficient information to defeat a

motion to dismiss with respect to scienter for the claims presented here until, on September 22,

2022 Blue Ocean revealed unlawful payments from GCBC to a company affiliated with Defendant

Kam and Golden Meditech (*see* ¶55), and the Cayman Grand Court detailed evidence that the bank

statement relied on by Defendant Albert Chen to show GCBC's payment of $664 million in the

Cellenkos transaction was forged (*see* ¶¶71-75). At this point, the limitations period likely began to run. *See Intesa Sanpaolo, S.p.A. v. Credit Agricole Corp. & Inv. Bank*, 924 F. Supp. 2d 528, 535-36 (S.D.N.Y. 2013) (statute of limitations on Exchange Act claims did not begin to run until plaintiffs could show scienter through defendants' emails published in related litigation, notwithstanding earlier publication of articles revealing certain facts relevant to scienter).[20]

Prior to September 22, 2022 the publicly available information showed that the Cellenkos transaction was disadvantageous to GCBC, reached through a rushed process, and suffered from conflicts of interest. This information represented the materialization of risks concealed by Defendants and caused declines in GCBC's stock price, but that alone did not begin the running of the limitations period. *See Valentini v. Citigroup, Inc.*, 837 F. Supp. 2d 304, 321 (S.D.N.Y. 2011) (statute of limitations on Exchange Act claims did not begin to run when plaintiffs sustained losses on their investments).

Therefore, the limitations period likely began running on September 22, 2022, and the Amended Complaint filed on September 20, 2024, would therefore have been timely even without regard relation back or an extension of Plaintiffs' time to serve.

## VI.    Plaintiffs Request Leave To Amend, If Necessary

If the Court grants any part of Defendants' motion, Plaintiffs respectfully request leave to amend. *See* Fed. R. Civ. P. 15(a)(2). While Plaintiffs recognize that they could have sought leave

---

[20] While insiders with special access to information may have uncovered these facts earlier, that would also fail to show that such information was available to reasonable investors so as to commence the limitations period. *See In re Peabody Energy Corp. Sec. Litig.*, 2022 WL 671222, at *11 (S.D.N.Y. Mar. 7, 2022) ("That Peabody's employees, its contractors and mine inspectors, all with special access to the NGM, knew of certain potential hazards does not establish as a matter of law that through the exercised of diligence a reasonably investor without equivalent access would have known or could have known essentially the same information.").

to amend in response to Defendants' pre-motion letters and motions, and that the Court set a deadline of February 14, 2024 to move to amend (ECF No. 113), for the reasons set forth *supra* Plaintiffs do not believe Defendants' arguments warrant dismissal. Because this is the first time that the Court has evaluated Plaintiffs' allegations, they request an opportunity to address any deficiencies identified by the Court. *See Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 190 (2d Cir. 2015) ("[w]ithout the benefit of a ruling, many a plaintiff will not . . . be in a position to weigh the practicality and possible means of curing specific deficiencies").

## **CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully request that the Court deny Defendants' motions in their entirety.

Dated: February 28, 2025

By: */s/ Garth Spencer*
**GLANCY PRONGAY & MURRAY LLP**
Robert V. Prongay
Garth Spencer (GS-7623)
Christopher Fallon (*admitted pro hac vice*)
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160

Gregory B. Linkh (GL-0477)
230 Park Ave., Suite 358
New York, NY 10169
Telephone: (212) 682-5340
Facsimile: (212) 884-0988
glinkh@glancylaw.com

*Lead Counsel for Lead Plaintiff Alessandro Somansino, Named Plaintiff Mark Lewko, and the Putative Class*

## **CERTIFICATE OF COMPLIANCE WITH LOCAL CIVIL RULE 7.1**

The foregoing memorandum contains 23,160 words, excluding the caption, table of contents, table of authorities, signature blocks, and this certificate. On December 3, 2024, the Court so ordered (ECF No. 115) the Parties' stipulation authorizing Plaintiffs to "file a single consolidated opposition to all motions to dismiss, the length of which shall not exceed the total number of pages of Defendants' supporting briefs." Defendants have filed a total of 112 pages of briefing. Therefore, the foregoing memorandum complies with Local Civil Rule 7.1(c) and the Court's order.

Dated: February 28, 2025                          */s/ Garth Spencer*
                                                  Garth Spencer

**PROOF OF SERVICE**

I, the undersigned say:

I am not a party to the above case and am over eighteen years old.

On February 28, 2025, I served true and correct copies of the foregoing document, by posting the document electronically to the ECF website of the United States District Court for the Southern District of New York, for receipt electronically by the parties listed on the Court's Service List.

I affirm under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on February 28, 2025.


*s/ Garth Spencer*
Garth Spencer