# PX J

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-----------------------------------------------------------X

In re COMVERSE TECHNOLOGY, INC.        **REPORT & RECOMMENDATION**
SECURITIES LITIGATION.                 06-CV-1825 (NGG)(RER)


-----------------------------------------------------------X

**RAMON E. REYES, JR., U.S.M.J.:**

Before the Court is a class action lawsuit brought by lead plaintiffs Menorah Insurance

Co., Ltd. and Mivtachim Pension Funds, Ltd. (collectively "Menorah Group") on behalf of

stockholders of Comverse Technology, Inc. ("Comverse" or "company") for violations of § 10(b)

of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder; § 20(a) of the

Securities Exchange Act of 1934; and § 14(a) of the Securities Exchange Act of 1934 and Rule

14a promulgated thereunder.  These claims relate to an alleged stock option backdating scheme

perpetuated by the named individual defendants and Comverse.  On August 16, 2006, the

Honorable Nicholas G. Garaufis referred this consolidated class action complaint to the Court.

(Docket Entry 39.)  Defendants Jacob "Kobi" Alexander ("Alexander"), David Kreinberg

("Kreinberg"), William F. Sorin ("Sorin"), John H. Friedman ("Friedman"), Sam Oolie

("Oolie"), Ron Hiram ("Hiram") and Comverse each move to dismiss Menorah Group's

consolidated amended complaint.  For the reasons set forth below, I respectfully recommend that

these motions be granted in part and denied in part.

I.        BACKGROUND

The facts in this case are not in serious dispute and have already been recounted in large

part in previous and concurrent opinions.  Certain facts are repeated again here because they are

relevant to the underlying claims and motions addressed herein.

A.    The Parties to This Action

Comverse is a computer and telecommunications corporation based in New York City. (Consolidated Am. Compl. ("Compl.") ¶¶ 20, 28.) Plaintiffs are purchasers of Comverse common stock between April 30, 2001 and November 14, 2006 ("Class Period"). (*Id.* ¶ 1.) Lead plaintiff Menorah Group purchased common stock and held those shares through the end of the Class Period. (*Id.* ¶ 18.) Class action representative plaintiff Steven B. Prystowsky purchased 500 shares of Comverse common stock on May 18, 2001 and held them through the end of the Class Period. (*Id.* ¶ 19; *see also id*. at 82-83.)

Each of the named defendants served as an executive for Comverse during some or all of the Class Period. Alexander was Chairman of the Board of Directors and the Chief Executive Officer. (*Id.* ¶ 21.) Kreinberg acted as Chief Financial Officer and, starting in 2002, also as the company's Vice President of Finance. (*Id.* ¶ 22.) Sorin was Comverse's General Counsel, Corporate Secretary and a member of the Board of Directors. (Mem. of Law of Defs.' Friedman and Oolie in Supp. of Their Mot. to Dismiss the Consolidated Am. Compl. 3-4.) On May 1, 2006, Alexander, Krienberg and Sorin resigned from Comverse. (Compl. ¶¶ 21-23.)

Oolie, Friedman and Hiram each served on the Board of Directors starting in May 1986, June 1994 and June 2001, respectively. (*Id.* ¶¶ 24-26.) Oolie, Friedman and Hiram also served as members of the company's Audit Committee and Compensation Committee, with Oolie acting as Chairman of the Audit Committee and Friedman acting as Chairman of the Compensation Committee. (*Id.*)

B.    The Alleged Backdating Scheme

Beginning at least in 1997, Comverse issued stock options to its employees as a means to compensate those employees and align their interests with that of the company.[1]  (*Id.* ¶¶ 31-33.) Menorah Group claims that, during the Class Period, Comverse stock options generally vested over a four-year period.  (*Id.* ¶ 33.)  Comverse's Compensation Committee was given the authority to issue stock options either by holding a meeting or through a unanimous written consent order in lieu of a meeting.  (*Id.* ¶¶ 37-39.)  Menorah Group alleges that all Comverse stock options during the Class Period were issued via unanimous written consent orders.  (*Id.* ¶ 40.)  Consistent with Comverse's charter, the Compensation Committee had sole authority to select employees who would receive options, to determine the number of options these employees would receive and to establish the exercise price of each stock option.  (*Id.* ¶ 38.)

Comverse stock options were granted via Stock Incentive Compensation Plans ("Plans") drafted by Sorin, approved by the Compensation Committee and then approved by shareholders through a proxy vote.  (*Id.* ¶ 31.)  Four such Plans were adopted in 1997, 1999, 2000 and 2001. (*See* Decl. of David A. Landman in Supp. of Oolie and Friedman's Mot. to Dismiss the

---

[1] Stock options allow a holder to purchase shares of company stock at the so-called "exercise price" regardless of the actual stock price at the time the option is exercised.  (*See* Compl. ¶ 29.)  The exercise price is, in turn, determined by the closing price of the stock on the "grant date." (*See id*.)  When the stock price at the time the option is exercised is greater than the exercise price, the holder receives a windfall equal to the difference between the two prices.  This creates an incentive for the holder to increase the stock price, thus aligning the employee's interests with that of shareholders.

It should be noted that employees who exercised Comverse stock options could elect to simply receive their windfall in cash.  (*See* Decl. of David A. Landman in Supp. of Friedman and Oolie's Mot. to Dismiss the Consolidated Am. Compl. ("Landman Decl.") Ex I, ¶ 8.6.)  Such cash payments are a common and accepted corporate accounting practice.  *See* ACCOUNTING PRINCIPLES BOARD, OPINION 25: ACCOUNTING FOR STOCK ISSUED TO EMPLOYEES ¶ 18 (1972).

-3-

Consolidated Am. Compl. ("Landman Decl.") Exs. F, G, H, I.)  Each Plan was nearly identical and stipulated that the exercise price of stock options must not be "less than the Fair Market Value of a share of Common Stock on the date of grant." (*See, e.g.*, *id*. Ex. I, ¶ 8.2.)  Fair Market Value was defined as the closing price of common stock on a given date.  (*See, e.g.*, *id.* Ex. I ¶ 2.13.)

Menorah Group alleges that, rather than follow these stated practices, defendants instead awarded stock options through October 2001 with exercise prices that were below the closing price on the date the options were granted.  (Compl. ¶ 47.)  Menorah Group claims that Alexander and/or Kreinberg would pick past dates when Comverse shares had closed at favorably low prices, thus creating an "instantaneous paper profit." (*Id.* ¶¶ 30, 47.)  Alexander and/or Kreinberg allegedly would direct Sorin to draft unanimous consent forms containing grant dates that were "as of" the selected past date.  (*Id.* ¶¶ 47-48.)  The unanimous consent forms were then given to the Compensation Committee for their approval and signature.  (*Id.* ¶¶ 47, 49.)

If Menorah Group's allegations are true, than what might appear to be a small accounting discrepancy had a dramatic impact on Comverse's compensation expenses.  In 2001 alone, Menorah Group alleges that over 9.4 million stock options were given to employees.  (*Id.* ¶ 53.)  By purportedly selecting an "as of" grant date when Comverse stock traded at a low price, this created excess compensation expenses of over $44.5 million in the aggregate that year.  (*Id.*)

Menorah Group claims that defendants were among those who directly profited from the scheme.  Of the 2001 grants, Menorah Group claims that Alexander received 600,000 options, with an excess profit of over $2.8 million; Kreinberg received 125,000 options, with an excess

-4-

profit of $590,000; and Sorin received 27,000 options, with an excess profit of $127,440.[2]  (*Id*.)

Menorah Group also alleges that, during the Class Period, Friedman sold 35,000 Comverse shares worth over $830,000, Hiram sold 44,000 Comverse shares for over $1,090,000, and Oolie sold 81,000 Comverse shares for over $1,800,000.  (*Id*. ¶¶ 24-26.)  Menorah Group does not allege that these shares were issued via stock options, only that their sale prices were "inflated by the fraudulent scheme."  (*Id*.)

Menorah Group claims that Alexander and Kreinberg also created a "slush fund" with which to bestow stock options on employees after the Compensation Committee had approved grants for that year.  (*Id*. ¶ 54.)  This slush fund was allegedly created by providing a list of fictitious recipients to the Compensation Committee.  (*Id*.)  Menorah Group claims that all of the fictitious names listed the home address of Alexander's assistant.  (*Id*. ¶ 55.)  These fictitious names were purportedly stored on Comverse's database in files named "I.M. Phantom"[3] and later "Fargo."  (*Id*. ¶ 55.)  Menorah Group alleges that, between 1999 and 2002, Alexander distributed approximately 175,000 stock options from this account.  (*Id*. ¶ 56.)

---

[2] Menorah Group alleges that defendants' backdating scheme started at least as early as 1994.  (Compl. ¶ 53.)  Menorah Group claims that during the Class Period, defendants understated Comverse's compensation expenses by at least $192 million.  (*Id*. ¶¶ 58-59.)  This amount is equal to the minimum amount of all improperly backdated stock options, including some options that were granted before the Class Period.  (*Id*.)

In 1998 and 1999, Menorah Group claims that defendants granted over 7.5 million backdated options that created an excess profit of nearly $180 million.  (*Id*. ¶ 53.)  Of these grants, Menorah Group alleges that Alexander received over one-million options, with an excess profit of over $19 million; Kreinberg received 82,500 options, with an excess profit of over $1.8 million; and Sorin received 87,500 options, with an excess profit of over $1.77 million.  (*Id*.)

[3] It appears that the file might have actually been named "I.M. Fantom."  *See* Complaint ¶ 75, *SEC v. Alexander et al.*, No. 06-CV-3844 (NGG)(RER) (E.D.N.Y. Aug. 9, 2006).

In addition to backdating stock options, Menorah Group alleges that defendants committed additional accounting irregularities.  (*Id*. ¶ 57.)  Referred to as "Additional Accounting Claims" in Menorah Group's amended complaint, these claims include "premature recognition of revenue on certain contracts with customers; improper classification of certain expenses; and improper treatment of tax deferral accounts."  (*Id*. ¶ 57, 171-72.)  Menorah Group alleges that defendants used these accounting irregularities to artificially inflate Comverse's stock price to benefit option holders when they sold their stock.  (*Id*. ¶ 201; *see also* Pls.' Omnibus Mem. in Opp'n to Defs.' Mot. to Dismiss 18.)

C.    Defendants' Accounting of Stock Options and Public Disclosures

Menorah Group claims that defendants' issuance of stock options was guided by a number of generally accepted accounting principles ("GAAP").  (Compl. ¶¶ 41-46.)  The first of these guidelines is ACCOUNTING PRINCIPLES BOARD, OPINION 25: ACCOUNTING FOR STOCK ISSUED TO EMPLOYEES (1972) ("APB No. 25 ").  Under APB No. 25, compensation expenses relating to stock options should be accounted during the period in which the options vest.  *See* APB No. 25 ¶¶ 12-15.  Menorah Group claims that options-related compensation expenses should therefore be "amortized . . . evenly over the vesting period."  (Compl. ¶ 42.)  Further, under APB No. 25, such expenses create an offset in the corporation's income tax.  *See* APB No. 25 ¶¶ 16-17.  Due to the diminished income tax reduction, any payment to an employee relating to the exercise of an option, whether cash or otherwise, should thus be accounted as an expense. *See id*. ¶ 18.  According to Menorah Group, this means that proper accounting of stock options should create "two offsetting entries in the balance sheet: a deferred tax asset equal to the

lowered tax due to the compensation expense and an offsetting increase in the shareholder equity." (Compl. ¶ 42.)

Menorah Group claims that defendants were also guided by FINANCIAL ACCOUNTING STANDARDS BOARD, STATEMENT OF FINANCIAL ACCOUNTING STANDARDS NO. 123 (1995), *available at* www.fasb.org/pdf/fas123.pdf ("SFAS No. 123"). Under SFAS No. 123, the "grant date" for stock options is the "date at which an employer and an employee have a mutual understanding of the terms of a stock-based compensation award." SFAS No. 123 at 119. This is consistent with other GAAP. *See* APB No. 25 ¶ 10(b) (noting that the measurement date for compensation costs of stock options is typically "the date an option . . . is granted . . . to an individual employee"); FINANCIAL ACCOUNTING STANDARDS BOARD, INTERPRETATION NO. 44: ACCOUNTING FOR CERTAIN TRANSACTIONS INVOLVING STOCK COMPENSATION, AN INTERPRETATION OF APB OPINION NO. 25 (2000), *available at* www.fasb.org/pdf/fin%2044.pdf (noting that, for stock option plans requiring shareholder approval, awards "shall not be deemed granted" until shareholder approval is obtained). Thereafter, the employer is "contingently obligated on the grant date to issue equity instruments or transfer assets to employees who fulfill vesting requirements." SFAS No. 123 at 119.

Menorah Group alleges that, throughout the Class Period, Comverse issued financial statements that represented compliance with the above-mentioned accounting practices.[4] (Compl. ¶¶ 58, 64-151.) Menorah Group alleges that proper accounting of any excess

---

[4] Both SFAS 123 and APB 25 have since been superceded by an updated version of SFAS 123 that places even greater emphasis on basing options on the actual grant date. *See* FINANCIAL ACCOUNTING STANDARDS BOARD, STATEMENT OF FINANCIAL ACCOUNTING STANDARDS NO. 123 at ii (rev. 2004), *available at* www.fasb.org/pdf/fas123r.pdf.

compensation created through the backdating scheme should have been disclosed as an expense and apportioned pro rata over the options' four-year vesting period.  (*Id.* ¶¶ 58-59.)

Instead, Menorah Group claims that Comverse's disclosures: (1) misrepresented that options were approved at "market prices;" (2) failed to disclose that options had not been accounted according to GAAP; (3) understated compensation to the individual defendants; (4) failed to disclose that compensation was the result of collusion with the Compensation Committee; (5) failed to disclose that the stated purpose of issuing options to align employee interests with shareholders had been negated; (6) failed to disclose that options were granted to fictitious employees; and (7) falsely certified financial statements under the Sarbanes-Oxley Act of 2002 ("SOX").  (*Id.* ¶¶ 61-62.)  Menorah Group alleges that the purpose of defendants' false disclosures "was to inflate Comverse's reported results while illegally enriching the [individual defendants] and a vast number of Company employees."  (*Id*. ¶ 58.)

Menorah Group devotes considerable space in their complaint to recounting Comverse's financial disclosures between 2001 and 2005.  (*Id.* ¶¶ 64-151.)  On April 30, 2001, and for each subsequent year, Comverse filed 10-K statements for fiscal years ending on January 31.  (*Id.* ¶¶ 65-69, 89-94, 109-14, 124-28, 138-42; *see also* Decl. of Shaheen Rushd in Supp. of Lead Pl.'s Opp'n to Defs.' Mot. to Dismiss ("Rushd Decl.") Exs. 2, 3.)  Menorah Group alleges that each 10-K statement: (1) understated compensation expenses created by the backdating scheme; (2) misrepresented that stock options were granted at fair market value on the date of grant; (3) misstated expenses due to the Additional Accounting Claims; and (4) was signed by each of the

individual defendants.[5]  (Compl. ¶¶ 65-69, 89-94, 109-14, 124-28, 138-42.)  Similarly, Menorah Group claims that Comverse's quarterly 10-Q statements, which were released in June, September and December of each year: (1) misstated Comverse's compensation expenses; and (2) were affected by the Additional Accounting Claims.  (*Id*. ¶¶ 80-88, 95-108, 115-23, 129-37, 143-51.)

Menorah Group further alleges that Comverse released proxy statements in June 2001 and October 2002 that: (1) understated compensation expenses; (2) misrepresented that stock options were granted at fair market value on the date of grant; (3) misstated that the purpose of the options was to align the interests of employees with stockholders; and (4) were signed by Sorin as Secretary for Comverse.  (*Id.* ¶¶ 70-79, 109-14.)  In addition, starting in September 2002, Comverse included SOX certifications with all of its financial disclosures.  (*See*, *e.g.*, *id*. ¶ 100.)  Menorah Group alleges that these statements, which were each signed by Alexander and Kreinberg, were false and misleading.  (*See, e.g.*, *id*. ¶ 101.)

Several years later, on March 14, 2006, Comverse issued a press release stating that it had created a special committee of outside directors and independent legal counsel to examine "the accuracy of the stated dates of option grants and whether all proper corporate procedures were followed."  (*Id*. ¶ 152.)  The release also noted that Comverse might be restating its past financial statements.  (*Id*.)  In response to this announcement, Menorah Group alleges that Comverse's stock price fell by $4.30 per share, to $24.85 per share.  (*Id*. ¶ 154.)

---

[5] Hiram, who joined Comverse's board in June 2001, did not sign the 2001 10-K statement.  (*See* Rushd Decl. Ex. 3 at 73.)

Approximately one month later, on April 17, 2006, Comverse issued a press release stating that it would in fact be restating its financial results for fiscal years 2001 through 2005. (*Id.* ¶ 157.)  This statement was based on the special committee's conclusion that the actual dates of certain options "differed from the recorded grant dates for such awards." (*Id.*)  As a result, the press release warned that investors should no longer rely on any related financial statements made by Comverse. (*Id.*)  At the same time, the release stated that Comverse thought that any future restatements would "not . . . have a material impact" on the company's revenues and expenses. (*Id.* ¶ 158.)  Menorah Group alleges that the next day, on April 18, 2006, Comverse shares further fell to $22.94 per share. (*Id.* ¶ 159.)

On May 4, 2006, Comverse disclosed that it had been subpoenaed by the Department of Justice. (*Id.* ¶ 162.)  On June 12, 2006, Comverse announced that, due to its ongoing internal investigation, the company would be delaying release of its June 2006 10-Q filing. (*Id.* ¶ 164.)  As a result, Comverse warned investors that its stock could be delisted from the NASDAQ. (*Id.*)  Menorah Group claims that as a result of these disclosures, Comverse's stock price fell to $20.48 on June 12, 2006. (*Id.* ¶¶ 154, 164.)

After trading had ended on November 14, 2006, Comverse issued another press release disclosing that the company had possibly found additional accounting irregularities (referred to as the Additional Accounting Claims above). (*Id.* ¶ 171.)  Comverse warned investors that it was "unable to estimate the effect" of the accounting irregularities on previously issued statements or how long it would take to issue restatements. (*Id.* ¶ 172.)  The next day, Comverse's stock price fell to $17.69. (*Id.* ¶ 173.)  On December 11, 2006, Comverse announced a further delay in filing

its quarterly report. (*Id.* ¶ 178.) On January 31, 2007, Comverse announced that its stock had been delisted from the NASDAQ. (*Id.* ¶ 180.)

Comverse issued a press release on March 22, 2007 that updated the progress of its internal investigation. (Aff. of Matthew L. Mustokoff in Supp. of Comverse's Mot. to Dismiss ("Mustokoff Aff.") Ex. D.) Regarding backdated options, Comverse announced that it had determined that inaccurate grant dates had been given to certain past options awarded between January 1, 1991 through October 31, 2005. (*Id*. at 5.) As a result, Comverse announced that it had recorded an "incremental cumulative stock-based compensation expense and related withholding and income tax effects in the aggregate of approximately $314 million" during the entire period between 1991 and 2005. (*Id.* at 1.) This amount included approximately $49 million in tax liability relating to owed withholdings, penalties and interest. (*Id*. at 5.) Comverse also disclosed that the cost of the special committee's internal investigation totaled approximately $68 million. (*Id*.)

Regarding the Additional Accounting Claims, Comverse announced that it was continuing to investigate the matter and that it might result in further material adjustments of the company's financial statements. (*Id.* at 1.) However, Comverse noted that the Additional Accounting Claims would not likely materially change previously reported "aggregate historical sales and total cash flows." (*Id*.) Comverse's internal investigation into the Additional Accounting Claims has concluded, although this data has not yet been released publicly and is currently being audited by the company's independent accountants. (Rushd Decl. Ex. 1 at 3-4.)

     D.    <u>Concurrent and Previous Litigation</u>

-11-

This class action is but one of a number of civil and criminal actions commenced in the wake of Comverse's public disclosures.  Alexander, Kreinberg and Sorin were each indicted by the United States Attorney's Office for the Eastern District of New York on charges of conspiracy and securities fraud.[6]  *See United States v. Alexander*, No. 06-CR-628 (NGG)(RER) (E.D.N.Y. superceding indictment filed Oct. 11, 2006); *United States v. Krienberg*, No. 06-CR-704 (NGG)(RER) (E.D.N.Y. July 31, 2006); *United States v. Sorin*, No. 06-CR-723 (NGG)(RER) (E.D.N.Y. July 31, 2006).  In addition, Alexander, Kreinberg and Sorin were each charged by the Securities Exchange Commission ("SEC") for violation of the Securities Act of 1933 and the Securities Exchange Act of 1934.  *See SEC v. Alexander et al.*, No. 06-CV-3844 (NGG)(RER) (E.D.N.Y. Aug. 9, 2006).

On October 24, 2006, Kreinberg settled the SEC's claim and agreed to pay a $2.4 million fine.  (Compl. ¶ 168.)  Kreinberg also pled guilty to two counts of conspiracy and securities fraud.  (*Id*.)  In his allocution, Kreinberg admitted that he knew that Comverse had issued stock options with backdated grant dates.  (Landman Decl. Ex. J at 23-24.)  Kreinberg stated that this practice was accomplished by Alexander selecting past grant dates and then having either Alexander's assistant, Sorin or Kreinberg prepare the required paperwork containing the selected date.  (*Id.* at 24.)  Kreinberg admitted that at times he provided Alexander with a printout of Comverse's past trading prices so that Alexander could select a favorable exercise price for option grants.  (*Id*.)  Kreinberg stated that Comverse's public filings and statements, to which Kreinberg signed, were inaccurate and did not reflect the backdating scheme.  (*Id.* at 23, 25.)

---

[6] Menorah Group repeatedly notes that Alexander was also charged with additional counts of obstruction of justice due to an attempted bribe of Krienberg, the alleged purpose of which was to shift sole responsibility for the fraudulent scheme to Kreinberg.  (Compl. ¶ 167.)

Kreinberg also admitted that he assisted Alexander in creating and concealing the secret slush fund with which Kreinberg and Alexander assigned stock options to Comverse employees. (*Id.* at 25-26.)

On November 2, 2006, Sorin pled guilty to one count of conspiracy to commit securities fraud. (Compl. ¶ 170.) In his allocution, Sorin admitted that Alexander had told Sorin that he had selected exercise prices for stock options based on the lowest price in which Comverse had traded in the past quarter. (Landman Decl. Ex. K at 20-21.) Sorin stated that this practice took place from the late 1990s through 2002. (*Id.*) Sorin admitted that he prepared and approved proxy statements and other filings that he knew falsely reported the exercise price for backdated Comverse options. (*Id.*) This included the fact that the options should have been accounted as compensation expenses. (*Id.*)

Unlike Sorin and Kreinberg, Alexander has not pled guilty to the criminal charges against him. Instead, Alexander fled to Namibia, where he was arrested on September 27, 2006, by Interpol pursuant to a request by the United States. (Compl. ¶ 167.) Alexander is currently contesting extradition to the United States. (Lead Pl.'s Sur-Reply to the Reply Mem. in Further Supp. of Alexander's Mot. to Dismiss ("Sur-Reply") Ex. A.) He is also considered a fugitive by the Federal Bureau of Investigation. *See United States v. All Funds on Deposit at Citigroup Smith Barney Accounts Held in the Name of Kobi Alexander*, No. 06-CV-3730, at *4 (NGG)(RER) (E.D.N.Y. Sept 10, 2007) (Docket Entry 80).[7]

---

[7] Although this postdated opinion was not part of the filings in this case, it is appropriate for the Court to take judicial notice of facts raised in related litigation. *See Anderson v. Rochester-Genesee Reg'l Transp. Auth.*, 337 F.3d 201, 205 n.4 (2d Cir. 2003) (citing cases); *see also In re Pronetlink Sec. Litig.*, 403 F. Supp. 2d 330, 333 (S.D.N.Y. 2005) ("In addition to the facts set forth in the complaint, the Court may also consider documents attached thereto and/or

All defendants are subject to derivative lawsuits in state and federal courts brought on behalf of Comverse shareholders. *See In re Comverse Tech., Inc. Derivative Litig.*, No. 06-CV-1849 (NGG)(RER) (E.D.N.Y. April 20, 2006); *In re Comverse Tech., Inc. Derivative Litig.*, No. 06-601272 (N.Y. Sup. Ct. Aug. 14, 2007).

E.    Plaintiffs' Class Action Suit

1.    Menorah Group's Class Action Claims

The present action stems from five consolidated complaints filed in the Eastern and Southern Districts of New York that were referred or voluntarily transferred to this Court. (*See* Docket Entries 39 & 40.)[8]

Menorah Group presents five claims for relief. Count I of the amended complaint alleges that defendants violated SEC Rule 10b-5(b) by fraudulently issuing false and misleading financial statements. (Compl. ¶¶ 193-202.) Count II alleges that Sorin, Friedman, Oolie and Hiram violated SEC Rule 10b-5(a) and (c) by approving and improperly accounting for backdated stock options. (*Id.* ¶¶ 203-07.) Count III alleges that the individual defendants violated § 20(a) of the Securities Exchange Act of 1934 by failing to accurately disseminate

---

incorporated by reference therein.") (citing *Automated Salvage Transp., Inc. v. Wheelabrator Envtl. Sys., Inc.*, 155 F.3d 59, 67 (2d Cir. 1998); *Pani v. Empire Blue Cross Blue Shield*, 152 F.3d 67, 75 (2d Cir. 1998)).

[8] As an initial matter, the Court dealt with the issue of appointing a lead plaintiff and lead counsel as dictated by the Private Securities Litigation Reform Act of 1995, Pub. L. 104-67, 109 Stat. 737 (1995). On September 27, 2006, this Court named Plumbers and Pipefitters National Pension Fund as lead plaintiff in this action. (Docket Entry 45.) The Court also held that the class action met the requirements of Rule 23 of the Federal Rules of Civil Procedure. (*Id*. at 9-14.) Following a successful appeal to the Honorable Nicholas G. Garaufis, Menorah Group was named lead plaintiff on March 2, 2007 and was ordered to file an amended complaint. (Docket Entry 65.) Three weeks later, on March 23, 2007, Menorah Group filed their amended complaint. (Docket Entry 74.)

information regarding Comverse's financial condition.  (*Id.* ¶¶ 208-16.)  Count IV alleges that

defendants violated SEC Rule 10b-5(b) by issuing false and misleading information in

Comverse's January 16, 2002 proxy statement.  (*Id.* ¶¶ 217-25.)  Count V alleges that defendants

violated SEC Rule 14a by issuing false and misleading information in Comverse's 2003, 2004

and 2005 proxy statements.  (*Id.* ¶¶ 226-40.)

> 2.    Defendants' Motions to Dismiss

Defendants have each put forth a number of separate grounds to dismiss Menorah

Group's complaint.  Comverse argues that: (1) the Additional Accounting Claims should be

dismissed for failure to allege particularized facts; (2) Count I should be partially dismissed for

claims that occurred after Comverse's April 17, 2006 press release; and (3) Count IV is defective

and time-barred.

Friedman and Oolie jointly claim that: (1) Counts I, II and IV fail to allege that Friedman

or Oolie acted with the requisite scienter; (2) all claims are time-barred against Friedman and

Oolie under the statute of limitations; (3) Count III fails to sufficiently allege that Friedman or

Oolie culpably participated in fraudulent conduct; (4) plaintiffs lack standing to bring Count II,

which should instead be brought as a derivative claim; (5) Count IV fails to state an actionable

claim; (6) Count V does not allege a material misrepresentation or omission; and (7) Menorah

Group lacks standing to bring Counts II and IV because it was not a shareholder at the time the

fraud occurred.  Hiram joins in Friedman and Oolie's claims and reiterates that: (1) Counts I, II,

and IV fail to allege that Hiram acted with the requisite scienter; and (2) Count III fails to

sufficiently allege that Hiram culpably participated in fraudulent conduct.

-15-

Alexander, Kreinberg and Sorin each move to dismiss because they claim they have not been adequately served with a copy of plaintiffs' summons and complaint.  Sorin also claims that Counts I, II and III are partially time-barred against him under the statute of limitations.

### 3.    Service of Process

Of the five originally commenced actions ("original complaints"), Menorah Group acknowledges that in only one did any plaintiff attempt to serve any of the defendants.  *See Nadel v. Comverse Technology, Inc.*, No. 06-CV-3190 (RPP) (S.D.N.Y. filed May 4, 2006).[9]  On April 26, 2006, the *Nadel* summons and complaint was handed to Brenda Marinez, an executive assistant for Comverse's then-general counsel.  (Alexander's Notice of Mot. to Dismiss Ex. A.)  The process server's affidavit alleges that Marinez told the process server that "she was authorized to accept service on behalf of Defendants Comverse Technology[,] Inc., Kobi Alexander and David Kreinberg."  (*Id*.)

Menorah Group filed their amended complaint on March 23, 2007.  On May 4, 2007, plaintiffs filed an affidavit by Sorin that waived personal service of the amended complaint and acknowledged due service "as of April 11, 2007."  (Docket Entry 79.)  Sorin's affidavit stated that it was without prejudice or waiver of any defenses or objections, including untimely service under Rule 4(m) of the Federal Rules of Civil Procedure.  (*Id*.)

Following defendants' filing of motions to dismiss due to inadequate service of process, Menorah Group attempted to serve the amended complaint on Alexander and Krienberg.  On

---

[9] Sorin was named as a defendant in one of the other original, unconsolidated complaints. *See Moore v. Comverse, Inc.*, No. 06-CV-4418 (RPP) (S.D.N.Y. June 12, 2006).  Menorah Group admits, however, that Sorin was never served with a copy of any original complaint. (Pls.' Omnibus Mem. in Opp'n to Defs.' Mot. to Dismiss 42.)

June 13, 2007, summons and copies of the amended complaint were mailed to and left with Kreinberg's wife at their home in New Jersey. (Docket Entry 90.) The previous day, on June 12, 2007, summons and copies of the amended complaint were mailed to and left with a doorman at Alexander's apartment in New York City. (Docket Entry 91.) Alexander claims that he has not returned to his apartment in New York City in over a year. (Resp. to Lead Pl.'s Sur-Reply to the Reply Mem. of Law in Further Supp. of Alexander's Mot. to Dismiss ("Alexander's Resp.") 3.)

II.    DISCUSSION

A.    Motions to Dismiss for Inadequate or Defective Service

Alexander, Kreinberg and Sorin each move to dismiss the amended complaint due to plaintiffs' purported failure to properly serve process and to do so within 120 days of filing as required by Rule 4(m) of the Federal Rules of Civil Procedure ("Rule 4(m)").[10] Insufficient service is grounds for dismissal. *See* FED. R. CIV. P. 12(b)(5). When defendants so move, the plaintiff bears the burden of proving that service of process was adequate. *See Hertzner v. U.S. Postal Serv.*, No. 05-CV-2371 (DRH)(ARL), 2007 WL 869585, at *3 (E.D.N.Y. Mar. 20, 2007) (citations omitted); *Williams v. Bernard*, No. 05-CV-3202 (FB)(CLP), 2007 WL 2455175, at *5 (E.D.N.Y. Aug. 23, 2007) (citations omitted).

Alexander, Kreinberg and Sorin each argues a slightly different version of the same theme: that service of the original complaint was defective or non-existent; and that service of the amended complaint falls outside of Rule 4(m)'s 120-day window. Alexander also claims that

---

[10] Defendants Friedman, Hiram, Oolie and Comverse do not join Alexander, Krienberg and Sorin in this motion, instead having each been properly served or having waived service.

service of the amended complaint at his New York City apartment was inadequate because he

resides in Namibia.

### 1.    Service of the Original Complaints on Alexander and Kreinberg

Menorah Group claims that service of the *Nadel* summons and complaint upon Marinez

was sufficient as to Alexander and Kreinberg.  Service on an individual is proper either under the

law of the state of New York or:

> by delivering a copy of the summons and of the complaint to the individual
> personally or by leaving copies thereof at the individual's dwelling house or usual
> place of abode with some person of suitable age and discretion then residing
> therein or by delivering a copy of the summons and of the complaint to an agent
> authorized by appointment or by law to receive service of process.

FED. R. CIV. P. 4(e)(2).  Under New York law, service via the so-called "leave and mail" method

requires delivery to a person's "actual place of business" *and* mailing to either the person's last

known address or actual place of business.  *See* N.Y. C.P.L.R. 308(2) (McKinney 2001).

Menorah Group does not counter Alexander and Kreinberg's assertion that the *Nadel* complaint

was never personally delivered nor mailed to defendants.  Thus, the only issue is whether service

on Marinez was sufficient under Rule 4(e)'s authorized agent provision.

Alexander and Kreinberg claim that the *Nadel* service was inadequate because neither

defendant had actually given Marinez the authority to receive the summons and complaint on

their behalf.  Under the authorized agent provision of Rule 4(e), an executive assistant or

secretary may only properly accept service of process on behalf of another individual if he or she

has been given such authority.  *See* 4A CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL

PRACTICE AND PROCEDURE, CIVIL PROCEDURE § 1097 (3d ed. 2007) (noting that "a secretary . . .

probably will not be deemed an agent appointed to receive process absent a factual basis for

-18-

believing that an appointment of that type has taken place") (citations omitted); 28 FEDERAL

PROCEDURE, LAWYERS EDITION § 65:145 (2006) (noting that Rule 4(e)'s authorized agent

provision "was intended to cover the situation where an individual actually appoints an agent for

the purpose of receiving service. . . . The process cannot just be left at the defendant's place of

employment with a secretary . . . .") (citations omitted).[11]

At her deposition, Marinez denied that she told the *Nadel* process server that she was

authorized to accept service on Alexander and Kreinberg's behalf.  (Rushd Decl. Ex. 5 at 36-37.)

Even assuming that Marinez had in fact told the process server that she was so authorized, under

Rule 4(e) "an agent's authority to act cannot be established solely from the agent's actions; the

authority must be established by an act of the principal." *Dorrough v. Harbor Sec., LLC*, No. 99-

CV-7589 (ILG), 2002 WL 1467745, at *4 n.6 (E.D.N.Y. May 10, 2002) (quoting *Fed. Deposit

Ins. Corp. v. Oaklawn Apartments*, 959 F.2d 170, 175 (10th Cir. 1992)) (other citations omitted);

*see also Blommer Chocolate Co. v. Nosira Sharon Ltd.*, 776 F. Supp. 760, 764-65 (S.D.N.Y.

---

[11] I agree with Alexander that Menorah Group's reliance on *Fashion Page v. Zurich Ins. Co.*, 50 N.Y.2d 265, 272, 406 N.E.2d 747, 751 (N.Y. 1980), is misplaced.  *Fashion Page* relates to service on a corporation rather than on an individual.  As such, the New York Court of Appeals permitted a more lenient standard because a "'process server cannot be expected to know the corporation's internal practices' and thereby may justifiably rely on 'the corporate employees to identify the proper person to accept service.'" *Luv N' Care, Ltd. v. Babelito, S.A.*, 306 F. Supp. 2d 468, 471 (S.D.N.Y. 2004) (quoting *Fashion Page*, 50 N.Y.2d at 272, 406 N.E.2d at 751); *see also Tadco Constr. Corp. v. Peri Framework Sys., Inc.*, 460 F. Supp. 2d 408, 411-12 (E.D.N.Y. 2006) (further explaining *Fashion Page*'s apparent authority approach to service of process on corporations).  In other words, it is not always clear who precisely is authorized to receive process on behalf of a corporation, and therefore a process server may rely on representations of authority made by the corporation's employees.

Such a rationale does not extend to service on an individual because the same likelihood of confusion is absent.  This distinction is further demonstrated by the fact that the provisions for service on an individual and on a corporation are contained in separate subsections of the Federal Rules of Civil Procedure.  *Compare* FED. R. CIV. P. 4(e) *with* FED. R. CIV. P. 4(h).

1991) (requiring evidentiary proof of an agency relationship for valid service on behalf of another party).

Menorah Group claims that Marinez "was never told . . . not to accept service" on Alexander and Kreinberg's behalf.  (Lead Pls.' Omnibus Mem. in Opp'n to Defs.' Mot. to Dismiss 45.)  Double negatives aside, this falls short of evidence that either Alexander or Kreinberg did in fact tell Marinez to receive service on their behalf, especially given Marinez's repeated denials on this point.  (*See* Rushd Decl. Ex. 5 at 11, 19, 25-26, 45.)  At most, Menorah Group has shown that documents were routinely routed through Marinez's office as they were passed along to her supervisor, who was neither Alexander nor Krienberg but instead another Comverse executive.  (*Id.* at 6.)  Alexander claims that he never gave Marinez authority to receive process on his behalf.  (Decl. of Alexander in Supp. of Mot. to Dismiss.)  In the absence of any evidence to the contrary, Menorah Group has failed to meet its burden.  Service of the *Nadel* summons and complaint was, therefore, insufficient as to Alexander and Kreinberg.

2.      Service of the Amended Complaint on Alexander
        at His New York City Apartment

Menorah Group claims that even if service of the original complaint on Alexander was insufficient, service of the amended complaint at Alexander's New York City apartment was proper as to Alexander under either Rule 4(e)(2) or Rule 4(f) of the Federal Rules of Civil Procedure.  Menorah Group argues that personal service was sufficient under Rule 4(e)(2) because Alexander's New York City apartment constituted his "dwelling house or usual places of abode."  FED. R. CIV. P. 4(e)(2).  This Circuit recognizes that "[t]here is nothing startling in the conclusion that a person can have two or more 'dwelling houses or usual places of abode,'

provided each contains sufficient indicia of permanence." *Nat'l Dev. Co. v. Triad Holding Corp.*, 930 F.2d 253, 257 (2d Cir. 1991).  Menorah Group claims that, while Alexander was not present at the time of service, his New York City apartment bears indicia of permanence: he continues to own the apartment; he has recently paid an artist to redesign it; he regularly pays property taxes on the apartment; and a doorman stated that Alexander has mail and packages delivered to him via the building's lobby.  (Sur-Reply Exs. B, C, D, E, F and affixed Aff. of Julie M. Carrion ("Carrion Aff.").)

In his reply brief,[12] Alexander argues that service at his apartment was ineffective under Rule 4(e)(2) because at the time of service he resided in Namibia.  (Reply Memo. of Law in Further Supp. of Alexander's Mot. to Dismiss 6-7.)  Alexander is correct that none of the evidence presented, nor the cases cited by Menorah Group, is sufficient to overcome the simple fact that -- beginning at least in September 2006 and continuing through attempted service of the amended complaint in June 2007 -- Alexander has *only* resided in Namibia.  (*See* Compl. ¶¶ 3, 166.)  In fact, Alexander is a fugitive who is fighting extradition to face criminal charges. Alexander has therefore gone to great lengths to avoid returning to the United States.  In contrast, each of the cases cited by Menorah Group involved parties who continued to visit or spend time at their residence through the time of service or shortly before.  For instance, in *National Development Co.*, the Second Circuit held that a defendant's New York City apartment was his

---

[12] I note that arguments normally may not be made for first time in a reply brief.  *See Knipe v. Skinner*, 999 F.2d 708, 711 (2d Cir. 1993).  However, in his motion to dismiss, Alexander presented the more general argument that service of process had not taken place. Furthermore, Menorah Group's attempted service of the amended complaint occurred *after* Alexander had filed his motion to dismiss.  For these reasons, I recommend deciding this argument on the merits, even though technically it was first presented in Alexander's reply.

Case 1:24-cv-03071-PKC    Document 137-10    Filed 02/28/25    Page 23 of 56
Case 1:06-cv-01825-NGG-RER    Document 135    Filed 10/31/07    Page 22 of 55 PageID
#: 2470

dwelling place or usual place of abode because, while it was only one of his many residences, the

defendant was staying there at the time of service and he resided there for a total of thirty-four

days during the previous year. 930 F.2d at 255-56. No such showing has been made here. Nor

could it have been, because Alexander has not returned to the United States for over a year.

Service of the amended complaint at Alexander's New York City apartment was therefore

inadequate under Rule 4(e)(2).

In the alternative, Menorah Group claims that substituted or alternative service on

Alexander is warranted under Rule 4(f)(3). Alexander responds that substituted service is

inappropriate because no plaintiff has ever attempted to serve him in Namibia and Menorah

Group has not sought a court order directing substituted service. (Alexander's Resp. 5)

Substituted or alternative service is permitted on an individual in a foreign country "by . . . means

not prohibited by international agreement *as may be directed by the court*." FED. R. CIV. P.

4(f)(3) (emphasis added). Alexander is correct that alternative or substituted service under Rule

4(f)(3) requires prior court approval. *See Brockmeyer v. May*, 383 F.3d 798, 805-06 (9th Cir.

2004). Because no such prior court approval was given, service of the amended complaint at

Alexander's New York City apartment was inadequate under Rule 4(f) as well. I therefore

respectfully recommend that Alexander has yet to be properly served.

### 3.    Re-Service of the Amended Complaint on Alexander

Having established that Alexander has yet to be properly served, the next issue is whether

dismissal of the complaint is warranted or whether Menorah Group should be permitted to re-

serve Alexander. "Where service of process is insufficient, the courts have broad discretion to

dismiss the action or to retain the case but quash the service that has been made on defendant,

even though service will ordinarily be quashed and the action preserved where there is a reasonable prospect that plaintiff ultimately will be able to serve defendant properly." *Montalbano v. Easco Hand Tools, Inc.*, 766 F.2d 737, 740 (2d Cir. 1985) (internal quotation marks and citations omitted); *see also Ebanks v. Ebanks*, No. 07-CV-314 (KMK)(MDF), 2007 WL 2591196, at *4-5 (S.D.N.Y. Sept. 6, 2007) (quashing inadequate service and permitting party an additional thirty days to effect proper service). Dismissal due to inadequate service is typically without prejudice. *See, e.g.*, *Levy v. Rowland*, 359 F. Supp. 2d 267, 275 (E.D.N.Y. 2005) (citing *Kirkendall v. Univ. of Connecticut Health Ctr.*, 205 F.3d 1323, 2000 WL 232071, at *1 (2nd Cir. 2000)).

It is worth noting here that Alexander's argument under Rule 4(f) is inconsistent with his request for dismissal under Rule 4(m). *See infra* II.A.4. Because Alexander only resides in Namibia, Rule 4(m)'s requirement of service within 120 days of filing does not apply. *See* FED. R. CIV. P. 4(m) ("This subdivision does not apply to service in a foreign country . . . .").[13] Instead, when a defendant is in a foreign country, courts use "a flexible due diligence standard to determine whether service of process is timely." *Standard Commercial Tobacco Co., Inc. v. Mediterranean Shipping Co.*, No. 94-CV-7040 (PKL), 1995 WL 753901, at *1 (S.D.N.Y. Dec. 19, 1995) (citation omitted); *see also SEC v. Gottlieb*, 88 Fed.App'x. 476, 477 (2d Cir. 2004)

---

[13] For the reasons given throughout this subsection, I find that the outcome of cases cited by Alexander to be factually distinguishable. *See USHA (India), Ltd. v. Honeywell Int'l, Inc.*, 421 F.3d 129, 134 (2d Cir. 2005) (applying 120-day time limit in order to preserve diversity jurisdiction by dismissing complaint against defendant who had never been served); *Montalbano*, 766 F.2d at 740 (applying 120-day time limit where plaintiff had "not exactly bent over backward to effect service"); *SEC v. Steinberg*, No. 99-CV-6050 (ARR)(JMA), 2007 WL 922257, at *8 (E.D.N.Y. Mar. 26, 2007) (applying 120-day time limit to defendant who had not been served during seven years after filing of complaint).

(summary order) (citing *Gleason v. McBride*, 869 F.2d 688, 691 (2d Cir. 1989)).  Therefore, the only bar to permitting re-service on Alexander is if the Court determines that Menorah Group has not acted with due diligence.

Alexander characterizes Menorah Group as having failed to identify and remedy defects in service that were "caused solely by its own mistake and neglect." (Alexander's Resp. 5)  In doing so, Alexander conveniently overlooks the unique facts of this case.  First and foremost, Menorah Group was selected as lead plaintiff under the Private Securities Litigation Reform Act of 1995 ("PSLRA"), Pub. L. No. 104-67, 109 Stat. 737 (1995), and thus inherited the original complaints' defective service.  Menorah Group was but one of a number of parties vying to become lead plaintiff in this class action. (*See* Docket Entry 45.)  Until being named lead plaintiff, which took place *almost an entire year* after the initial filing of this case, Menorah Group was merely a passive participant in this suit.  It was only as of March 2007 that Menorah Group would have had reason to become aware of defective service of the original complaints.  Once Menorah Group was made aware of those defects, it made a good-faith albeit inadequate attempt to re-serve Alexander at his New York City apartment.

By that time, not only had the 120-day limit under Rule 4(m) expired, *see infra* II.A.4, but Alexander had long since fled to Namibia to avoid the impending criminal and civil claims arising from the alleged backdating scheme.  Alexander has actively fought extradition back to the United States.  In other contexts, courts apply the fugitive disentitlement doctrine to those who undercut "the authority and dignity of the judicial process" and take the posture of "heads I win, tails you'll never find me." *Gao v. Gonzales*, 481 F.3d 173, 177 (2d Cir. 2007).  While this

-24-

doctrine is inapplicable here,[14] its very existence helps show whether plaintiffs acted with due diligence. In other words, Alexander is at least equally culpable for Menorah Group's failed service because he has actively evaded the jurisdiction of this Court. This creates a valid excuse for Menorah Group's failed service.

Alexander also overlooks the fact that, as a defendant in a litany of lawsuits all arising from the same facts alleged in this class action, it is utterly incongruous that he has not received actual notice of the claims presented here. Alexander is so keenly aware of these claims that he took the drastic step of fleeing the country and becoming a fugitive. At the same time, Alexander's counsel have made appearances in this case. (*See* Docket Entries 44 & 88.) Alexander's counsel are also opposing the other criminal and civil charges against him. Of course, actual notice alone does not cure Menorah Group's failure to comply with the statutory requirements of serving process. *See Nat'l Dev. Co.*, 930 F.2d at 256; *Sartor v. Toussaint*, 70 Fed.App'x. 11, 13 (2d Cir. 2002) (summary order) (citing cases). It does, however, help show that Menorah Group has acted with due diligence given the unique circumstances of this class action.

Prejudice to the parties also weighs in favor of permitting Menorah Group to re-serve Alexander. Dismissal for failed service of process is without prejudice, thus dismissal typically only burdens the parties with additional expense and delays the adjudication of controversies on the merits. *See* 5B CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND

---

[14] The fugitive disentitlement theory "is an equitable doctrine that provides courts with discretion to dismiss the appeal of a defendant or petitioner who is a fugitive from justice during the pendency of the appeal." *Gao*, 481 F.3d at 175. The Supreme Court has held that the theory is inapplicable to appeals by civil litigants because "the justice would be too rough." *Degen v. United States*, 517 U.S. 820, 828-29 (1996).

PROCEDURE, CIVIL PROCEDURE § 1354 (3d ed. 2007). Here, dismissing the complaint against Alexander would not only create additional expense and delay, but it would cause great prejudice to plaintiffs because the statute of limitations for Counts I, II and III is five years after any such violation. *See* 28 U.S.C. § 1658(b)(2). These counts are based on facts alleged to have occurred in part in 2001 and early 2002, meaning that Menorah Group's claims on behalf of plaintiffs would substantially be abrogated were the court to dismiss the complaint. In contrast, there would be minimal prejudice to Alexander by allowing re-service because he has already received actual notice of the claims in this case. *See Singh v. Maresco*, No. 04-CV-1439 (JG)(CLP), 2007 WL 2471690, at *7 (E.D.N.Y. Mar. 23, 2007) (holding that defendant was not prejudiced by delayed service where he received actual notice and contributed to the delay) (citations omitted).

Policy reasons also militate toward permitting re-service of process. There appears to be two competing interests when dealing with service of process. On the one hand, this Circuit has long stressed that Rule 4 should be construed liberally to further the purpose of finding personal jurisdiction where a party has received actual notice. *Grammenos v. Lemos*, 457 F.2d 1067, 1070 (2d Cir. 1972); *see also Jaiyeola v. Carrier Corp.*, 73 Fed.App'x. 492, 494 (2d Cir. 2003) (summary order) (quoting *Romandette v. Weetabix Co.*, 807 F.2d 309, 311 (2d Cir. 1986)). On the other hand, "there must be compliance with the terms of the rule, and absent waiver, incomplete or improper service will lead the court to dismiss the action *unless it appears that proper service may still be obtained.*" *McGann v. State of New York*, 77 F.3d 672, 674 (2d Cir. 1996) (quoting *Grammenos*, 457 F.2d at 1070) (emphasis added). Permitting Menorah Group to re-serve Alexander would fulfill both interests: it would allow for personal jurisdiction where Alexander has already received actual notice of plaintiffs' claims and it would ensure full

-26-

compliance with the terms of Rule 4.  For all of these reasons, re-service of Alexander is warranted.

As for the method of re-service, substituted or alternative service appears to be appropriate given the unique circumstances in this case.  Following the Ninth Circuit in *Rio Props., Inc. v. Rio Int'l Interlink*, 284 F.3d 1007, 1015-16 (9th Cir. 2002), courts in this Circuit have interpreted Rule 4 as having no hierarchy between the methods of serving individuals in foreign countries under subsection (f)(3) and those under subsections (f)(1) and (f)(2).  *See Ehrenfeld v. Salim a Bin Mahfouz,* No. 04-CV-9641 (RCC), 2005 WL 696769, at *2-4 (S.D.N.Y. Mar. 23, 2005); *Ryan v. Brunswick Corp.*, No. 02-CV-0133E (F), 2002 WL 1628933, at *2 (W.D.N.Y. May 31, 2002); *Swarna v. Al-Awadi*, No. 06-CV-4880 (PKC), 2007 WL 2815605, at *1 (S.D.N.Y. Sept. 20, 2007).  Alternative service under Rule 4(f)(3) is neither a last resort nor an extraordinary remedy.  *Rio Props.*, 284 F.3d at 1015.  Instead, Rule 4(f)(3) permits a court to direct a special method of service provided that the method gives reasonable notice, is consistent with due process and minimizes offense to foreign law.  *See* FED. R. CIV. P. 4(f)(3) advisory committee's note (1993).  Substituted service is an especially appropriate remedy "[w]here the plaintiff can show that deliberate avoidance and obstruction by the defendants have made the giving of notice impossible."  *SEC v. Tome*, 833 F.2d 1086, 1092 (2d Cir. 1987), *cert. denied*, 486 U.S. 1014 (1988).  Given that Alexander has fled the country to avoid criminal and civil claims arising from the facts alleged in this case, such deliberate avoidance has occurred here.

Due process requires that a method of service provides a party with adequate notice and the opportunity to present objections.  *Mullane v. Central Hanover Bank and Trust Co.*, 339 U.S. 306, 314 (1950) (citations omitted).  Substituted service must therefore be "reasonably calculated

to apprise the interested parties of the lawsuit." *Tome*, 833 F.2d at 1093 (citing *Mullane*, 339

U.S. at 314). In *Tome*, the Second Circuit held that substituted service via publication in an

international newspaper satisfied the due process requirement because the plaintiff had made

diligent efforts to serve defendants who were otherwise on notice of the pending action. 833

F.2d at 1093-94. As noted, Menorah Group and the other plaintiffs here have made efforts to

serve Alexander and he otherwise has received notice of the claims in this case.

The only remaining potential bar to alternative or substituted service is if such service is

offensive to Namibian law. Under Rule 4(f)(3), substituted service on a person in a foreign

country requires that "*an earnest effort . . .* be made to devise a method of communication that

. . . minimizes offense to foreign law." FED. R. CIV. P. 4(f)(3) advisory committee's note (1993)

(emphasis added). Few courts have dealt with this requirement. At least one court in this Circuit

has, however, held that substituted service is permissible under Rule 4(f)(3) even where it creates

technical violations of foreign service requirements but is otherwise undisruptive. *See*

*Export-Import Bank of U.S. v. Asia Pulp & Paper Co., Ltd.*, No. 03-CV-8554 (LTS)(JCF), 2005

WL 1123755, at *5 (S.D.N.Y. May 11, 2005). *Cf. In re Ski Train Fire in Kaprun, Austria on*

*November 11, 2000*, No. 01-CV-7342 (SAS), 2003 WL 1807148, at *3 (S.D.N.Y. Apr. 4, 2003)

(holding that direct service of legal documents in a foreign language on individuals without legal

representation, which is explicitly prohibited by Austrian law and is regarded as an infringement

of Austrian sovereignty, was unwarranted under Rule 4(f)(3)). Even where substituted service

was rejected by the Eleventh Circuit, the court nonetheless noted that district courts have

discretion under Rule 4(f)(3) even if substituted service is in contravention of foreign law. *See*

*Prewitt Enterprises, Inc. v. Org. of Petroleum Exporting Countries*, 353 F.3d 916, 928 n.21 (11th Cir. 2003).

In related litigation, the Honorable Nicholas G. Garaufis dealt with a similar and related issue. There, the question was whether service on Alexander by Namibian deputy sheriffs without a prior request from a foreign state or court violated Rule 4(f)(2)(C)(i)'s requirement that personal service not be prohibited by foreign law. *SEC v. Alexander et al.*, No. 06-CV-3844 (NGG)(RER), at *6-11 (E.D.N.Y. Sept. 26, 2007). Alexander's expert testified that:

> [t]he provisions of Namibian law that provide that a Deputy Sheriff may personally serve an individual in Namibia only after Namibia receives a request from a foreign state or court are the only applicable provisions that address the service of civil process originating from a foreign country on persons in Namibia -- applicable Namibian law makes no other provision for service of such process.

*Id*. at *5. Judge Garaufis rejected Alexander's argument that this statement means that Namibian law *prohibits* service via methods other than as described. *Id*. Instead, Judge Garaufis held that service was valid under Rule 4(f)(2)(C)(i) because "nothing about Namibian law expressly prohibits personal service" even if a request from a foreign state or court had not been made. *Id*. at *11.

Given that Namibian law merely proscribes one method of service rather than prohibits alternative methods, substituted service in this case would be of minimal offense to Namibian law. It should be noted that in *SEC v. Alexander* modified service of process passed muster under Rule 4(f)(2)(C)(i), which is an even higher hurdle than Rule 4(f)(3)'s requirement that courts make an earnest effort to minimize offense to foreign law. As such, *even if* Namibian law in fact prohibited substituted service, the Court could devise a method that is minimally offensive. "[N]o one form of substitute service is favored over any other so long as the method

chosen is reasonably calculated, under the circumstances of the particular case, to give the defendant actual notice of the pendency of the lawsuit and an opportunity to present his defense." *Int'l Controls Corp. v. Vesco*, 593 F.2d 166, 176 (2d Cir. 1979) (footnote omitted).

Under Rule 4(f)(3), courts may approve substituted service via ordinary mail to the defendant in a foreign country and to his counsel in the United States. *See RSM Production Corp. v. Fridman*, No. 06-CV-11512 (DLC), 2007 WL 2295907, at *6 (S.D.N.Y. Aug. 10, 2007) (citing *SEC v. Unifund SAL*, 910 F.2d 1028, 1034 (2d Cir.1990); *Levin v. Ruby Trading Corp.*, 248 F. Supp. 537, 540 (S.D.N.Y. 1965)); *see also Int'l Controls Corp.*, 593 F.2d at 174-76 (holding that district court was authorized to permit service of process by ordinary mail to foreign party's last-known address); *Forum Fin. Group v. President, Fellows of Harvard Coll.*, 199 F.R.D. 22, 23-24 (D.Me. 2001) (authorizing service by certified mail to defendant's attorney). In this case, a similar method would ensure that Menorah Group has fully complied with the requirements of Rule 4 and that Alexander receives further notice of the lawsuit. This method will also ensure that there will be minimal offense to Namibian sovereignty and law because no actual intrusion into Namibia will be made. As such, I respectfully recommend that, pursuant to Rule 4(f)(3), Menorah Group be ordered to re-serve the amended complaint by hand delivering a copy to Alexander's apartment in New York City and by delivering via certified mail an additional copy to his attorneys.

4.    Good Cause for Delayed Service and Discretionary Extension of Service of the Amended Complaint to Kreinberg and Sorin

The Court must next determine whether service of the amended complaint on Krienberg in June 2007 and Sorin in May 2007 satisfied Rule 4(m).[15]  Rule 4(m) requires that:

> [i]f service of the summons and complaint is not made upon a defendant within 120 days after the filing of the complaint, the court . . . shall dismiss the action without prejudice as to that defendant or direct that service be effected within a specified time; provided that if the plaintiff shows good cause for the failure, the court shall extend the time for service for an appropriate period.

FED. R. CIV. P. 4(m).  Even absent a showing of good cause, courts may exercise discretion in extending the 120-day deadline.  FED. R. CIV. P. 4(m) advisory committee's note (1993) (authorizing the court "to relieve a plaintiff of the consequences of an application of this subdivision even if there is no good cause shown"); *see also Zapata v. City of New York*, -- F.3d --, 2007 WL 2742612, at *2-3 (2d Cir. Sept. 20, 2007) (citations omitted).  Menorah Group neither served nor obtained a waiver from Kreinberg and Sorin until more than 120 days after filing of the original complaints in this action.  Menorah Group argues, however, that an extension of Rule 4(m)'s 120-day time limit is warranted either for good cause or under the Court's discretion.

The Second Circuit recently held that courts are free to decide whether it is useful to engage in a bifurcated inquiry into Rule 4(m)'s good cause and discretionary provisions.  *Zapata*, 2007 WL 2742612, at *4.  Both inquiries "involve a weighing of overlapping equitable considerations" and are matters of discretion for the district court to decide.  *Id.*  As to the first inquiry, in ascertaining whether good cause for a delay existed, courts measure a plaintiff's

---

[15] Alexander joined in this argument as well.  It has already been established that Alexander is in a foreign country and that Rule 4(m)'s 120-day service window does not apply.  *See supra* II.A.3.  Were the Court to hold otherwise, the analysis in this subsection would also apply to Alexander.  This subsection therefore serves as an alternative grounds for permitting re-service on Alexander.  *See supra* II.A.3.a.

reasonable efforts to effect service against prejudice to the defendant caused by the delay. *See Chrobak v. Hilton Group PLC*, No. 06-CV-1916 (MGC), 2007 WL 2325913, at *4 (S.D.N.Y. Aug. 15, 2007) (citation omitted); *Williams v. Health Receivables Mgmt., Inc.*, No. 06-CV-5353 (SDF)(MDG), 2007 WL 2230081, at *1 (E.D.N.Y. July 31, 2007) (citations omitted).

Kreinberg and Sorin join Alexander in characterizing Menorah Group's failure to serve process within 120 days of filing of the original complaints as neglectful. While it is true that any delay "resulting from the mere inadvertence, neglect, or mistake of a litigant's attorney does not constitute good cause," *AIG Managed Market Neutral Fund v. Askin Capital Mgmt., L.P.*, 197 F.R.D. 104, 108 (S.D.N.Y. 2000) (citations omitted), Kreinberg and Sorin ignore the unique circumstances that led to Menorah Group's delay in service. As noted, *supra* II.A.3, Menorah Group's delay in service was caused almost exclusively due to the PSLRA lead plaintiff selection process: by the time that Menorah Group was named lead plaintiff, the 120-day window had already closed. Good cause exists because of the "exceptional circumstances" in this case, where Menorah Group's "failure to make timely service was the result of circumstances beyond [its] control." *See Myers v. Sec'y of the Dept. of the Treasury*, 173 F.R.D. 44, 46 (E.D.N.Y. 1997) (citation and internal quotation marks omitted).

Kreinberg and Sorin would nonetheless have the Court impute onto Menorah Group the "lax attitude" taken by plaintiffs who filed the original complaints in this class action. Kreinberg and Sorin are correct that, unlike Alexander, both remained available to receive service of process. (*See* Reply Mem. in Supp. of Kreinberg's Mot. to Dismiss 6; Reply Mem. in Supp. of Kreinberg's Mot. to Dismiss 3.) However, prior to being named as lead plaintiff, Menorah Group reasonably relied on service of the *Nadel* complaint on Krienberg and the fact that Sorin

-32-

had received actual notice of the class action complaint filed against him. (*See* Decl. of Solomon N. Klein in Supp. of Sorin's Mot. to Dismiss ("Klein Decl.") Ex. A.) Once Menorah Group became aware of defects in service, it made reasonable efforts to promptly serve both Krienberg and Sorin. In fact, Kreinberg does not dispute that service at his home on June 13, 2007 was proper. (Reply Mem. in Supp. of Kreinberg's Mot. to Dismiss 1 n.1.) Sorin does not dispute that he waived service of the amended complaint "as of April 11, 2007." (*See* Mem. of Law in Supp. of Sorin's Mot. to Dismiss 5.) Menorah Group has therefore demonstrated that, once it was named lead plaintiff, it made reasonable efforts to serve Kreinberg and Sorin, and that its failure to serve defendants within Rule 4(m)'s 120-day window was excused by the unique circumstances of the PSLRA procedures.

Neither Krienberg nor Sorin can claim that they were prejudiced by Menorah Group's delay in service. Much like Alexander, both Kreinberg and Sorin received actual notice of the claims in this lawsuit because Menorah Group's amended complaint alleges the same facts as the criminal and SEC charges brought against them. In fact, both Kreinberg and Sorin pled guilty to those very charges in October and November 2006 respectively, well before Rule 4(m)'s window had expired. (*See* Landman Decl. Exs. J, K.) Like Alexander, *supra* II.A.3, neither Kreinberg nor Sorin can claim surprise or that they have been unable to present arguments in opposition to Menorah Group's complaint.

Even were the Court to impute the lax attitude of other class action plaintiffs onto Menorah Group, a discretionary extension of Rule 4(m)'s 120-day window is warranted under the facts of this case. In deciding whether to grant discretionary relief, courts will generally look at the following factors:

-33-

> (1) whether the applicable statute of limitations would bar the refiled action;
> (2) whether the defendant had actual notice of the claims asserted in the
> complaint; (3) whether the defendant had attempted to conceal the defect in
> service; and (4) whether the defendant would be prejudiced by the granting of
> plaintiff's request for relief from the provision.

*Beauvoir v. U.S. Secret Serv.*, 234 F.R.D. 55, 58 (E.D.N.Y. 2006) (citations omitted). While,

under the third factor, Kreinberg and Sorin have not attempted to conceal the defective service,

the second and fourth factors weigh in Menorah Group's favor: Kreinberg and Sorin have

received actual notice of the claims in this case and they have not demonstrated that they would

be prejudiced by extending the service deadline.

As for the first discretionary factor, the statute of limitations has expired on a substantial

portion of Menorah Group's claims. *See supra* II.A.3. District courts have discretion "to decide

on the facts of each case how to weigh the prejudice to the defendant that arises from the

necessity of defending an action after both the original service period and the statute of

limitations have passed before service." *Zapata*, 2007 WL 2742612, at *5. Sorin claims that

Menorah Group is "trying to have it both ways" regarding service of process and the statute of

limitations. (Reply Mem. in Supp. of Kreinberg's Mot. to Dismiss 3.) This is inaccurate. The

advisory committee notes make clear that when the statute of limitations has expired on a

plaintiff's claim, there is a valid reason for the court to exercise discretion in extending the

deadline for service of process. FED. R. CIV. P. 4(m) advisory committee's note (1993) ("Relief

may be justified, for example, if the applicable statute of limitations would bar the refiled action,

. . . ."). In other words, the advisory committee notes dictate that courts should avoid the harsh

result of dismissing a complaint when the statute of limitations has expired on a plaintiff's

underlying claims.

-34-

In similar settings to this case, where plaintiffs in a consolidated Rule 10b-5 action had failed to serve process within Rule 4(m)'s 120-day service window, courts have exercised their discretion and declined to dismiss the complaint. *See In re Pronetlink Sec. Litig.*, 403 F. Supp. 2d 330, 336-37 (S.D.N.Y. 2005); *In re Reliance Sec. Litig.*, 91 F. Supp. 2d 706, 718-19 (D.Del. 2000); *In re Sunbeam Sec. Litig.*, 89 F. Supp. 2d 1326, 1343 (S.D.Fla. 1999). In another setting, Judge Garaufis recently held that a discretionary extension is warranted where the statute of limitations had expired on a plaintiff's claims but defendants had otherwise received notice of the suit. *See Almonord v. Kingsbrook Jewish Medical Center*, No. 04-CV-4071 (NGG)(RML), 2007 WL 2324961, at *13-14 (E.D.N.Y. Aug. 10, 2007). Similar relief is warranted here. Menorah Group has met the requirements to show grounds for both good cause and a discretionary extension of the 120-day service requirement. I therefore respectfully recommend that service of the amended complaint on Krienberg in June 2007 and Sorin's waiver of service as of April 2007 were adequate under Rule 4(m).

B.    Defendants' Rule 12(b)(6) Motions

Defendants make various arguments to dismiss the amended complaint under Rule 12(b)(6). When ruling on a defendant's motion to dismiss pursuant to Rule 12(b)(6), the court must "accept as true all factual allegations contained in the complaint and draw all reasonable inferences in the plaintiff's favor." *Overton v. Todman & Co., CPAs, P.C.*, 478 F.3d 479, 483 (2d Cir. 2007) (citing *Rombach v. Chang*, 355 F.3d 164, 169 (2d Cir. 2004)). "Dismissal is appropriate only where 'it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" *Still v. DeBuono*, 101 F.3d 888, 891 (2d Cir. 1996) (quoting *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957)) (other citation omitted).

"To survive dismissal, the plaintiff must provide the grounds upon which his claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.'" *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (quoting *Bell Atl. Corp. v. Twombly*, -- U.S. --, 127 S.Ct. 1955, 1965 (2007)) (footnote omitted). "[O]nce a claim has been adequately stated, it may be supported by showing any set of facts consistent with the allegations in the complaint." *Twombly*, 127 S.Ct. at 1969 (citation omitted). To the extent that Menorah Group's amended complaint alleges fraud, these circumstances must be stated with particularity. FED. R. CIV. P 9(b).

### 1.    Whether Menorah Group Meets the Heightened Pleading Standard for Securities Claims

Menorah Group's first, second and fourth counts are based on securities fraud. In order to survive defendants' motions to dismiss, these claims must meet not only Rule 9(b)'s particularity requirement but also the heightened pleading standard under the PSLRA. *See ATSI Commc'ns*, 493 F.3d at 99 (citations omitted). The PSLRA requires that the complaint "state with particularity facts giving rise to a *strong inference* that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2) (emphasis added). This state of mind, commonly known as scienter, is defined as "a mental state embracing intent to deceive, manipulate, or defraud." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, -- U.S. --, 127 S.Ct. 2499, 2507 (2007) (citation, quotation marks and footnote omitted). Failure to sufficiently allege scienter under the PSLRA is grounds for dismissal. *See* 15 U.S.C. § 78u-4(b)(3)(A).

The Supreme Court recently clarified the criteria to determine whether a complaint has met the PSLRA pleading requirement. A court need not find that the inference of scienter is

"irrefutable" but must "consider plausible nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff." *Tellabs*, 127 S.Ct. at 2510.  A complaint will only survive a motion to dismiss "if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id*. (footnote omitted).

a.    Counts I, II and IV Against Friedman, Oolie and Hiram

Friedman, Oolie and Hiram claim that Menorah Group's first, second and fourth counts have failed to meet the PSLRA pleading requirement.[16]  To satisfy this requirement, Menorah Group must allege facts that: (1) show that defendants had both motive and opportunity to commit fraud; or (2) constitute strong circumstantial evidence of conscious misbehavior or recklessness.  *See ATSI Commc'ns*, 493 F.3d at 99 (citation omitted).  Under the first criteria, Menorah Group must show a greater motive than is "generally possessed by most corporate directors and officers . . . ; instead, plaintiffs must assert a concrete and personal benefit to the individual defendants resulting from the fraud." *Kalnit v. Eichler*, 264 F.3d 131 (2d Cir. 2001) (citation omitted).  Menorah Group's amended complaint alleges that Friedman, Oolie and Hiram sold Comverse stock for cash at some time during the Class Period.  Menorah Group has not, however, alleged that Friedman, Oolie or Hiram received these securities through stock options.[17]

---

[16] The other defendants do not join in this motion to dismiss.

[17] I note that Comverse's 2002 proxy statement refers to grants of 86,000 stock options to Friedman and 65,000 to Oolie, with none given to Hiram. (Landman Decl. Ex B at 9.)  Menorah Group's complaint does not refer to these grants.  Menorah Group has also failed to allege that either Friedman or Oolie ever exercised these options, or that they received improper compensation resulting from these grants.  Under the PSLRA's heightened pleading standard, I therefore recommend that there has been an insufficient showing that Friedman, Oolie or Hiram received improper stock options.

Menorah Group has also failed to show that the compensation Friedman, Oolie or Hiram received was unusual. *See Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 54 (2d Cir. 1995). Rather, Menorah Group merely alleges that Friedman, Oolie and Hiram benefitted from the alleged backdated options scheme because the sale price of Comverse stock was artificially inflated. This, however, is an insufficient motive in a securities fraud action. *See Rombach*, 355 F.3d at 177 (2d Cir. 2004) (holding that artificially inflating stock price to increase personal compensation fails to allege requisite motive) (quoting *Acito*, 47 F.3d at 54); *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1130-31 (2d Cir. 1994) (same holding); *In re Refco, Inc. Sec. Litig.* ("*Refco I*"), 503 F. Supp. 2d 611, 645 (S.D.N.Y. 2007) (same holding) (citation omitted).

Menorah Group places greater emphasis on the second pleading criteria and presents evidence that allegedly shows that Friedman, Oolie and Hiram acted with conscious misbehavior or recklessness. To prove recklessness, Menorah Group must show that defendants' actions were "highly unreasonable, representing an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Rothman v. Gregor*, 220 F.3d 81, 90 (2d Cir. 2000) (citation and quotation marks omitted). This requires sufficient evidence to show that defendants, inter alia, "knew facts or had access to information suggesting that their public statements were not accurate" or "failed to check information they had a duty to monitor." *Novak v. Kasaks*, 216 F.3d 300, 311 (2d Cir. 2000) (citations omitted). "An egregious refusal to see the obvious, or to investigate the doubtful, may in some cases give rise to an inference of recklessness." *In re Carter-Wallace, Inc., Sec. Litig.*, 220 F.3d 36, 40 (2d Cir. 2000) (quoting *Chill v. General Elec. Co.*, 101 F.3d 263, 269 (2d Cir. 1996)) (quotation marks omitted).

The central piece of evidence presented by Menorah Group is the fact that Friedman, Oolie and Hiram each signed unanimous consent forms containing inaccurate grant dates. Menorah Group claims this was in contravention of both GAAP and Comverse's SEC filings. Menorah Group also claims that, in 1999, Friedman and Oolie received a list of fictitious names, each with the same address, that constituted an illegal slush fund. Menorah Group alleges that if Friedman and Oolie had examined this list, "they would have immediately know that something was amiss." (Lead Pls.' Omnibus Mem. in Opp'n to Defs.' Mot. to Dismiss 29.)

While these "red flags . . . are glaringly suggestive of fraud," the question remains whether Menorah Group has alleged sufficient facts that "would place a reasonable party in [defendants'] position on notice of wrongdoing." *Refco I*, 503 F. Supp. 2d at 649 (citation and quotation marks omitted). Friedman, Oolie and Hiram argue that there is no evidence that they knew or understood that the unanimous consent orders they signed were fraudulent. Friedman, Oolie and Hiram claim that instead they relied on representations by Sorin, who was Comverse's legal counsel, and point out that even Comverse's outside accounting firm failed to discover either the alleged backdating scheme or the illegal slush fund. (*See* Mem. of Law of Friedman and Oolie in Supp. of Their Mot. to Dismiss 15.) Hiram also contends that, because he joined Comverse's board in June 2001, he only signed one of the allegedly fraudulent unanimous consent orders.

Friedman, Oolie and Hiram's theory that they were actively duped by Alexander, Krienberg and Sorin constitutes at least a "plausible nonculpable" explanation for their conduct. *See Tellabs*, 127 S.Ct. at 2510. Friedman, Oolie and Hiram's mere membership "in a committee with oversight responsibilities . . . is not enough to give rise to an inference of recklessness."

-39-

*Refco I*, 503 F.Supp.2d at 653.  Under the facts of this case, it is plausible that the simple, ministerial task of signing unanimous consent forms would not have alerted Friedman, Oolie or Hiram that Comverse was issuing fraudulent stock options.  *See In re Adelphia Commc'ns Corp. Sec. and Derivative Litig.*, No. 03-MD-1529 (LMM), 2007 WL 2615928, at *4-5 (S.D.N.Y. Sept. 10, 2007) (holding that vague allegations that outside board members were aware of GAAP violations does not meet heightened scienter requirement in 10b-5 action).

In fact, it is a more likely theory that Alexander, Krienberg and Sorin actively hid the alleged backdating scheme from Friedman, Oolie and Hiram.  In his criminal allocution, Kreinberg admitted that he helped conceal the existence of the illegal slush fund from the Compensation Committee.  (Landman Decl. Ex. J at 25-26.)  The uncontroverted evidence shows that it was Sorin who drafted the unanimous consent forms for Friedman, Oolie and Hiram to sign.  At the same time, Menorah Group has failed to allege specific evidence that Friedman, Oolie and Hiram "knew or, more importantly, should have known" that by signing the forms that they were allowing Comverse to issue fraudulent stock options.  *See Novak*, 216 F.3d at 308.  While Menorah Group has shown that Friedman, Oolie and Hiram were negligent in fulfilling their duty to oversee Comverse's options program, this alone does not fulfill the scienter requirement for showing recklessness.  *See In re JP Morgan Chase Sec. Litig.*, 363 F. Supp. 2d 595, 624 (S.D.N.Y. 2005) (citations omitted) ("Recklessness in the scienter context cannot be merely enhanced negligence.").  It is therefore "at least as compelling" that Friedman, Oolie and Hiram did not act recklessly in signing unanimous consent orders granting fraudulent stock options.  *See Tellabs*, 127 S.Ct. at 2510.  Thus, I respectfully recommend that Counts I, II and IV should be dismissed against Friedman, Oolie and Hiram.

b.        Additional Accounting Claims

Comverse argues that the Additional Accounting Claims should be dismissed because

Menorah Group fails to meet Rule 9(b) and the PSLRA pleading requirement.  Comverse

contends that the Additional Accounting Claims merely parrot language from the company's

November 14, 2006 press release whereby Comverse stated that it was investigating the potential

of such past accounting irregularities.  Menorah Group responds, inter alia, that Comverse's

press release alone shows that the Additional Accounting Claims are tied to the alleged option

backdating scheme.  Menorah Group points to the fact that Comverse's press release stated that

past financial statements should not be relied upon because of the Additional Accounting Claims

"*in addition to* stock options grant practices."  (Compl. ¶ 176) (emphasis added).  The Additional

Accounting Claims are also clearly tied to the alleged backdating scheme because of the simple

fact that Comverse referred to its internal investigation as "Phase I" and "Phase II" respectively.

(Rushd Decl. Ex. 1 at 3-4.)  As such, isolation of the Additional Accounting Claims runs afoul of

the Supreme Court's admonition that "the court's job is not to scrutinize each allegation in

isolation but to assess all the allegations holistically."  *Tellabs*, 127 S.Ct. at 2511.

The question is whether -- when viewed alongside Menorah Group's detailed allegations

regarding backdated stock options -- Comverse's press release and ongoing internal investigation

into the Additional Accounting Claims meets Rule 9(b) and the PSLRA.  *Tellabs* again provides

guidance: "When the allegations are accepted as true and taken *collectively*, would a reasonable

person deem the inference of scienter at least as strong as any opposing inference?" 127 S.Ct. at

2511 (emphasis added and footnote omitted).  In its press releases, Comverse has repeatedly

warned that the Additional Accounting Claims might lead to further material adjustments in past

financial disclosures. Coupled with the detailed allegations of backdated stock options, it is highly plausible that defendants engaged in additional accounting irregularities in order to cover up the backdated options and, in the process, artificially drive up Comverse's stock price. The fact that Comverse has warned of the need to materially restate its financial disclosures weighs toward the likelihood that defendants engaged in such additional deliberate misconduct. *See Sirota v. Solitron Devices, Inc.*, 673 F.2d 566, 573 (2d Cir. 1982) (holding that, when examining restatement of past earnings, it "was proper to infer intent from subsequent admissions of misrepresentations, coupled with the defendants' continuous intimate knowledge of company affairs"); *In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 488-89 (S.D.N.Y. 2004) (citing cases) ("When a company is forced to restate its previously issued financial statements, the mere fact that the company had to make a large correction is some evidence of scienter.").

Furthermore, Comverse's internal investigation into the Additional Accounting Claims is ongoing and has stretched out for over a year and a half. This significantly weighs toward the likelihood of wrongdoing. *See Kaltman v. Key Energy Servs.*, 447 F. Supp. 2d 648, 664 (W.D. Tex. 2006). More importantly, whatever evidence exists regarding the Additional Accounting Claims is still in the hands of Comverse. It would be inappropriate to pare away the Additional Accounting Claims at this stage of litigation given that Menorah Group has otherwise met its pleading requirement over their allegations of backdated stock options. In other words, Comverse should not be rewarded because it has yet to conclude its internal investigation into the Additional Accounting Claims. Should Comverse's internal investigation reveal that the Additional Accounting Claims are immaterial, than Comverse would be free to make such an

argument at a later stage of litigation.  At *this* stage of litigation, accepting as true that defendants engaged in accounting irregularities, and when viewed holistically alongside the backdated stock options scheme, a reasonable person could find that there is as strong an inference that defendants engaged in the Additional Accounting Claims.  *See Tellabs*, 127 S.Ct. at 2509-10.  I therefore respectfully recommend denying Comverse's motion to dismiss as to the Additional Accounting Claims.

2.      <u>Whether Menorah Group Alleges Count III with Sufficient Particularity</u>

Friedman, Oolie and Hiram each move to dismiss Count III against them.  To state a claim under § 20(a) of the Securities Exchange Act of 1934, "a plaintiff must show (1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud."  *ATSI Commnc'ns*, 493 F.3d at 108 (citation omitted).  Friedman, Oolie and Hiram each claim that Menorah Group has failed to sufficiently allege that they culpably participated in the fraud.  To meet this requirement, Menorah Group "must plead with particularity facts giving rise to a strong inference that the controlling person knew or should have known that the primary violator, over whom that person had control, was engaging in fraudulent conduct."  *Refco I*, 503 F. Supp. 2d at 661 (citation and internal quotations omitted); *see also Kalin v. Xanboo, Inc.*, No. 04-CV-5931 (KMK), 2007 WL 273546, at *12 (S.D.N.Y. Jan. 31, 2007) (citing cases); *In re Worldcom, Inc.*, -- B.R. --, 2007 WL 2983694, at *19 (Bankr. S.D.N.Y. Oct. 15, 2007) (explaining Second Circuit pleading requirements for § 20(a)).

For the reasons given, *supra* II.B.1.a, Menorah Group has failed to sufficiently allege that Friedman, Oolie or Hiram knew or should have known that the other named defendants were

-43-

engaged in fraud.  Menorah Group has therefore failed to meet their pleading requirement as to culpable participation.  I respectfully recommend that Count III should be dismissed against Friedman, Oolie and Hiram.

### 3.    Whether Count IV States an Actionable Claim

Comverse, Friedman and Oolie, joined by the other defendants, argue that Count IV is defective and otherwise barred by the three-year statute of limitations for § 14(a) of the Securities Exchange Act of 1934.  *See* 15 U.S.C. § 77m.  In Count IV, Menorah Group alleges that Comverse's 2002 Proxy Statement misled voters into repricing stock options and that plaintiffs were injured by the resulting dilution of Comverse shares.  As a remedy, Menorah Group seeks to rescind these option grants.  (*See* Compl. ¶ 225.)

Defendants contend that Menorah Group has sought to take advantage of the five-year statute of limitations under SOX by disguising Count IV as an SEC Rule 10b-5 claim when it is, in fact, plainly a claim under § 14(a).  Courts faced with similar recharacterizations of § 14(a) claims have explicitly rejected applying a five-year statute of limitations.  *See, e.g.*, *In re Global Crossing, Ltd. Sec. Litig.*, 313 F. Supp. 2d 189, 196-97 (S.D.N.Y. 2003); *In re Exxon Mobile Corp. Sec. Litig.*, 387 F. Supp. 2d 407, 423-24 (D.N.J. 2005); *see also In re Alstom SA Sec. Litig.*, 406 F. Supp. 2d 402, 412-18 (S.D.N.Y. 2005) (similar analysis to claims brought under §§ 11, 12(a)(2) and 15 of Securities Act of 1933).  Menorah Group seems to concede this point in their opposition brief, having failed to cite any authority in support of pursuing Count IV under Rule 10b-5.  (*See* Pls.' Omnibus Mem. in Opp'n to Defs.' Mot. to Dismiss 33-34.)  Menorah Group instead focuses on share dilution, which is extraneous to Menorah Group's allegation that defendants issued a false and misleading proxy.  In any case, the claim of injury resulting from

-44-

false representations in the 2002 proxy statement has already been pled under Count I of the

amended complaint. Therefore, I respectfully recommend that Count IV should be dismissed

against all defendants for failure to state an actionable claim or, in the alternative, because it is

barred by the statute of limitations.

### 4.    Whether Count V Alleges Material Misrepresentations

Oolie and Friedman, joined by the other defendants, argue that Count V should be

dismissed for failure to allege material misrepresentations. Menorah Group brings Count V

under § 14(a) of the Securities Exchange Act of 1934, which "prohibits the solicitation of proxies

by means of materially false or misleading statements." *Va. Bankshares, Inc. v. Sandberg*, 501

U.S. 1083, 1087-87 (1991); *see also Resnick v. Swartz*, 303 F.3d 147, 151 (2d Cir. 2002).

Claims under § 14(a) are subject to the heightened pleading requirement under the PSLRA. *See*

*Fisher v. Kanas*, 467 F. Supp. 2d 275, 281 (E.D.N.Y. 2006) (citations omitted).

Menorah Group claims that the 2003, 2004 and 2005 proxies were materially misleading

because they inaccurately referred to Alexander and Kreinberg's "value realized"

compensation.[18] (*See* Compl. ¶ 237(c).) Menorah Group acknowledges, however, that Comverse

stopped granting allegedly backdated options at the end of 2001. (*See id.* ¶ 47.) Defendants

contend that any references to past grants were accurate because the "value realized"

compensation reflected the correct value of the options after they were exercised or vested. *See*

17 C.F.R. § 229.402. In other words, defendants claim that the proxy statements used the

---

[18] Menorah Group also claims that the proxies inaccurately stated that the purpose of stock options was to align employee interests with shareholders. (Pls.' Omnibus Mem. in Opp'n to Defs.' Mot. to Dismiss 34-35.) I agree with defendants that this statement was materially accurate given that employees still had an incentive to maximize the value of options even after they had received their fraudulent profit due to backdated grant dates.

allegedly backdated grant dates in calculating compensation. Menorah Group disputes this, and argues that the value realized column did not reflect the backdated grant dates. Given that this dispute of fact arises in a motion to dismiss, I must assume that the proxies did contain misstatements regarding the value realized compensation to Alexander and Kreinberg.

The remaining question, however, is whether Menorah Group has met the heightened pleading requirement by showing that any such misstatements were material. "[A]t the pleading stage, the plaintiff satisfies the materiality requirement by alleging a statement or omission that a reasonable investor would have considered significant in making investment decisions." *Fisher*, 467 F. Supp. 2d at 281 (quoting *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 161 (2d Cir. 2000)) (quotation marks omitted); *see also Seinfeld v. Gray*, 404 F.3d 645, 650 (2d Cir. 2005) ("[T]he plaintiff must show that there was a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available.") (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)) (other citation and quotation marks omitted). Omissions of fact are not actionable when "the disputed transaction would have occurred even if the proxy statement had been complete and accurate." *Minzer v. Keegan*, 218 F.3d 144, 150 (2d Cir. 2000) (citing *Va. Bankshares*, 501 U.S. at 1107-08).

The alleged misstatement here relates to the amount of past compensation to Alexander and Kreinberg. Even though Alexander and Kreinberg's past compensation was greater than previously disclosed, this fact would have been unlikely to cause investors to reject the 2003, 2004 and 2005 proxies. First, the proxies granted multiple millions of dollars in compensation to Comverse's executives, meaning that investors would be unlikely to view additional past

-46-

compensation as a bar to future compensation.  Second, Menorah Group has not alleged that the

2003, 2004 and 2005 proxies granted fraudulent or backdated options.  Thus, even were the

Court to hold that the omissions were material, there is no causal link between the omission

relating to past compensation and the approval of the proxies.  *See Minzer*, 218 F.3d at 145.

Instead, the total mix of information contained in the 2003, 2004 and 2005 proxies allowed

investors to reasonably and accurately decide whether to approve *prospective* compensation

packages, regardless of incorrect data regarding past compensation to Alexander and Kreinberg.

*See Seinfeld*, 404 F.3d at 650-51.  Menorah Group has therefore failed to meet their burden, and I

respectfully recommend that Count V should be dismissed against all defendants.

> 5.    Whether Plaintiffs Have Standing to Bring Counts II, III and IV

Friedman and Oolie argue, as do other defendants by incorporation, that plaintiffs lack

standing to bring Counts II, III and IV.  Defendants argue that Count II should be brought as a

derivative claim, and that Menorah Group lacks standing to bring Counts II, III and IV because it

was not a shareholder at the time of the alleged fraud.  As to the first argument, it is important to

note that Menorah Group's claim is essentially that defendants' failure to disclose backdated

stock options acted as a market manipulation.  "The gravamen of a market manipulation claim is

that defendants' actions convey to investors, via the market (which, absent manipulation, would

produce a price that fairly reflects the value of securities), a false sense of a security's value."  *In

re Refco Capital Markets, Ltd. Brokerage Customer Sec. Litig.* ("*Refco II*"), No. 06-CV-643

(GEL), 2007 WL 2694469, at *7 (S.D.N.Y. Sept. 17, 2007) (citing *ATSI Commc'ns*, 493 F.3d at

101).  Menorah Group claims that plaintiffs were injured by defendants' fraudulent scheme

because as investors they purchased Comverse securities at artificially inflated prices.  The fact

that Comverse's stock price fell sharply after the company disclosed the backdating scheme strongly reinforces Menorah Group's claim of injury.  As such, plaintiffs have standing to bring Count II because they have alleged an injury resulting from defendants' violation of Rule 10b-5(a) and 10b-5(c).[19]

Defendants' second standing argument is likewise without merit.  The PSLRA requires that the Court appoint a lead plaintiff to represent the interests of all class members.  *See* 15 U.S.C. § 78u-4(a)(3)(B).  The PSLRA does not, however, require that lead plaintiff Menorah Group have standing to bring all claims under the complaint.  *See In re Global Crossing, Ltd. Sec. Litig.*, 313 F. Supp. 2d at 204.  Such a requirement is contrary to the very purpose of the PSLRA, which is to manage complex securities litigation involving a large number of plaintiffs, *see id.* at 204-05, and to ensure that such litigation is investor-driven.  *See In re Initial Public Offering Sec. Litig.*, 214 F.R.D. 117, 123 (S.D.N.Y. 2002).

Even were, as defendants urge, the Court to impose such a standing requirement on Menorah Group individually, Menorah Group has alleged that it purchased Comverse stock in 2006 at prices inflated by defendants' ongoing improper accounting of backdated stock options.  Menorah Group made such a purchase in reliance on past disclosures.  Therefore, Menorah Group has met its standing requirement as to Counts II, III and IV.  I respectfully recommend that defendants' motions to dismiss based on plaintiffs' standing should be denied.

> 6.    Whether Plaintiffs' Claim Under Count I Ended on April 17, 2006

---

[19] None of the cases cited by Oolie and Friedman diminish plaintiffs' claim of injury.  At best, these cases show that a claim of *corporate waste* resulting from improper compensation must be brought as a derivative lawsuit.  (*See* Mem. of Law of Friedman and Oolie in Supp. of Their Mot. to Dismiss at 18-20.)  This is not the basis of plaintiffs' claim here.

-48-

Comverse, joined by the other defendants, argues for a partial dismissal of Count I for any claims that occurred after April 17, 2006, when the company issued a press release confirming that its past financial statements should no longer be relied upon and would need to be restated. (*See* Mustokoff Aff. Ex. B.) A successful 10b-5 claim requires a showing of causation, which has two elements: transaction causation and loss causation. *See Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc.*, 343 F.3d 189, 196-97 (2d Cir. 2003) (citations omitted). Transaction causation, which is analogous to reliance, refers to the causal link between a defendant's misrepresentations or omissions and a plaintiff's purchase of securities. *Id*. at 197 (citations omitted). Loss causation, which is analogous to proximate cause in a torts context, refers to the causal relationship between a defendant's misrepresentations or omissions and a subsequent decline in the value of the company's securities. *Id.* (citations omitted). Comverse seems to argue that both elements of causation ended on April 17, 2006.

As to transaction causation, Comverse cites two cases that it claims are directly on point. *See In re Livent Noteholders Sec. Litig.*, 151 F. Supp. 2d 371 (S.D.N.Y. 2001); *Semerenko v. Cedent Corp.*, 223 F.3d 165 (3d Cir. 2000). In *Livent*, the relevant press release warned of "massive, systematic accounting irregularities" that "appear to involve millions of dollars" and "could give rise to an event of default." 151 F. Supp. 2d at 390, 439, 440. This press release was sufficiently dire that it led the NASDAQ and Toronto Stock Exchange to halt trading of the company's stock. *Id*. at 390. As such, the court concluded that "Cassandra herself could not have warned [the plaintiffs] more directly and ominously that Livent's prior statements about the company's financial health could no longer be reasonably relied upon." *Id*. at 439-40.

In contrast, Comverse's April 17, 2006 press release failed to give similarly detailed warnings about the scope of the backdated options scheme. While Comverse's press release confirmed that past financial statements were inaccurate, it hedged that warning by stating that the company did not expect any future restatements to have a material impact on revenues and expenses. In fact, the company later disclosed that previously unaccounted-for expenses totaled approximately $314 million, which was arguably far more severe than Comverse had initially indicated. The April 17, 2006 press release also did not indicate that the company would be delaying its annual report as a result of its internal investigation. This delay led to NASDAQ delisting Comverse's stock. Nor did the press release indicate that Alexander, Kreinberg and Sorin would be the subject of criminal charges. Nor did the press release give any indication of the Additional Accounting Claims, which were first disclosed in Comverse's November 2006 press release. In sum, the April 17, 2006 only warned investors about the existence of backdated options and the need to restate past financial statements, but it gave no indication about the gravity of the alleged scheme nor its impact on the company.

The question is whether such a warning would have nonetheless sufficiently put plaintiffs on notice about the continued risk of owning or purchasing Comverse securities. The Second Circuit provides guidance in how to assess Comverse's motion to dismiss:

> [T]he key question a district court must decide when determining whether to grant a motion to dismiss a securities fraud complaint is whether plaintiffs have overcome the existence of [cautionary] language. Plaintiffs may do this by showing, for example, that the cautionary language did not expressly warn of or did not directly relate to the risk that brought about plaintiffs' loss. Of course, considering the enormous number of different settings in which securities fraud litigation arises, that question has to be decided on a case-by-case basis. In all cases, however, the court must keep in mind that a complaint fails to state a claim

of securities fraud if *no reasonable investor* could have been misled about the nature of the risk when he invested.

*Halperin v. eBanker USA.com, Inc.*, 295 F.3d 352, 359 (2d Cir. 2002) (citation omitted and emphasis in original). Although *Halperin* involved the reliability of certain forward-looking predictions that are not at issue here, a similar analysis is still warranted. As noted, the cautionary language in Comverse's press release did not fully warn plaintiffs of what the company would eventually reveal up through November 2006. A reasonable investor could have thus concluded from Comverse's April 17, 2006 press release that the worst was already over. *See Fogarazzo v. Lehman Bros., Inc.*, 341 F. Supp. 2d 274, 294 (S.D.N.Y. 2004) ("A statement can also be misleading, though not technically false, if it amounts to a half-truth by omitting some material fact.").

The other case cited by Comverse further undermines its position. *Semerenko* arose in the context of a proposed merger which failed when the defendant company issued an April 15, 1998 press release disclosing past accounting irregularities. 223 F.3d at 170-71. The press release stated that the irregularities would cause the company to restate its annual and quarterly earnings for the 1997 fiscal year by $0.02 per share. *Id*. at 170. In the months following this press release, the company announced that the irregularities were actually worse than expected and earnings would be reduced by over $270 million, or $0.28 per share. *Id*. at 171. In assessing these disclosures, the Third Circuit held that reliance on the financial disclosures prior to the April 15, 1998 press release was unreasonable given that the company had warned about their inaccuracy. *Id*. at 181. The same is true here: plaintiffs cannot claim that they purchased

-51-

Comverse securities in reliance on pre-April 17, 2006 disclosures once they knew those disclosures were inaccurate.

As Menorah Group points out, however, Comverse erroneously focuses on only this first part of the *Semerenko* holding. The Third Circuit went on to hold that, while the public warning ended any reliance on prior disclosures, investors *did* detrimentally rely on the company's inaccurate April 15, 1998 assessment regarding the scope of restated earning. *Id*. at 181-83 ("Nevertheless, we do not accept the defendants' contention that the Class could not have reasonably relied on the alleged misrepresentations that were *included* in the April 15, 1998 announcement.") (emphasis in original). Similarly, Menorah Group alleges here that plaintiffs detrimentally relied on Comverse's April 17, 2006 representation about the scope of the fraudulent scheme, specifically that any future restatements would not have a material impact on revenues and expenses. Menorah Group has sufficiently alleged that the April 17, 2006 press release was either misleading or contained omissions of material fact because, as noted, it gave little if any indication about the full impact and scope of the backdating scheme and the Additional Accounting Claims. Given the standard by which a motion to dismiss under Rule 12(b)(6) must be determined, Menorah Group's showing is therefore sufficient to prove that transaction causation occurred beyond April 17, 2006.

Comverse also claims that loss causation ended with the April 17, 2006 press release because Menorah Group has not sufficiently alleged a causal link between post-April 17 disclosures and the subsequent drops in the company's stock price. *See Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 346-47 (2005). Comverse is free to argue loss causation to the fact finder, but for now it sufficiently plausible that the drops in the company's stock price that

-52-

occurred through November 2006 were caused by Comverse's disclosures. *See Refco I*, 503 F. Supp. 2d at 657. Menorah Group has sufficiently alleged that each of the post-April 17 disclosures resulted in an immediate drop in Comverse's stock price. (*See* Compl. ¶¶ 162, 164, 174.) None of the cases cited by Comverse overcomes the fact that, as discussed above, the April 17, 2006 press release did not reveal the full magnitude of defendants' alleged fraud. This is a sufficient showing to carry Menorah Group's burden at the pleading stage of litigation. Therefore, I respectfully recommend that plaintiffs' claim under Count I did not end on April 17, 2006.

### 7. Whether Menorah Group's Claims Are Barred by the Statute of Limitations

Sorin claims that Counts I, II and III should be partially dismissed against him for any acts or omissions that occurred prior to June 12, 2001.[20] The statute of limitations for these counts, which are raised under §§ 10(b) and 20(a) of the Securities Exchange Act of 1934, is five years after any violation. *See* 28 U.S.C. § 1658(b)(2). Because Sorin was first named a defendant in this case on June 12, 2006, he urges dismissal of claims arising from Comverse's disclosures prior to June 12, 2001. (*See* Compl. ¶¶ 65-82.) Menorah Group responds that Sorin is still liable because Comverse republished its pre-June 12, 2001 financial statements in later disclosures. Further, Menorah Group claims that, because the relevant options vested four years after their grant date, Sorin is still liable for allegedly fraudulent statements that occurred after June 12, 2001 but were related to the grant of backdated options before this date.

---

[20] Friedman and Oolie have made a similar argument. However, because I recommend that Counts I, II and III should otherwise be dismissed against them, I make no recommendation on these grounds.

Courts in this Circuit have raised questions as to whether the continuing violation doctrine applies to securities fraud actions. *See, e.g.*, *SEC v. Caserta*, 75 F. Supp. 2d 79, 80 (E.D.N.Y. 1999) (citation omitted). Nonetheless, more than one court in this Circuit has found that where misrepresentations "were followed by additional materially false statements regarding the same subject matter" than the period of repose runs from when the last alleged misrepresentation was made. *In re Dynex Capital, Inc. Securities Litigation*, No. 05-CV-1897 (HB), 2006 WL 314524, at \*5 (S.D.N.Y. Feb. 10, 2006); *accord Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.*, No. 05-CV-1898 (SAS), 2005 WL 2148919, at \*5 (S.D.N.Y. Sept. 6, 2005) (citing *Quaak v. Dexia S.A.*, 357 F. Supp. 2d 330, 338 (D.Mass. 2005); *Borden, Inc. v. Spoor Behrins Campbell & Young, Inc.*, 778 F. Supp. 695, 699 (S.D.N.Y. 1991); *Continental Bank, Nat'l Ass'n v. Ludlow*, 777 F. Supp. 92, 102 (D.Mass. 1991)). *Cf. In re Zoran Corp. Derivative Litig.*, -- F. Supp. 2d --, 2007 WL 1650948, at \*21 (N.D.Cal. 2007) (applying statute of limitations to first rather than last misrepresentation where no scheme was alleged that connected nine years worth of option grants).

Menorah Group has made a sufficient showing that Comverse's financial statements after June 12, 2001 contained active misrepresentations about stock options issued before this date. The fact that Menorah Group has alleged that Comverse stock options did not vest for four years also weighs in favor of rejecting Sorin's motion. Menorah Group alleges that, under proper accounting, Comverse should have amortized the compensation expense derived from stock options evenly over the entire vesting period. Assuming this is true, than options granted prior to June 12, 2001 would nonetheless still have an impact on Comverse's later financial disclosures. In other words, Menorah Group does not solely claim that Sorin's malfeasance took place prior

to the statute of limitations, *see Shalam v. KPMG, LLP*, 05-CV-3602 (HB), 2005 WL 2139928, at *2-3 (S.D.N.Y. Sept. 6, 2005), but rather that Sorin engaged in a continuing and related series of fraudulent disclosures well after the period of repose. At a later stage of litigation, Sorin is free to argue that disclosures after June 12, 2001 were not related to the options scheme. He may also dispute Menorah Group's allegation that Comverse options vested over four years. However, at this stage of the litigation, I respectfully recommend that Sorin's motion to partially dismiss Counts I, II and III be denied.

CONCLUSION

For the forgoing reasons, I respectfully recommend that: (1) Menorah Group should be ordered to re-serve the amended complaint by hand delivering a copy to Alexander's apartment in New York City and by delivering via certified mail an additional copy to his attorneys; (2) all counts should be dismissed against Oolie, Friedman and Hiram; and (3) Counts IV and V should be dismissed against all defendants. I respectfully recommend that all other motions to dismiss should be denied. Any objections to this Report and Recommendation must be filed with the Clerk of the Court and the Honorable Nicholas G. Garaufis within ten business days of receiving this Report and Recommendation. Failure to file timely objections may waive the right to appeal the District Court's Order. *See* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 6(a), 6(e), 72; *Small v. Secretary of Health & Human Servs.*, 892 F.2d 15, 16 (2d Cir. 1989).

**Dated:     Brooklyn, New York**
**           October 31, 2007**

*Ramon E. Reyes, Jr.*

**RAMON E. REYES, JR.**
**U.S. Magistrate Judge**