UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x

IN RE: GLOBAL CORD BLOOD                        24-cv-3071 (PKC)
CORPORATION SECURITIES LITIGATION
                                                <u>OPINION AND ORDER</u>


------------------------------------------------------------x
CASTEL, Senior District Judge:

   Plaintiffs in this putative securities class action assert that defendants

engaged in a years-long scheme to illicitly transfer hundreds of millions of dollars from the

cash reserves of defendant Global Cord Blood Corporation ("Global Cord"), a company

whose shares formerly traded on the NYSE, to the founder of its former parent company

and businesses under his control.  In an effort to conceal this alleged misappropriation of

company funds, defendants publicly announced what plaintiffs allege to be sham

acquisition of a small medical-research startup, defendant Cellenkos, Inc. ("Cellenkos"), in

a deal that was to include $664 million in cash consideration for an allegedly worthless

product technology.  That transaction was never consummated, however, after Global

Cord's majority shareholder brought legal proceedings in the Cayman Islands and

elsewhere.

   Plaintiffs are two Global Cord shareholders who brings claims against eight

defendants, including Global Cord, CEO Ting ("Tina") Zheng, CFO Bing Chuen

("Albert") Chen, and two independent directors, Mark Da-Jian Chen and Jennifer Weng.

They also bring claims against Yuen Kam and Golden Meditech Holdings Limited

("Meditech"), who allegedly received the undisclosed cash transfers from Global Cord and

stood to benefit from the failed Cellenkos transaction, and a claim against Cellenkos itself.

The claims are brought under section 10(b) and rule 10b-5 of the Securities Exchange Act

of 1934, 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5, as well as a claim of control-person

liability under Section 20(a), 15 U.S.C. § 78t(a).  Plaintiffs assert that Global Cord, Zheng

and Albert Chen are liable for making actionable misstatements and omissions under

section 10(b) and rule 10b-5(b), and that all eight defendants are liable for what is

commonly known as "scheme liability" under rule 10b-5(a) and (c), premised on the

purportedly fraudulent Cellenkos transaction.

Five motions to dismiss have been filed, urging that the Amended

Complaint (the "Complaint" or "Compl't") should be dismissed for failure to effectuate

timely service of process, lack of personal jurisdiction over defendants who are foreign

nationals, and failure to state a claim.  Rule 12(b)(2), 12(b)(5) and 12(b)(6), Fed. R. Civ. P.

Global Cord has not filed a motion to dismiss, and its two officer defendants, CEO Tina

Zheng and CFO Albert Chen, move to dismiss only on grounds of untimely service and

personal jurisdiction.

For the reasons that will be explained, defendants' motions to dismiss on

grounds of untimely service and personal jurisdiction will be denied in their entirety.  The

Rule 12(b)(6) motions of defendants Cellenkos, Mark Da-Jian Chen and Jennifer J. Weng

will be granted in their entirety.  The Rule 12(b)(6) motion of Meditech will be denied as to

the claim of scheme liability asserted in Count One but granted as to the claim of control

person liability asserted in Count Three.

BACKGROUND

    A.  <u>Overview of Global Cord.</u>

Global Cord is in the business of processing and storing umbilical cord

blood for expectant parents in China for potential use in medical treatments.  (Compl't ¶¶

2, 17.)  It is incorporated in the Cayman Islands and its principal place of business is in Hong Kong.  (Compl't ¶ 17.)

Global Cord began operating in or around 2003.  (Compl't ¶ 36.)  It originally was a subsidiary of defendant Meditech until in or around 2009, when its shares began to trade publicly on the New York Stock Exchange.  (Compl't ¶ 37.)

Until January 31, 2018, Meditech held a 65% equity interest in Global Cord. (Compl't ¶ 39.)  On or about that date, a limited partnership named Nanjing Ying Peng Hui Kang Medical Industry Investment Partnership, and its subsidiary Blue Ocean Structure Investment Company Ltd ("Blue Ocean"), purchased Meditech's shares in Global Cord. (Compl't ¶ 39.)

Global Cord's Form 20-F filings to the SEC showed a profitable company, in part because China's government granted it an exclusive license for cord blood banking in many of the country's largest regions.  (Compl't ¶ 42-43.)  For example, in 2021, Global Cord reported total assets of approximately $1,206,741,000, including $927,349,000 in cash and cash equivalents, and liabilities of $546,933,000.  (Compl't ¶ 43.)

According to the Complaint, shareholders and analysts were attuned to Global Cord's large cash reserves and urged the Company to distribute earnings to shareholders, either via dividends or stock buybacks.  (Compl't ¶¶ 44-47.)  In a 2019 earnings call, a Merrill Lynch analyst observed that the Company's share value was below the estimated cash value per share due to "the inefficiency of capital deployment" and asked the CEO to defend a policy of "capital storage as opposed to capital efficiency for shareholders."  (Compl't ¶ 45.)  One investor described the Company's approach to capital allocation as "laughable" and stated that management "hoard[ed]" cash.  (Compl't ¶ 45.)

B.  Overview of Meditech and Its CEO Yuen Kam.

Global Cord's former parent company, Meditech, is a healthcare conglomerate that has done business in China since 2001.  (Compl't ¶ 28.)  It has many subsidiaries and affiliated companies in the fields of hospital management, medical insurance, genetic testing and medical-device sales.  (Compl't ¶¶ 18, 28.)

Defendant Yuen Kam founded Meditech and has been its CEO for most of the class period, with the exception of a period in 2019-2020 when he temporarily departed Meditech after being censured by the Hong Kong Stock Exchange for what it called "serious breaches" of rules governing disclosure and shareholder approval.  (Compl't ¶ 30.)  However, in 2020, Kam led a successful effort to privatize Meditech and withdraw its listing on the Hong Kong Stock Exchange, after which he resumed his prior role as its executive director and CEO.  (Compl't ¶ 35.)

C.  Alleged Ongoing Ties Between Global Cord, Meditech and Kam.

According to the Complaint, after Meditech sold its interest in Global Cord to Blue Ocean in 2018, defendant Kam secretly "remained in control" of Global Cord.  (Compl't ¶ 41.)  During the class period, Global Cord's CEO and CFO allegedly were closely tied to Kam and Meditech.

The Complaint asserts that the following four defendants had ties to Meditech or Kam while they served as officers or directors of Global Cord:

Tina Zheng.  Defendant Zheng was Global Cord's CEO and chaired its board throughout the class period.  (Compl't ¶ 22.)  She previously was a director of Meditech and "had been in charge of" its subsidiaries' financial and internal controls.  (Compl't ¶¶ 22, 29.)  Zheng resigned as a director of Meditech after the Listing Committee of the Hong Kong Stock Exchange issued findings in December 2018.  (Compl't ¶ 33.)

4

Zheng is also married to defendant Kam and has two children with him, a fact that was not known to investors during the class period.  (Compl't ¶¶ 22, 89.)

           <u>Albert Chen.</u>  Defendant Albert Chen was Global Cord's CFO and one of its directors throughout the class period.  (Compl't ¶ 23.)  He previously was corporate finance vice president at Meditech.  (Compl't ¶ 23.)  According to the Complaint, Albert Chen "remained deeply involved" in Meditech's finances, though he had no official title and used pseudonyms to conceal his identity when working at Meditech.  (Compl't ¶¶ 23, 29, 41.)  The Complaint alleges that Albert Chen's "various aliases" included "Kong Kam Yu, Sammy," also known as "SK," with the email address samkykong@goldenmeditech.com. (Compl't ¶¶ 84, 95, 100.)

           <u>Mark Da-Jian Chen.</u>  Defendant Mark Chen was an independent director of Global Cord during the class period.  (Compl't ¶¶ 24, 38, 75.)  He sat on the Company's board of directors during the time that it was chaired by defendant Kam.  (Compl't ¶ 40.) He is married to defendant Jennifer Weng.  (Compl't ¶ 24.)

           <u>Jennifer J. Weng.</u>  Defendant Weng was an independent director of Global Cord during the class period.  (Compl't ¶ 25, 75.)  She sat on the board of directors during the time that it was chaired by defendant Kam.  (Compl't ¶ 40.)  As noted, she is married to defendant Mark Chen.  (Compl't ¶ 25.)

           D.  The Claimed Fund Transfers from Global Cord to
              <u>Entities Controlled by Meditech and/or Kam.</u>

           According to the Complaint, from 2015 through 2022, the defendants caused Global Cord and its subsidiaries to transfer hundreds of millions of dollars in cash to firms controlled by defendant Kam, including Meditech subsidiaries.  (Compl't ¶ 54.) These transfers allegedly became known to Global Cord shareholders and the investing

public when the Cellenkos transaction was announced and in ensuing litigation proceedings in the Cayman Islands.  (Compl't ¶¶ 79-82, 55-61.)

The Complaint identifies the following cash transfers from Global Cord to entities affiliated with Kam and/or Meditech:

- Between April 1, 2017 and May 31, 2022, Global Cord transferred 3,557,616,000 Chinese yuan (roughly $515,000,000 under the current exchange rate) to a Kam-owned entity, Beijing Jingjing Medial Equipment Co., Ltd.  (Compl't ¶ 55.)

- Between 2015 and 2022, a Global Cord subsidiary paid 4,261,000,000 Chinese yuan (approximately $606,000,000) through 74 transfers to Meditech entities controlled by Kam.  (Compl't ¶ 57.)

- Global Cord's bank statements reflected $9.9 million in payments between April 2021 to June 2022 from Global Cord to accounts of Meditech made through checks authorized by defendant Albert Chen.  (Compl't ¶ 60.)

E.  Global Cord's Proposed Transaction with Cellenkos.

The Complaint asserts that defendants intended to conceal these fund transfers through a sham transaction to acquire a small drug-development company named Cellenkos, Inc.  (Compl't ¶¶ 5, 62.)

Cellenkos is a Delaware corporation with a principal place of business in Texas, and Meditech is alleged to be its controlling shareholder.  (Compl't ¶ 19.) Cellenkos is in the business of developing drugs to treat inflammation and autoimmune diseases.  (Compl't ¶ 19.)  At all relevant times, Cellenkos had no revenue and no product candidates with regulatory approval, and its business prospects were "highly uncertain." (Compl't ¶ 49.)

On April 29, 2022, Global Cord filed an SEC Form 6-K announcing its proposed acquisition of Cellenkos through a series of Stock Purchase Agreements. (Compl't ¶ 63.)  Global Cord was to acquire 95% of outstanding shares of Cellenkos common stock in exchange for 65.7 million ordinary shares of Global Cord.  (Compl't ¶ 63.)  The SEC filing also stated that Global Cord had entered into a separate "Framework Agreement" with a Meditech subsidiary, GM Precision Medicine (BVI) Limited ("GMPM"), which was to receive 12.4 million ordinary shares of Global Cord and $664 million in cash consideration, "with the purpose to provide the Company with the intellectual property that will be necessary to develop Cellenkos' product candidates in the field of umbilical cord blood treatment for acute and chronic autoimmune diseases and inflammatory disorders in Asia."  (Compl't ¶ 63.)

The Complaint describes Cellenkos as a "tiny" firm that had recently issued shares worth a total of $15 million.  (Compl't ¶¶ 5, 81.)  Plaintiffs assert that Global Cord "grossly inflated" the transaction's value to "cover up" the past transfer of hundreds of millions of dollars from Global Cord to Meditech and its subsidiaries.  (Compl't ¶ 7.)

The Complaint states that Cellenkos was majority owned by persons affiliated with defendants Kam and Meditech, and that the Cellenkos website stated that Meditech and an unidentified "strategic investor" owned 51% of its voting shares. (Compl't ¶¶ 5, 53.)  The CFO and chair of Cellenkos was a Meditech executive director, non-party Kim Chuan ("Jackie") Leong.  (Compl't ¶¶ 5, 52.)  According to the Complaint, Cellenkos did not have a publicly identified CEO, and Leong was one of only two directors of the company.  (Compl't ¶ 52.)

F.  Blue Ocean's Legal Proceedings to Block the Cellenkos Transaction.

As noted, Blue Ocean was the majority shareholder of Global Cord at the time that the Cellenkos transaction was announced.  On May 5, 2022 – seven days after Global Cord announced the proposed transaction – Blue Ocean brought legal proceedings in the Grand Court of the Cayman Islands to enjoin the transaction and institute shareholder protections.  (Compl't ¶¶ 69, 88.)

The events in this proceeding post-date plaintiffs' proposed class period and are not alleged to constitute corrective disclosures.  The Court understands these allegations to be raised as context intended to set forth the full scope of defendants' alleged fraudulent acts.

During the Cayman litigation, Global Cord produced a bank statement purporting to show payments to "certain Kam controlled PRC [i.e., People's Republic of China] entities" as proof that $664 million in cash consideration had already been paid as part of the Cellenkos transaction.  (Compl't ¶ 70.)  The Cayman Grand Court described evidence suggesting that the bank statement was a forgery and found that "it is very difficult to avoid the conclusion that this . . . was in fact a forged document" created by defendant Albert Chen, then the CFO of Global Cord.  (Compl't ¶¶ 71-74.)

The Cayman Grand Court granted an "Amended Winding Up Petition" filed by Blue Ocean and appointed Joint Provisional Liquidators (the "Liquidators") to oversee Global Cord.  (Compl't ¶ 76.)  It found that "connections . . . clearly did exist" between Global Cord management and Cellenkos, that Global Cord failed to observe formalities required by Cayman corporate law and that it was "impossible . . . to discern any easily comprehensible commercial rationale" for the Cellenkos transaction.  (Compl't ¶¶ 92-94.)

As summarized in the Complaint, the Liquidators thereafter found that Global Cord "engaged in hundreds of millions of dollars' worth of undisclosed related party payments to entities controlled by Defendant Kam." (Compl't ¶ 83.) The Liquidators publicly disclosed for the first time that defendants Kam and Tina Zheng were married and had two children together, and that Albert Chen had used aliases to mask his role at Meditech. (Compl't ¶¶ 84, 89, 95.)

The Liquidators' reports described efforts by Albert Chen, Tina Zheng and Global Cord directors to frustrate or thwart the Liquidators' investigation and oversight of the Company. (Compl't ¶¶ 85-87.) The Grand Cayman Court later found that this was a "delaying tactic[ ]" intended to advance Kam's commercial interests. (Compl't ¶ 104.) It found that Albert Chen submitted misleading evidence and acted under the instructions of Kam as his "puppet" and "a sort of shadow management" for Global Cord. (Compl't ¶¶ 107-08.)

Blue Ocean also brought actions in the British Virgin Islands and the High Court of the Hong Kong Special Administrative Region. (Compl't ¶¶ 110-25.) Courts in those proceedings also made findings as to Chen's use of a pseudonym to conceal his involvement with Meditech, the creation of forged documents, Tina Zheng's lack of credibility as a witness and Kam's exercise of control over various defendants. (See id.)

G. Allegedly False and Misleading Statements
   Made During the Class Period.

While the Court need not detail their contents here, the Complaint identifies six allegedly false and misleading statements which are claimed to be actionable under section 10(b) and rule 10b-5(b). (Compl't ¶¶ 127-62.) These statements were set forth in Global Cord's Form 6-K and Form 20-F filings reporting on Global Cord's financial results and the Form 6-K filing announcing the planned Cellenkos acquisition. (Id.) Plaintiffs

9

allege that the statements were materially false and/or misleading, or failed to disclose material adverse facts, relating to the misappropriation of Global Cord's cash to entities controlled by Kam, did not disclose Global Cord's relationship to Meditech via Zheng's marital relationship to Kam, and misrepresented Global Cord's financial conditions, cash and assets.  (Id.)

These filings were signed by Tina Zheng and/or Albert Chen.  Global Cord, Zheng and Albert Chen have not moved pursuant to Rule 12(b)(6) to dismiss the rule 10b-5(b) claim brought against them in Count Two.

### H.  Declines in Global Cord's Share Price.

The Complaint asserts that Global Cord's share price dropped on May 2 and May 5, 2022 as a result of public reports about the Cellenkos transaction.  (Compl't ¶¶ 79-82.)

Global Cord announced the proposed Cellenkos transaction after close of trading on Friday, April 29, 2022.  (Compl't ¶ 79.)  Plaintiffs assert that "[d]efendants' scheme and misleading statements and omissions began to come to light" with that announcement.  (Compl't ¶ 79.)  On Monday, May 2, 2022, Global Cord's share price fell $0.98, or 28.6%, to $2.45 per share.  (Compl't ¶ 80.)

On May 5, 2022, Blue Ocean filed its petition in the Cayman Ground Court seeking to enjoin the transaction.  (Compl't ¶ 81.)  The petition described a rushed approval process by the Global Cord board and the overvaluation of Cellenkos, as well as other details about the transaction, such as CFO Albert Chen proposing a meeting in which defendant Kam, who had no formal affiliation with the Company, would act as its representative.  (Compl't ¶ 81.)  On that date, Global Cord's share price fell an additional $0.22, or 9.1%, to $2.20 per share.  (Compl't ¶ 82.)

I.   Overview of Plaintiffs' Claims.

Alessandro Somansino is the lead plaintiff under the PSLRA.  (Compl't ¶ 15; ECF 56.)  Mark Lewko is also a named plaintiff in the Complaint.  (Compl't ¶ 16.) They bring claims on behalf of a putative class of persons and entities who purchased publicly traded shares of Global Cord between June 18, 2019 and May 9, 2022 and were damaged thereby.  (Compl't ¶ 165.)

Count One brings a claim of scheme liability against all defendants under section 10(b) and rule 10b-5(a) and (c) promulgated thereunder.  (Compl't ¶¶ 178-80.) Plaintiffs assert that the proposed Cellenkos transaction was a device, scheme and artifice to defraud, and that it operated as a fraud or deceit upon purchasers of Global Cord's shares.  (Compl't ¶ 179.)

Count Two is brought under section 10(b) and rule 10b-5(b) against Global Cord, its CEO Tina Zheng and its CFO Albert Chen.  (Compl't ¶¶ 181-183.)  It asserts that these defendants made false statements of material facts and/or omitted material facts that were necessary to make certain statements not misleading.  (Compl't ¶¶ 181-83.)

Count Three brings a claim under section 20(a) against all individual defendants and Meditech, asserting that they acted as controlling persons within the meaning of the statute, and induced the alleged violations of section 10(b) and rule 10b-5. (Compl't ¶¶ 184-89.)

THE MOTION TO DISMISS FOR UNTIMELY
SERVICE OF PROCESS WILL BE DENIED.

Defendants Kam, Zheng, Albert Chen, Mark Chen and Meditech move to dismiss the Complaint on the grounds that they were not timely served with process.  See Rule 12(b)(5), Fed. R. Civ. P.  The motion will be denied.

"On a Rule 12(b)(5) motion to dismiss, the plaintiff bears the burden of establishing that service was sufficient." Khan v. Khan, 360 Fed. App'x 202, 203 (2d Cir. 2010) (summary order).  A court "must look to Rule 4" in deciding a Rule 12(b)(5) motion. George v. Professional Disposables Int'l, Inc., 221 F. Supp. 3d 428, 432 (S.D.N.Y. 2016) (Abrams, J.).

On October 22, 2024, the Court granted plaintiffs' motion to effectuate service of process by alternative means upon Kam, Tina Zheng, Albert Chen, Mark Chen and Meditech pursuant to Rule 4(f)(3), Fed. R. Civ. P.   (ECF 90, 81.)  The Court permitted service to be made via these defendants' respective United States counsel in a factually related shareholder derivative litigation pending in the New York Supreme Court, New York County.  (ECF 90.)

Rule 4(f) governs service of process upon individuals located in a foreign country.  Rule 4(f)(3) states that "[u]nless federal law provides otherwise, an individual . . . may be served at a place not within any judicial district of the United States . . . by means not prohibited by international agreement, as the court orders."  Courts often permit alternative service of process upon the United States counsel of a foreign defendant pursuant to Rule 4(f)(3), and have concluded that such service satisfies due process.  See, e.g., Orient Plus Int'l Ltd. v. Baosheng Media Grp. Holdings Ltd., 2024 WL 2317715, at *4-5 (S.D.N.Y. May 22, 2024) (Rochon, J.) (collecting cases); Jian Zhang v. Baidu.com Inc., 293 F.R.D. 508, 515 (S.D.N.Y. 2013) (it is "common" to order alternative service upon domestic counsel pursuant to Rule 4(f)(3)) (Furman, J.).  Judge Gardephe has explained that serving process through United States counsel is consistent with the text of Rule 4(f)(3) because "the relevant circumstance is where the defendant is, and not the location of the intermediary," and "ultimately, the foreign individual is served and thereby

provided notice outside a United States judicial district, in accordance with Rule 4's plain language." Washington State Inv. Bd. v. Odebrecht S.A., 2018 WL 6253877, at *4 (S.D.N.Y. Sept. 21, 2018).

The parties dispute whether plaintiffs were required to serve process within 90 days of the initial complaint's filing as required by Rule 4(m) or whether the timing of service is governed by the "flexible diligence" standard applied to a foreign defendant served under Rule 4(f). Rule 4(m) states in relevant part: "If a defendant is not served within 90 days after the complaint is filed, the court—on motion or on its own after notice to the plaintiff—must dismiss the action without prejudice against that defendant or order that service be made within a specified time." But it also states that "[t]his subdivision (m) does not apply to service in a foreign country under Rule 4(f) . . . ." The timing of service upon a foreign defendant is afforded greater leeway because "there is no time limit by which service must be effected on a defendant in a foreign country pursuant to Rule 4(f). Instead, courts have used a 'flexible due diligence standard' in determining whether service of process under Rule 4(f) is timely." S.E.C. v. Shehyn, 2008 WL 6150322, at *4 (S.D.N.Y. Nov. 26, 2008) (Preska, J.) (internal citations and quotation marks omitted).

The Court concludes that the "flexible due diligence" standard under Rule 4(f) applies and is satisfied. The initial complaint was filed on April 22, 2024. (ECF 1.) On June 21, 2024 and June 24, 2024, three competing motions were filed for the appointment of lead plaintiff under the PSLRA. (ECF 43, 46, 49.) On July 9, 2024, the Court appointed Alessandro Somansino as lead plaintiff and Glancy, Prongay & Murray LLP as lead counsel. (ECF 56.) Plaintiffs filed the Amended Complaint on September 20, 2024. (ECF 60.) On October 3, 2024, plaintiffs filed their motion to effectuate alternative service, which the Court granted on October 22, 2024. (ECF 81, 90.) On October 23,

2024, plaintiffs filed an affidavit of service stating that service had been made that same day via email to United States counsel for each of Meditech, Kam, Tina Zheng, Albert Chen and Mark Chen.  (ECF 91.)  Only 14 days elapsed between the filing of the Amended Complaint and plaintiffs' motion for alternative service, and plaintiffs made service the day after that motion was granted.  The Court concludes that plaintiffs acted with the due diligence required by Rule 4(f).[1]

Accordingly, defendants' Rule 12(b)(5) motion will be denied.

## DEFENDANTS' MOTIONS TO DISMISS FOR LACK OF PERSONAL JURISDICTION WILL BE DENIED.

### I.  Legal Standard.

On a Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction, a court construes the pleadings and any affidavits in the light most favorable to plaintiffs and resolves all doubts in their favor.  Sullivan v. UBS AG, 149 F.4th 206, 217 (2d Cir. 2025).  To survive the motion, "plaintiffs need only make a prima facie showing of personal jurisdiction over defendant[s]."  Id. (quotation marks omitted).  Legal conclusions couched as factual allegations do not support that showing.  DeLorenzo v. Viceroy Hotel Grp., LLC, 757 Fed. App'x 6, 8 (2d Cir. 2018) (summary order).  "A plaintiff must establish the court's jurisdiction with respect to each claim asserted."  Sunward Elecs., Inc. v. McDonald, 362 F.3d 17, 24 (2d Cir. 2004) (emphasis in original).

---

[1] If Rule 4(m) applied, the Court would exercise its broad discretion to extend plaintiffs' service deadline nunc pro tunc.  See, e.g., Zapata v. City of New York, 502 F.3d 192, 198 (2d Cir. 2007) (courts may extend time for service if there is "some colorable excuse for neglect"); Astoria General Contracting Corp. v. Office of the Comptroller of the City of New York, 2016 WL 3144059 (S.D.N.Y. Apr. 12, 2016) (Buchwald, J.) (extending service deadline nunc pro tunc).  Relevant considerations include the delay caused by the need to appoint a lead plaintiff under the PSLRA, defendants' receipt of actual notice of the claims, the absence of unfair prejudice identified by defendants, and the likelihood that dismissal could render plaintiffs' claims time-barred.  See, e.g., AIG Managed Market Neutral Fund v. Askin Capital Mgmt., L.P., 197 F.R.D. 104, 109-12 (S.D.N.Y. 2000) (Sweet, J.); In re Comverse Tech., Inc. Sec. Litig., 543 F. Supp. 2d 134, 147 (E.D.N.Y. 2008) (Garaufis, J.).

On a pre-discovery Rule 12(b)(2) motion, a court may consider documents that are properly subject to judicial notice.  See, e.g., Gov't Emps. Ins. Co. v. Onyema, 790 F. Supp. 3d 147, 161 n.4 (E.D.N.Y. 2025) (Chen, J.).  An SEC filing is properly subject to judicial notice.  See, e.g., Gimpel v. The Hain Celestial Group, Inc., 156 F.4th 121, 129 (2d Cir. 2025).

"Since the Securities Exchange Act permits the exercise of personal jurisdiction to the limit of the Due Process Clause of the Fifth Amendment, the personal jurisdiction challenge raised by [defendant] must be tested against due process standards." S.E.C. v. Unifund SAL, 910 F.2d 1028, 1033 (2d Cir. 1990) (internal citations omitted); see also Caplan v. Dollinger, 2025 WL 1808530, at *6 (S.D.N.Y. June 30, 2025) ("Plaintiffs' securities fraud claims are governed by the Exchange Act, 'which provides for worldwide service of process and permits the exercise of personal jurisdiction to the limit of the Fifth Amendment's Due Process Clause.'") (Furman, J.) (quoting Alki Partners, L.P. v. Vatas Holding GmbH, 769 F. Supp. 2d 478, 487 (S.D.N.Y. 2011) (Batts, J.)); 15 U.S.C. § 78aa(a) ("Any suit or action to enforce any liability or duty created by [the Exchange Act] or rules and regulations thereunder, or to enjoin any violation of such chapter or rules and regulations, may be brought in any such district or in the district wherein the defendant is found or is an inhabitant or transacts business . . . .").

"The due process test for personal jurisdiction has two related components: the 'minimum contacts' inquiry and the 'reasonableness' inquiry."  Metropolitan Life Ins. Co. v. Robertson-Ceco Corp., 84 F.3d 560, 567 (2d Cir. 1996).  "Because the Exchange Act authorizes nationwide service of process, the relevant contacts for purposes of the 'minimum contacts' analysis are those with the United States as a whole."  S.E.C. v. Passos, 760 F. Supp. 3d 95, 109 (S.D.N.Y. 2024) (Woods, J.).  "A federal court may not

exercise personal jurisdiction over a foreign defendant unless, among other things, that defendant has 'minimum contacts with [the forum][2] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice.'" Sullivan, 149 F.4th at 217 (quoting Int'l Shoe Co. v. Washington, 326 U.S. 310, 316 (1945)).

"[T]he Due Process Clause of the Fifth Amendment necessarily permits a more flexible jurisdictional inquiry commensurate with the Federal Government's broader sovereign authority." Fuld v. Palestine Liberation Org., 606 U.S. 1, 16 (2025). "[U]nder the Fifth Amendment the court can consider the defendant's contacts throughout the United States, while under the Fourteenth Amendment only the contacts with the forum state may be considered." Chew v. Dietrich, 143 F.3d 24, 28 n. 4 (2d Cir. 1998). To satisfy due process, "the defendant's suit-related conduct must create a substantial connection with the forum . . . ." Walden v. Fiore, 571 U.S. 277, 284 (2014).

When "the conduct that forms the basis for the controversy occurs entirely out-of-forum," the exercise of jurisdiction is determined under the so-called "effects test." Licci ex rel. Licci v. Lebanese Canadian Bank, SAL, 732 F.3d 161, 173 (2d Cir. 2013). "In such circumstances, the exercise of personal jurisdiction may be constitutionally permissible if the defendant expressly aimed its conduct at the forum." Id. "[T]he fact that harm in the forum is foreseeable, however, is insufficient for the purpose of establishing specific personal jurisdiction over a defendant." In re Terrorist Attacks on Sept. 11, 2001, 714 F.3d 659, 674 (2d Cir. 2013). The forum contacts must be created by the defendant individually. Sullivan, 149 F.4th at 218.

---

[2] In this Exchange Act case, references to the "forum" refer to a defendant's contacts with the United States as a whole.

"Once it has been decided that a defendant purposefully established minimum contacts within the [forum], these contacts may be considered in light of other factors to determine whether the assertion of personal jurisdiction would comport with 'fair play and substantial justice.'" Burger King Corp. v. Rudzewicz, 471 U.S. 462, 476 (1985). "[W]here a defendant who purposefully has directed his activities at forum residents seeks to defeat jurisdiction, he must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable." Id. at 477.  The reasonableness analysis weighs "the burden that the exercise of jurisdiction will impose on the defendant," the forum's interests in adjudicating the case, and plaintiff's interest in obtaining convenient and effective relief. Metropolitan Life, 84 F.3d at 568.  When the defendant is the citizen of a foreign county, a court should also "consider the procedural and substantive policies of other nations whose interests are affected by the assertion of jurisdiction" and "the Federal interest in Government's foreign relations policies." Asahi Metal Indus. Co. v. Superior Court of California, Solano Cnty., 480 U.S. 102, 115 (1987) (emphasis in original).[3]

"[C]ourts have found personal jurisdiction to exist where 'an executive of a foreign securities issuer, wherever located, participates in a fraud directed to deceiving United States shareholders.'" In re Banco Bradesco S.A. Sec. Litig., 277 F. Supp. 3d 600, 643 (S.D.N.Y. 2017) (emphasis in original) (Woods, J.) (quoting SEC v. Sharef, 925 F. Supp. 2d 539, 547 (S.D.N.Y. 2013) (Scheindlin, J.)).  "[S]igning or directly manipulating financial statements to cover up illegal foreign action, with knowledge that those statements will be relied upon by United States investors satisfies this test." Id. (quotation marks omitted).

---

[3] No defendant urges that the two Asahi factors play a role in the Court's exercise of jurisdiction in this case.

II. Plaintiffs Have Made a Prima Facie Case for Exercising Personal Jurisdiction and No
Defendant Has Made a Compelling Case that Doing So Would be Unreasonable.

        A.  Plaintiffs Have Made Out a Prima Facie
            Showing of Personal Jurisdiction Over Kam.

Kam argues that the Complaint does not plausibly allege that he is subject to personal jurisdiction in the United States because it solely attributes conduct to him that occurred outside of the United States with effects outside of the United States.  He argues that, assuming the truth of the Complaint's factual allegations, the Complaint describes the Cellenkos transaction as an attempt to conceal misappropriations from a non-United States entity, Global Cord, to persons and entities located outside the United States.

Kam is domiciled in Hong Kong and/or mainland China.  (Compl't ¶ 21.) He is not alleged to have been an officer or director of Global Cord during the class period. Plaintiffs do not contend that Kam is subject to general personal jurisdiction.

But Kam signed two Schedule 13D filings made to the SEC on May 23, 2022 and May 31, 2022.  (ECF 137-6, -7.)  The filings stated that Kam and two other entities – Golden Meditech Stem Cells (BVI) Company Limited ("GMSC") and Magnum Opus International Holdings Limited ("Magnum Opus") – owned an aggregate 64.9% of Global Cord's ordinary shares.  (Id.)  The first filing stated that GMSC had obtained 78,874,106 ordinary shares of Global Cord, constituting 64.9% of all ordinary shares, by executing a security interest under a loan agreement with Blue Ocean after a purported event of default occurred.  (ECF 137-6.)  The second filing purported to respond to what it described as a "misleading" Schedule 13D filing by Blue Ocean.  (ECF 137-7.)  It stated that GMSC would "vigorously" oppose the continuation of an injunction order that Blue Ocean obtained from a court in the Virgin Islands.  (Id.)

18

These filings were made to the SEC after Blue Ocean brought a proceeding in the British Virgin Islands High Court of Justice seeking orders to declare as invalid two purported security agreements, including the purported GMSC agreement.  (Compl't ¶ 110.)  The Complaint quotes findings made by that tribunal, including that there was no supporting correspondence or documentation that showed the negotiation or drafting of such an agreement, no attorney participation, and no correspondence prior to GMSC's purported enforcement of the agreement.  (Compl't ¶¶ 110-14.)  That tribunal concluded: "It is an understatement that this perfect capsule of coincidences stretches the credibility of a reasonable objective observer to a breaking point."  (Compl't ¶ 114.)  It concluded that the agreement's signatures were not "genuine" and granted summary judgment to Blue Ocean on what it called "the forgery issue."  (Compl't ¶¶ 112-13.)

The Complaint does not expressly reference the Form 13D filings, but documents of which the Court may take judicial notice, including SEC filings, are properly considered on a Rule 12(b)(2) motion.[4]

The Court concludes that Kam aimed conduct expressly to the United States when he signed and filed the two Form 13D filings, and that this conduct related to plaintiffs' scheme liability claim.  That claim asserts that the proposed Cellenkos transaction was a sham intended to cover up payments that Global Cord made to Kam and Meditech-affiliated entities.  The Form 13D filings related to that transaction in that they were part of an attempt to consummate the transaction over the objections of the majority shareholder, Blue Ocean.  To the extent that the filings were made outside of the class period and could not have been relied upon by plaintiffs when they acquired Global Cord

---

[4] In no instance does the Court accept a judicial notice document for the truth of its contents.  Here, the Form 13D filings are considered solely for the purpose of whether Kam aimed suit-related conduct expressly to the United States.

shares, the filings are not considered for purposes of ultimate liability, but the issue of whether Kam expressly aimed conduct to the United States in connection with the claims against him.

The Court separately concludes that Kam has not made out a compelling case that exercising personal jurisdiction over him would be unreasonable. "The Court of Appeals has emphasized . . . that courts must analyze reasonableness in tandem with minimum contacts, because 'depending on the strength of the defendant's contacts with the forum state, the reasonableness component of the constitutional analysis may have a greater or lesser effect on the outcome of the due process inquiry.'" Biofrontera AG v. Deutsche Balaton AG, 2020 WL 1489788, at *6 (S.D.N.Y. Mar. 27, 2020) (Preska, J.) (quoting Metropolitan Life, 84 F.3d at 568). As noted, when a defendant has purposefully directed activities to the forum, he or she "must present a compelling case" that other considerations render jurisdiction unreasonable. Rudzewicz, 471 U.S. at 477.

Kam cites his lack of geographic ties to the United States, his poor English proficiency and the forum's "diminished interest" in adjudicating this case. But "generalized complaints of inconvenience" do not make a compelling case that exercising jurisdiction would be unreasonable. Chloe v. Queen Bee of Beverly Hills, LLC, 616 F.3d 158, 173 (2d Cir. 2010); see also Lewis v. Madej, 2015 WL 6442255, at *8 (S.D.N.Y. Oct. 23, 2015) (it was not unreasonable to exercise jurisdiction over a United Kingdom defendant who allegedly filed invalid trademark protections with the USPTO) (Cote, J.).

Kam also notes that multiple cases involving the Cellenkos transaction have been brought in other forums. But those proceedings were not brought for the purpose of seeking relief on behalf of Global Cord shareholders. The Cayman Islands proceeding was brought by Blue Ocean to enjoin the Cellenkos transaction, the British Virgin Islands

proceeding challenged two purported security agreements identified by Meditech, and the Hong Kong proceeding related to Global Cord subsidiaries that were alleged to be "wrongly taken over" by individual defendants.  (Compl't ¶¶ 81, 110, 115.)  A shareholder derivative action, MEW Gestion v. Cellenkos Inc., Index No. 653598/2023 (N.Y. Sup. Ct. N.Y. Cnty.), has been dismissed because plaintiffs failed to establish their standing to bring the action under Cayman Islands law.  (ECF 160.)  Plaintiffs are differently positioned because they seek monetary relief as Global Cord shareholders, on their own behalves as well as on behalf of a putative class.

Kam's Rule 12(b)(2) motion will be denied.

B.  Tina Zheng and Albert Chen Have Not Made a Compelling
    Case that Exercising Jurisdiction Over Them Is Unreasonable.

Tina Zheng and Albert Chen challenge the exercise of personal jurisdiction over them solely on grounds of unreasonableness.  See generally Rudzewicz, 471 U.S. at 476.  They do not dispute that plaintiffs have adequately identified that they have minimum contacts with the United States.  As noted, Chen was the CFO and a director of Global Cord during the class period, and Zheng was the Company's CEO and chair during the class period.  (Compl't ¶¶ 22, 23.)  All statements in the Complaint that are alleged to contain material misstatements or omissions pursuant to rule 10b-5(b) were made in SEC filings signed by Chen, Zheng or both.  (Compl't ¶¶ 127-62.)

In urging that the exercise of personal jurisdiction over them would be unreasonable, Zheng and Chen echo the arguments as Kam, including the burden of defending this case while they are domiciled in China, the absence of geographic ties to the United States, and the existence of parallel litigation in other forums.  For the reasons explained, these arguments do not make out a compelling case that the exercise of jurisdiction over them would be unreasonable.

Zheng and Chen also point out that this action was commenced approximately one week before the statute of limitations was set to expire, a fact that has little or nothing to do with the Court's assessment of the reasonableness of exercising personal jurisdiction.  It is not apparent why it would be unreasonable to subject Zheng and Chen to United States jurisdiction, given that there is no discernable prejudice arising from a timely filed complaint.

The Rule 12(b)(2) motion of Tina Zheng and Albert Chen will be denied.

C.  Plaintiffs Have Made Out a Prima Facie Case for
    Exercising Personal Jurisdiction over Mark Chen.

Mark Chen, a director of Global Cord, argues that the Complaint does not describe any purposeful conduct directed to the United States that gives rise to any claim against him.  He argues that he therefore cannot be subject to personal jurisdiction.

The Complaint's allegations regarding Mark Chen principally relate to an Extraordinary General Meeting that took place in New York City on June 16, 2022. (Compl't ¶¶ 24, 91.)  Blue Ocean called for the meeting "to prevent the Cellenkos transaction."  (Compl't ¶ 24.)  As quoted in the Complaint, a written decision of Justice Kawaley of the Cayman Islands Grand Court observed that "'[c]onflicting evidence was filed in relation to 'argy bargy'[5] shortly prior to the [extraordinary general meeting] which resulted in Jennifer Weng and Mark Chen, directors of the Company, being refused entry to the meeting room by lawyers for [Blue Ocean],' where '[e]ach side accused the other of inappropriate conduct.'"  (Compl't ¶ 91.)  The Complaint also quotes from a Blue Ocean petition filed in the Cayman Islands proceeding, which asserted that "[t]he clear intention

---

[5] "Argy bargy" is defined as "a lively discussion : ARGUMENT, DISPUTE."  https://www.merriam-webster.com/dictionary/argy-bargy

of the purported directors . . . was to prevent [Blue Ocean] from voting and thereby prevent the resolutions from being passed."  (Compl't ¶ 103.)

Mark Chen argues that his physical presence at the New York shareholder meeting does not establish specific jurisdiction because plaintiffs' claims do not arise out of that meeting, as opposed to the alleged misappropriation of funds from Global Cord and the ensuing cover up.  He notes that he is not alleged to have taken any action at the meeting.  He also notes that he is not alleged to have had a role in the preparation or dissemination of the alleged misstatements identified in the Complaint.

But assuming the truth of the Complaint's factual allegations, Mark Chen was physically present in the United States with the goal of advancing the Cellenkos transaction, which the Complaint asserts was at the heart of the scheme to conceal the transfer of funds to Kam and Meditech affiliates.  Drawing every reasonable inference in favor of the plaintiffs as non-movants, they have plausibly alleged that by being physically present in the United States for the purpose of advancing the Cellenkos transaction at a shareholder meeting, Mark Chen expressly aimed suit-related conduct to the United States, sufficient to make out a prima facie case for the exercise of personal jurisdiction over him.[6]

Chen argues that the exercise of jurisdiction over him would be unreasonable because, as a resident of China, he would face a "plainly onerous" burden in defending this action.  As noted, however, a generalized assertion of burden does not make out a compelling case that the exercise of jurisdiction would be unreasonable.  Chloe, 616 F.3d at 173; Lewis, 2015 WL 6442255, at *8.

Mark Chen's Rule 12(b)(2) motion will be denied.

---

[6] As with the SEC filings executed by Kam, this conduct occurred outside of the proposed class period and is considered for the jurisdictional analysis only.

D.  The Court Has Personal Jurisdiction over Meditech Based
    Upon Its Alter Ego Relationship With Non-Party GMPM.

  1.  Federal Common Law Governs the Analysis for Exercising
      Personal Jurisdiction Based on Alter Ego Status.

Meditech is a Cayman Islands corporation with a principal place of business in Hong Kong.  (Compl't ¶ 18.)  Plaintiffs argue that Meditech is subject to personal jurisdiction because any of four companies discussed in the Complaint – Global Cord, Cellenkos, non-party Golden Meditech (BVI) Company Limited ("GMCL") and non-party GM Precision Medicine (BVI) Limited ("GMPM") – were its alter egos, sufficient to subject it to personal jurisdiction in the United States consistent with due process.[7]

The Second Circuit has recently indicated that when a case arises under federal law, the analysis is governed by federal common law: "In diversity cases, we look to the choice-of-law rules of the forum state to determine the veil-piercing law to apply. . . . This case, however, arises under federal law.  Other courts have held that federal common law governs alter-ego theories when a federal interest is implicated by the decision of whether to pierce the corporate veil."  In re Platinum & Palladium Antitrust Litig., 61 F.4th 242, 275 n.11 (2d Cir. 2023) (quotation marks omitted); see also United States v. Peters, 732 F.3d 93, 103 n. 4 (2d Cir. 2013) ("because this case arises under federal question jurisdiction and involves a federal statute that 'demands national uniformity,' federal common law, not New York State law, presumably controls the question of whether the corporate veil should be pierced . . . ."); City of Long Beach v. Total Gas & Power North America, Inc., 465 F. Supp. 3d 416, 437-38 (S.D.N.Y. 2020) (analyzing alter-ego

---

[7] Plaintiffs do not expressly use the term "alter ego" in reference to GMCL and GMPM, instead describing them as "mere shells used by [Meditech] to carry out the fraud . . . ."  (Opp. Mem. at 42.)  Plaintiffs' language is consistent with an alter-ego theory of personal jurisdiction.  See, e.g., In re Platinum & Palladium Antitrust Litig., 61 F.4th 242, 275-76 (2d Cir. 2023).

jurisdiction in an antitrust action under federal common law because the claims arise under United States law) (Kaplan, J.).

Though the Second Circuit has stopped short of explicitly holding that federal common law governs, its application to plaintiffs' Exchange Act claims is consistent with a national interest in enforcing the Exchange Act and deciding personal jurisdiction consistent with the Fifth Amendment's guarantee of due process. No party has identified an interest in applying the laws of the various entities' places of incorporation.[8] The Court will therefore apply federal common law to plaintiffs' alter ego arguments.

"The alter-ego theory provides for personal jurisdiction if the parent company exerts so much control over the subsidiary that the two do not exist as separate entities but are one and the same for purposes of jurisdiction." In re Platinum, 61 F.4th at 274. The complaint must make "a specific averment of facts" that, if credited, would show that the corporate entities "operate as a single economic unit . . . ." Southern New England Telephone Co. v. Global NAPS Inc., 624 F.3d 123, 138-39 (2d Cir. 2010). A plaintiff must allege facts showing that the subsidiary is a "shell" of its owner and that the owner exercises "total and exclusive domination of the corporation." In re Platinum, 61 F.4th at 276. It is insufficient to merely allege that the subsidiary was "financially dependent" on a defendant, that the defendant placed its employees on the subsidiary's board, or that the subsidiary took allegedly unlawful actions on behalf of the defendant. Id. at 276.

But a plaintiff is not required to show that the "sham" corporate structure had an "evil purpose," and "need only demonstrate that it would be unfair under the circumstances not to disregard the corporate form. . . . '[T]he rule in federal cases is

---

[8] Global Cord is incorporated in the Cayman Islands and Cellenkos is incorporated in Delaware. (Compl't ¶¶ 17, 19.) The Complaint does not identify where GMCL and GMPM are incorporated, but their corporate names suggest that they are British Virgin Islands corporations.

founded only on the broad principle that a corporate entity may be disregarded in the interests of public convenience, fairness and equity.'" Southern New England Tel. Co., 624 F.3d at 139 (quoting Brotherhood of Locomotive Eng'rs v. Springfield Terminal Ry. Co., 210 F.3d 18, 26 (1st Cir. 2000)); accord Clipper Wonsild Tankers Holding A/S v. Biodiesel Ventures, LLC, 851 F. Supp. 2d 504, 509 (S.D.N.Y. 2012) ("it is clear that under federal law, litigants pursuing the alter ego theory need not adduce evidence of perpetration of fraud.") (Sullivan, J.).  It is "well established that the exercise of personal jurisdiction over an alter ego corporation does not offend due process."  Southern New England Tel. Co., 624 F.3d at 138.

### 2.  Plaintiffs Have Made a Prima Facie Showing of Personal Jurisdiction Through Meditech's Relationship with GMPM.

The Court concludes that Meditech is subject to personal jurisdiction in the United States based on the relationship with its subsidiary, GMPM, which purportedly would have received $664 million in consideration pursuant to the so-called "Framework Agreement" that was part of the Cellenkos transaction.

The Framework Agreement is not annexed to the Complaint, but it is referenced throughout, and is publicly available through the SEC's EDGAR system.[9]  The Framework Agreement was executed by defendant Zheng on behalf of Global Cord and defendant Kam on behalf of GMPM.  The agreement's recitals described how GMPM came to acquire the license for a Cellenkos product called CK0802 and stated that GMPM intended to sell its rights in CK0802 to Global Cord.  In exchange, Global Cord would pay $664 million to GMPM as consideration, and transfer to GMPM ordinary shares worth an additional $136 million.  The agreement describes yet another Meditech-affiliated

---

[9] See https://www.sec.gov/Archives/edgar/data/1467808/000110465922053627/tm2213605d1_ex4-7.htm

company, the similarly-named Golden Meditech Precision Medicine Limited, as having

assigned all rights in CK0802 to GMPM in certain Asian countries, without identifying any

consideration paid for those rights.

Importantly, Article 2.2 of the Framework Agreement contemplated that

GMPM could designate "shareholders or Affiliates" to "receive all or a portion of the

Consideration and the amount of Cash Consideration" due on the transaction.  Article 10

broadly defines "Affiliate" to mean:

> with respect to any Person, any other Person that directly, or
> indirectly through one or more intermediaries, controls, is
> controlled by or is under common control with, such Person.
> For purposes of this definition, "control," "controlled by" and
> "under common control with," as applied to any Person, means
> the possession, directly or indirectly, of the power to direct or
> cause the direction of the management and policies of that
> Person, whether through the ownership of voting securities, by
> Contract or otherwise.

This extremely broad definition of "Affiliates" appears to comfortably encompass

Meditech and entities under its control.

The Framework Agreement allowed for the $664 million in consideration to

be paid, at GMPM's direction, to Meditech or entities "under common control" with

GMPM.  The Complaint alleges that the Cellenkos transaction and the Framework

Agreement were designed to conceal past cash transfers from Global Cord to entities under

the control of Kam or Meditech.  (Compl't ¶¶ 5, 62-67.)  It noted that Global Cord had

agreed to pay $664 million to GMPM affiliates.  (Compl't ¶ 67.)  Viewed in the context of

the Complaint's allegations, GMPM's authority to designate payment to Meditech and

other affiliated entities is consistent with GMPM's status as an alter ego of Meditech.  See

In re Platinum, 61 F.4th at 274 ("The alter-ego theory provides for personal jurisdiction if

the parent company exerts so much control over the subsidiary that the two do not exist as

separate entities but are one and the same for purposes of jurisdiction.") (quotation marks omitted); Southern New England Tel. Co., 624 F.3d at 138-39 (exercising jurisdiction based on alter-ego status is warranted where entities "operate as a single economic unit . . . .").

The Framework Agreement was filed with the SEC as an exhibit to the Form 6-K of April 29, 2022.  Whether an attachment to an SEC filing or a statement quoted within an SEC filing is sufficient to confer personal jurisdiction over a foreign non-signatory is a fact-specific question.  For example, in In re Banco Bradesco, Judge Woods concluded that statements contained in an exhibit to an SEC filing were sufficient to subject a defendant to United States jurisdiction when the defendant's background and experience supported the inference that he knew the exhibit would likely be filed in the United States and relied upon by United States investors.  277 F. Supp. 3d at 643-45.  By contrast, Judge Oetken concluded that certain defendants' statements incorporated into an SEC filing did not confer jurisdiction over them because there was no allegation that they "anticipated or intended" that the statements would be filed with the SEC, and the fact that they merely "might have foreseen" such a filing was not enough.  Rex & Roberta Ling Living Tr. u/a Dec. 6, 1990 v. B Communications Ltd., 2019 WL 1407453, at *7 (S.D.N.Y. Mar. 28, 2019).

Here, the Complaint asserts that the Framework Agreement was part of a device, scheme or artifice to defraud, and it was signed by Kam on behalf of GMPM and Zheng on behalf of Global Cord.  Based on Kam's past history as a Global Cord director, and his close involvement in the alleged scheme, it is reasonable to infer that he knew and intended that the Framework Agreement would be filed with the SEC and relied upon by United States investors.

The Court therefore concludes that, for purposes of exercising personal jurisdiction only, plaintiffs have made out a prima facie showing that GMPM was an alter ego of Meditech and directed its conduct to the United States, sufficient to subject Meditech to personal jurisdiction consistent with due process.

Meditech has not made out a compelling case that exercising personal jurisdiction over it would be unreasonable. Meditech notes that it is a Cayman Islands company with a principal place of business in China, and that the purported scheme is alleged to have taken place outside of the United States. It further notes that the proposed Cellenkos transaction never closed. But these arguments do not make out a compelling case that the exercise of personal jurisdiction over Meditech would be unreasonable in light of the forum's interest in enforcing the Exchange Act and plaintiffs' interest in obtaining relief. Rudzewicz, 471 U.S. at 476; Metropolitan Life, 84 F.3d at 568.

Meditech's Rule 12(b)(2) motion will therefore be denied.[10]

## THE RULE 12(b)(6) MOTIONS WILL BE GRANTED IN PART AND DENIED IN PART.

### I. Legal Standard.

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)). A court assessing the sufficiency of a complaint must disregard legal labels or conclusions, which are not entitled to the presumption of the truth. Iqbal, 556 U.S. at 678. Instead, the court must examine only the well-pleaded factual allegations, if any, "and then determine whether they plausibly give rise to an

---

[10] The Court need not address plaintiffs' alternative arguments that Global Cord and Cellenkos were also alter egos of Meditech.

entitlement to relief." Id. at 679. "Dismissal under Rule 12(b)(6) is therefore appropriate only if 'it is clear from the face of the complaint, and matters of which the court may take judicial notice, that the plaintiff's claims are barred as a matter of law.'" Michael Grecco Products, Inc. v. RADesign, Inc., 112 F.4th 144, 150 (2d Cir. 2024) (quoting Sewell v. Bernardin, 795 F.3d 337, 339 (2d Cir. 2015)).

When reviewing a motion to dismiss pursuant to Rule 12(b)(6), "the complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference." Chambers v. Time Warner, Inc., 282 F.3d 147, 152 (2d Cir. 2002) (quoting International Audiotext Network, Inc. v. American Telephone and Telegraph Co., 62 F.3d 69, 72 (2d Cir. 1995) (per curiam)). "Even where a document is not incorporated by reference, the court may nevertheless consider it where the complaint 'relies heavily upon its terms and effect,' which renders the document 'integral' to the complaint." Id. at 153 (quoting International Audiotext, 62 F.3d at 72). In addition, the Court may consider "'matters of which judicial notice may be taken.'" Id. (quoting Brass v. American Film Technologies, Inc., 987 F.2d 142, 150 (2d Cir. 1993)).

In reviewing a Rule 12(b)(6) motion, the Court assumes all factual allegations in the complaint to be true and draws all reasonable inferences in favor of the non-moving party. Peretti v. Authentic Brands Group LLC, 33 F.4th 131, 137 (2d Cir. 2022).

II. The Motion to Dismiss Count One Will Be Denied as to Meditech
But Granted as to Cellenkos, Mark Chen and Jennifer Weng.

A. The Law of Scheme Liability Under Rule 10b-5(a) and (c).

Section 10(b) makes it unlawful to "use or employ . . . any manipulative or deceptive device or contrivance" contrary to a rule of the SEC. 15 U.S.C. § 78j(b). Rule

10b-5 makes it unlawful "(a) To employ any device, scheme, or artifice to defraud . . . or
(c) To engage in any act, practice, or course of business which operates or would operate as
a fraud or deceit . . . in connection with the purchase or sale of any security."  17 C.F.R. §
240.10b-5.

   "Unlike the better-known subsection (b), these subsections do not require
the defendant to make a misstatement or omission; they require only deceptive conduct."
Plumber & Steamfitters Loc. 773 Pension Fund v. Danske Bank A/S, 11 F.4th 90, 105 (2d
Cir. 2021).  "To state a scheme liability claim, a plaintiff must show: (1) that the defendant
committed a deceptive or manipulative act, (2) in furtherance of the alleged scheme to
defraud, (3) with scienter, and (4) reliance.  And, of course, the deceptive or fraudulent
scheme or activity must have occurred in connection with the purchase or sale of a
security."  Id. (quotation marks and internal citations omitted).  A plaintiff also must plead
loss causation.  Pacific Investment Mgmt. Co. LLC v. Mayer Brown LLP, 603 F.3d 144,
151 (2d Cir. 2010).

   "These provisions capture a wide range of conduct."  Lorenzo v. S.E.C., 587
U.S. 71, 79 (2019).  Lorenzo held that the "dissemination of false or misleading statements
with intent to defraud can fall within the scope of subsections (a) and (c) of Rule 10b–5 . . .
. even if the disseminator did not 'make' the statements and consequently falls outside
subsection (b) of the Rule."  Id. at 78.  The defendant must not have "simply facilitated
manipulative conduct," and instead must have been a "co-participant[ ] . . . in the
manipulative scheme and [have] profited by that scheme."  City of Providence, Rhode
Island v. Bats Global Markets, Inc., 878 F.3d 36, 51 (2d Cir. 2017).

   "[M]isstatements and omissions can form part of a scheme liability claim,
but an actionable scheme liability claim also requires something beyond misstatements and

omissions, such as dissemination." <u>S.E.C. v. Rio Tinto plc</u>, 41 F.4th 47, 49 (2d Cir. 2022) (emphasis in original); <u>see also</u> <u>Maso Cap. Investments Ltd. v. E-House (China) Holdings Ltd.</u>, 2024 WL 2890968, at *5 n. 4 (2d Cir. June 10, 2024) ("[M]isstatements and omissions cannot form the 'sole basis' for liability under the scheme subsections.") (summary order).  Conduct giving rise to liability may include the use of "sham agreements, sham transactions, sham companies, or undisclosed payments to [persons] who appeared independent." <u>In re Turquoise Hill Res. Ltd. Sec. Litig.</u>, 625 F. Supp. 3d 164, 253 (S.D.N.Y. 2022) (Liman, J.).  "The Second Circuit has explicitly left open the question what 'extra' facts –  beyond the knowing dissemination to the public of a false statement made by another in <u>Lorenzo</u> – would be sufficient to state a claim for scheme liability.  But it's clear that an act must be 'inherently deceptive' to give rise to scheme liability; allegations of 'corporate mismanagement' do not suffice." <u>In re CarLotz, Inc. Sec. Litig.</u>, 2024 WL 3924708, at *5 (S.D.N.Y. Aug. 23, 2024) (Subramanian, J.) (internal citations and quotation marks omitted).

For example, the late Judge Pauley concluded that plaintiffs alleged an actionable scheme based on defendants' formation of a subsidiary and use of subcontractors to retain the benefits of certain cost-saving measures rather than passing on those savings to the plaintiff mutual-fund investors. <u>In re Smith Barney Transfer Agent Litig.</u>, 884 F. Supp. 2d 152, 160-61 (S.D.N.Y. 2012).  The Eighth Circuit also concluded that plaintiffs alleged an actionable scheme to influence the content of medical journals based on defendants' secret payments to physicians to conceal a procedure's side effects and adverse health events. <u>West Virginia Pipe Trades Health & Welfare Fund v. Medtronic, Inc.</u>, 845 F.3d 384, 393 (8th Cir. 2016).  The claim was not premised solely on

misrepresentation because "[p]aying someone else to make a misrepresentation is not itself a misrepresentation."  Id.

"Because scheme claims sound in fraud, they are subject to the heightened pleading requirements of Federal Rule of Civil Procedure 9(b)."  Plumbers & Steamfitters, 11 F.4th at 105.  "To maintain a 10b-5(a) or (c) claim, a plaintiff must specify what deceptive or manipulative acts were performed, which defendants performed them, when the acts were performed, and the effect the scheme had on investors in the securities at issue."  Id.  The plaintiff must "articulate with precision the contours of an alleged scheme to defraud investors, or which specific acts were conducted in furtherance of it."  Id. "Absent some sort of enumeration of which specific acts constituted an alleged scheme in connection with the purchase or sale of securities, [a plaintiff's] claim does not comply with the applicable heightened pleading standard and cannot go forward."  Id.

Plaintiffs must also allege that the defendants "acted with scienter, a mental state embracing intent to deceive, manipulate, or defraud."  New England Carpenters Guaranteed Annuity & Pension Funds v. DeCarlo, 122 F.4th 28, 48 (2d Cir. 2024) (quotation marks omitted).  "Scienter may be established by alleging facts (1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness."  Id. (quotation marks omitted).  "To plead recklessness through circumstantial evidence, Plaintiffs would have to show, 'at the least, conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it.'"  ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co., 553

F.3d 187, 202-03 (2d Cir. 2009) (quoting <u>Kalnit v. Eichler</u>, 264 F.3d 131, 142 (2d Cir. 2001)).

A court must "evaluate the sufficiency of a complaint's allegations of scienter 'holistically,' considering <u>all</u> of the facts alleged, taken collectively, rather than any individual allegation, scrutinized in isolation. <u>Set Capital LLC v. Credit Suisse Grp. AG</u>, 996 F.3d 64, 78 (2d Cir. 2021) (emphasis in original; quotation marks omitted). "For an inference of scienter to be strong, as required by the PSLRA, a reasonable person must deem it cogent and <u>at least as compelling</u> as any opposing inference one could draw from the facts alleged." <u>Id.</u> (emphasis in original; quotation marks omitted).

B. <u>Meditech's Motion to Dismiss Count One Will Be Denied.</u>

1. <u>Count One Alleges Meditech's Fraud with Particularity.</u>

Meditech argues that the Complaint does not allege its involvement in the Cellenkos transaction with sufficient particularity. It argues that the Complaint relies entirely on the roles of Meditech's two subsidiaries, GMPL and GMCL, neither of which are named as defendants.

Based on the Complaint's allegations, as well as the text of the Framework Agreement, which is incorporated by reference in the Complaint, the Court concludes that plaintiffs have sufficiently alleged Meditech's participation in a device, scheme or artifice to defraud through its subsidiary, GMPM.

As detailed in the personal jurisdiction analysis, the Framework Agreement provided that Global Cord would pay $664 million to GMPM as consideration for its rights in a Cellenkos product, and transfer to GMPM ordinary shares worth an additional $136 million. The text of the Framework Agreement contemplated that any GMPM "Affiliate," which could include Meditech itself, could receive some or all of the consideration. That

the Framework Agreement contemplated a cash payment to Meditech or its subsidiaries as an "Affiliate" of GMPM is consistent with Meditech acting through GMPM to advance the Cellenkos transaction in order to conceal historical cash transfers from Global Cord. Further, defendant Kam executed the agreement on GMPM's behalf, and Article 9 of the agreement designates Kam as the recipient of any notice required to GMPM under the Agreement.  At the time, Kam was CEO and chairman of Meditech.  (Compl't ¶¶ 21, 35.) Meditech's central role in the transaction is also underscored by the fact that yet another Meditech subsidiary, GMCL, was to receive more than 34 million Global Cord shares as part of the Cellenkos transaction.  (Compl't ¶ 65.)

The Court concludes that the text of the Complaint together with the Framework Agreement identify with the requisite particularity Meditech's role in the allegedly fraudulent Cellenkos transaction.

In moving to dismiss, Meditech argues that the Complaint does not allege fraud with particularity because it attributes certain conduct to "Defendants" in aggregate. But much of the Complaint makes detailed allegations about the acts of Meditech, its subsidiaries and other defendants.  That it sometimes references "Defendants" as a whole does not amount to group pleading.

Meditech also points out that the Complaint does not name GMPM as a defendant.  It is true that GMPM is not a party to this action and the Complaint does not closely parse the Framework Agreement's text.  But the Complaint does assert that the agreement provided for the payment of $664 million "to GMPM or its affiliates" and details the role of GMPM and Meditech in the purported scheme.  (Compl't ¶ 67.)  It also quotes extensively from the Form 6-K that summarized the Cellenkos transaction, including the Framework Agreement and the role of GMPM.  (Compl't ¶¶ 63-65.)  The

allegations are sufficient to allege that Meditech engaged in a device, scheme or artifice to defraud through its subsidiary, GMPM.

The Court concludes that, as to Meditech, the Complaint has adequately "articulate[d] with precision the contours of an alleged scheme to defraud investors . . . ." Plumbers & Steamfitters, 11 F.4th at 105. It has alleged that Meditech, through GMPM, knowingly entered into a sham transaction under which it was to receive $664 million in cash consideration with the understanding that no such consideration would be forthcoming because the transaction was intended to conceal historical, past transfers from Global Cord to Meditech subsidiaries.

2. The Complaint Raises a Strong
Inference of Scienter as to Meditech.

Meditech also argues that the Complaint does not raise a strong inference of scienter. A plaintiff may allege that a defendant had the motive and opportunity to defraud through allegations that it "benefitted in some concrete and personal way from the purported fraud." ECA, 553 F.3d at 198. Plaintiffs adequately allege that Meditech had the motive and opportunity to defraud in order to continue to conceal that hundreds of millions of dollars had been transferred to it by Global Cord through its subsidiaries. (Compl't ¶¶ 4, 7, 54.)

3. The Complaint Alleges that the Purported Scheme
Related to the Purchase or Sale of a Security.

Meditech separately argues that Count One should be dismissed because the Complaint does not adequately allege that it performed any act "in connection with the purchase or sale of any security," as the text of rule 10b-5 requires. "A plaintiff makes out a sufficient nexus with the purchase or sale of securities when the defendants' deceptive

conduct affects a market for securities." In re Parmalat Securities Litigation, 376 F. Supp. 2d 472, 505-06 (S.D.N.Y. 2005) (Kaplan, J.).

        The Complaint alleges that Global Cord shareholders were attuned to the Company's unused cash stockpile and had confronted management about the issue during earnings calls in 2019 and 2020. (Compl't ¶¶ 45-48.) The Complaint also alleges that the Liquidators appointed by the Cayman Grand Court found that a Global Cord subsidiary paid approximately $606 million to Meditech affiliates in 74 transactions from September 2015 to May 2022. (Compl't ¶ 57.)

        Assuming the truth of the Complaint's allegations, plaintiffs bought Global Cord shares on the false premise that Global Cord actually possessed the cash reserves it claimed, when, in truth, more than $600 million had been secretly transferred to Meditech. Via the Framework Agreement, Meditech acted through GMPM to knowingly advance a deception to Global Cord shareholders – i.e., that GMPM was to receive $664 million in consideration for a licensing arrangement. This was part of a scheme to conceal those past transfers.

        The Court concludes that the Complaint adequately alleges that the purported device, artifice or scheme to defraud was undertaken in connection with the purchase or sale of a security.

        4.  The Complaint Adequately Alleges
           Reliance and Loss Causation.

        "Reliance by the plaintiff upon the defendant's deceptive acts is an essential element of the § 10(b) private cause of action. It ensures that, for liability to arise, the 'requisite causal connection between a defendant's misrepresentation and a plaintiff's injury' exists as a predicate for liability." Stoneridge Inv. Partners, LLC v. Scientific-

Atlanta, 552 U.S. 148, 159 (2008) (quoting Basic Inc. v. Levinson, 485 U.S. 224, 243 (1988)).

Meditech argues that the Complaint does not allege reliance because, according to the Complaint, plaintiffs and other shareholders were unaware of Meditech's alleged actions. This is true insofar as the Complaint identifies Meditech as the secret recipient of Global Cord's cash transfers, but the scheme liability claim centers on the public announcement of the Cellenkos transaction and Meditech's role in the Framework Agreement. At the pleading stage, it is plausible that an investor could have relied upon the public description of GMPM's receipt of $664 million as part of the Cellenkos transaction to conclude that Global Cord's actually possessed those cash reserves and/or that the parties intended to proceed with the transaction as announced.

As to loss causation, the burden to plead loss causation "is not a heavy one," and "[t]he complaint must simply give Defendants 'some indication' of the actual loss suffered and of a plausible causal link between that loss and the alleged misrepresentations." Loreley Financing (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC, 797 F.3d 160, 187 (2d Cir. 2015). "In order to plead corrective disclosure, plaintiffs must plausibly allege a disclosure of the fraud by which the available public information regarding the company's financial condition was corrected, and that the market reacted negatively to the corrective disclosure. Plaintiffs need not demonstrate on a motion to dismiss that the corrective disclosure was the only possible cause for decline in the stock price." Carpenters Pension Trust Fund of St. Louis v. Barclays PLC, 750 F.3d 227, 233 (2d Cir. 2014).

The Complaint asserts that the alleged misappropriation of Global Cord cash "began to come to light" when the Cellenkos transaction was announced on April 29, 2022,

and Global Cord share price declined by 28.6% on the next trading day of May 2, 2022. (Compl't ¶¶ 79, 80.)  On May 5, 2022, Blue Ocean filed its petition in the Cayman Islands seeking an order to enjoin the Cellenkos transaction, and Global Cord share price declined by another 9.1%.  (Compl't ¶¶ 81-82.)

Meditech argues that the announcements of April 29 and May 5, 2022 could not have been corrective disclosures because they did not place the investing public on notice that Global Cord's cash reserves had been depleted through undisclosed transfers to Meditech, or that the Cellenkos transaction was itself a sham.  Meditech also argues that it is implausible to allege that the April 29 announcement of the Cellenkos transaction both advanced a fraud and operated as a corrective disclosure.  (See Compl't ¶¶ 158-62, 79-80.)

But "there is no requirement that a corrective disclosure take a particular form or be of a particular quality.  It is the exposure of the fraudulent representation that is the critical component of loss causation.  It is also clear that a corrective disclosure need not take the form of a single announcement, but rather, can occur through a series of disclosing events."  In re Bristol Myers Squibb Co. Sec. Litig., 586 F. Supp. 2d 148, 165 (S.D.N.Y. 2008)  (Crotty, J.) (citations, quotation marks and ellipsis omitted).  Thus, an announcement that the Justice Department had commenced a criminal investigation can serve as a partial corrective disclosure if the subject matter of investigation is referenced. Id. at 164-65.  "In essence, the announcement of the investigation was not an isolated event in itself, it was instead the 'tip of the iceberg' – the first in a series of revelations which would ultimately expose the Company's entire fraudulent scheme . . . ."  Id. at 165.

Drawing every reasonable inference in favor of plaintiffs, the Blue Ocean petition of March 5, 2022 contained sufficient detail to alert the investing public of the purportedly fraudulent nature of the Cellenkos transaction.  (See ECF 132-3.)  The petition

detailed Global Cord's history with Meditech, including that Meditech previously owned approximately 65.4% of Global Cord's shares, Kam's history as a Global Cord director and CEO of Meditech and Albert Chen's roles at both Global Cord and Meditech.  (Pet. ¶¶ 5, 6.)  It stated that the cash consideration to be paid to GMPM would "use up over 2/3 of the Company's free cash flow."  (Pet. ¶¶ 16, 19.)  The petition described how Blue Ocean received no advance notice of the proposed transaction despite holding a majority of Global Cord's shares and the seemingly hasty process for board approval.  (Pet. ¶¶ 17-19.)  It characterized the proposed transaction as a "related party transaction," highlighting the roles of Meditech, Kam, Tina Zheng and Albert Chen.  (Pet. ¶¶ 20-26.)  It described suspect qualities of the transaction, including the fact that Cellenkos shareholders were to receive "differing valuations for the same shares," that the CK0802 product had been subject to only a Phase 1 study for its efficacy for treating a Covid-19 symptom, and that GMPM and GMPML were Meditech subsidiaries and "wholly owned by Mr Kam."  (Pet. ¶¶ 31-35.)  The petition asserted "an urgent need to investigate the Company's affairs and conduct . . . in particular the circumstances of the Transaction . . . ."  (Pet. ¶ 43.2.)

As in Bristol Myers, it is plausible that the petition "marked the first in a series of corrective disclosures which would reveal to the market that the Company had engaged in misconduct . . . ."  586 F. Supp. 2d at 165.  It described the Cellenkos transaction as a "related party transaction" with suspicious terms that was hastily approved and would drain two-thirds of Global Cord's cash flow.  The petition would not have placed the investing public on notice of the full extent of the alleged fraud, but it contained sufficient detail that a reasonable investor could have understood it to describe misconduct relating to Global Cord's cash reserves.

The Form 6-K filing of April 29, 2022 that announced the Cellenkos transaction raises a closer question.  At the pleading stage, the Court declines to adjudicate whether the announcement and the resulting drop in share price reflected a negative response from the investing public to what it understood to be a commercially unfavorable transaction, or whether, instead, its description of the deal's enormous cash consideration and the role of Meditech was understood to have a fraudulent character.  The issue is more properly resolved on a developed factual record after the close of discovery.

The Court concludes that the Complaint adequately alleges reliance and loss causation.

### C.  Cellenkos's Motion to Dismiss Count One Will Be Granted.

Unlike Meditech, the Complaint describes a narrower role for Cellenkos. For the reasons that will be explained, the Court concludes that the Complaint describes Cellenkos as functioning more in the role of an aider or abettor and not a primary violator. Cellenkos's motion to dismiss will therefore be granted.

It is well-established that section 10(b) and rule 10b-5 do not allow for aiding and abetting liability.  See Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A., 511 U.S. 164, 177 (1994); see also Rio Tinto, 41 F.4th at 55 ("To respect the line that Congress has drawn between primary and secondary liability, subsections (a) and (c) have been used historically only to state a claim against a defendant for the underlying deceptive devices or frauds themselves, and not as a short cut to circumvent Central Bank's limitations on liability for a secondary actor's involvement in making misleading statements.") (quotation marks omitted).

Courts have distinguished conduct that merely facilitates a scheme to defraud from the commission of an affirmatively deceptive or manipulative act.

Allegations that describe a party's participation in a scheme, but do not attribute a deceptive or manipulative act to the party, have been held not to give rise to a claim of scheme liability.  Parmalat, 376 F. Supp. 2d  at 505; Simpson v. AOL Time Warner Inc., 452 F.3d 1040, 1053 (9th Cir. 2006), cert. granted, judgment vacated sub nom. Avis Budget Grp., Inc. v. California State Teachers' Ret. Sys., 552 U.S. 1162 (2008), and vacated on other grounds sub nom. Simpson v. Homestore.com, Inc., 519 F.3d 1041 (9th Cir. 2008).

       A more detailed description of the Cellenkos's role is warranted.  Global Cord was to acquire approximately 95% of Cellenkos common shares through a series of Stock Purchase Agreements ("SPAs") with holders of Cellenkos common stock.  (Compl't ¶ 63.)  In exchange, those Cellenkos shareholders would receive approximately 65.7 million ordinary shares of Global Cord with a par value of $0.0001 per share.  (Compl't ¶ 63.)  Global Cord was to pay $4 million to Cellenkos for clinical trials and product development, and an additional $2.1 million per month for twelve months.  (Compl't ¶ 102.)

       Each SPA was executed on behalf of Cellenkos by director Simrit Parmar, who is a non-party, and on behalf of Global Cord by defendant Zheng.  (Compl't ¶ 65.)  Of the 65.7 million Global Cord shares received by Cellenkos shareholders, approximately 61.4 million went to three non-party Cellenkos shareholders: Golden Meditech (BVI) Company Limited ("GMCL"); non-party Kim Chuan Leong, a Meditech director and the CFO of Cellenkos; and Vyserion Limited, whose SPA was executed by the sister of defendant Kam, who signed using a pseudonym.  (Compl't ¶ 65.)  Cellenkos was not a party to the Framework Agreement.

The role of Cellenkos in the transaction is similar to those of defendants in Parmalat and Simpson, whose conduct may have facilitated others' acts of fraud, but who were not themselves alleged to have taken the types of actions that could constitute a device, artifice or scheme to defraud.

The complaint in Parmalat asserted that Citibank made loans to Parmalat, but that the loans were structured in a way that disguised them as equity investments. 376 F. Supp.2d at 482. Parmalat, an international dairy conglomerate, was performing poorly and feared that its credit rating would be harmed if it issued debt through the bond markets. Id. Parmalat's balance sheets recorded the Citibank funding as equity, though in reality they were loans that should have been recorded as debt, and the scheme allowed Parmalat to understate its liabilities by $137 million. Id. at 483. Citibank allegedly knew that the arrangements allowed Parmalat to conceal its debts and acknowledged as much after Parmalat's collapse. Id. at 482-83. As a result of the transactions, Citibank earned annual returns of $5 to $6 million and approximately $7 million in structuring fees. Id. at 484.

In granting Citibank's motion to dismiss a scheme liability claim, Judge Kaplan concluded that the "transactions were not shams. Nor did they depend on any fictions." Id. at 505. There were no allegations that Citibank did not actually own the Parmalat equity interests that it was purported to have bought. Id. Judge Kaplan concluded that any deceptive conduct was attributable to Parmalat, and that the complaint described Citibank acting as an aider and abettor and hence was not actionable under Central Bank:

> Any deceptiveness resulted from the manner in which Parmalat or its auditors described the transactions on Parmalat's balance sheets and elsewhere. In entering into these transactions, the banks therefore did not use or employ a deceptive device or contrivance. At worst, the banks designed and entered into the transactions knowing or even intending

> that Parmalat or its auditors would misrepresent the nature of
> the arrangements. That is, they substantially assisted fraud
> with culpable knowledge – in other words, they aided and
> abetted it. Under Central Bank, of course, that is not a basis
> for private civil liability

Id.

The Ninth Circuit's Simpson decision involved a scheme wherein an e-commerce company called Homestore engaged in so-called "barter transactions" through which it would make payments to companies that would then return part of the money to Homestore in a different transaction, which allowed Homestore to deceptively record the returned funds as revenue. 452 F.3d at 1043. After scrutiny from its auditor, Homestore made these transactions more complex through "triangular" transactions that disguised their revenue sources. Id. In these transactions, Homestore made payments to thinly capitalized companies that needed to record revenue. Id. Those companies, in turn, used the cash to buy advertising from Homestore through AOL. Id. at 1044. AOL took a commission on the transaction, but the initial payment would largely be recouped by Homestore and recorded as revenue. Id. at 1043-44.

Plaintiffs brought a claim of scheme liability against AOL and its officers, asserting that they helped organize and create the "triangular" transactions that were necessary for Homestore to overstate its revenue. Id. at 1052. The Ninth Circuit concluded that the complaint did not allege that AOL or its officers created sham business entities or engaged in deceptive conduct as part of illegitimate transactions. Id. While AOL's role in the triangulation had "suspect qualities," including exaggerated commissions, there was no allegation that actual advertisements were not bought and sold. Id. at 1053. Rather, the allegations were consistent with AOL serving as a "conduit for the flow of revenue" as an

advertising agent.  Id. at 1052-53.  "This may pin liability on Homestore, but not on AOL

or its officers."  Id. at 1053.

Simpson also observed that any misrepresentation of the transactions

involving AOL were based on Homestore's misreporting of income and agreements

between Homestore and the firms that it paid.  Id.  It explained:

> The transactions involving AOL did not create a false
> appearance until they were viewed in conjunction with
> Homestore's actions before and after the transaction.  While
> AOL would be liable under § 10(b) for its deceptive conduct
> as part of a scheme to defraud if AOL engaged in deceptive
> conduct, it may not be held liable for participating in legitimate
> transactions that became 'deceptive' only when distorted by
> the willful or intentional fraud of another party.

Id. (citing Parmalat, 376 F. Supp. 2d at 505).

The claim against Cellenkos suffers from defects similar to those explained

in Parmalat and Simpson.  Plaintiffs assert that the Cellenkos transaction was a "pretext for

[Global Cord] to supposedly transfer $664 million to Golden Meditech, to cover up that

Defendants had already stolen hundreds of millions of dollars form [sic] [Global Cord]."

(Compl't ¶ 7; emphasis in original.)  The heart of the alleged scheme was the purported

payment of $664 million to a non-Cellenkos entity, GMPM, as documented in allegedly

forged bank documents created by Global Cord CFO Albert Chen.  (Compl't ¶¶ 70-74.)

Neither the claimed non-payment to GMPM nor the forgeries of Chen involved a deceptive

or manipulative act by Cellenkos.  Like AOL's role in Simpson, Cellenkos's role in the

transaction had "suspect qualities," but its conduct "became 'deceptive' only when

distorted by the willful or intentional fraud of another party" – namely, Global Cord's

claimed payment to GMPM and the purported forgeries of Albert Chen.  452 F.3d at 1053.

Cellenkos may have been party to a grossly overvalued transaction but it is

not alleged to have engaged in a deceptive or manipulative act.  Plaintiffs do not contend

that Cellenkos advanced any deception or manipulation about the status of its own product candidates, its allegedly poor business prospects or revenue, or any aspect of its role in the transaction.  Cellenkos's weak business prospects were sufficiently well known that Blue Ocean filed a petition to block the transaction seven days after it was publicly announced and arranged for its lawyers to write Global Cord's directors with "concerns" about the transaction, apparently while approval was pending.  (Compl't ¶ 81.)

   Because the Complaint does not allege that Cellenkos engaged in deceptive or manipulative conduct, its motion to dismiss Count One will be granted.

   D.  <u>Count One Will Be Dismissed as to Mark Chen and Jennifer Weng.</u>

   The Complaint does not allege with particularity that Mark Chen or Jennifer Weng committed a deceptive or manipulative act in furtherance of a scheme to defraud. <u>See</u> <u>Plumber & Steamfitters Local 773</u>, 11 F.4th at 105.  Even if it did, the Complaint does not identify facts specific to these two defendants that raise a strong inference of scienter. <u>New England Carpenters</u>, 122 F.4th at 48.  Their motion to dismiss Count One will therefore be granted.

   Chen and Weng were independent directors of Global Cord during the proposed class period.  (Compl't ¶¶ 24-25, 75.)  According to the Complaint, Global Cord's directors were notified of the Cellenkos transaction by email on the evening of April 26, 2022, "a mere three days before the agreement was rushed through by management and publicly announced, with little or no Board deliberation."  (Compl't ¶ 81, 99.)  The email to directors included a draft PowerPoint presentation and execution versions of the transaction documents.  (Compl't ¶ 99.)  On April 28, 2022, Global Cord's directors were sent draft minutes for a meeting to be held the next day, for the purpose of resolving that the Cellenkos transaction was in the best interests of Global Cord.  (Compl't

¶ 99.)  The petition filed by Blue Ocean in the Cayman Grand Court states that the Global

Cord directors approved the Cellenkos transaction within 62 hours of learning about it.

(ECF 132-3 ¶ 42.3.)

        While the Complaint does not describe the contents of the materials

distributed to the directors, it elsewhere refers to an "extremely aggressive and unrealistic

valuation of Cellenkos performed by Redwood Valuation Partners for GCBC . . . ."

(Compl't ¶ 50.)  Blue Ocean's "Winding Up Petition," which is referenced throughout the

Complaint and therefore properly considered on this motion to dismiss, states that the

directors received a 25-page report on Global Cord authored by Duff & Phelps Opinion

Practice, a 52-page "Cellenkos Valuation Report" authored by Redwood Valuation

Partners, a 4-page analysis of "the attractiveness of the technology developed licensed or

owned" by Cellenkos, and a 20-page Global Cord tax analysis drafted by Deloitte.  (ECF

132-3 § 18.2.)

        On April 29, 2022, Global Cord published a press release titled "Global

Cord Blood Corporation Announces Entry into Cell Therapy Market by Acquiring

Cellenkos and Its Products Rights" that it attached as an exhibit to a Form 6-K filed with

the SEC.  (Compl't ¶ 158.)  It stated that Global Cord's board of directors "believes that

[Cellenkos] is a perfect fit for the Company and that its products can have distinct

synergies with the Company's existing line of business."  (Compl't ¶ 161.)  It is not alleged

to directly quote Chen or Weng.

        The Complaint describes conduct that might be consistent with negligence

on the part of Chen and Weng or perhaps a breach of fiduciary duty, but it does not

describe how their votes in favor of the transaction could be a deceptive or manipulative

act in furtherance of a scheme to defraud.  The Complaint does not allege that the

documents distributed to the directors were known by the directors to be some type of sham, nor does it allege that Chen and Weng, who both were independent directors of Global Cord, had a basis to know or suspect that the Cellenkos transaction was intended to conceal allegedly fraudulent cash transfers from Global Cord.  The Complaint does not assert that Chen or Weng participated in any misappropriation or acts of forgery or that they disseminated any misrepresentations about the Cellenkos transaction.

The Complaint also describes the unsuccessful attempt of Chen and Weng to attend the extraordinary general meeting of Global Cord shareholders on June 16, 2022, allegedly in an effort to advance the Cellenkos transaction.  (Compl't ¶ 91.)  They apparently were refused entry and had a verbal dispute with Blue Ocean representatives.  (Compl't ¶¶ 91, 103.)  But their failed attempt to attend the meeting is not alleged to have had a deceptive or fraudulent quality, not alleged to have affected the proposed transaction and occurred outside of the proposed class period.  The Complaint does not allege with particularity how the failed attempt to attend the meeting advanced a device, scheme or artifice to defraud.

Count One is separately dismissed as to Chen and Weng because the Complaint does not raise a strong inference of scienter against them.  It does not allege that either personally benefited from the conduct described in the Complaint.  See ECA, 553 F.3d at 198.  It also does not allege facts constituting strong circumstantial evidence of conscious misbehavior or recklessness.  New England Carpenters, 122 F.4th at 48.  The Complaint broadly alleges that the individual defendants were "privy to confidential information" concerning Global Cord, Meditech and Cellenkos, which gave them knowledge that statements disseminated to the investing public were false or misleading.  (Compl't ¶¶ 163-64.)  But the Complaint identifies no items of information known to Chen

and Weng that raise a strong inference that they acted recklessly or fraudulently when they voted to approve the Cellenkos transactions.  Viewing the Complaint's allegations holistically and in the light most favorable to plaintiffs, they do not include facts that raise a strong inference of conscious misbehavior by Chen and Weng or an "extreme departure" from the standards of ordinary care.  See ECA, 553 F.3d at 202-03.

Count One will therefore be dismissed as to Mark Chen and Jennifer Weng.

III.  The Claims of Control Person Liability Against Mark Chen, Jennifer Weng and Meditech Will Be Dismissed.

A.  The Complaint Does Not Allege that Mark Chen and Jennifer Weng Were Control Persons of Global Cord.

Count Three asserts that Mark Chen and Jennifer Weng acted as control persons within the meaning of Section 20(a) and are therefore liable for inducing any violation of section 10(b) and rule 10b-5.  (Compl't ¶ 185.)

"To state a claim of control person liability under § 20(a), a plaintiff must show (1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud."  Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC, 750 F.3d 227, 236 (2d Cir. 2014) (quotation marks omitted).  "With respect to the second factor, the Section 20(a) defendant must not only have actual control over the primary violator, but have actual control over the transaction in question."  In re Aegean Marine Petroleum Network, Inc. Sec. Litig., 529 F. Supp. 3d 111, 150 (S.D.N.Y. 2021) (Buchwald, J.) (quotation marks brackets omitted; emphasis in original); accord Genesee Cnty. Employees' Ret. Sys. v. DocGo Inc., 773 F. Supp. 3d 62, 93-94 (S.D.N.Y. 2025) (Failla, J.).

As previously discussed, the Complaint says little about Chen and Weng, asserting that they voted to approve the Cellenkos transaction and unsuccessfully attempted to attend the extraordinary general meeting of shareholders called by Blue Ocean. The Complaint characterizes them as independent directors and does not assert that they had a day-to-day role in managing Global Cord, had knowledge of the alleged cash transfers to Kam and/or Meditech, or personally benefited from the alleged scheme. They are not alleged to have signed any SEC filings, nor are they alleged to have any relationship to the alleged material misstatements and omissions that form the basis for the rule 10b-5(b) claim asserted in Count Two.

Because the Complaint does not plausibly allege that either Mark Chen or Jennifer Weng had actual control over the proposed Cellenkos transaction or was a culpable participant in the alleged fraud, the section 20(a) claim against them will be dismissed.

### B. The Complaint Does Not Allege that Meditech Was a Control Person of Global Cord.

Count Three also asserts that Meditech is liable as a control person of Global Cord.[11]  (Compl't ¶ 185.)  As discussed, the Complaint describes how Meditech benefited from its participation in the scheme alleged in Count One, but it does not include facts that describe it exercising actual control over Global Cord in the Cellenkos transaction. It also does not include facts showing Meditech's exercise of control over the allegedly material misstatements and omissions in Count Two.

The section 20(a) claim against Meditech will be dismissed.

---

[11] It separately asserts that Meditech was a control person of Cellenkos.  Because the Court has concluded that the Complaint does not state a primary violation by Cellenkos, Meditech cannot be liable as its control person.

CONCLUSION.

The Rule 12(b)(5) motions to dismiss for untimely service of process are DENIED. The Rule 12(b)(2) motions to dismiss for lack of personal jurisdiction are DENIED. The Rule 12(b)(6) motions are GRANTED in their entirety as to defendants Cellenkos, Inc., Mark Da-Jian Chen and Jennifer J. Weng, and GRANTED as to defendant Golden Meditech Holdings Limited on Count Three only.

The Clerk is respectfully directed to terminate the motions. (ECF 120, 125, 127, 129, 130.)

SO ORDERED.

P. Kevin Castel
United States District Judge

Dated: New York, New York
February 17, 2026