**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE: GLOBAL CORD BLOOD CORPORATION SECURITIES LIGATION | Case No. 1:24-cv-03071-PKC<br><br>**ANSWER AND AFFIRMATIVE AND OTHER DEFENSES IN RESPONSE TO THE AMENDED CLASS ACTION COMPLAINT** |

Defendants Ting (Tina) Zheng ("Ms. Zheng") and Bing Chuen (Albert) Chen ("Mr. Chen"), (collectively, "Defendants"), by their undersigned counsel, Dechert LLP, make the following answers and assert the following defenses in response to Lead Plaintiff Alessandro Somansino ("Plaintiff Somansino") and Named Plaintiff Mark Lewko ("Plaintiff Lewko") (collectively, "Plaintiffs") Amended Class Action Complaint (the "Complaint") (ECF No. 60).

## GENERAL DENIAL AND OBJECTION

Defendants deny any allegation in the Complaint not expressly admitted herein. Defendants specifically deny that they are liable to Plaintiffs, or any members of the proposed class, pursuant to: (i) Section 10(b) of the Exchange Act; (ii) Rule 10-b(5)(a) and (c); and (iii) Section 20(a) of the Exchange Act. Defendants also object to the Complaint as it fails to follow Rules 8(a)(2) and 8(d)(1) of the Federal Rules of Civil Procedure, which require, *inter alia,* that "[e]ach allegation must be simple, concise, and direct."

Paragraph numbers in this Answer and the responses contained therein correspond and respond to the allegations in like-numbered paragraphs in the Complaint. To the extent the paragraphs in the Complaint are grouped under headings and sub-headings, Defendants respond generally that such headings and sub-headings state unsupported legal conclusions to which no response is required. To the extent a response is necessary, Defendants deny each heading and

1

sub-heading in the Complaint and incorporate by reference this response in each paragraph below as if fully set forth therein. Defendants deny any characterization, including bolding, italics, or paraphrasing of any alleged statement that does not quote the actual complete statement in context. Defendants further deny that any foreign case filings quoted in the Complaint are final decisions binding on this Court. To the extent Defendants respond that a document speaks for itself, such an assertion shall not be deemed to be an admission that the contents of any such document are truthful, accurate, or complete. Defendants reserve the right to revise, amend, or supplement these responses as the facts may develop or circumstances may warrant.

On February 17, 2026, the Court issued an Opinion and Order dismissing certain claims and parties to this action. (ECF No. 163). To the extent any of Plaintiffs' allegations in the Complaint relate to claims that were dismissed, Defendants refer Plaintiffs to that Order.

Subject to the foregoing, Defendants answer as follows:

## I.    NATURE OF THE ACTION AND OVERVIEW

1.    This is a federal securities class action on behalf of a class consisting of all persons and entities who purchased the publicly traded ordinary shares of GCBC between June 18, 2019 and May 9, 2022, both dates inclusive (the "Class Period"), and who were damaged thereby. Plaintiffs seek to recover compensable damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5 promulgated thereunder.

**ANSWER:** Defendants admit that Plaintiffs purport to bring a putative securities class action under the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5 on behalf of purchasers of the securities of Global Cord Blood Corporation ("GCBC") and admit that Plaintiffs purport to represent a class beginning June 18, 2019 and ending May 9, 2022 (the "Class Period"). Except as so expressly admitted, Defendants deny each and every allegation in Paragraph 1.

2.    Defendant GCBC's primary business activity is processing and storing umbilical cord blood for expectant parents in Mainland China, for potential use in future medical treatments.

2

During the Class Period its ordinary shares were listed on the New York Stock Exchange, and it purported to be an independent, publicly owned and controlled company, with highly profitable operations and over one billion dollars in cash on its balance sheet by the end of the Class Period.

**ANSWER:** Defendants admit that GCBC's primary business activity is processing and storing umbilical cord blood stem cells for expectant parents in Mainland China for potential use in future medical treatments. Defendants admit that GCBC's ordinary shares were listed on the New York Stock Exchange during the Class Period. Defendants respectfully refer the Court to GCBC's public filings with the Securities and Exchange Commission ("SEC") for a complete and accurate account of representations made by GCBC regarding its independence, ownership, and balance sheet, and deny any allegations inconsistent with, contrary to, or not supported by, the entirety of those documents. Except as so expressly admitted, Defendants deny each and every allegation in Paragraph 2.

3.    In fact, at all times GCBC was secretly dominated by Defendant Yuen Kam and his company Golden Meditech Holdings Limited ("Golden Meditech"), a healthcare industry conglomerate doing business in Mainland China, although they had sold their prior majority stake in GCBC's stock in 2018. Defendant Kam controlled GCBC through, inter alia, his undisclosed relationships with GCBC's CEO and chairperson, Defendant Ting (Tina) Zheng, and its CFO Defendant Bing Chuen (Albert) Chen. Kam and Zheng are married and have two children together, which only became publicly known as a result of litigation after the Class Period. Likewise, subsequent litigation revealed that Albert Chen secretly worked on behalf of Kam and Golden Meditech during the Class Period, while using fake names to conceal his identity.

**ANSWER:** Defendants deny that Ms. Zheng is married to Defendant Yuen Kam ("Mr. Kam") but admit that Ms. Zheng and Mr. Kam share two children. Defendants respectfully refer the Court to GCBC's public filings with the SEC, including GCBC's Schedule 13D/A, filed on January 31, 2018, for a complete and accurate statement of their contents, including regarding share sales by Golden Meditech and/or its affiliates. Defendants deny any allegations inconsistent with, contrary to, or not supported by, the entirety of those documents. Except as so expressly admitted, Defendants deny each and every allegation in Paragraph 3.

4.      As revealed by GCBC's majority shareholder Blue Ocean Structure Investment Company Limited ("Blue Ocean"), and confirmed by the Joint Provisional Liquidators ("JPLs") appointed by the Grand Court of the Cayman Islands to oversee GCBC's business due to fraud by its former management, from 2015 through 2022 GCBC and its subsidiaries made undisclosed transfers of hundreds of millions of dollars to companies controlled by Defendant Kam, including Golden Meditech subsidiaries.

**ANSWER:** Defendants admit GCBC's majority shareholder was Blue Ocean, which had effective control of GCBC at the time.  Defendants also admit that on September 22, 2022, the Grand Court of the Cayman Islands (the "Cayman Court") appointed Joint Provisional Liquidators ("JPLs") on an *ex parte* basis which were purportedly "authorized and empowered by the Grand Court to take such steps as they consider necessary or expedient to protect the Company's assets," but deny that such proceeding is valid or that those reports constitute final determinations binding on this Court.  Except as so expressly admitted, Defendants deny each and every allegation in Paragraph 4.

5.      To conceal their theft of GCBC's funds, Defendants devised a sham transaction for GCBC to acquire Cellenkos, Inc. ("Cellenkos"). Cellenkos is a small drug development company based in Texas with no revenue that is years away from any potential regulatory approval of its product candidates. It is also majority owned by persons affiliated with Defendant Kam and Golden Meditech. Golden Meditech executive director Kim Chuan ("Jackie") Leong served as its CFO and Chairman throughout the Class Period. Although Cellenkos is a tiny, unproven company whose most recent fundraising round had raised only $15 million at a modest valuation, GCBC's proposed acquisition of Cellenkos called for it to pay $664 million to a Golden Meditech subsidiary for a license on certain potential future Cellenkos products, and to issue vast amounts of valuable GCBC stock to the selling Cellenkos shareholders affiliated with Defendant Kam.

**ANSWER:** Paragraph 5 asserts characterizations and legal conclusions to which no response is required.  To the extent a response is required, Defendants state that Golden Meditech is an "investor or partner" of Cellenkos but lack knowledge or information sufficient to form a belief as to the truth of the allegations regarding whether Cellenkos is "majority owned by persons affiliated with Defendant Kam and Golden Meditech," and so deny same.  To the extent Paragraph 5 purports to reference GCBC's April 29, 2022 SEC Form 6-K, Defendants respectfully refer the

4

Court to that document for a complete and accurate statement of its contents. Except as so expressly admitted, Defendants deny each and every allegation in Paragraph 5.

6.      While Defendant Albert Chen claimed to the Cayman Islands Grand Court that a GCBC subsidiary had in fact paid the $664 million on April 29, 2022, that was a lie. The Cayman court found, and Defendants have later admitted, that the bank statement submitted by Albert Chen to the court to prove the payment was a forgery.

**ANSWER:** Defendants state that Plaintiffs fail to identify the source of the statements they purport to reference and characterize in Paragraph 6. To the extent that Plaintiffs purport to reference (1) certain representations made by Mr. Chen to the Grand Court of the Cayman Islands; and (2) Judgments entered by the Grand Court of the Cayman Islands, Defendants respectfully refer the Court to those documents for a complete statement of their contents, without conceding the accuracy or characterizations set forth in the Judgments. Defendants further state that any judgments purportedly referenced in Paragraph 6 were filed in a foreign proceeding and are not final. Except as so expressly admitted, Defendants deny each and every allegation in Paragraph 6.

7.      In reality, the main reason for the Cellenkos transaction and its grossly inflated valuation was to provide a pretext for GCBC to supposedly transfer $664 million to Golden Meditech, to cover up that Defendants had *already* stolen hundreds of millions of dollars form GCBC. The basic structure of the transaction is illustrated in the below simplified chart:



**ANSWER:** Paragraph 7 asserts characterizations and legal conclusions to which no response is required. To the extent a response is required, Defendants deny each and every allegation in Paragraph 7.

8. However, despite Defendants' efforts to rush through the Cellenkos transaction in a matter of days with no meaningful deliberation of GCBC's Board and no approval form GCBC's shareholders, GCBC's majority shareholder Blue Ocean managed to prevent it from closing through promptly opposing it in the Cayman Islands Grand Court. Through this Cayman Islands litigation, and satellite litigation in the British Virgin Islands and in Hong Kong, additional details of Defendants' fraudulent scheme have come to light. This litigation has revealed Defendant Kam's immense degree of control over the Defendants, and Defendants' repeated false testimony and reliance on forged, back-dated, or otherwise falsified corporate records, in legal proceedings.

**ANSWER:** Defendants state that Plaintiffs fail to identify the source of the statements they purport to reference and characterize in Paragraph 8. Defendants admit that GCBC's majority shareholder was Blue Ocean and had effective control of the company at the time. Defendants admit that the Cellenkos transaction was not consummated and that there was or is litigation pending in courts of the Cayman Islands, British Virgin Islands, and Hong Kong which involve one or more parties to the instant litigation. Defendants further state that any litigation filings in the Cayman Islands, British Virgin Islands, and Hong Kong purportedly referenced in Paragraph

8 were filed in a foreign proceeding and do not constitute final decisions binding on this Court.

Except as so expressly admitted, Defendants deny each and every allegation in Paragraph 8.

9.     After GCBC announced the Cellenkos transaction on April 29, 2022, and again after Blue Ocean filed its first Winding Up Petition in the Cayman Islands Grand Court on May 5, 2022 revealing serious problems with the Cellenkos transaction, GCBC's publicly traded stock price fell by large amounts, as the truth about Defendants' scheme was partially disclosed to investors.

**ANSWER:** Defendants admit that the Cellenkos transaction was announced on April 29, 2022 and respectfully refer the Court to GCBC's public statements and SEC filings dated April 29, 2022 for a complete and accurate statement of their contents.  Defendants deny any allegations inconsistent with, contrary to, or not supported by the entirety of those documents.  Defendants admit that on May 5, 2022, Blue Ocean filed its first Winding Up Petition in the Cayman Island Grand Court but deny the accuracy of the statements made therein.  To the extent Paragraph 9 purports to make allegations concerning stock trading prices, those prices are a matter of public record, and speak for themselves.  Except as so expressly admitted, Defendants deny each and every allegation in Paragraph 9.

10.     As a result of Defendants' scheme and misleading statements and omissions, and the resulting precipitous decline in the market value of GCBC's ordinary shares, Plaintiffs and other Class members have suffered significant losses and damages.

**ANSWER:** Paragraph 10 contains legal conclusions to which no responsive pleading is required.  To the extent a response is required, Defendants deny each and every allegation in Paragraph 10.

## II.    JURISDICTION AND VENUE

11.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and SEC Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

**ANSWER:** Paragraph 11 contains legal conclusions to which no responsive pleading is required. To the extent a response is required, Defendants deny each and every allegation in Paragraph 11.

12. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

**ANSWER:** Paragraph 12 contains legal conclusions to which no responsive pleading is required. To the extent a response is required, Defendants deny each and every allegation in Paragraph 12.

13. Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa). The alleged misstatements entered and subsequent damages took place within this judicial district. During the Class Period GCBC's ordinary shares traded on the New York Stock Exchange ("NYSE"), which is headquartered in this Judicial District. Defendants Weng and Mark Chen took official actions as GCBC directors in this District in furtherance of Defendants' fraudulent scheme. Defendants retained professional service providers in New York to further their fraudulent scheme. Defendants chose New York law to govern the Stock Purchase Agreements used in the Cellenkos transaction. Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District.

**ANSWER:** Paragraph 13 contains legal conclusions to which no responsive pleading is required. To the extent a response is required, Defendants admit only that venue is proper in this District. Except as so expressly admitted, Defendants deny each and every allegation in Paragraph 13.

14. In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

**ANSWER:** Paragraph 14 contains legal conclusions to which no responsive pleading is required. To the extent a response is required, Defendants deny each and every allegation in Paragraph 14.

## III.    PARTIES

15. Lead Plaintiff Alessandro Somansino, as set forth in his previously filed certification

(Dkt. No. 45-2), incorporated by reference herein, purchased publicly traded GCBC ordinary shares during the Class Period, and suffered damages as a result of the federal securities law violations, scheme, and false and/or misleading statements and/or material omissions alleged herein.

**ANSWER:** Defendants admit only that Plaintiff Somansino attached a Certification as Exhibit B to the Declaration of Gregory B. Linkh in Support of Alessandro Somansino's Motion for Appointment as Lead Plaintiff and Approval of Lead Counsel (ECF No. 45-2). Defendants deny the allegations of Paragraph 15 to the extent they imply there is a valid class or that the Class Period as defined is appropriate. Except as so expressly admitted, Defendants deny each and every allegation in Paragraph 15.

16.     Plaintiff Mark Lewko, as set forth in his previously filed certification (Dkt. No. 524 at page 8), incorporated by reference herein, purchased publicly traded GCBC ordinary shares during the Class Period, and suffered damages as a result of the federal securities law violations, scheme, and false and/or misleading statements and/or material omissions alleged herein.

**ANSWER:** Defendants admit only that Plaintiff Lewko attached a Certification as Exhibit D to the Declaration of Jeremy A. Lieberman in Support of Motion of MW Gestion and Mark Leweko for Appointment as Co-Lead Plaintiffs and Approval of Lead Counsel (ECF No. 52-4). Defendants deny the allegations of Paragraph 16 to the extent they imply there is a valid class or that the Class Period as defined is appropriate. Except as so expressly admitted, Defendants deny each and every allegation in Paragraph 16.

17.     Defendant Global Cord Blood Corporation is incorporated in the Cayman Islands. During the Class Period GCBC maintained its principal executive offices at 48th Floor, Bank of China Tower, 1 Garden Road, Central, Hong Kong S.A.R. During the Class Period GCBC's ordinary shares were listed and traded on the NYSE under the ticker symbol "CO". GCBC's primary business activity is processing and storing umbilical cord blood for expectant parents in Mainland China, for potential use in future medical treatments.

**ANSWER:** Defendants admit the allegations of Paragraph 17.

18.     Defendant Golden Meditech Holdings Limited is incorporated in the Cayman Islands. During the Class Period Golden Meditech maintained its principal executive offices at 48th Floor, Bank of China Tower, 1 Garden Road, Central, Hong Kong S.A.R. Golden Meditech is a

healthcare industry conglomerate in Mainland China that operates various business including hospital management, medical insurance services, genetic testing, and medical device sales. Prior to the Class Period Golden Meditech was the controlling shareholder of GCBC.

**ANSWER:** Defendants admit that Golden Meditech is incorporated in the Cayman Islands and maintained its principal executive offices at 48th Floor, Bank of China Tower 1, Garden Road, Central, Hong Kong S.A.R. during the Class Period. Defendants admit that Golden Meditech is a healthcare industry conglomerate in Mainland China that operates various business including hospital management, medical insurance services, genetic testing, and medical device sales. Except as so expressly admitted, Defendants deny each and every allegation in Paragraph 18.

19. Defendant Cellenkos, Inc. is incorporated in Delaware. During the Class Period Cellenkos maintained its principal executive offices at 5416 Chaucer Drive, Houston, Texas 77005. Cellenkos is a clinical stage biotechnology company that is seeking to develop drug product candidates to treat autoimmune diseases and inflammatory disorders. During the Class Period Golden Meditech was the controlling shareholder of Cellenkos.

**ANSWER:** Defendants admit the allegations in Paragraph 19, except Defendants lack sufficient information to form a belief as to the allegation that "During the Class Period Golden Meditech was the controlling shareholder of Cellenkos," and so deny same.

20. Defendants GCBC, Golden Meditech, and Cellenkos, are herein referred to as the "Corporate Defendants."

**ANSWER:** The allegations in Paragraph 20 require no response.

21. Defendant Yuen Kam is the founder, chairman, controlling shareholder, and CEO of Golden Meditech. Prior to the Class Period, he was also the chairman of GCBC. Throughout the Class Period, Defendant Kam controlled Golden Meditech, and secretly controlled GCBC although purportedly no longer involved in GCBC's management. Defendant Kam is married to and has two children with Defendant Zheng, which Defendants concealed from investors during the Class Period. Defendant Kam is believed to reside in Hong Kong and/or Mainland China.

**ANSWER:** Defendants deny that Ms. Zheng is married to Mr. Kam but admit that Ms. Zheng and Mr. Kam share two children and that Mr. Kam is believed to reside in Mainland China. Defendants admit that Mr. Kam is the founder of Golden Meditech and previously served as the chairman of GCBC, but lack sufficient information to form a belief as to whether Mr. Kam is the

current "chairman, controlling shareholder, and CEO of Golden Meditech," and so deny same.

Unless as so expressly admitted, Defendants deny the allegations in Paragraph 21.

22.    Defendant Ting (a/k/a Tina) Zheng was GCBC's CEO and chairperson throughout the Class Period. Prior to the Class Period, Zheng served as a director of Golden Meditech. Defendant Zheng is married to and has two children with Defendant Kam, which Defendants concealed from investors during the Class Period. Defendant Zheng is believed to reside in Hong Kong and/or Mainland China.

ANSWER: Defendants admit the allegations in Paragraph 22, except deny that Ms. Zheng is married to Mr. Kam and that "Defendants concealed [that Ms. Zheng had children with Mr. Kam] from investors during the Class Period."  Defendants also deny that Ms. Zheng served as a director of Golden Meditech, as Ms. Zheng served as a non-executive director of Golden Meditech before she resigned in May 2019.

23.    Defendant Bing Chuen (a/k/a Albert) Chen was GCBC's CFO and director throughout the Class Period. Prior to the Class Period, he officially served as corporate finance vice president of Golden Meditech. During the Class Period, Albert Chen remained deeply involved in Golden Meditech's financial operations, but had no official title and concealed his identity when working for Golden Meditech. Defendant Albert Chen is believed to reside in Hong Kong.

ANSWER: Defendants admit the allegations of Paragraph 23 except deny that "Albert Chen remained deeply involved in Golden Meditech's financial operations, but had no official title and concealed his identity when working for Golden Meditech."

24.    Defendant Mark Da-Jian Chen was a director of GCBC during the Class Period. He attempted to attend the Extraordinary General Meeting in New York called by a GCBC shareholder to prevent the Cellenkos transaction. Defendant Mark Chen is married to and has children with Defendant Weng. He is believed to reside in New York and/or Mainland China.

ANSWER: Defendants Mark Da-Jian Chen and Jennifer Weng have been dismissed from this action pursuant to the Court's Opinion and Order on Defendants' Motions to Dismiss (ECF No. 163) and accordingly, no response is required.

25.    Defendant Jennifer Weng was a director of GCBC during the Class Period. She attempted to attend the Extraordinary General Meeting in New York called by a GCBC shareholder to prevent the Cellenkos transaction. Defendant Weng is married to and has children

11

with Defendant Mark Chen. She is believed to reside in New York.

**ANSWER:** Defendants Mark Da-Jian Chen and Jennifer Weng have been dismissed from this action pursuant to the Court's Opinion and Order on Defendants' Motions to Dismiss (ECF No. 163) and accordingly, no response is required.

26.    Defendants Kam, Zheng, Albert Chen, Mark Chen, and Weng, are herein referred to as the "Individual Defendants."

**ANSWER:** The allegations in Paragraph 26 require no response.

27.    The Individual Defendants and the Corporate Defendants are collectively referred to herein as "Defendants."

**ANSWER:** The allegations in Paragraph 27 require no response.

## IV.    BACKGROUND

### A.    Defendant Kam And His Company Golden Meditech

28.    Defendant Yuen Kam founded Golden Meditech, a healthcare industry conglomerate doing business in Mainland China, in or around 2001. He has controlled it, its many subsidiaries, and various affiliated companies, ever since. From approximately 2001 to 2020, Golden Meditech was listed on the Hong Kong Stock Exchange. At most times during and before the Class Period, Defendant Kam served as Golden Meditech's Chairman and CEO, with a brief departure in 2019-2020 after being censured by the Hong Kong Stock Exchange.

**ANSWER:** Defendants admit that Defendant Yuen Kam founded Golden Meditech, a healthcare industry conglomerate doing business in Mainland China, in or around 2001. Defendants lack sufficient information to form a belief as to the other allegations of Paragraph 28, including whether Mr. Kam has "controlled [Golden Meditech], its many subsidiaries, and various affiliated companies, ever since [2001]" and that "at most times during and before the Class Period, Defendant Kam served as Golden Meditech's Chairman and CEO, with a brief departure in 2019-2020 after being censured by the Hong Kong Stock Exchange," and so deny same.

29.    Other Defendants and related persons have occupied key roles at Golden Meditech under Defendant Kam. Defendant Zheng served as an executive director of Golden Meditech and had been in charge of its and its subsidiaries' financial and internal control systems since September 2001, until becoming a non-executive director in August 2012. Defendant Albert Chen

served as the corporate finance vice president of Golden Meditech from March 2005 until an unknown time, and even after his ostensible departure from Golden Meditech continued to be secretly involved in key aspects of its management. Kim Chuan Leong has worked for Golden Meditech since 2006, was appointed as Deputy Chief Financial Officer of the Company in 2015 making him responsible for the Group's finances and corporate projects, and served as an executive director throughout the Class Period.

ANSWER: Defendants admit that Ms. Zheng served as an executive director of Golden Meditech from in or around 2001 to in or around August 2012 and that Mr. Chen served as Vice President of Finance of Golden Meditech from in or around 2005 to June 2009. Defendants lack information sufficient to admit or deny allegations regarding Kim Chuan Leong, and so deny same. Except as so explicitly admitted, Defendants deny each and every allegation in Paragraph 29.

30.    On December 18, 2018 the Listing Committee of the Hong Kong Stock Exchange censured Golden Meditech and Defendant Kam, and criticized Defendant Zheng, among other Golden Meditech personnel, for "serious breaches of the Exchange Listing Rules in relation to disclosure and shareholders' approval requirements" with respect to "a series of transactions/events involving [Golden Meditech's] interest in a company called Funtalk China Holdings Limited ('Funtalk')." Kim Chuan Leong served as CFO of Funtalk. The Listing Committee found that Golden Meditech, Defendant Kam, and Defendant Zheng, violated numerous Exchange Listing Rules, including rules requiring "that the information contained in any announcement or corporate communication must be accurate and complete in all material respects and not be misleading or deceptive."

ANSWER: Defendants state that Paragraph 30 purports to reference a December 18, 2018 Censure issued by the Listing Committee of the Hong Kong Stock Exchange, which relates to conduct unrelated to this case. Defendants respectfully refer the Court to the censure for a complete statement of its contents. Defendants otherwise deny each and every allegation in Paragraph 30.

31.    The Listing Committee found that Defendant Kam ignored standard corporate practices and formalities, noting that "Mr Kam, as [Golden Meditech's] sole representative on the board of Fortress, agreed to the disposal of Funtalk by Fortress without consulting the Board, obtaining professional advice, conducting any due diligence or even reviewing the implications of the change in the nature of the disposal." The Listing Committee found that Defendant Kam "reported to the Board that the disposal of Fortress by the Company had been completed, as they took the view that the disposal of Funtalk by Fortress was essentially the same as the Company disposing of its interest in Fortress. This was untrue and clearly misleading."

**ANSWER:** Defendants state that Paragraph 31 purports to reference a December 18, 2018 Censure issued by the Listing Committee of the Hong Kong Stock Exchange, which relates to conduct unrelated to this case. Defendants respectfully refer the Court to the censure as that is the best evidence of its contents. Defendants otherwise deny each and every allegation in Paragraph 31.

32.     The Listing Committee found that another Golden Meditech executive director, Kong Kam Yu, "did not exercise his own independent judgement" apart from Kam concerning the disposal of Funtalk. The Listing Committee similarly found that Defendant Zheng and other Golden Meditech directors "relied upon the information provided to them by Mr Kam and Mr Kong, and did not apply their own independent judgment," and "[t]here was no evidence that they raised any enquiries with Mr Kam." The Listing Committee concluded that "[t]he conduct of the Relevant Directors, in particular that of Mr Kam and Mr Kong, undermined the integrity of the Company."

**ANSWER:** Defendants state that Paragraph 32 purports to reference a December 18, 2018 Censure issued by the Listing Committee of the Hong Kong Stock Exchange, which relates to conduct unrelated to this case. Defendants respectfully refer the Court to the censure for a complete statement of its contents. Defendants otherwise deny each and every allegation in Paragraph 32.

33.     Shortly after the Hong Kong Stock Exchange Listing Committee issued its decision censuring Golden Meditech and Defendant Kam, and criticizing Defendant Zheng, they resigned from their Golden Meditech positions. In a May 24, 2019 press release, Golden Meditech announced that Defendant Kam, Defendant Zheng, and three other Golden Meditech directors at issue in the decision had simultaneously "voluntarily resigned due to personal reasons." The press release announced that Kim Chuan Leong had been promoted from deputy chief financial officer to CEO and executive director of Golden Meditech. The press release noted that Defendant Kam remained Golden Meditech's major shareholder.

**ANSWER:** Defendants state that Paragraph 33 refers to a press release published by Golden Meditech and Defendants respectfully refer the Court to that press release for a complete and accurate statement of its contents. Defendants deny that Plaintiffs have appropriately characterized the resignations described in Paragraph 33, which were announced on May 24, 2019,

14

as having occurred "shortly after" the December 18, 2018 censure.  Defendants otherwise deny the allegations in Paragraph 33.

34.    In or about 2020, Defendant Kam and various companies affiliated with him launched a proposal to privatize Golden Meditech and withdraw its Hong Kong Stock Exchange Listing, which they successfully completed.

**ANSWER:** Defendants admit that on October 15, 2020, Golden Meditech filed Announcements and Notices with the Hong Kong Stock Exchange which proposed the privatization of Golden Meditech and respectfully refers the Court to those filings for a complete and accurate statement of its contents.  Defendants otherwise lack information sufficient to admit or deny the remaining allegations and characterizations of Paragraph 34, and so deny same.

35.    Shortly after Golden Meditech's privatization and de-listing from the Hong Kong Stock Exchange, Defendant Kam resumed his prior role as executive director and CEO.

**ANSWER:** Defendants lack knowledge or information sufficient to admit or deny the allegations of Paragraph 35, and so deny same.

### B.    GCBC's History As A Golden Meditech Subsidiary

36.    The business of GCBC began operating in or around 2003, under the name of China Cord Blood Services Corporation, when Golden Meditech began to acquire cord blood banking companies. From 2003 through the end of the Class Period, Defendant Zheng was in charge of the Company's cord blood bank operations.

**ANSWER:** Defendants admit that "the business of GCBC began operating in or around 2003."  Defendants deny that Ms. Zheng was solely "in charge of" GCBC's cord blood bank operations for the times specified, as GCBC maintained proper governance structures throughout the Class Period, which included oversight by GCBC's board of directors.  Defendants otherwise deny each and every allegation in Paragraph 36.

37.    The business continued as a majority owned subsidiary of Golden Meditech, until in or around 2009, when it went public via a business combination with Pantheon China Acquisition Corp. Following the business combination the business was named China Cord Blood Corporation, incorporated in the Cayman Islands, and publicly traded on the NYSE under the ticker symbol "CO".

**ANSWER:** Defendants admit that GCBC is incorporated in the Cayman Islands and was publicly traded on the NYSE under the ticker symbol "CO" beginning in or around November 2009, following a business combination involving Pantheon China Acquisition Corp. Defendants admit that GCBC previously operated under the name China Cord Blood Corporation. Defendants otherwise lack information sufficient to admit or deny the remaining allegations and characterizations of Paragraph 37, and so deny same.

38. Throughout GCBC's history as a public company, Defendant Zheng has served as its CEO, Defendant Albert Chen has served as CFO, Defendant Mark Chen has served as a director, and Defendant Jennifer Weng has served as a director. Defendant Zheng served as Chairperson of the Board from 2009 through in or about 2013 when Defendant Kam became the Board Chair. Golden Meditech remained GCBC's largest and controlling shareholder up until 2018, with its beneficial ownership ranging from approximately 40% to 65% over that period.

**ANSWER:** Defendants admit that Ms. Zheng was GCBC's CEO, and Mr. Chen was GCBC's CFO when GCBC became a public company in 2009 and they remained in those roles until September 22, 2022. Defendants admit that Ms. Zheng served as Chairperson of GCBC's Board during the Class Period. Defendants Mark Da-Jian Chen and Jennifer Weng have been dismissed from this action pursuant to the Court's Opinion and Order on Defendants' Motions to Dismiss (ECF No. 163) and accordingly, no response is required as to the allegations in Paragraph 38 which refer to those persons. Defendants admit that Golden Meditech's stock ownership of GCBC ranged from approximately 40% to 65% of GCBC's stock until 2018. Except as so expressly admitted, Defendants deny each and every allegation in Paragraph 38.

**C.    After Golden Meditech Sold Its GCBC Stock, Defendant Kam Secretly Continued To Control GCBC**

39. On January 31, 2018, Nanjing Ying Peng Hui Kang Medical Industry Investment Partnership (limited partnership) and its subsidiary Blue Ocean Structure Investment Company Ltd purchased Golden Meditech's approximately 65% equity interest in the Company.

**ANSWER:** Defendants respectfully refer the Court to GCBC's public filings with the SEC, including regarding share sales by Golden Meditech and its affiliates filed on January 31, 2018 for a complete and accurate statement of its contents. Defendants deny any allegations inconsistent with, contrary to, or not supported by, the entirety of those documents.

40.     Shortly following the purchase, the Company changed its name to Global Cord Blood Corporation, and Defendant Kam resigned from his position as Chairman of the Board. However, Defendant Zheng remained CEO and resumed her prior role as Chairperson, Defendant Albert Chen remained CFO and director, and Defendants Mark Chen and Jennifer Weng remained as directors.

**ANSWER:** Defendants admit that on January 31, 2018, Mr. Kam resigned from his positions as Chairman and Director of GCBC. Defendants admit that as of January 31, 2018, Ms. Zheng was and remained CEO of GCBC and became Chairperson of GCBC. Defendants admit that under the supervision of Xu Ping, Albert was and remained CFO and Director of GCBC. Defendants admit that on March 16, 2018, the shareholders of GCBC changed the company's name from "China Cord Blood Corporation" to "Global Cord Blood Corporation." Defendants Mark Da-Jian Chen and Jennifer Weng have been dismissed from this action pursuant to the Court's Opinion and Order on Defendants' Motions to Dismiss (ECF No. 163) and accordingly, no response is required as to the allegations in Paragraph 40 which refer to those persons. Except as so expressly admitted, Defendants deny each and every allegation in Paragraph 40.

41.     Unknown to the public, Defendant Kam remained in control of GCBC through his relationships with its directors and officers. As discussed in greater detail below, Defendant Kam was married to and had two children with Defendant Zheng, and Defendant Albert Chen still worked for Kam's company Golden Meditech. None of this was publicly disclosed.

**ANSWER:** Defendants deny that Ms. Zheng is married to Mr. Kam but admit that Ms. Zheng and Mr. Kam share two children. Except as so expressly admitted, Defendants deny each and every allegation in Paragraph 41.

**D.    GCBC Purported To Stockpile $1 Billion In Cash While Defendants Ignored Repeated Calls To Distribute Earnings To Investors**

42.    According to the financial results published by GCBC, the Company was extremely profitable. As GCBC explained in its public filings, under PRC regulations at most one license to conduct cord blood banking activities was granted per region. GCBC held the licenses for the Beijing, Guangdong and Zhejiang regions, effectively giving its business a monopoly in those regions.

**ANSWER:** Defendants state that Plaintiffs fail to identify the source of the statements they purport to reference in Paragraph 42.    To the extent that Plaintiffs purport to reference representations made by GCBC in SEC filings, Defendants respectfully refer the Court to those documents for a complete and accurate statement of their contents.    Defendants deny any allegations inconsistent with, contrary to, or not supported by, the entirety of those documents. Except as so expressly admitted, Defendants deny each and every allegation in Paragraph 42.

43.    The following selected financial results are taken from GCBC's annual reports filed with the SEC on Form 20-F, for its fiscal years ending on March 31, in thousands of U.S. dollars:

|  | 3/31/2015 | 3/31/2016 | 3/31/2017 | 3/31/2018 |
|---|---|---|---|---|
| **Cash and cash equivalents** | 393,072 | 466,567 | 509,976 | 677,646 |
| **Total assets** | 664,539 | 727,036 | 752,980 | 931,739 |
| **Total liabilities** | 415,594 | 461,306 | 485,292 | 434,539 |
|  |  |  |  |  |
| **Revenues** | 102,456 | 102,822 | 110,411 | 149,343 |
| **Total operating expenses** | -43,477 | -50,724 | -51,208 | -75,792 |
| **Operating income** | 37,909 | 29,673 | 38,480 | 44,618 |
| **Net income** | 17,389 | 14,164 | 18,696 | 38,402 |
|  |  |  |  |  |
| **Net cash provided by operating activities** | 95,961 | 90,105 | 92,636 | 130,528 |
| **Net cash used in investing activities** | -6,845 | -2,556 | -13,158 | -10,598 |
| **Net cash provided by financing activities** | 0 | -255 | -8,717 | -321 |

|  | 3/31/2019 | 3/31/2020 | 3/31/2021 | 3/31/2022 |
|---|---|---|---|---|
| **Cash and cash equivalents** | 744,706 | 772,988 | 927,349 | 1,050,744 |
| **Total assets** | 976,123 | 1,019,638 | 1,206,741 | 1,346,288 |
| **Total liabilities** | 466,116 | 470,478 | 536,933 | 575,703 |
|  |  |  |  |  |
| **Revenues** | 147,031 | 172,503 | 176,995 | 196,119 |
| **Total operating expenses** | -62,443 | -66,843 | -66,520 | -71,158 |
| **Operating income** | 56,869 | 78,950 | 83,162 | 96,045 |
| **Net income** | 43,987 | 67,467 | 78,788 | 80,369 |
|  |  |  |  |  |
| **Net cash provided by operating activities** | 118,031 | 88,124 | 96,266 | 96,794 |
| **Net cash used in investing activities** | -4,502 | -20,626 | -3,069 | -3,098 |
| **Net cash provided by financing activities** | -3,158 | -570 | -927 | -1,219 |

**ANSWER:** Defendants state that Paragraph 43 purports to reference GCBC's Form 20-F SEC filings for the years 2015-2022. Defendants respectfully refer the Court to those documents for a complete and accurate statement of their contents. Defendants deny any allegations inconsistent with, contrary to, or not supported by, the entirety of those documents. Except as so expressly admitted, Defendants deny each and every allegation in Paragraph 43.

44. Shareholders noticed the large and growing cash balances reflected on the balance sheet, and routinely urged GCBC to distribute earnings to shareholders via dividends or stock buybacks.

**ANSWER:** Defendants lack information sufficient to admit or deny the allegations and characterizations of Paragraph 44, and so deny same.

45. For example, during GCBC's Q4 2019 earnings call held on June 19, 2019:

(a) Merrill Lynch analyst Jeffrey Neal stated, "The shares closed below the company's estimated cash value per share yesterday and there's principally one reason for that, the inefficiency of capital to deployment. So, I'd like Ms. Zheng, to enumerate the reasons that the company maintains this policy with regards to basically capital storage as opposed to capital efficiency for shareholders";

(b) Kent McCarthy from investor Jayhawk Capital stated, "We and every other shareholder had asked for 10 years for a share repurchase and a special dividend";

(c) Individual investor Jeffrey Morrison stated, "I find it laughable that you guys are vigorously debating how to allocate capital -- you don't allocate capital. You hoard it, I don't know what you're going to do with it. But you're consistently not looking out for the shareholders".

**ANSWER:** Defendants lack information sufficient to admit or deny the allegations and characterizations of Paragraph 45, and so deny same.

46. During GCBC's Q1 2020 earnings call held on August 28, 2019 Chun Ding from CRCM Ventures stated "with our stock price way below the cash value of $4.60, why are we going to acquire other business? Can we buy back shares or pay dividend at this level? It's -- there's nothing out there that's as cheap as we are."

**ANSWER:** Defendants lack information sufficient to admit or deny the allegations and characterizations of Paragraph 46, and so deny same.

19

47.     On GCBC's Q2 2020 earnings call held on November 27, 2019 Michael Schmitz from Jayhawk Capital stated "Obviously, the most important issue that continues to be ignored by the company is how you plan to utilize the cash resources that are now and have been for some time greater than the market cap of the company".

**ANSWER:** Defendants lack information sufficient to admit or deny the allegations and characterizations of Paragraph 47, and so deny same.

48.     Despite such consistent requests from shareholders and analysts, and despite GCBC purportedly having hundreds of millions of dollars in unused cash throughout the Class Period, Defendants never returned any significant amount of earnings to shareholders (GCBC made a small dividend in 2018, resulting in total payments to shareholders of only $2.7 million).

**ANSWER:** Defendants deny each and every allegation in Paragraph 48, except admit GCBC announced a dividend distribution on June 26, 2018.

**E.     Cellenkos Is A Small Drug Development Company With Its Product Candidates Still Years Away From Possible Regulatory Approval**

49.     At all times, Cellenkos was a tiny drug development company in its infancy, with no revenue and no product candidates that had obtained regulatory approval. In fact, even at the April 2022 time of the proposed Cellenkos transaction, none of Cellenkos's product candidates had even entered Phase II trials. As such, Cellenkos was still years away from any potential future regulatory approvals to market its products. Many such early stage experimental product candidates never obtain regulatory approval, and so Cellenkos's business prospects were at all times highly uncertain.

**ANSWER:** Defendants deny each and every allegations in Paragraph 49 or lack sufficient information to form a belief as to the allegations of Paragraph 49, and so deny same.

50.     Even the extremely aggressive and unrealistic valuation analysis of Cellenkos performed by Redwood Valuation Partners for GCBC to attempt to justify the excessive valuation used in the Cellenkos transaction did not project Cellenkos to earn any revenues until 2024.

**ANSWER:** Defendants deny each and every allegation in Paragraph 50.

51.     After Blue Ocean filed an action in the Southern District of Texas (Case No. 4:22-mc-01161) in July 2022 to obtain discovery from Cellenkos relating to the Cellenkos transaction, Cellenkos's representative Tara Sadeghi stated in declarations to the court that Cellenkos "has a full-time staff of only eleven employees," and that only "approximately 65 individual patients . . . have received Cellenkos's T-reg cellular therapies for the treatment of diseases in connection with various clinical trials and emergency use investigational new drug applications."

**ANSWER:** Defendants state that Plaintiffs fail to identify the source of the statements they purport to reference and characterize in Paragraph 51. To the extent that Plaintiffs purport to reference the Declaration of Tara Sadeghi (Case No. 4:22-mc-01161, ECF No. 5-2), and the Supplemental Declaration of Tara Sadeghi (Case No. 4:22-mc-01161, ECF No. 11-2), Defendants respectfully refer the Court to those documents for a complete statement of their contents. Defendants otherwise lack sufficient information to form a belief as to the allegations of Paragraph 51, and so deny same.

52.    At all times during the Class Period, Golden Meditech executive director Kim Chuan Leong served as Chairman and CFO of Cellenkos. Cellenkos does not appear to have had a CEO, or at least to have publicly disclosed having one. For tax years 2019 through 2022 (forms dated February 24, 2020 through February 22, 2023), Cellenkos's annual franchise tax reports to the state of Delaware list Leong as one of only two directors along with Simrit Parmar.

**ANSWER:** Defendants lack sufficient information to form a belief as to the allegations of Paragraph 52, and so deny same.

53.    From at least January 25, 2018 through at least December 2, 2020, Cellenkos's website stated under the heading "Our Investor" that "Golden Meditech and the strategic investor collectively own 51% of the voting stock of the new company," without identifying the "strategic investor." The 2019/20 annual report of Golden Meditech dated June 30, 2020 states that "management determined that the Group has significant influence over Cellenkos, including participation in its financial and operating policy decisions."

**ANSWER:** Paragraph 53 purports to reference and selectively quote certain statements from Golden Meditech in its 2019/20 Annual Report. Defendants respectfully refer the Court to the 2019/20 Annual Report of Golden Meditech for a complete and accurate statement of its contents. Defendants otherwise lack sufficient information to form a belief as to the allegations of Paragraph 53, and so deny same.

## V.    DEFENDANTS' SCHEME TO STEAL HUNDREDS OF MILLIONS OF DOLLARS FROM GCBC AND CONCEAL THE THEFT

### A.    The Theft

54.    From 2015 through 2022, Defendants caused GCBC and its subsidiaries to make

undisclosed transfers of hundreds of millions of dollars to companies controlled by Defendant Kam, including to Golden Meditech subsidiaries.

**ANSWER:** Defendants deny each and every allegation in Paragraph 54.

55.    In an Amended Winding Up Petition filed with the Grand Court of the Cayman Islands on September 22, 2022, Blue Ocean Structure Investment Company Limited ("Blue Ocean") revealed that it had "obtained evidence indicating that the Company [GCBC] without lawful excuse or justification has paid RMB3,557,616,000 to JingJing [Beijing Jingjing Medical Equipment Co., Ltd] (which is owned by Kam) between 1 April 2017 and 31 May 2022," and that these "[u]nlawful [p]ayments are not recorded in any of the published financial statements of the Company for the relevant period."

**ANSWER:** Paragraph 55 purports to reference and selectively quote certain statements made by Blue Ocean Structure Investment Company Limited ("Blue Ocean"), that are unproven allegations in a case pending in the Grand Court of the Cayman Islands.  Defendants deny that such proceeding is valid or that the Amended Winding Up Petition contains factual determinations that are binding in this proceeding.  Defendants respectfully refer the Court to the September 22, 2022 Amended Winding Up Petition for a complete statement of its contents, without conceding the accuracy or characterizations set forth therein.  Defendants otherwise deny each and every allegation in Paragraph 55.

56.    After their appointment, the JPLs further corroborated the claims of fraud by GCBC. In a declaration filed in the U.S. Bankruptcy Court for the Southern District of New York on October 7, 2022 (Case No. 22-11347, ECF No. 3), Margot MacInnis, one of the three JPLs appointed by the Cayman Grand Court, recounted that "the Grand Court has expressed significant concerns about the conduct of the Debtor [GCBC] and its management, including largely unanswered allegations of a substantial fraud, involving forgery of bank statements for the purpose of filing them in evidence in the Grand Court," and that "[n]othing in my investigations to date contradicts these concerns." Ms. MacInnis continued to state that "the JPLs' investigations to date have not disclosed any reason to doubt the accuracy of" the "evidence filed by Blue Ocean in the Grand Court."

**ANSWER:** Paragraph 56 purports to reference and selectively quote certain statements made in the declaration Margot MacInnis, one of the JPLs appointed in a case pending in the Grand Court of the Cayman Islands, filed in the United States Bankruptcy Court for the Southern District

of New York.  Defendants deny the accuracy of these unproven statements and respectfully refer the Court to Ms. MacInnis' declaration for a complete statement of its contents, which states that these allegations are unproven. Defendants otherwise deny each and every allegation in Paragraph 56.

57.     The JPLs revealed further details of Defendants' fraud in their First Report to Court filed in the Cayman Litigation, dated October 20, 2022. The First Report stated that the JPLs had identified "Payments totalling RMB4,261 million (the equivalent of approximately US$606 million) from Chen Hong [GCBC subsidiary Beijing Jiachenhong Biological Technologies Co., Ltd] to entities controlled by Yuen Kam between 2015 and 2022." More specifically, "the JPLs have prepared an analysis of transactions shown in extracts of bank account information produced in the proceedings leading to the JPL's appointment" and "[t]hat analysis shows that Chen Hong (an indirect subsidiary of the Company) appears to have generated sufficient cash inflows to fund total payments of approximately US$606 million in 74 transactions during the period from September 2015 to May 2022 to entities related to GMHL [Golden Meditech]." The JPLs further noted that "[d]uring the 2015 to 2022 fiscal years . . . the Company reported in its annual reports filed with the SEC, payments . . . to related parties" totaling RMB 283,635,000, equivalent to US$ 42,975,000, and that "[i]n comparison to the US$42.9 million GCBC reported it paid to all related parties during the period, the US$606 million of Chen Hong payments to parties related to GMHL is more than 14 times the related party payments . . . reported in its Annual Reports and the JPLs have seen no indication or explanation for this substantial inconsistency."

ANSWER: Paragraph 57 purports to reference and selectively quote certain statements by JPLs appointed in a case pending in the Grand Court of the Cayman Islands.  Defendants deny the accuracy of these unproven statements and respectfully refer the Court to the JPLs' First Report to the Cayman Court for a complete statement of its contents, without conceding the accuracy or characterizations set forth therein.  Defendants further state that the JPL reports issued in the Cayman Court and referenced in Paragraph 57 do not constitute final decisions.  Defendants otherwise deny each and every allegation in Paragraph 57.

58.     The JPLs' report further noted concerns indicating that GCBC's cash balances may be significantly smaller than reported, including: (i) "indications that the Company sought short-term financing from third parties, despite purporting to have cash and cash equivalents of more than US$1 billion as at 31 March 2022"; (ii) "repeated reluctance to utilise a supposedly growing and unused cash reserve in the face of investor pressure to either pay dividends or otherwise return capital to investors"; and (iii) "indications that the Group had cash reserves may be significantly below the US$1 billion it reported as at 31 March 2022."

23

**ANSWER:** Paragraph 58 purports to reference and selectively quote certain statements by JPLs appointed in a case pending in the Grand Court of the Cayman Islands.  Defendants deny the accuracy of these unproven statements and respectfully refer the Court to the JPLs' First Report to the Cayman Court for a complete statement of its contents, without conceding the accuracy or characterizations set forth therein.  Defendants further state that JPL reports issued in the Cayman Court and referenced in Paragraph 58 do not constitute final decisions.  Defendants otherwise deny each and every allegation in Paragraph 58.

59.     The JPLs further noted in their First Report that GCBC's directors were refusing to cooperate with their efforts to investigate and take control of GCBC's operations, and that Defendants Zheng and Albert Chen appeared to be actively taking steps to impede those efforts. For example, the First Report stated:

> it is believed that Albert Chen and/or Ting Zheng appear to be taking steps or are causing steps to be taken to disrupt the JPLs' efforts to take control of the HK Subsidiaries which have included (i) adding directors to the boards of the HK Subsidiaries to frustrate the JPLs' majority control; and (ii) changing the names of the HK Subsidiaries. Additionally, the Company's website has been deactivated and the JPLs have been denied access to the GCBC HQ where the books and records should be maintained.

The JPLs further stated that "[n]one of the directors of the Company, other than Xu Ping [who unlike the other directors is affiliated with Blue Ocean rather than Defendant Kam], have responded or co-operated with the JPLs."

**ANSWER:** Paragraph 59 purports to reference and selectively quote certain statements by JPLs appointed in a case pending in the Grand Court of the Cayman Islands.  Defendants deny the accuracy of these unproven statements and respectfully refer the Court to the JPLs' First Report to the Cayman Court for a complete statement of its contents, without conceding the accuracy or characterizations set forth therein.  Defendants further state that JPL reports issued in the Cayman Court and referenced in Paragraph 59 do not constitute final decisions.  Defendants otherwise deny each and every allegation in Paragraph 59.

60.     In a Third Report to the Cayman Grand Court dated March 1, 2023, the JPLs noted

additional suspicious transactions between GCBC and Golden Meditech, stating "A review of the Company's Bank of China statements also demonstrates that there has been a total of US$9.9 million of payments made by cheques authorised by Albert Chen to GMHL from that account from April 2021 to June 2022." The JPLs further reported that they had "queried these payments with GMHL and received no response to date."

**ANSWER:** Paragraph 60 purports to reference and selectively quote certain statements by JPLs appointed in a case pending in the Grand Court of the Cayman Islands. Defendants deny the accuracy of these unproven statements and respectfully refer the Court to the JPLs' Third Report to the Cayman Court for a complete statement of its contents, without conceding the accuracy or characterizations set forth therein. Defendants further state that JPL reports issued in the Cayman Court and referenced in Paragraph 60 do not constitute final decisions. Defendants otherwise deny each and every allegation in Paragraph 60.

61.    In their Ninth Report to the Cayman Grand Court dated September 2, 2024, the JPLs state that as of that time they had only been able to identify "[b]ank accounts for GCBC with a total balance of c.US$218k," and "[b]ank accounts for subsidiaries of GCBC with a total balance of c. US$168k (excluding known balances of PRC Subsidiaries), US$155k of which has been secured." The Ninth Report further noted that GCBC's former management (Defendants Zheng and Albert Chen) and affiliated Board members (including Defendants Weng and Mark Chen) continued to refuse to cooperate with the JPLs' efforts to investigate and take control of GCBC's operations, and did not respond to requests for information and documents.

**ANSWER:** Paragraph 61 purports to reference and selectively quote certain statements by JPLs appointed in a case pending in the Grand Court of the Cayman Islands. Defendants deny the accuracy of these unproven statements and respectfully refer the Court to the JPLs' Ninth Report to the Cayman Court for a complete statement of its contents, without conceding the accuracy or characterizations set forth therein. Defendants further state that JPL reports issued in the Cayman Court and referenced in Paragraph 61 do not constitute final decisions. Defendants otherwise deny each and every allegation in Paragraph 61.

B.    **The Attempted Cover-Up**

62.    An integral part of Defendants' scheme to steal GCBC's assets was their plan to

25

conceal the theft through the Cellenkos transaction.

**ANSWER:** Defendants deny each and every allegation in Paragraph 62.

63.    GCBC publicly announced the proposed Cellenkos transaction on April 29, 2022, in an SEC Form 6-K stating in relevant part:

On April 29, 2022, Global Cord Blood Corporation (the "Company") entered into a series of Stock Purchase Agreements, each dated April 29, 2022 (the "SPAs" and, collectively, the "SPA"), between the Company and the holders of approximately 95% of the outstanding shares of common stock (the "CLK Shares") of Cellenkos, Inc., a Delaware corporation ("Cellenkos") providing for the acquisition by the Company of such CLK Shares . . . in exchange for an aggregate of approximately 65.7 million of the Company's ordinary shares of US$0.0001 par value per share (the "Ordinary Shares") and units of the holding company partnership described below equivalent to an aggregate of 36,112,267 Ordinary Shares on a fully-diluted basis . . .

In connection with the execution and delivery of the SPAs, the Company entered into Framework Agreement dated as of April 29, 2022 (the "Framework Agreement") with GM Precision Medicine (BVI) Limited ("BVI Company"). The consideration for entering into the Framework Agreement consists of approximately 12.4 million Ordinary Shares to be issued to the BVI Company and US$664 million cash consideration, with the purpose to provide the Company with the intellectual property that will be necessary to develop Cellenkos' product candidates in the field of umbilical cord blood treatment for acute and chronic autoimmune diseases and inflammatory disorders in Asia.

**ANSWER:** Defendants admit that GCBC publicly announced the proposed Cellenkos transaction on April 29, 2022 in an SEC Form 6-K.  Defendants respectfully refer the Court to the April 29, 2022 SEC Form 6-K for a complete and accurate statement of its contents.  Defendants deny any allegations inconsistent with, contrary to, or not supported by the entirety of those documents.

64.    Attached to the Form 6-K were redacted copies of the SPAs, Framework Agreement, a GCBC press release, an employment agreement between GCBC and Kim Chuan Leong, and various other documents. The press release summarized key aspects of the Cellenkos transaction:

As of the date hereof, the Company has entered into agreements with the holders of approximately 95% of CLNK outstanding equity interest and GM Precision Medicine (BVI) Limited ("GMPM"). Following the entry into an agreement at substantially the same terms with the remaining 5% holder, at closing, the Company will issue approximately 125 million new shares (on an as-converted and fully

26

diluted basis) valued at US$11 per share and pay US$664 million in cash as total consideration.

\*   \*   \*

Upon completion of all transactions, the Company will own 100% of CLNK equity, the global rights for most of its products, and the laboratory assets under GMPM.

**ANSWER:** Defendants admit that GCBC publicly announced the proposed Cellenkos transaction on April 29, 2022 in an SEC Form 6-K, which attached copies of the Stock Purchase Agreements, a Framework Agreement, Employment Agreements, a Partnership Agreement, and Press Release. Defendants deny that these documents were impermissibly or substantively "redacted" and respectfully refer the Court to the April 29, 2022 SEC Form 6-K and attached documents for a complete and accurate statement of its contents. Defendants deny any allegations inconsistent with, contrary to, or not supported by the entirety of those documents.

65.    Cellenkos was a party to each SPA, and each SPA was signed on behalf of Cellenkos by Simrit Parmar. Defendant Zheng signed each SPA on behalf of GCBC. Of the 65.7 million GCBC ordinary shares to be issued in connection with the SPAs Golden Meditech (BVI) Company Limited, a subsidiary of Golden Meditech, was to receive 34,143,249 shares. Kim Chuan Leong, a Golden Meditech executive director and the Chairman and CFO of Cellenkos, was to receive 7,331,062 shares. Vyserion Limited was to receive 19,918,429 shares, and "O NA," listing the title of Director, signed the SPA on behalf of Vyserion Limited. Although not publicly known at the time, as revealed in later litigation O NA was a pseudonym used by Defendant Kam's sister. Therefore, 61.4 million of the 65.7 million GCBC shares to be issued under the SPAs, or 93.5%, would go to persons affiliated with or controlled by Defendant Kam and Golden Meditech.

**ANSWER:** Defendants admit that Cellenkos was a party to each Share Purchase Agreement ("SPA") and that each SPA was signed on behalf of Cellenkos by Simrit Parmar. Defendants admit that Ms. Zheng signed each SPA on behalf of GCBC. Defendants respectfully refer the Court to the April 29, 2022 SEC Form 6-K and attachments for a complete and accurate statement of their contents. Defendants deny any allegations inconsistent with, contrary to, or not supported by the entirety of those documents. Defendants deny that "O NA" is a pseudonym and

27

deny that "O NA" is Mr. Kam's sister. Defendants otherwise deny each and every allegation in

Paragraph 65.

66.    Likewise, the partnership whose units would be equivalent to 36.1 million GCBC ordinary shares, Cellenkos Holdings L.P., was controlled by persons affiliated with or controlled by Defendant Kam and Golden Meditech. The Certificate of Limited Partnership of Cellenkos Holdings L.P. provides that its general partner is Cellenkos GP Limited, which lists its address as:

> Albert Chen / Dorothy Tam
> 48/F Bank of China Tower
> 1 Garden Road
> Central
> Hong Kong

The certificate was signed by Albert Chen as Director of Cellenkos GP Limited. The Limited Partnership Agreement of Cellenkos Holdings L.P. likewise provided that notices to the partnership should be sent to the attention of Albert Chen.

**ANSWER:** Defendants respectfully refer the Court to GCBC's April 29, 2022 SEC Form

6-K and attachments for a complete and accurate statement of its contents. Defendants deny any

allegations inconsistent with, contrary to, or not supported by the entirety of those documents.

Defendants lack sufficient information as to form a belief as to the certificate referenced, and so

Defendants otherwise deny each and every allegation in Paragraph 66.

67.    Under the Framework Agreement between GCBC and GM Precision Medicine (BVI) Limited ("GMPM"), GCBC was to acquire a ten-year license from GMPM to market one of Cellenkos's product candidates in Asia. GMPM is a subsidiary of Golden Meditech, and had received the license from another Golden Meditech subsidiary Golden Meditech Precision Medicine Limited, which had obtained the license in an October 2021 agreement with Cellenkos. There is no indication that GMPM or Golden Meditech Precision Medicine Limited ever paid any consideration for the license. Nonetheless, GCBC agreed to provide $664 million and 12,363,636 of its ordinary shares to GMPM or its affiliates in exchange for the license and ownership of another Golden Meditech subsidiary. The Framework Agreement required GMPM to provide GCBC with an assignment agreement for the license executed by GMPM and Cellenkos. The Framework Agreement was signed on behalf of GCBC by Defendant Zheng, and on behalf of GMPM by Defendant Kam. Notices pursuant to the Framework Agreement were to be sent to GMPM to the attention of Defendant Kam, and to GCBC to the attention of Defendant Albert Chen.

**ANSWER:** Defendants respectfully refer the Court to GCBC's April 29, 2022 Framework

Agreement attached to GCBC's SEC Form 6-K for a complete and accurate statement of its

contents. Defendants deny any allegations inconsistent with, contrary to, or not supported by the entirety of that document. Defendants lack information sufficient to admit or deny that "GMPM is a subsidiary of Golden Meditech," and so deny same. Defendants otherwise deny each and every allegation in Paragraph 67.

68.    Prior to the proposed Cellenkos transaction, there were approximately 121.5 million GCBC ordinary shares then outstanding. As such, the issuance of 61.4 million shares to Kam-affiliated persons under the SPAs, Albert Chen's control of the partnership whose units would be equivalent to 36.1 million GCBC ordinary shares, and the issuance of 12.4 million shares to GMPM under the Framework Agreement, would effectively give a controlling ownership stake in GCBC back to Defendant Kam and Golden Meditech.

**ANSWER:** Defendants respectfully refer the Court to CGBC's April 29, 2022 SEC Form 6-K and attached filings for a complete and accurate statement of their contents. Defendants deny any allegations inconsistent with, contrary to, or not supported by the entirety of those documents. Defendants otherwise deny each and every allegation in Paragraph 68.

69.    However, due to the vigilance of GCBC's majority shareholder Blue Ocean, the Cellenkos transaction was never completed. Upon learning of the proposed transaction Blue Ocean promptly attempted to stop it, including by filing a Winding Up Petition in the Cayman Grand Court on May 5, 2022. By proving Defendants' fraud in connection with the Cellenkos transaction, Blue Ocean was ultimately successful in obtaining an orders from the Grand Court to halt the transaction.

**ANSWER:** Defendants admit that GCBC's majority shareholder was Blue Ocean, which had effective control of GCBC at the time. Defendants also admit that Blue Ocean filed a Winding Up Petition in the Grand Court of the Cayman Islands on May 5, 2022 and that the Cellenkos transaction was ultimately halted. Defendants otherwise deny each and every allegation in Paragraph 69.

70.    Blue Ocean's Amended Winding Up Petition filed with the Cayman Court on September 22, 2022 stated that on July 9, 2022 GCBC had produced in the Cayman litigation a bank statement purportedly from Guangfa Bank showing a series of payments from a GCBC subsidiary to "certain Kam controlled PRC entities, including JingJing," in order to prove that the $664 million cash consideration for the Cellenkos transaction was paid on April 29, 2022. The Amended Winding Up Petition further revealed that Blue Ocean "subsequently obtained from

Guangfa Bank a true record of transactions from the bank account in question for the period 2830 April 2022," which "proves that substantially all of the transactions on the Bank Statement never occurred and that the Bank Statement was therefore forged."[1]

**ANSWER:** Paragraph 70 purports to reference and selectively quote certain statements made by Blue Ocean Structure Investment Company Limited ("Blue Ocean"), that are unproven allegations in a case pending in the Grand Court of the Cayman Islands. Defendants respectfully refer the Court to the Amended Winding Up Petition for a complete statement of its contents, without conceding the accuracy of the characterizations set forth therein. Defendants otherwise deny each and every allegation in Paragraph 70, including the footnote referenced therein.

71. The Grand Court of the Cayman Islands issued an Ex Tempore Ruling on September 22, 2022 that provides additional details corroborating Blue Ocean's revelation of the forged bank statement. The Ex Tempore Ruling stated that the forged bank statement had been submitted to the court as an exhibit to the Fourth Affidavit of Defendant Albert Chen. The Ex Tempore Ruling recited evidence from the First Affirmation of Siqi Wang, an employee of Nanjing Ying Peng Asset Management Company Limited (a parent company of Blue Ocean). The Ex Tempore Ruling quotes from Wang's affirmation:

> At around 9.30 am on the morning of August 9, 2022, Beijing time, with the assistance and arrangement of the Nanjing Municipal Government, accompanied by the staff from Nanjing Local Financial Supervision and Administration (or 'Nanjing FSFM') and Jiangsu Branch of the State Administration of Foreign Exchange (or 'Jiangsu SAFE'), my colleagues from Ying Peng Asset and I went to the Nanjing branch of China Guangfa Bank Company and met with the staff of Guangfa Nanjing.

The Ex Tempore Ruling continues to summarize the evidence from Wang's affidavit, stating "[t]he long and the short of it is that he presented a copy of the bank statement exhibited to the Fourth Albert Affidavit, which was purportedly a bank statement issued by China Guangfa Bank, and was told by bank employees that the bank statement produced in Fourth Albert was not an authentic document issued by the bank."

**ANSWER:** Defendants respectfully refer the Court to the Ex Tempore Ruling of the Grand Court of the Cayman Islands, dated September 22, 2022 for a complete recitation of its contents,

---

[1] Although the Amended Winding Up Petition was filed on September 22, 2022, the Judgment entered in the Hong Kong litigation on February 8, 2024 later revealed that Blue Ocean had filed evidence of the forgery with the Cayman court on August 10, 2022.

without conceding the accuracy or characterizations set forth therein.  Defendants state the ruling referenced in Paragraph 71 was filed in a foreign proceeding and is not final.  Defendants otherwise deny each and every allegation in Paragraph 71.

72.    The Ex Tempore Ruling summarized further evidence showing that Defendant Albert's version of the bank statement appeared to be a forgery:

> A very straightforward analysis of the true bank statement produced by the bank in question demonstrates that not only is the 'concocted' document inconsistent with what appears to be standard banking practice in the People's Republic of China ("PRC"), whereby identification numbers are assigned to bank statements so that their veracity can be easily confirmed; the document exhibited to Fourth Albert had no authentication code. But also, most significantly . . . the key amounts that were relied on by the Company as having been paid on or about 29 April 2022 to consummate this Transaction simply were not in the relevant bank account, let alone paid out of it, at the time that the Company's deponent swore those monies were there and were paid.

**ANSWER:** Defendants respectfully refer the Court to the Ex Tempore Ruling of the Grand Court of the Cayman Islands, dated September 22, 2022 for a complete recitation of its contents, without conceding the accuracy or characterizations set forth therein.  Defendants state the ruling referenced in Paragraph 72 was filed in a foreign proceeding and is not final.  Defendants otherwise deny each and every allegation in Paragraph 72.

73.    The Ex Tempore Ruling quoted GCBC's response to the forgery claim, from the Sixth Affidavit of Chen Bing Chuen Albert:

> Chen 6 claims that the bank statement which I exhibited at pages 1203 to 1204 of exhibit AC4 to Albert 4, bank statement, is a forgery and that the US$ 664 million stage one payment was not made on 29 April 2022. These claims are false. The bank statement is not a forgery. The stage one payment was made on 29 April 2022. However, the Company is not in the position to disclose further materials based on advice by the Company's PRC legal counsel and potential investigations in the PRC.

**ANSWER:** Defendants respectfully refer the Court to the Ex Tempore Ruling of the Grand Court of the Cayman Islands, dated September 22, 2022 for a complete recitation of its contents, without conceding the accuracy or characterizations set forth therein.  Defendants state the ruling

31

referenced in Paragraph 73 was filed in a foreign proceeding and is not final. Defendants otherwise deny each and every allegation in Paragraph 73.

74. On these facts, the Ex Tempore Ruling found, "it is very difficult to avoid the conclusion that this . . . was in fact a forged document," and that "Mr Albert himself has, despite having an opportunity to explain the various discrepancies, merely denied the forgery allegation and said nothing more than that about it." The Ex Tempore Ruling further concluded that "there is in fact no cogent or convincing response to as serious an allegation as could ever be made against the Chief Financial Officer of a listed company," and that "the best available evidence strongly suggests that the Chief Financial Officer of the Company has misled the Court and put before the Court a false bank statement pivotal to the matters that the Court was adjudicating at the 13-15 July 2022 hearing."

ANSWER: Defendants respectfully refer the Court to the Ex Tempore Ruling of the Grand Court of the Cayman Islands, dated September 22, 2022 for a complete recitation of its contents, without conceding the accuracy or characterizations set forth therein. Defendants state the ruling referenced in Paragraph 74 was filed in a foreign proceeding and is not final. Defendants otherwise deny each and every allegation in Paragraph 74.

75. The Ex Tempore Ruling further noted the apparent complicity in Albert Chen's fraud of GCBC's so-called "independent" directors, including Defendants Mark Chen and Jennifer Weng, noting the "seeming silence, or paralysis, on the part of the independent directors in the face of these shocking allegations about forgery." The Ruling goes on to state:

> One might have thought that if the independent directors were in fact capable of exercising control, that they would have taken steps by now to demonstrate very decisively that they were in fact putting the ship in order; that they were marginalising the crew who appeared to be guilty of misconduct and that the Court need have no concern that the Company's affairs going forward would be conducted in an orderly manner. Nothing of that sort has happened as far as the material before the Court is concerned . . .

ANSWER: Defendants respectfully refer the Court to the Ex Tempore Ruling of the Grand Court of the Cayman Islands, dated September 22, 2022 for a complete recitation of its contents, without conceding the accuracy or characterizations set forth therein. Defendants state the ruling referenced in Paragraph 75 was filed in a foreign proceeding and is not final. To the extent Paragraph 75 refers to allegations against Defendants Mark Da-Jian Chen and Jennifer Weng,

32

those parties have been dismissed from this action pursuant to the Court's Opinion and Order on

Defendants' Motions to Dismiss (ECF No. 163) and accordingly, no response is required.

Defendants otherwise deny each and every allegation in Paragraph 75.

76.     The Ex Tempore Ruling concluded that "[c]oncerns do arise about the misuse of the Company's assets having regard to the fact that money that Albert 4 said was in a particular account has now been shown not to have been there," and further that:

> There is further evidence, which I do not propose to consider for the purposes of this present application, which suggests that in fact the reason for the Cellenkos Transaction might be 'filling a gap' because, looking at historic documents, it appears that legitimate or published related party payments are in fact less than payments which were actually made, as revealed by bank account records.

Based on Blue Ocean's evidence of fraud and GCBC's failure to meaningfully address it, the Cayman Grand Court granted the Amended Winding Up Petition and appointed the Joint Provisional Liquidators.

**ANSWER:** Defendants respectfully refer the Court to the Ex Tempore Ruling of the Grand

Court of the Cayman Islands, dated September 22, 2022 for a complete recitation of its contents,

without conceding the accuracy or characterizations set forth therein.  Defendants state the ruling

referenced in Paragraph 76 was filed in a foreign proceeding and is not final.  Defendants otherwise

deny each and every allegation in Paragraph 76.

77.     A Judgment of the Cayman Grand Court dated August 14, 2023 provides further details regarding the forged bank statement. The Judgment was made with respect to a discovery dispute raised by Blue Ocean against GCBC's self-styled Litigation Steering Committee ("LSC"), comprised of Defendant Zheng, Defendant Albert Chen, Defendant Weng, Defendant Mark Chen, and other directors of GCBC aligned with their and Defendant Kam's interests. The apparent purpose of the LSC was to take legal action to impede the efforts of Blue Ocean and the JPLs to investigate and take control over GCBC's operations. At issue in the Judgment, Blue Ocean sought to compel the LSC to produce documents including emails through which Defendant Albert Chen claimed to come into possession of the forged bank statement. According to the Judgment, "the LSC admits [the bank statement] had been forged." Also according to the Judgment, "[t]he production request sought an electronic copy of the email Albert says he received during preparations for the July 2022 hearing which attached the Bank Statement," however "[h]e now says he cannot retrieve the email." The court found that "[t]he deponent's averments that it is not possible for him to locate the email are unsatisfactory on their face."

**ANSWER:** Defendants respectfully refer the Court to the Judgment of the Grand Court of the Cayman Islands, dated August 14, 2023 for a complete recitation of its contents, without conceding the accuracy or characterizations set forth therein. Defendants state the judgment referenced in Paragraph 77 was filed in a foreign proceeding and is not final. Defendants otherwise deny each and every allegation in Paragraph 77.

78.   In sum, the evidence produced in the Cayman litigation shows that Defendant Albert Chen's purported proof of the $664 million payment from GCBC to Golden Meditech as part of the Cellenkos transaction was a forgery. In fact, "the key amounts that were relied on by the Company as having been paid on or about 29 April 2022 to consummate this Transaction simply were not in the relevant bank account, let alone paid out of it." The payment, like the Cellenkos transaction, was a sham, designed to conceal Defendants' prior misappropriation of hundreds of millions of dollars from GCBC.

**ANSWER:** Defendants state that Plaintiffs fail to identify the source of the statements they purport to reference and characterize in Paragraph 78. Defendants otherwise deny each and every allegation in Paragraph 78.

## VI.   THE COVER-UP CELLENKOS TRANSACTION IS REVEALED, CAUSING LARGE DECLINES IN GCBC'S STOCK PRICE

79.   On Friday April 29, 2022, after the close of stock market trading on the NYSE, Defendants' scheme and misleading statements and omissions began to come to light when GCBC announced the Cellenkos transaction. Defendants' plan to double GCBC's share count and ostensibly pay $664 million to Golden Meditech for the unknown, zero-revenue startup Cellenkos shocked investors.

**ANSWER:** Defendants admit only that on April 29, 2022, GCBC filed an SEC Form 6-K, which announced the Cellenkos transaction. Defendants respectfully refer the Court to that document for a complete and accurate statement of its contents. Defendants otherwise deny each and every allegation in Paragraph 79.

80.   On this news, GCBC's share price fell $0.98 as compared to the prior day closing price, or 28.6%, to close at $2.45 per share on Monday May 2, 2022 (the next trading day after GCBC's Friday evening announcement of the Cellenkos transaction), on extremely heavy trading volume.

**ANSWER:** Paragraph 80 purports to allege trading prices or trading volume for GCBC's shares, which are a matter of public record, and Defendants state that those public records speak for themselves.  Except as so expressly admitted, Defendants deny the allegations in Paragraph 80.

81.     On May 5, 2022, Blue Ocean filed its original Winding Up Petition in the Grand Court of the Cayman Islands, seeking an order enjoining the Cellenkos transaction and additional investor protections. The Winding Up Petition revealed serious problems with the Cellenkos transaction, including that Blue Ocean's representative on the GCBC Board was only notified of the proposed transaction by email on the evening of April 26, 2022, a mere three days before the agreement was rushed through by management and publicly announced, with little or no Board deliberation. The Winding Up Petition further revealed that Cellenkos's most recent fundraising (a $15 million share shale in November 2021) valued it at $28.67 per share, far below the grossly inflated consideration that GCBC agreed to pay in the Cellenkos transaction. The Winding Up Petition also revealed that when Blue Ocean's lawyers wrote to GCBC's Board regarding its concerns about the Cellenkos transaction, Defendant Albert Chen proposed a meeting between GCBC and Blue Ocean in which *Defendant Kam* (who stood to obtain a controlling interests in GCBC and purportedly $664 million from the Cellenkos transaction, and who had no official role at GCBC at that time) would act as *GCBC's* representative.

**ANSWER:** Defendants respectfully refer the Court to Blue Ocean's Winding Up Petition dated May 5, 2022 for a complete recitation of its contents, without conceding the accuracy or characterizations set forth therein.  Defendants otherwise deny each and every allegation in Paragraph 81.

82.     On this news, GCBC's share price fell $0.22 as compared to the prior day closing price, or 9.1%, to close at $2.20 per share on May 5, 2022.

**ANSWER:** Paragraph 82 purports to allege trading prices or trading volume for GCBC's shares, which are a matter of public record, and Defendants state that those public records speak for themselves.  Except as so expressly admitted, Defendants deny the allegations in Paragraph 82.

## VII.    AFTER THE CLASS PERIOD, LITIGATION AROUND THE WORLD FURTHER REVEALS DEFENDANTS' SCHEME

### A.    GCBC'S Joint Provisional Liquidators Appointed By The Cayman Grand Court Confirm The Company's Fraud

83.     As described *supra*, due to the fraud perpetrated by GCBC's former management, at Blue Ocean's urging the Cayman Islands Grand Court appointed the JPLs (Margot MacInnis, John Royle, and Chow Tsz Nga Georgia, each of whom is employed by affiliates of the Grant Thornton

firm) to take control over GCBC's business, and the JPLs have since confirmed that GCBC engaged in hundreds of millions of dollars' worth of undisclosed related party payments to entities controlled by Defendant Kam. Additional facts from the JPLs' reports to the Grand Court and their other public statements further show Defendants' fraud and Defendant Kam's control over the other Defendants.

**ANSWER:** Defendants state that Plaintiffs fail to identify the source of the statements they purport to reference and characterize in Paragraph 83.  To the extent Plaintiffs purport to refer to JPL reports issued in the Grand Court of the Cayman Islands, Defendants deny the accuracy of unproven statements made by the JPLs and respectfully refer the Court to those reports for a complete statement of their contents, without conceding the accuracy or characterizations set forth therein.  Defendants further state that JPL reports issued in the Cayman Court and purportedly referenced in Paragraph 83 do not constitute final decisions.  Defendants otherwise deny each and every allegation in Paragraph 83.

84.    In the JPLs' First Report to the Cayman court dated October 20, 2022, the JPLs reported that "Yuen Kam and Tina Zheng had two children together," and that "Albert Chen had been using various aliases to continue to be involved in GMHL matters, a fact conceded to by Albert Chen in an affidavit dated 9 September 2022 submitted to the Court."

**ANSWER:** Paragraph 84 purports to reference and selectively quote certain statements by JPLs appointed in a case pending in the Grand Court of the Cayman Islands.  Defendants deny the accuracy of these unproven statements and respectfully refer the Court to the JPLs' First Report to the Cayman Court for a complete statement of its contents, without conceding the accuracy or characterizations set forth therein.  Defendants further state that JPL reports issued in the Cayman Court and referenced in Paragraph 84 do not constitute final decisions.  Defendants deny that Mr. Chen "had been using various aliases to continue to be involved in GMHL matters."  Defendants otherwise deny each and every allegation in Paragraph 84, except admit that Ms. Zheng has two children with Mr. Kam.

85.    The JPLs' First Report further stated that "steps are likely being taken by of Albert

36

Chen and/or Tina Zheng to allot shares, change the name, registered address and directors of the HK Subsidiaries," and that "the directors are failing to comply with or acknowledge the requests of the JPLs, (with the exception of Xu Ping)."

**ANSWER:** Paragraph 85 purports to reference and selectively quote certain statements by JPLs appointed in a case pending in the Grand Court of the Cayman Islands. Defendants deny the accuracy of these unproven statements and respectfully refer the Court to the JPLs' First Report to the Cayman Court for a complete statement of its contents, without conceding the accuracy or characterizations set forth therein. Defendants further state that JPL reports issued in the Cayman Court and referenced in Paragraph 85 do not constitute final decisions. Defendants otherwise deny each and every allegation in Paragraph 85.

86. In the JPLs' Third Report to the Cayman court dated March 1, 2023, the JPLs reported that "The JPLs' efforts have been impeded by the actions of various parties whose intentions appear to be to frustrate access to and control of the HK Subsidiaries and PRC Subsidiaries and the Group's operating businesses which include," among other things, "noncooperation and deliberate steps being taken by the Company's Former Board (excluding Xu Ping) to frustrate the JPLs' authority despite evidence that they are aware of the Order appointing the JPLs and its terms."

**ANSWER:** Paragraph 86 purports to reference and selectively quote certain statements by JPLs appointed in a case pending in the Grand Court of the Cayman Islands. Defendants deny the accuracy of these unproven statements and respectfully refer the Court to the JPLs' Third Report to the Cayman Court for a complete statement of its contents, without conceding the accuracy or characterizations set forth therein. Defendants further state that JPL reports issued in the Cayman Court and referenced in Paragraph 86 do not constitute final decisions. Defendants otherwise deny each and every allegation in Paragraph 86.

87. The Third Report stated that "Yuen Kam . . . owns and controls the Golden Meditech group companies and has particularly close links to Company's former directors, Albert Chen and Tina Zheng."

**ANSWER:** Paragraph 87 purports to reference and selectively quote certain statements by JPLs appointed in a case pending in the Grand Court of the Cayman Islands. Defendants deny the accuracy of these unproven statements and respectfully refer the Court to the JPLs' Third Report to the Cayman Court for a complete statement of its contents, without conceding the accuracy or characterizations set forth therein. Defendants further state that JPL reports issued in the Cayman Court and referenced in Paragraph 87 do not constitute final decisions. Defendants otherwise deny each and every allegation in Paragraph 87.

### B.    Cayman Litigation Reveals Stolen Funds, A Fake Bank Statement, And Kam's Control Over The Defendants

88.    On May 5, 2022 GCBC's majority shareholder Blue Ocean commenced litigation in the Cayman Islands Grand Court, seeking to enjoin the Cellenkos transaction and institute other protections for GCBC's investors. That action eventually led to, among other things, the court's appointment of the JPLs. As discussed above, the Cayman litigation revealed, among other things the misappropriation of hundreds of millions of dollars from GCBC to a Golden Meditech subsidiary, and that the bank statement relied on by Defendant Albert Chen to show that GCBC had made the $664 million payment under the Cellenkos transaction was forged. That case, *In The Matter Of Global Cord Blood Corporation*, Grand Court of the Cayman Islands, FSD [Financial Services Division] Cause No. 108 of 2022, before the Honorable Justice Kawaley, has also revealed additional facts further confirming Defendants' fraud and Defendant Kam's control over the other Defendants.

**ANSWER:** Defendants admit that on May 5, 2022, Blue Ocean filed its first Winding Up Petition in the Cayman Island Grand Court, but deny the accuracy of the statements made therein. Defendants otherwise deny each and every allegation in Paragraph 88.

89.    In a Writ of Summons filed by Blue Ocean in the Cayman Islands Grand Court on June 8, 2022, Blue Ocean states that "The 2nd Defendant [Ting Zheng] is the Chairwoman and Executive Director of the 1st Defendant [GCBC]. She is also the spouse of the 9th Defendant, Kam Yuen, and the mother of the 9th Defendant's two children," and similarly that "The 9th Defendant is . . . the spouse of the 2nd Defendant and the father of the 2nd Defendant's two children."

**ANSWER:** Paragraph 89 purports to reference and selectively quote certain statements made by Blue Ocean, that are unproven allegations in a case pending in the Grand Court of the

Cayman Islands.  Defendants respectfully refer the Court to the Blue Ocean's June 8, 2022 Writ of Summons for a complete statement of its contents, without conceding the accuracy or characterizations set forth therein.  Defendants otherwise deny each and every allegation in Paragraph 89, except admit that Ms. Zheng shares two children with Mr. Kam.

90.    In a Judgment dated July 29, 2022, the Honorable Justice Kawaley of the Cayman Islands Grand Court states that "the First Affidavit of Chen Bing Chuen Albert, an executive director and Chief Financial Officer of the Company, sworn on June 7, 2022 . . . explained that the cash consideration of US$664 million was paid on April 29, 2022."

**ANSWER:** Defendants respectfully refer the Court to the Judgment of the Grand Court of the Cayman Islands, dated July 29, 2022, for a complete recitation of its contents, without conceding the accuracy or characterizations set forth therein.  Defendants state the judgment referenced in Paragraph 90 was filed in a foreign proceeding and is not final.  Defendants otherwise deny each and every allegation in Paragraph 90.

91.    The July 29 Judgment further states that, with respect to an extraordinary general meeting of GCBC shareholders convened in New York by Blue Ocean on June 16, 2022, "[c]onflicting evidence was filed in relation to 'argy bargy' shortly prior to the EGM [extraordinary general meeting] which resulted in Jennifer Weng and Mark Chen, directors of the Company, being refused entry to the meeting room by lawyers for the Petitioner," where "[e]ach side accused the other of inappropriate conduct."

**ANSWER:** Defendants respectfully refer the Court to the Judgment of the Grand Court of the Cayman Islands, dated July 29, 2022, for a complete recitation of its contents, without conceding the accuracy or characterizations set forth therein.  Defendants state the judgment referenced in Paragraph 91 was filed in a foreign proceeding and is not final.  To the extent Paragraph 91 refers to allegations against Defendants Mark Da-Jian Chen and Jennifer Weng, those parties have been dismissed from this action pursuant to the Court's Opinion and Order on Defendants' Motions to Dismiss (ECF No. 163) and accordingly, no response is required. Defendants otherwise deny each and every allegation in Paragraph 91.

92.    Regarding the Cellenkos transaction, the July 29 Judgment notes the "connections which clearly did exist between the Company's management and entities on the other side of the Transaction."

**ANSWER:** Defendants respectfully refer the Court to the Judgment of the Grand Court of the Cayman Islands, dated July 29, 2022, for a complete recitation of its contents, without conceding the accuracy or characterizations set forth therein. Defendants state the judgment referenced in Paragraph 92 was filed in a foreign proceeding and is not final. Defendants otherwise deny each and every allegation in Paragraph 92.

93.    Justice Kawaley further commented on GCBC's failure to follow formalities required by Cayman corporate law, namely the maintenance of a register of shareholders:

> The non-compliance with section 40 which is most significant in the present case is the failure to record in what is treated as the share register the dates on which members became and ceased to become members as required by section 40(1)(b) and (c) of the Act. The Company's lackadaisical approach to its statutory obligations in this regard is demonstrated by the fact the "register" on its face does not appear to be anything more significant than a list of shareholders from time to time. Despite being a listed company, the Company's website's identification of its issued share capital is not kept up to date and no regulatory filings seem to be made in a timely fashion about even massive issues of new shares.

Justice Kawaley continued to note that "[t]he share register is for essentially the same reasons not compliant with Article 43 (1) on its face."

**ANSWER:** Defendants respectfully refer the Court to the Judgment of the Grand Court of the Cayman Islands, dated July 29, 2022, for a complete recitation of its contents, without conceding the accuracy or characterizations set forth therein. Defendants state the judgment referenced in Paragraph 93 was filed in a foreign proceeding and is not final. Defendants otherwise deny each and every allegation in Paragraph 93.

94.    Regarding the Cellenkos transaction, the July 29 Judgment states:

> On any view it is impossible at this stage to discern any easily comprehensible commercial rationale for the Company, especially being a listed company, consummating and implementing an arrangement which was so financially and strategically significant with such a breath-taking combination of speed and stealth,

40

particularly in circumstances where the Company was (as at April 29, 2022) under 'minority' rather than majority shareholder control.

**ANSWER:** Defendants respectfully refer the Court to the Judgment of the Grand Court of the Cayman Islands, dated July 29, 2022, for a complete recitation of its contents, without conceding the accuracy or characterizations set forth therein. Defendants state the judgment referenced in Paragraph 94 was filed in a foreign proceeding and is not final. Defendants otherwise deny each and every allegation in Paragraph 94.

95.    The Amended Winding Up Petition filed by Blue Ocean in the Cayman court on September 22, 2022 states that Defendant Albert Chen ceased officially working for Golden Meditech on July 1, 2009, "but continued to work for GMHL under the alias 'SK' and continues to work for GMHL and its subsidiaries under this alias presently."

**ANSWER:** Paragraph 95 purports to reference and selectively quote certain statements made by Blue Ocean that are unproven allegations in a case pending in the Grand Court of the Cayman Islands. Defendants deny that such proceeding is valid or that the Amended Winding Up Petition contains factual determinations that are binding in this proceeding. Defendants respectfully refer the Court to the Amended Winding Up Petition for a complete recitation of its contents, without conceding the accuracy or characterizations set forth therein. Defendants deny that Mr. Chen "continued to work for GMHL under the alias 'SK' and continues to work for GMHL and its subsidiaries under this alias presently." Defendants otherwise deny each and every allegation in Paragraph 95.

96.    The Amended Winding Up Petition also revealed that "Vyserion was owned by 'O Na', also known as 'Na Wang'," and that Blue Ocean had "discovered that she is, in fact, Kam's sister and until October 2020, she used a property owned by Kam and Jin Liu as her registered address in Hong Kong."

**ANSWER:** Paragraph 96 purports to reference and selectively quote certain statements made by Blue Ocean that are unproven allegations in a case pending in the Grand Court of the Cayman Islands. Defendants deny that such proceeding is valid or that the Amended Winding Up

41

Petition contains factual determinations that are binding in this proceeding. Defendants respectfully refer the Court to the Amended Winding Up Petition for a complete recitation of its contents, without conceding the accuracy or characterizations set forth therein. Defendants deny that "O NA" is Mr. Kam's sister. Defendants otherwise deny each and every allegation in Paragraph 96.

97.    The Amended Winding Up Petition also stated that by April 2022 Golden Meditech owned a 30.5% interest in Cellenkos, Kim Chuan Leong held a 7.2% interest in Cellenkos, and Vyserion had an 18% interest in Cellenkos (in each case, assuming exercise of warrants held by them), and that "[o]n this basis, as of April 2022, Kam owned or controlled 55.7% of Cellenkos."

ANSWER: Paragraph 97 purports to reference and selectively quote certain statements made by Blue Ocean that are unproven allegations in a case pending in the Grand Court of the Cayman Islands. Defendants deny that such proceeding is valid or that the Amended Winding Up Petition contains factual determinations that are binding in this proceeding. Defendants respectfully refer the Court to the Amended Winding Up Petition for a complete recitation of its contents, without conceding the accuracy or characterizations set forth therein. Defendants otherwise deny each and every allegation in Paragraph 97.

98.    The Amended Winding Up Petition noted that the market value of the equity consideration to be provided by GCBC in the Cellenkos transaction as of April 29, 2022 was $400,885,057.

ANSWER: Paragraph 98 purports to reference certain statements made by Blue Ocean that are unproven allegations in a case pending in the Grand Court of the Cayman Islands. Defendants deny that such proceeding is valid or that the Amended Winding Up Petition contains factual determinations that are binding in this proceeding. Defendants respectfully refer the Court to the Amended Winding Up Petition for a complete recitation of its contents, without conceding the accuracy or characterizations set forth therein. Defendants otherwise deny each and every allegation in Paragraph 98.

99.     The Amended Winding Up Petition states, based on information from Blue Ocean's representative on GCBC's Board, that regarding the Cellenkos transaction, "[o]n 26 April 2022 at 7:06pm China time, the Board was first informed of the Transaction and provided with a draft PowerPoint presentation and execution versions of the Transaction Documents," and that "[o]n 28 April 2022 at 8:15pm China time, the Board were sent a fully drafted and complete set of Board minutes for the meeting that was to be held the following day, and, inter alia, resolving that the Transaction was in the best interests of the Company."

**ANSWER:** Paragraph 99 purports to reference and selectively quote certain statements made by Blue Ocean, that are unproven allegations in a case pending in the Grand Court of the Cayman Islands. Defendants deny that such proceeding is valid or that the Amended Winding Up Petition contains factual determinations that are binding in this proceeding.    Defendants respectfully refer the Court to the Amended Winding Up Petition for a complete recitation of its contents, without conceding the accuracy or characterizations set forth therein.    Defendants otherwise deny each and every allegation in Paragraph 99.

100.    The Amended Winding Up Petition further revealed that:

> Albert, who is the CFO and only other executive director of the Company, has at all material times, including to the present day, acted as the CFO and authorized representative of GMHL using the alias "SK" and the email address samkykong@goldenmeditech.com. In this capacity, Albert concealed his identity and passed himself off as Kong Kam Yu, Sammy – a former director of GMHL.

**ANSWER:** Paragraph 100 purports to reference and selectively quote certain statements made by Blue Ocean, that are unproven allegations in a case pending in the Grand Court of the Cayman Islands. Defendants deny that such proceeding is valid or that the Amended Winding Up Petition contains factual determinations that are binding in this proceeding. Defendants respectfully refer the Court to the Amended Winding Up Petition for a complete recitation of its contents, without conceding the accuracy or characterizations set forth therein.    Defendants deny that Mr. Chen "at all material times, including to the present day, acted as CFO and authorized

representative of GMHL using the alias 'SK,'" and "concealed his identity."    Defendants

otherwise deny each and every allegation in Paragraph 100.

101.    The Amended Winding Up Petition also stated that "GMHL's registered address in Hong Kong is 48F, Bank of China Tower, 1 Garden Road, which is the same address as the Company. The Company and GMHL share office space, telephone numbers and personnel."

**ANSWER:** Paragraph 101 purports to reference and selectively quote certain statements made by Blue Ocean, that are unproven allegations in a case pending in the Grand Court of the Cayman Islands. Defendants deny that such proceeding is valid or that the Amended Winding Up Petition contains factual determinations that are binding in this proceeding. Defendants respectfully refer the Court to the Amended Winding Up Petition for a complete recitation of its contents, without conceding the accuracy or characterizations set forth therein.    Defendants otherwise deny each and every allegation in Paragraph 101.

102.    The Amended Winding Up Petition revealed that as part of the Cellenkos transaction, GCBC would be "required to commit initial funding of US$4 million to Cellenkos for clinical trials and product development and an additional US$2.1 million per month for the first 12 months."

**ANSWER:** Paragraph 102 purports to reference and selectively quote certain statements made by Blue Ocean that are unproven allegations in a case pending in the Grand Court of the Cayman Islands. Defendants deny that such proceeding is valid or that the Amended Winding Up Petition contains factual determinations that are binding in this proceeding. Defendants respectfully refer the Court to the Amended Winding Up Petition for a complete recitation of its contents, without conceding the accuracy or characterizations set forth therein.    Defendants otherwise deny each and every allegation in Paragraph 102.

103.    Regarding the June 16, 2022 extraordinary general meeting of shareholders convened in New York by Blue Ocean, the Amended Winding Up Petition states:

two persons purporting to be directors of the Company and two attorneys from Carey Olsen attempted to attend the allegedly invalid EGM together with a

44

shareholder associated with the Kam Directors (Hunter S. Reisner). The clear intention of the purported directors, supporting shareholder and Carey Olsen attorneys was to prevent the Petitioner from voting and thereby prevent the resolutions from being passed.

**ANSWER:** Paragraph 103 purports to reference and selectively quote certain statements made by Blue Ocean that are unproven allegations in a case pending in the Grand Court of the Cayman Islands. Defendants deny that such proceeding is valid or that the Amended Winding Up Petition contains factual determinations that are binding in this proceeding. Defendants respectfully refer the Court to the Amended Winding Up Petition for a complete recitation of its contents, without conceding the accuracy or characterizations set forth therein. Defendants otherwise deny each and every allegation in Paragraph 103.

104. In a document titled Reasons For Decision filed September 8, 2023 with the Cayman Grand Court, the Honorable Justice Kawaley states, referring to the so-called Litigation Steering Committee, comprised of former GCBC directors including the Defendants, that "I felt entirely justified in viewing the LSC's attempts, actively supported by Mr Kam himself, to postpone adjudicating [Blue Ocean]'s Set Aside Summons in order to undertake a fuller inquiry into a beneficial owner level dispute, with a leery eye." Justice Kawaley continues to note the LSC's "latest iteration of delaying tactics quite transparently in service of the commercial interests of Mr Kam (advanced by a former management which seemed to consider it unnecessary to make plausible attempts to advance bona fide shareholder interests)."

**ANSWER:** Defendants respectfully refer the Court to the Reasons for Decision filed in the Grand Court of the Cayman Islands, dated September 8, 2023, for a complete recitation of its contents, without conceding the accuracy or characterizations set forth therein. Defendants state that the Reasons for Decision referenced in Paragraph 104 was issued in a foreign proceeding and is not final. Defendants otherwise deny each and every allegation in Paragraph 104.

105. The Reasons For Decision continues noting further irregularities' in Defendants' conduct of GCBC's business:

By the LSC's own account, the former management has conducted the affairs of the Company in astonishingly unexpected ways. Most dramatically, it has (a) purported to secure the Company's underlying businesses in relation to a debt owed by one shareholder to another shareholder (without disclosing such significant

45

transactions in the accounts); (b) facilitated the enforcement of that purported security, denuding the Company of its assets while the JPLs' appointment was pending; and (c) sworn (through Mr Albert Chen) (1) that the Guangfa Statement was genuine before the 29 July 2022 Judgment and then (2) months later averred that in fact Mr Albert Chen was never in a position to depose to the veracity of the Bank Statement at all. When one is dealing with commercial actors who admit to operating according to a playbook governed by principles so far removed from commercial normality (not to mention morality), ordinary risk assessments simply could not be applied.

**ANSWER:** Defendants respectfully refer the Court to the Reasons for Decision filed in the Grand Court of the Cayman Islands, dated September 8, 2023, for a complete recitation of its contents, without conceding the accuracy or characterizations set forth therein. Defendants state that the Reasons for Decision referenced in Paragraph 105 was issued in a foreign proceeding and is not final. Defendants otherwise deny each and every allegation in Paragraph 105.

106.    Justice Kawaley further noted in the Reasons For Decision that "The LSC was by the date of the 15-16 August 2023 hearing arguably the most ill-suited party to be purporting to uphold corporate propriety and the interests of the majority of the shareholders."

**ANSWER:** Defendants respectfully refer the Court to the Reasons for Decision filed in the Grand Court of the Cayman Islands, dated September 8, 2023, for a complete recitation of its contents, without conceding the accuracy or characterizations set forth therein. Defendants state that the Reasons for Decision referenced in Paragraph 106 was issued in a foreign proceeding and is not final. Defendants otherwise deny each and every allegation in Paragraph 106.

107.    Concerning statements made in an affidavit filed with the Cayman court by Defendant Albert Chen, the Reasons For Decision stated that:

The astonishing feature of this evidence was that the Company's former CFO in my judgment quite implicitly admitted that (assuming this revised version of events to be correct) . . . he had previously given deliberately misleading evidence about how the Cellenkos Transaction was promoted and the extent of the 'independent' management's autonomy for no other reason than that he was asked to do this by someone whose instructions Mr Kam had told him he should follow.

**ANSWER:** Defendants respectfully refer the Court to the Reasons for Decision filed in the Grand Court of the Cayman Islands, dated September 8, 2023, for a complete recitation of its

46

contents, without conceding the accuracy or characterizations set forth therein.  Defendants state

that the Reasons for Decision referenced in Paragraph 107 was issued in a foreign proceeding and

is not final.  Defendants otherwise deny each and every allegation in Paragraph 107.

108.    Recounting his statements at oral argument, Justice Kawaley wrote in the Reasons For Decision that:

> the current position, if he is right, is that the chief financial officer is not really, in any sense understood by men of commerce or men of law, the chief financial officer at all. He's merely a puppet for the sort of ultimate beneficial owner of the majority shareholder and there is, in fact, a sort of shadow management running the company.

**ANSWER:** Defendants respectfully refer the Court to the Reasons for Decision filed in

the Grand Court of the Cayman Islands, dated September 8, 2023, for a complete recitation of its

contents, without conceding the accuracy or characterizations set forth therein.  Defendants state

that the Reasons for Decision referenced in Paragraph 108 was issued in a foreign proceeding and

is not final.  Defendants otherwise deny each and every allegation in Paragraph 108.

109.    Justice Kawaley concluded the Reasons For Decision stating that "it is impossible to discern what legitimate interests the LSC's opposition to the present application was designed to serve."

**ANSWER:** Defendants respectfully refer the Court to the Reasons for Decision filed in

the Grand Court of the Cayman Islands, dated September 8, 2023, for a complete recitation of its

contents, without conceding the accuracy or characterizations set forth therein.  Defendants state

that the Reasons for Decision referenced in Paragraph 109 was issued in a foreign proceeding and

is not final.  Defendants otherwise deny each and every allegation in Paragraph 109.

### C.    British Virgin Islands Litigation Reveals Forged Guarantee Signatures And Further Shows Kam's Control Over The Defendants

110.    On May 20, 2022, Blue Ocean instituted proceedings in the British Virgin Islands High Court of Justice, Commercial Division against Golden Meditech Stem Cells (BVI) Company Limited ("GM BVI") (Claim No. BVIHCM 2022/0101), seeking orders declaring invalid two purported security agreements: (i) one over GCBC shares owned by Blue Ocean in favor of Golden Meditech; and (ii) a second over Blue Ocean shares owned by its parent company in favor of GM

BVI; in both instances as collateral for purported March 2018 loan agreements between Blue Ocean's parent companies and Golden Meditech. Blue Ocean alleged that the purported security agreements and the purported March 29, 2018 loan agreement were forged. By Judgment dated July 31, 2023, the Honorable Gerhard Wallbank granted summary judgment to Blue Ocean, with the Judgment revealing additional facts concerning Defendants' fraud and Defendant Kam's control over the other Defendants.

**ANSWER:** Defendants respectfully refer the Court to the Judgment issued in the British Virgin Islands High Court of Justice, Commercial Division dated July 31, 2023 for a complete recitation of its contents, without conceding the accuracy or characterizations set forth therein. Defendants state that the Judgment referenced in Paragraph 110 was issued in a foreign proceeding and was reversed. Defendants otherwise deny each and every allegation in Paragraph 110.

111. In the Judgment, Justice Wallbank discusses Defendant Albert Chen's habit of concealing his identity when working on behalf of Golden Meditech:

> Correspondence between Conyers and someone from the Defendant's side concerning preparation of the Share Charges is in evidence. It shows that Conyers corresponded with someone identifying as 'samkykong', signing off as 'SK', using an email address of samkykong@goldenmeditech.com. It appears to be uncontroversial that 'samkykong' and 'SK' are other names, or aliases, that Mr. Albert Chen uses. He does not deny, and indeed states in terms, that it is he who dealt with Conyers. Another name he uses at least when using WeChat, according to the evidence, is 'DRACO'. Quite why Mr. Albert Chen adopts different identities when conducting business is unclear, although there is evidence before the Court that in Cayman proceedings evidence has been led that Mr. Albert Chen explained in a WeChat message in relation to a different transaction (in 2016):
>
> 'I am Albert CHEN but on this project, people refer to me as SK."
>
> The evidence is that Mr. Albert Chen was then (in 2016) asked whether 'SK' stood for anything. He is said to have responded:
>
> "It does not. I just can't be myself on this deal."
>
> It would appear, on the face of this, that the persona of 'SK' has evolved since 2016 to become a more fulsome 'samkykong' by March 2018 and that on the present impugned transaction he could also not, for some reason, 'be himself.'

**ANSWER:** Defendants respectfully refer the Court to the Judgment issued in the British Virgin Islands High Court of Justice, Commercial Division dated July 31, 2023 for a complete

recitation of its contents, without conceding the accuracy or characterizations set forth therein.

Defendants state that the Judgment referenced in Paragraph 111 was issued in a foreign proceeding

and was reversed. Defendants otherwise deny each and every allegation in Paragraph 111.

112.    Justice Wallbank stated that "the central dispute in these Proceedings was as to whether the signatures of Mr. Xu on the Share Charges were genuine," and that "[w]ith the permission of the Court the parties instructed handwriting experts and those experts exchanged their respective reports on 25th November 2022. The result of this was that both sides' experts took the view that the signatures were not genuine."

**ANSWER:** Defendants respectfully refer the Court to the Judgment issued in the British

Virgin Islands High Court of Justice, Commercial Division dated July 31, 2023 for a complete

recitation of its contents, without conceding the accuracy or characterizations set forth therein.

Defendants state that the Judgment referenced in Paragraph 112 was issued in a foreign proceeding

and was reversed. Defendants otherwise deny each and every allegation in Paragraph 112.

113.    As such, Justice Wallbank concluded that "[t]his evidence is so strong that there is no real prospect of a claim succeeding that these signatures and the chop were genuine. It is clear that a claim to this effect cannot be sustained," and that "[t]he Claimants [Blue Ocean] are thus entitled to summary judgment on this, the forgery issue."

**ANSWER:** Defendants respectfully refer the Court to the Judgment issued in the British

Virgin Islands High Court of Justice, Commercial Division dated July 31, 2023 for a complete

recitation of its contents, without conceding the accuracy or characterizations set forth therein.

Defendants state that the Judgment referenced in Paragraph 113 was issued in a foreign proceeding

and was reversed. Defendants otherwise deny each and every allegation in Paragraph 113.

114.    Justice Wallbank found the evidence and arguments put forward by Golden Meditech, including in an Affirmation of Defendant Kam filed March 13, 2023, to be completely implausible:

> It is also mightily unusual for contractual documents and security instruments to be prepared, exchanged, discussed and purportedly agreed, all without a single piece of correspondence flowing between the parties, with no lawyers involved in their finalisation, and no lawyers at all involved on the part of the side which stood to lose an entire valuable business if it defaulted (as it allegedly did). It is also most unusual for alleged default in failing to make a loan repayment not to be the subject

of any correspondence before the purported security was enforced. All these 'facts' coincide to suit the convenience, and perfectly so, of the party purporting to rely upon these putative documents. It is an understatement that this perfect capsule of coincidences stretches the credibility of a reasonable objective observer to breaking point.

**ANSWER:** Defendants respectfully refer the Court to the Judgment issued in the British Virgin Islands High Court of Justice, Commercial Division dated July 31, 2023 for a complete recitation of its contents, without conceding the accuracy or characterizations set forth therein. Defendants state that the Judgment referenced in Paragraph 114 was issued in a foreign proceeding and was reversed.  Defendants otherwise deny each and every allegation in Paragraph 114.

### D.    Hong Kong Litigation Reveals Backdated Transaction Records And Still Further Shows Kam's Control Over The Defendants

115.    On October 25, 2022 the JPLs instituted proceedings in the High Court Of The Hong Kong Special Administrative Region against Defendants Zheng, Albert Chen, and various related parties (case numbers HCA 1407/2022, 1408/2022, 1409/2022, and 1410/2022) to attempt to take control over various GCBC subsidiaries organized in Hong Kong and in Mainland China, which the JPLs alleged had been wrongly taken over by Defendants Zheng, Albert Chen, and their co-defendants, by using back-dated documents to circumvent the JPLs' authority over those subsidiaries after the Cayman court's entry of its September 22, 2022 order granting the JPLs authority over GCBC's business. By Judgment dated February 8, 2024, the Honorable Linda Chan ruled in favor of the JPLs, finding, among other things, the documents in question to have been backdated. The Judgment revealed yet more facts further showing Defendants' fraud and Defendant Kam's control over the other Defendants.

**ANSWER:** Defendants respectfully refer the Court to the proceedings in the High Court of the Hong Kong Special Administrative Region referenced in Paragraph 115, including the February 8, 2024 Judgment, for a complete recitation of their contents, without conceding the accuracy or characterizations set forth therein.  Defendants state that the Judgment referenced in Paragraph 115 was issued in a foreign proceeding and is not binding on this Court.  Defendants otherwise deny each and every allegation in Paragraph 115.

116.    In the background section of the Judgment, Justice Chan states that "[u]nless where otherwise indicated, the facts and matters below are taken from the Agreed Facts, Agreed Chronology and Agreed Dramatis Personae or facts which are not in dispute." That is, Defendants

Zheng and Albert Chen did not dispute such agreed facts. In the same section of the Judgment, Justice Chan states that "The founder of GMHL [Golden Meditech] is Mr Kam Yuen (甘源) ('Kam'), who was its majority shareholder, Chairman and an Executive Director. Kam through GMHL controlled GCBC until the Shares were sold in January 2018." The same section of the Judgment also states that Defendant Zheng "has 2 children with Kam."

**ANSWER:** Defendants respectfully refer the Court to the February 8, 2024 Judgment of the High Court of The Hong Kong Special Administrative Region for a complete recitation of its contents, without conceding the accuracy or characterizations set forth therein. Defendants state that the Judgment referenced in Paragraph 116 was issued in a foreign proceeding and is taken out of context. Defendants otherwise deny each and every allegation in Paragraph 116, except Defendants admit that Ms. Zheng shares two children with Mr. Kam.

117. Assessing the credibility of the witnesses before her, Justice Chan states regarding JPL Chow Tsz Nga Georgia that "She gives evidence in a straight forward and candid manner and answer all the questions put to her directly," and that "I accept Chow's evidence in full. Where her evidence on a matter differs from that of Tina, Albert, Lo and Chen, I prefer the evidence of Chow over that of the other witnesses."

**ANSWER:** Defendants respectfully refer the Court to the February 8, 2024 Judgment of the High Court of The Hong Kong Special Administrative Region for a complete recitation of its contents, without conceding the accuracy or characterizations set forth therein. Defendants state that the Judgment referenced in Paragraph 117 was issued in a foreign proceeding and is not binding on this Court. Defendants otherwise deny each and every allegation in Paragraph 117.

118. Regarding Defendant Zheng, Justice Chan states:

Tina is a well-educated and sophisticated businesswoman. She admits that she was in charge of the financial and internal control matters of GMHL during the period when she was a director. She was a director of 2 listed companies (GMHL and GCBC) and assumed important position as CEO of GCBC. With such experience and background, Tina must have a good knowledge and understanding of proper corporate governance and the fiduciary duties owed by a director of a listed company, which required her to protect and act in the best interests of the listed companies and to exercise her power qua director for the proper purposes of the companies and not for any collateral or personal purposes of anyone including any shareholders. Indeed, it is clear from her answer during cross-examination that Tina

understands and accepts that she was under a duty to act in the bests interests of GCBC and the Group as a whole when exercising her power as director of GCBC.

**ANSWER:** Defendants respectfully refer the Court to the February 8, 2024 Judgment of the High Court of The Hong Kong Special Administrative Region for a complete recitation of its contents, without conceding the accuracy or characterizations set forth therein. Defendants state that the Judgment referenced in Paragraph 118 was issued in a foreign proceeding and is not binding on this Court. Defendants otherwise deny each and every allegation in Paragraph 118.

119.    Justice Chan found that Defendant Zheng gave false evidence, stating "[i]t seems to me that Tina's evidence on the 1st Transfers Documents and the 1st Assignment Resolutions is plagued with inconsistencies and is unreliable. In particular, I reject Tina's evidence that the 1st Transfers Documents and the 1st Appointment Resolutions were signed by her in late August 202292 which I find to be untrue." Similarly, Justice Chan concluded that:

> I also find that Tina's evidence that she signed the Jiachenhong Resolutions before her resignation as director of North HK on 13 September 2022 to be false. The indisputable fact is that Guangzhou Co only came into existence on 1 November 2022, and she could only have signed the Jiachenhong Resolutions after 1 November 2022. It also affects the general credibility of her evidence.

**ANSWER:** Defendants respectfully refer the Court to the February 8, 2024 Judgment of the High Court of The Hong Kong Special Administrative Region for a complete recitation of its contents, without conceding the accuracy or characterizations set forth therein. Defendants state that the Judgment referenced in Paragraph 119 was issued in a foreign proceeding and is not binding on this Court. Defendants otherwise deny each and every allegation in Paragraph 119.

120.    Regarding Defendant Albert Chen, Justice Chan states that "[i]n my view, Albert is not a truthful witness and his evidence regarding the date when he signed the resolutions approving the 1st Transfers and the 1st Appointment Resolutions in relation to South HK and FFL is unreliable." Justice Chan concluded "I reject Albert's evidence that the resolutions approving the 1st Transfers and the 1st Appointment Resolutions in respect of North HK and FFL were signed by him in the week of 5 September 2022."

**ANSWER:** Defendants respectfully refer the Court to the February 8, 2024 Judgment of the High Court of The Hong Kong Special Administrative Region for a complete recitation of its contents, without conceding the accuracy or characterizations set forth therein. Defendants state

that the Judgment referenced in Paragraph 120 was issued in a foreign proceeding and is not

binding on this Court.  Defendants otherwise deny each and every allegation in Paragraph 120.

121.    Justice Chan concluded that "[t]he findings of backdating of the Impugned Documents are amply justified." Justice Chan found that the "the Impugned Documents were created on or after 29 September 2002 but backdated to 12 or 13 September 2022," and therefore:

> As Tina and Albert had already been removed as directors of the HK Subsidiaries by 24 September 2022, they had no authority to act on behalf of the HK Subsidiaries on or after 29 September 2022, and the 1st Transfers Documents and the 1st Appointment Resolutions signed by them are void for want of authority.

**ANSWER:** Defendants respectfully refer the Court to the February 8, 2024 Judgment of

the High Court of The Hong Kong Special Administrative Region for a complete recitation of its

contents, without conceding the accuracy or characterizations set forth therein.  Defendants state

that the Judgment referenced in Paragraph 121 was issued in a foreign proceeding and is not

binding on this Court.  Defendants otherwise deny each and every allegation in Paragraph 121.

122.    Justice Chan further found that Defendants Zheng and Albert Chen engaged in misappropriation of GCBC assets, stating:

> Tina and Albert approved the 1st Transfers which had the effect of giving away the HK Subsidiaries for nominal consideration. This was prima facie a use of their powers as directors for an improper purpose and constituted a misappropriation of the Plaintiffs' assets. The burden is on Tina and Albert to justify giving away the HK Subsidiaries for US$4.

**ANSWER:** Defendants respectfully refer the Court to the February 8, 2024 Judgment of

the High Court of The Hong Kong Special Administrative Region for a complete recitation of its

contents, without conceding the accuracy or characterizations set forth therein.  Defendants state

that the Judgment referenced in Paragraph 122 was issued in a foreign proceeding and is not

binding on this Court.  Defendants otherwise deny each and every allegation in Paragraph 122.

123.    Justice Chan noted that Defendants Zheng and Albert Chen admitted to blindly following instructions from Defendant Kam that were inconsistent with their duties as corporate directors and officers, stating that "[o]n Tina's evidence, she signed the 1st Transfers Documents in late August 2022 when being asked by Kam to do so. She did not apply her mind to consider whether it would be in the interests or for the proper purpose of the Plaintiffs to sign them."

53

Similarly, "On Albert's evidence, he was asked to sign the resolutions approving the 1st Transfers in respect of North HK and FFL at the request of Kam and according to his instructions." Therefore, Justice Chan concluded "that the 1st Transfers were procured by Tina and Albert in breach of their fiduciary duties as directors of the Plaintiffs."

**ANSWER:** Defendants respectfully refer the Court to the February 8, 2024 Judgment of the High Court of The Hong Kong Special Administrative Region for a complete recitation of its contents, without conceding the accuracy or characterizations set forth therein. Defendants state that the Judgment referenced in Paragraph 123 was issued in a foreign proceeding and is not binding on this Court. Defendants otherwise deny each and every allegation in Paragraph 123.

124.    Justice Chan further found that "[o]n the evidence before the court, it is clear that CISIL [China In Shine Investment Limited] and MS [Sonoe Muramatsu] were nominees of Kam."

**ANSWER:** Defendants respectfully refer the Court to the February 8, 2024 Judgment of the High Court of The Hong Kong Special Administrative Region for a complete recitation of its contents, without conceding the accuracy or characterizations set forth therein. Defendants state that the Judgment referenced in Paragraph 124 was issued in a foreign proceeding and is not binding on this Court. Defendants otherwise deny each and every allegation in Paragraph 124.

125.    Justice Chan also held that "Since Tina and Albert were procured by Kam to sign the Impugned Documents, Kam must have knowledge of (1) the backdating of the 1st Transfers Documents and the want of authority; and (2) the breach of fiduciary duties on the part of Tina and Albert."

**ANSWER:** Defendants respectfully refer the Court to the February 8, 2024 Judgment of the High Court Of The Hong Kong Special Administrative Region for a complete recitation of its contents, without conceding the accuracy or characterizations set forth therein. Defendants state that the Judgment referenced in Paragraph 125 was issued in a foreign proceeding and is not binding on this Court. Defendants otherwise deny each and every allegation in Paragraph 125.

## VIII.    DEFENDANT KAM CONTROLLED THE CORPORATE DEFENDANTS AND THEIR SUBSIDIARIES, WHICH OPERATED AS HIS ALTER EGOS

126.    As detailed above, during the Class Period Defendant Kam controlled GCBC, Golden

Meditech, their respective subsidiaries, and Cellenkos, and each of those companies acted as alter egos of Kam and Golden Meditech. Indicia of the alter ego relationship include, without limitation: (i) GCBC's failure to observe corporate formalities in obtaining meaningful Board approval or any shareholder approval of the major Cellenkos transaction; (ii) forgery, backdating, and falsification of corporate records relating to GCBC and/or Golden Meditech; (iii) the undisclosed diversion of GCBC's funds to Golden Meditech; (iv) their overlapping ownership, officers, directors and personnel; (v) the shared office space of GCBC and Golden Meditech; (vi) the lack of independence displayed by the Corporate Defendants in the conduct of their business; (vii) non-arm's length transactions including the misappropriation of GCBC's funds to Golden Meditech and the Corporate Defendants' entry into the grossly overvalued Cellenkos transaction; and (viii) the use of GCBC's property by Golden Meditech as if it belonged to Golden Meditech.

**ANSWER:** Paragraph 126 contains legal conclusions to which no responsive pleading is required. To the extent a response is required, Defendants deny each and every allegation in Paragraph 126.

## IX. MATERIALLY FALSE AND MISLEADING STATEMENTS ISSUED DURING THE CLASS PERIOD

127. During the Class Period, Defendants made multiple statements that misleadingly misrepresented and/or omitted to disclose that Defendants were misappropriating substantial amounts of GCBC's cash to companies controlled by Defendant Kam, including subsidiaries of Defendant Golden Meditech.[2]

**ANSWER:** Paragraph 127 contains legal conclusions to which no responsive pleading is required. To the extent a response is required, Defendants deny each and every allegation in Paragraph 127, including the footnote referenced therein.

### A. June 18-19, 2019 GCBC Announces Fiscal Year 2019 Results

128. The Class Period begins on June 18, 2019. On that date, GCBC published a press release titled "Global Cord Blood Corporation Reports Financial Results for the Fourth Quarter and Full Year of Fiscal 2019," and filed a Form 6-K with the SEC containing its FY 2019 results to which the press release was attached as an exhibit. GCBC's fiscal years end on March 31, and its FY 2019 ended on March 31, 2019. The Form 6-K was signed by Defendant Albert Chen.

---

[2] Defendants made numerous misleading statements throughout the Class Period. For the sake of brevity, Plaintiffs only allege herein a selection of key misleading statements. No inference should be made that Defendants' other statements issued during the Class Period were not misleading.

**ANSWER:** Defendants deny the allegations in Paragraph 128 which imply there is a valid class and that the Class Period as defined is appropriate. Defendants admit that GCBC filed an SEC Form 6-K on June 18, 2019 which attached a press release entitled "Global Cord Blood Corporation Reports Financial Results for the Fourth Quarter and Full Year of Fiscal 2019" and respectfully refer the Court to those filings for a complete recitation of their contents. Defendants admit that the fiscal year 2019 ended on March 31, 2019 and that the Form 6-K was signed by Mr. Chen. Unless as so expressly admitted, Defendants deny each and every allegation in Paragraph 128.

129. The Form 6-K and the press release both included an unaudited condensed consolidated balance sheet that stated that as of March 31, 2019 GCBC had RMB 4,997,861,000 (US$ 744,706,000) in cash and cash equivalents, and total current assets of RMB 5,147,928,000 (US$ 767,067,000).

**ANSWER:** Defendants respectfully refer the Court to GCBC's SEC Form 6-K filed on June 18, 2019 which attached a press release entitled "Global Cord Blood Corporation Reports Financial Results for the Fourth Quarter and Full Year of Fiscal 2019" for a complete recitation of their contents. Defendants deny any allegations inconsistent with, contrary to, or not supported by, the entirety of those documents. Except as so expressly admitted, Defendants deny each and every allegation in Paragraph 129.

130. On June 19, 2019 GCBC held a conference call with investors to discuss its FY 2019 results. On the call, Merrill Lynch analyst Jeffrey Neal asked:

> The shares closed below the company's estimated cash value per share yesterday and there's principally one reason for that, the inefficiency of capital to deployment. So, I'd like Ms. Zheng, to enumerate the reasons that the company maintains this policy with regards to basically capital storage as opposed to capital efficiency for shareholders.

Defendant Albert Chen responded in relevant part, "with the current Cord Blood Banking license regime and policy expiring in 2020, we are basically retaining capital and getting ready for a possible change in regulatory landscape."

**ANSWER:** Defendants lack information sufficient to admit or deny the allegations and characterizations of Paragraph 130, and so deny same.

131.    Defendants' statements identified in ¶¶129-130 were materially false and/or misleading, and/or failed to disclose material adverse facts because, as Defendants knew or recklessly disregarded, GCBC was not "retaining capital" but misappropriating it to companies controlled by Defendant Kam and Golden Meditech, and as a result GCBC had less than its stated amounts of cash and total current assets.

**ANSWER:** Paragraph 131 contains legal conclusions to which no responsive pleading is required.  To the extent a response is required, Defendants deny each and every allegation in Paragraph 131.

## B.    July 23, 2019 GCBC Form 20-F Annual Report for Fiscal Year 2019

132.    On July 23, 2019 GCBC filed with the SEC its annual report for FY 2019 on Form 20-F. The annual report was signed by Defendant Zheng.

**ANSWER:** Defendants respectfully refer the Court to GCBC's SEC Form 20-F filed on July 23, 2019 for a complete recitation of its contents.  Defendants deny any allegations inconsistent with, contrary to, or not supported by, the entirety of those documents.  Except as so expressly admitted, Defendants deny each and every allegation in Paragraph 132.

133.    The Form 20-F stated "[a]s of March 31, 2019, we had cash and cash equivalents of RMB4,997.9 million ($744.7 million)."

**ANSWER:** Defendants respectfully refer the Court to GCBC's SEC Form 20-F filed on July 23, 2019 for a complete recitation of its contents.  Defendants deny any allegations inconsistent with, contrary to, or not supported by, the entirety of those documents.  Except as so expressly admitted, Defendants deny each and every allegation in Paragraph 133.

134.    Defendants' statements identified in the preceding paragraph were materially false and/or misleading, and/or failed to disclose material adverse facts because, as Defendants knew or recklessly disregarded, Defendants had misappropriated substantial amounts of GCBC's cash to companies controlled by Defendant Kam, and as a result GCBC retained less than the stated amount of cash.

57

**ANSWER:** Paragraph 134 contains legal conclusions to which no responsive pleading is required. To the extent a response is required, Defendants deny each and every allegation in Paragraph 134.

135. The Form 20-F stated, under the heading "Related Party Transactions," that "[a] related party is any executive officer, director or a holder of more than five percent of our ordinary shares, including any of their immediate family members and any entity owned or controlled by such persons," and that "[s]ince February 1, 2018, Golden Meditech [Golden Meditech Holdings Limited] and China Bright [China Bright Group Co. Limited] were no longer related parties of the Company." The Form 20-F similarly stated that "[s]ince February 1, 2018, Golden Meditech and Beijing Jingjing [Beijing Jingjing Medical Equipment Co., Ltd.] were no longer related parties of the Company," and that "Since February 1, 2018, Golden Meditech (S) Pte Ltd. was no longer a related party of the Company."

**ANSWER:** Defendants respectfully refer the Court to GCBC's SEC Form 20-F filed on July 23, 2019 for a complete recitation of its contents. Defendants deny any allegations inconsistent with, contrary to, or not supported by, the entirety of those documents. Except as so expressly admitted, Defendants deny each and every allegation in Paragraph 135.

136. The Form 20-F also stated that "[f]or the years presented, the principal related party transactions are summarized as follows" (numbers in thousands):

|  | Note | 2017 | 2018 | Year ended March 31, 2019 | 2019 |
|---|---|---|---|---|---|
|  |  | RMB | RMB | RMB | US$ |
| Purchase of raw materials | (i) | 35,405 | 18,759 | – | – |
| Purchase of raw materials and machineries | (ii) | – | 19,419 | – | – |
| Consultancy expenses | (iii) | 4,337 | 4,481 | – | – |
| Interest expenses | 14 | 113,993 | 2,567 | – | – |
| Consultancy income | (iv) | 16,786 | – | – | – |
| Data access income | (v) | 26,316 | – | – | – |

**ANSWER:** Defendants respectfully refer the Court to GCBC's SEC Form 20-F filed on July 23, 2019 for a complete recitation of its contents. Defendants deny any allegations inconsistent with, contrary to, or not supported by, the entirety of those documents. Except as so expressly admitted, Defendants deny each and every allegation in Paragraph 136.

137. Defendants' statements identified in ¶¶135-136 were materially false and/or misleading, and/or failed to disclose material adverse facts because, as Defendants knew or

58

recklessly disregarded, Golden Meditech and its subsidiaries were related parties of GCBC because Defendant Zheng (a GCBC executive officer) was an immediate family member of Defendant Kam, who controlled Golden Meditech and its subsidiaries. Furthermore, Defendants had misappropriated substantial amounts of GCBC's cash to companies controlled by Defendant Kam.

**ANSWER:** Paragraph 137 contains legal conclusions to which no responsive pleading is required. To the extent a response is required, Defendants deny each and every allegation in paragraph 137.

138. The 20-F included as exhibits Sarbanes-Oxley certifications signed by Defendants Zheng and Albert Chen. These certifications stated, among other things, that: (1) "[b]ased on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made . . . not misleading"; and (2) "[b]ased on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the company."

**ANSWER:** Defendants respectfully refer the Court to GCBC's SEC Form 20-F filed on July 23, 2019, and attached Exhibits 12.1 and 12.2 for a complete recitation of their contents. Defendants deny any allegations inconsistent with, contrary to, or not supported by, the entirety of those documents. Except as so expressly admitted, Defendants deny each and every allegation in Paragraph 138.

139. Defendants' statements identified in the preceding paragraph were materially false and/or misleading, and/or failed to disclose material adverse facts because, as Defendants knew or recklessly disregarded, the Form 20-F contained misleading statements and omissions and inaccurately presented GCBC's financial condition as explained in this Part IX.B.

**ANSWER:** Paragraph 139 contains legal conclusions to which no responsive pleading is required. To the extent a response is required, Defendants deny each and every allegation in Paragraph 139.

### C. July 29, 2020 GCBC Form 20-F Annual Report for Fiscal Year 2020

140. On July 29, 2020 GCBC filed with the SEC its annual report for FY 2020 on Form 20-F. The annual report was signed by Defendant Zheng.

**ANSWER:** Defendants respectfully refer the Court to GCBC's SEC Form 20-F filed on July 29, 2020 for a complete recitation of its contents.  Defendants deny any allegations inconsistent with, contrary to, or not supported by, the entirety of those documents.  Except as so expressly admitted, Defendants deny each and every allegation in Paragraph 140.

141.    The Form 20-F stated "[a]s of March 31, 2020, we had cash and cash equivalents of RMB5,473.4 million (US$773.0 million)."

**ANSWER:** Defendants respectfully refer the Court to GCBC's SEC Form 20-F filed on July 29, 2020 for a complete recitation of its contents.  Defendants admit the quoted language appears in the document.

142.    Defendants' statements identified in the preceding paragraph were materially false and/or misleading, and/or failed to disclose material adverse facts because, as Defendants knew or recklessly disregarded, Defendants had misappropriated substantial amounts of GCBC's cash to companies controlled by Defendant Kam, and as a result GCBC retained less than the stated amount of cash.

**ANSWER:** Paragraph 142 contains legal conclusions to which no responsive pleading is required.  To the extent a response is required, Defendants deny each and every allegation in Paragraph 142.

143.    The Form 20-F stated, under the heading "Related Party Transactions," that "[a] related party is any executive officer, director or a holder of more than five percent of our ordinary shares, including any of their immediate family members and any entity owned or controlled by such persons," and that "[s]ince February 1, 2018, Golden Meditech [Golden Meditech Holdings Limited] and China Bright [China Bright Group Co. Limited] were no longer related parties of the Company." The Form 20-F similarly stated that "[s]ince February 1, 2018, Golden Meditech and Beijing Jingjing [Beijing Jingjing Medical Equipment Co., Ltd.] were no longer related parties of the Company," and that "Since February 1, 2018, Golden Meditech (S) Pte Ltd. was no longer a related party of the Company."

**ANSWER:** Defendants respectfully refer the Court to GCBC's SEC Form 20-F filed on July 29, 2020 for a complete recitation of its contents.  Defendants deny any allegations inconsistent with, contrary to, or not supported by, the entirety of those documents.  Except as so expressly admitted, Defendants deny each and every allegation in Paragraph 143.

144.    The Form 20-F also stated that "[f]or the years presented, the principal related party transactions are summarized as follows" (numbers in thousands):

| | Note | Year ended March 31, | | | |
| --- | --- | --- | --- | --- | --- |
| | | 2018 | 2019 | 2020 | 2020 |
| | | RMB | RMB | RMB | US$ |
| Purchase of raw materials | (i) | 18,759 | – | – | – |
| Purchase of raw materials and machineries | (ii) | 19,419 | – | – | – |
| Consultancy expenses | (iii) | 4,481 | – | – | – |
| Interest expenses | 14 | 2,567 | – | – | – |

**ANSWER:** Defendants respectfully refer the Court to GCBC's SEC Form 20-F filed on July 29, 2020 for a complete recitation of its contents.  Defendants deny any allegations inconsistent with, contrary to, or not supported by, the entirety of those documents.  Except as so expressly admitted, Defendants deny each and every allegation in Paragraph 144.

145.    Defendants' statements identified in ¶¶143-144 were materially false and/or misleading, and/or failed to disclose material adverse facts because, as Defendants knew or recklessly disregarded, Golden Meditech and its subsidiaries were related parties of GCBC because Defendant Zheng (a GCBC executive officer) was an immediate family member of Defendant Kam, who controlled Golden Meditech and its subsidiaries. Furthermore, Defendants had misappropriated substantial amounts of GCBC's cash to companies controlled by Defendant Kam.

**ANSWER:** Paragraph 145 contains legal conclusions to which no responsive pleading is required.  To the extent a response is required, Defendants deny each and every allegation in Paragraph 145.

146.    The 20-F included as exhibits Sarbanes-Oxley certifications signed by Defendants Zheng and Albert Chen. These certifications stated, among other things, that: (1) "[b]ased on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made . . . not misleading"; and (2) "[b]ased on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the company."

**ANSWER:** Defendants respectfully refer the Court to GCBC's SEC Form 20-F filed on July 29, 2020, and attached Exhibits 12.1 and 12.2 for a complete recitation of their contents.  Defendants deny any allegations inconsistent with, contrary to, or not supported by, the entirety of

those documents.  Except as so expressly admitted, Defendants deny each and every allegation in Paragraph 146.

147.    Defendants' statements identified in the preceding paragraph were materially false and/or misleading, and/or failed to disclose material adverse facts because, as Defendants knew or recklessly disregarded, the Form 20-F contained misleading statements and omissions and inaccurately presented GCBC's financial condition as explained in this Part IX.C.

**ANSWER:** Paragraph 147 contains legal conclusions to which no responsive pleading is required.  To the extent a response is required, Defendants deny each and every allegation in Paragraph 147.

### D.    July 29, 2021 GCBC Form 20-F Annual Report for Fiscal Year 2021

148.    On July 29, 2021 GCBC filed with the SEC its annual report for FY 2021 on Form 20-F. The annual report was signed by Defendant Zheng.

**ANSWER:** Defendants respectfully refer the Court to GCBC's SEC Form 20-F filed on July 29, 2021 for a complete recitation of its contents.  Defendants deny any allegations inconsistent with, contrary to, or not supported by, the entirety of those documents.  Except as so expressly admitted, Defendants deny each and every allegation in Paragraph 148.

149.    The Form 20-F stated "[a]s of March 31, 2021, we had cash and cash equivalents of RMB6,075.8 million (US$927.3 million)."

**ANSWER:** Defendants respectfully refer the Court to GCBC's SEC Form 20-F filed on July 29, 2021 for a complete recitation of its contents.  Defendants deny any allegations inconsistent with, contrary to, or not supported by, the entirety of those documents.  Except as so expressly admitted, Defendants deny each and every allegation in Paragraph 149.

150.    Defendants' statements identified in the preceding paragraph were materially false and/or misleading, and/or failed to disclose material adverse facts because, as Defendants knew or recklessly disregarded, Defendants had misappropriated substantial amounts of GCBC's cash to companies controlled by Defendant Kam, and as a result GCBC retained less than the stated amount of cash.

**ANSWER:** Paragraph 150 contains legal conclusions to which no responsive pleading is required. To the extent a response is required, Defendants deny each and every allegation in Paragraph 150.

151. The Form 20-F stated, under the heading "Related Party Transactions," that "[a] related party is any executive officer, director or a holder of more than five percent of our ordinary shares, including any of their immediate family members and any entity owned or controlled by such persons." The Form 20-F did not disclose any related party transactions.

**ANSWER:** Defendants respectfully refer the Court to GCBC's SEC Form 20-F filed on July 29, 2021 for a complete recitation of its contents. Defendants deny any allegations inconsistent with, contrary to, or not supported by, the entirety of those documents. Except as so expressly admitted, Defendants deny each and every allegation in Paragraph 151.

152. Defendants' statements identified in the preceding paragraph were materially false and/or misleading, and/or failed to disclose material adverse facts because, as Defendants knew or recklessly disregarded, Defendant Kam and the companies under his control were related parties of GCBC because Defendant Zheng (a GCBC executive officer) was an immediate family member of Defendant Kam. Furthermore, Defendants had misappropriated substantial amounts of GCBC's cash to companies controlled by Defendant Kam.

**ANSWER:** Paragraph 152 contains legal conclusions to which no responsive pleading is required. To the extent a response is required, Defendants deny each and every allegation in Paragraph 152.

153. The 20-F included as exhibits Sarbanes-Oxley certifications signed by Defendants Zheng and Albert Chen. These certifications stated, among other things, that: (1) "[b]ased on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made . . . not misleading"; and (2) "[b]ased on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the company."

**ANSWER:** Defendants respectfully refer the Court to GCBC's SEC Form 20-F filed on July 29, 2021, and attached Exhibits 12.1 and 12.2 for a complete recitation of their contents. Defendants deny any allegations inconsistent with, contrary to, or not supported by, the entirety of

63

those documents.  Except as so expressly admitted, Defendants deny each and every allegation in Paragraph 153.

154.    Defendants' statements identified in the preceding paragraph were materially false and/or misleading, and/or failed to disclose material adverse facts because, as Defendants knew or recklessly disregarded, the Form 20-F contained misleading statements and omissions and inaccurately presented GCBC's financial condition as explained in this Part IX.D.

**ANSWER:** Paragraph 154 contains legal conclusions to which no responsive pleading is required.  To the extent a response is required, Defendants deny each and every allegation in Paragraph 154.

### E.    February 28, 2022 GCBC Announces Results For Quarter Ended December 31, 2021

155.    On February 28, 2022, GCBC published a press release titled "Global Cord Blood Corporation Reports Financial Results for the Third Quarter and First Nine Months of Fiscal 2022," and filed a Form 6-K with the SEC containing its results for the quarter, to which the press release was attached as an exhibit. GCBC's FY 2022 third quarter ended on December 31, 2021. The Form 6-K was signed by Defendant Albert Chen.

**ANSWER:** Defendants respectfully refer the Court to GCBC's SEC Form 6-K filed on February 28, 2022 which attached a press release entitled "Global Cord Blood Corporation Reports Financial Results for the Third Quarter and First Nine Months of Fiscal 2022," for a complete recitation of their contents.  Defendants deny any allegations inconsistent with, contrary to, or not supported by, the entirety of those documents.  Except as so expressly admitted, Defendants deny each and every allegation in Paragraph 155.

156.    The Form 6-K and the press release both included an unaudited condensed consolidated balance sheet that stated that as of December 31, 2021 GCBC had RMB 6,505,014,000 (US$ 1,020,780,000) in cash and cash equivalents, and total current assets of RMB 6,782,199,000 (US$ 1,064,276).

**ANSWER:** Defendants respectfully refer the Court to GCBC's SEC Form 6-K filed on February 28, 2022 which attached a press release entitled "Global Cord Blood Corporation Reports Financial Results for the Third Quarter and First Nine Months of Fiscal 2022," for a complete

recitation of their contents.  Defendants deny any allegations inconsistent with, contrary to, or not supported by, the entirety of those documents.  Except as so expressly admitted, Defendants deny each and every allegation in Paragraph 156.

157.    Defendants' statements identified in the preceding paragraph were materially false and/or misleading, and/or failed to disclose material adverse facts because, as Defendants knew or recklessly disregarded, GCBC had misappropriated substantial amounts of GCBC's cash to companies controlled by Defendant Kam, and as a result GCBC retained less than the stated amounts of cash and total current assets.

**ANSWER:** Paragraph 157 contains legal conclusions to which no responsive pleading is required.  To the extent a response is required, Defendants deny each and every allegation in Paragraph 157.

**F.    April 29, 2022 GCBC Announces The Cellenkos Transaction**

158.    On April 29, 2022, GCBC published a press release titled "Global Cord Blood Corporation Announces Entry into Cell Therapy Market by Acquiring Cellenkos and Its Products Rights," and filed a Form 6-K with the SEC that attached exhibits including the press release. The Form 6-K was signed by Defendant Albert Chen.

**ANSWER:** Defendants respectfully refer the Court to GCBC's SEC Form 6-K filed on April 29, 2022 which attached a press release entitled "Global Cord Blood Corporation Announces Entry into Cell Therapy Market by Acquiring Cellenkos and Its Products Rights," for a complete recitation of their contents.  Defendants deny any allegations inconsistent with, contrary to, or not supported by, the entirety of those documents.  Except as so expressly admitted, Defendants deny each and every allegation in Paragraph 158.

159.    The Form 6-K stated that in connection with the Cellenkos transaction, GCBC would provide consideration of "approximately 12.4 million Ordinary Shares to be issued to the BVI Company [GM Precision Medicine (BVI) Limited] and US$664 million cash consideration, with the purpose to provide the Company with the intellectual property that will be necessary to develop Cellenkos' product candidates in the field of umbilical cord blood treatment for acute and chronic autoimmune diseases and inflammatory disorders in Asia."

**ANSWER:** Defendants respectfully refer the Court to GCBC's SEC Form 6-K filed on April 29, 2022 for a complete recitation of its contents.  Defendants deny any allegations

inconsistent with, contrary to, or not supported by, the entirety of that document.  Except as so expressly admitted, Defendants deny each and every allegation in Paragraph 159.

160.    The press release stated that as part of the Cellenkos transaction, GCBC would "pay US$664 million in cash as total consideration."

**ANSWER:** Defendants respectfully refer the Court to the Press Release entitled "Global Cord Blood Corporation Announces Entry into Cell Therapy Market by Acquiring Cellenkos and Its Products Rights" attached to SEC Form 6-K filed on April 29, 2022 for a complete recitation of its contents.  Defendants deny any allegations inconsistent with, contrary to, or not supported by, the entirety of that document.  Except as so expressly admitted, Defendants deny each and every allegation in Paragraph 160.

161.    The press release further stated that "[t]he Board of Directors of the Company [GCBC] believes that CLNK is a perfect fit for the Company and that its products can have distinct synergies with the Company's existing line of business."

**ANSWER:** Defendants respectfully refer the Court to the Press Release entitled "Global Cord Blood Corporation Announces Entry into Cell Therapy Market by Acquiring Cellenkos and Its Products Rights" attached to SEC Form 6-K filed on April 29, 2022 for a complete recitation of its contents.  Defendants deny any allegations inconsistent with, contrary to, or not supported by, the entirety of that document.  Except as so expressly admitted, Defendants deny each and every allegation in Paragraph 161.

162.    The statements identified in ¶¶159-161 were materially false and/or misleading, and/or failed to disclose material adverse facts because, as Defendants knew or recklessly disregarded, GCBC could not pay $664 million in cash because GCBC had misappropriated substantial amounts of its cash to companies controlled by Defendant Kam, and the true reason for the Cellenkos transaction was to conceal this misappropriation.

**ANSWER:** Paragraph 162 contains legal conclusions to which no responsive pleading is required.  To the extent a response is required, Defendants deny each and every allegation in Paragraph 162.

66

## X.    ADDITIONAL SCIENTER ALLEGATIONS

163.    As alleged herein, Defendants acted with scienter because Defendants: knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

ANSWER: Paragraph 163 contains legal conclusions to which no responsive pleading is

required.  To the extent a response is required, Defendants deny each and every allegation in

Paragraph 163.

164.    As set forth elsewhere herein in detail, the Individual Defendants, by virtue of their receipt of information reflecting Defendants' scheme and the true facts regarding GCBC, their control over, and/or receipt and/or modification of GCBC's allegedly materially misleading misstatements and/or their association with the GCBC, Golden Meditech, and Cellenkos, which made them privy to confidential proprietary information concerning those companies, participated in the fraud alleged herein.

ANSWER: Paragraph 164 contains legal conclusions to which no responsive pleading is

required.  To the extent a response is required, Defendants deny each and every allegation in

Paragraph 164.

## XI.    CLASS ACTION ALLEGATIONS

165.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities who purchased the publicly traded ordinary shares of GCBC between June 18, 2019 and May 9, 2022, both dates inclusive, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, any entity in which Defendants have or had a controlling interest, and any trust of which an Individual Defendant is the settler or which is for the benefit of an Individual Defendant and/or member(s) of his or her immediate family.

ANSWER: Defendants admit that Plaintiffs purport to bring this action as a class action

pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons and entities

who purchased the publicly traded ordinary shares of GCBC between June 18, 2019 and May 9,

2022, both dates inclusive, and who were damaged thereby, but deny that Plaintiffs state a legally

cognizable claim under the federal law, or any other statute, rule, or the common law, deny that

Plaintiffs' claims are properly certifiable as a class, and otherwise deny any and all remaining

allegations in Paragraph 165.

166.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, GCBC's shares actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are at least hundreds or thousands of members in the proposed Class. Millions of GCBC shares were traded publicly during the Class Period on the NYSE. Record owners and other members of the Class may be identified from records maintained by GCBC or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

**ANSWER:** Paragraph 166 contains legal conclusions to which no responsive pleading is

required.  To the extent a response is required, Defendants admit that GCBC stock was traded

publicly on the NYSE during the purported Class Period but otherwise deny each and every

allegation in Paragraph 166.

167.    Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

**ANSWER:** Paragraph 167 contains legal conclusions to which no responsive pleading is

required.  To the extent a response is required, Defendants deny each and every allegation in

Paragraph 167.

168.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

**ANSWER:** Paragraph 168 contains legal conclusions to which no responsive pleading is

required.  To the extent a response is required, Defendants deny each and every allegation in

Paragraph 168.

169.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)     whether Defendants employed a scheme to defraud investors;

(c)     whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of GCBC; and

(d)     to what extent the members of the Class have sustained damages and the proper measure of damages.

**ANSWER:** Paragraph 169 contains legal conclusions to which no responsive pleading is required.  To the extent a response is required, Defendants deny each and every allegation in Paragraph 169.

170.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

**ANSWER:** Paragraph 170 contains legal conclusions to which no responsive pleading is required.  To the extent a response is required, Defendants deny each and every allegation in Paragraph 170.

## XII.    LOSS CAUSATION

171.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiffs and the Class.

**ANSWER:** Paragraph 171 contains legal conclusions to which no responsive pleading is required.  To the extent a response is required, Defendants deny each and every allegation in Paragraph 171.

172.    During the Class Period, Plaintiffs and the Class purchased GCBC stock at prices artificially inflated by Defendants' scheme, misrepresentations, and/or omissions as alleged herein. The price of GCBC stock significantly declined when the scheme, misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

**ANSWER:** Paragraph 172 contains legal conclusions to which no responsive pleading is required. To the extent a response is required, Defendants deny each and every allegation in Paragraph 172.

## XIII. APPLICABILITY OF PRESUMPTION OF RELIANCE

173. The market for GCBC's shares was efficient at all relevant times. As a result of Defendants' scheme, materially false and/or misleading statements, and/or failures to disclose, GCBC's shares traded at artificially inflated prices during the Class Period. Plaintiffs and other members of the Class purchased the Company's shares relying upon the integrity of the market price of GCBC's shares and market information relating to GCBC.

**ANSWER:** Paragraph 173 contains legal conclusions to which no responsive pleading is required. To the extent a response is required, Defendants deny each and every allegation in Paragraph 173.

174. At all relevant times, the market for GCBC's shares was an efficient market for the following reasons, among others:

(a) GCBC shares met the requirements for listing, and were listed and actively traded on the NYSE, a highly efficient and automated market;

(b) As a regulated issuer, GCBC filed periodic public reports with the SEC; and

(c) GCBC regularly communicated with public investors via established market communication mechanisms, including through earnings calls and regular dissemination of press releases on the national circuits of major newswire services.

**ANSWER:** Paragraph 174 contains legal conclusions to which no responsive pleading is required. To the extent a response is required, Defendants deny each and every allegation in Paragraph 174.

175. As a result of the foregoing, the market for GCBC's shares promptly digested current information regarding GCBC from publicly available sources and reflected such information in GCBC's share price. Under these circumstances, a presumption of reliance applies for all purchasers of GCBC's shares during the Class Period.

**ANSWER:** Paragraph 175 contains legal conclusions to which no responsive pleading is required.  To the extent a response is required, Defendants deny each and every allegation in Paragraph 175.

176.    A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. U.S.*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material omissions. Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the Class Period material omissions set forth above, that requirement is satisfied here.

**ANSWER:** Paragraph 176 contains legal conclusions to which no responsive pleading is required.  To the extent a response is required, Defendants deny each and every allegation in Paragraph 176.

## XIV.   NO SAFE HARBOR

177.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of GCBC who knew that the statement was false when made.

**ANSWER:** Paragraph 177 contains legal conclusions to which no responsive pleading is required.  To the extent a response is required, Defendants deny each and every allegation in Paragraph 177.

## XV.    FIRST CLAIM

### Violation of Section 10(b) of The Exchange Act and
### Rule 10b-5(a) and (c) Promulgated Thereunder
### Against All Defendants

178.    Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

**ANSWER:** Defendants repeat and reallege each and every answer set forth above as if fully set forth herein.  Defendants admit that Plaintiffs' purported claim is asserted against all Defendants but deny that Plaintiffs state legally cognizable claims under the federal law, or any other statute, rule, or common law, and deny all remaining allegations of Paragraph 178.

179.    During the Class Period, as set forth herein, Defendants: (i) employed devices, schemes, and artifices to defraud; and (ii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's shares, in violation of Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c).

**ANSWER:** Paragraph 179 contains legal conclusions to which no responsive pleading is required.  To the extent a response is required, Defendants deny each and every allegation in Paragraph 179.

180.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's shares during the Class Period.

**ANSWER:** Paragraph 180 contains legal conclusions to which no responsive pleading is required.  To the extent a response is required, Defendants deny each and every allegation in Paragraph 180.

## XVI.   SECOND CLAIM

### Violation of Section 10(b) of The Exchange Act and
### Rule 10b-5(b) Promulgated Thereunder
### Against Defendants GCBC, Ting Zheng and Bing Chuen Chen

181.    Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

**ANSWER:** Defendants repeat and reallege each and every answer set forth above as if fully set forth herein. Defendants admit that Plaintiffs' purported claim is asserted against GCBC, Ms. Zheng, and Mr. Chen, but deny that Plaintiffs state legally cognizable claims under the federal law, or any other statute, rule, or common law, and deny all remaining allegations of Paragraph 181.

182.    During the Class Period, as set forth herein, Defendants GCBC, Ting Zheng, and Bing Chuen Chen made untrue statements of material facts and/or omitted to state material facts necessary in order to make the statement made, in the light of the circumstances under which they were made, not misleading, in violation of Section 10(b) of the Exchange Act and Rule 10b-5(b).

**ANSWER:** Paragraph 182 contains legal conclusions to which no responsive pleading is required. To the extent a response is required, Defendants deny each and every allegation in Paragraph 182.

183.    As a direct and proximate result of the wrongful conduct of Defendants GCBC, Ting Zheng, and Bing Chuen Chen, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's shares during the Class Period.

**ANSWER:** Paragraph 183 contains legal conclusions to which no responsive pleading is required. To the extent a response is required, Defendants deny each and every allegation in Paragraph 183.

## XVII.  THIRD CLAIM

### Violation of Section 20(a) of The Exchange Act
### Against The Individual Defendants and Golden Meditech

184.    Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

**ANSWER:** Defendants repeat and reallege each and every answer set forth above as if fully set forth herein. Defendants admit that Plaintiffs' purported claim is asserted against the Individual Defendants and Golden Meditech, but deny that Plaintiffs state legally cognizable

claims under the federal law, or any other statute, rule, or common law, and deny all remaining allegations of Paragraph 184.

185. Defendants Ting Zheng, Bing Chuen Chen, Mark Da-Jian Chen, Jennifer Weng, Yuen Kam, and Golden Meditech acted as controlling persons of GCBC within the meaning of Section 20(a) of the Exchange Act as alleged herein.

**ANSWER:** Paragraph 185 contains legal conclusions to which no responsive pleading is required. Claims of control person liability against Defendants Mark Da-Jian Chen and Jennifer Weng, and Golden Meditech have been dismissed pursuant to the Court's Opinion and Order on Defendants' Motions to Dismiss (ECF No. 163) and accordingly, no response is required. To the extent a response is required, Defendants deny each and every allegation in Paragraph 185.

186. Defendants Ting Zheng, Bing Chuen Chen, and Yuen Kam acted as controlling persons of Golden Meditech within the meaning of Section 20(a) of the Exchange Act as alleged herein.

**ANSWER:** Paragraph 186 contains legal conclusions to which no responsive pleading is required. To the extent a response is required, Defendants deny each and every allegation in Paragraph 186.

187. Defendant Yuen Kam and Golden Meditech acted as controlling persons of Cellenkos within the meaning of Section 20(a) of the Exchange Act as alleged herein.

**ANSWER:** Paragraph 187 contains legal conclusions to which no responsive pleading is required. Claims of control person liability against Golden Meditech have been dismissed pursuant to the Court's Opinion and Order on Defendants' Motions to Dismiss (ECF No. 163) and accordingly, no response is required. To the extent a response is required, Defendants deny each and every allegation in Paragraph 187.

188. The Individual Defendants and Golden Meditech directly or indirectly induced the acts constituting the violations of Section 10(b) of the Exchange Act and Rule 10b-5 by GCBC, Golden Meditech, and/or Cellenkos, and did not act in good faith.

**ANSWER:** Paragraph 188 contains legal conclusions to which no responsive pleading is required. To the extent a response is required, Defendants deny each and every allegation in Paragraph 188.

189.    As a direct and proximate result of the wrongful conduct of the Individual Defendants and Golden Meditech, Plaintiffs and other members of the Class suffered damages in connection with their respective purchases and sales of the Company's shares during the Class Period.

**ANSWER:** Paragraph 189 contains legal conclusions to which no responsive pleading is required. To the extent a response is required, Defendants deny each and every allegation in Paragraph 189.

## AFFIRMATIVE DEFENSES

Without admitting any wrongful conduct on the part of Defendants, and without admitting the Plaintiffs or the putative class members have suffered any loss, damage, or injury, Defendants allege the following affirmative defenses to the Complaint. By setting forth these affirmative defenses, Defendants do not assume any burden of proof, persuasion, or production with respect to any issue where the applicable law places the burden upon Plaintiffs, and reserve the right to amend this Answer to assert any additional defenses when, and if, in the course of their investigation, discovery, preparation for trial, or otherwise it becomes appropriate to assert such defenses, or any crossclaims, counterclaims, contribution claims, or third-party claims not asserted herein. To the extent any of the defenses asserted herein or to be asserted in the future, is mutually exclusive with another defense asserted herein or to be asserted in the future, such defense is asserted in the alternative to the other. These defenses do not include defenses to any dismissed claims.

## FIRST AFFIRMATIVE DEFENSE

The claims asserted in the Complaint are barred or fail, in whole or in part, because GCBC's relevant SEC filings, press releases, investor presentations, conference calls, and other communications did not contain any materially false or misleading statements or omissions.

## SECOND AFFIRMATIVE DEFENSE

The claims asserted in the Complaint are barred or fail, in whole or in part, because the Defendants made a reasonable investigation of the facts and had reasonable grounds to believe, and did believe, that GCBC's SEC filings, press releases, conference calls, investor presentations and other communications did not contain an untrue statement and did not omit any material fact at the time those documents were issued or became effective.

## THIRD AFFIRMATIVE DEFENSE

The claims asserted in the Complaint are barred or fail, in whole or in part, because, throughout the putative class period, Defendants reasonably relied on their professionals, third-party advisors and legal counsel in preparing and presenting the alleged misstatements. Thus, no reasonable jury could conclude that Defendants acted with scienter.

## FOURTH AFFIRMATIVE DEFENSE

The claims asserted in the Complaint are barred or fail, in whole or in part, because Defendants did not possess any motive and/or opportunity for committing the wrongful acts alleged. Thus, no reasonable jury could conclude that Defendants acted with scienter.

## FIFTH AFFIRMATIVE DEFENSE

The claims asserted in the Complaint are barred or fail, in whole or in part, because Defendants fully met all disclosure obligations; specifically, Defendants did not have any duty to

disclose, did not possess information which they had a duty to disclose earlier, and/or did not have a duty to disclose further information than what was disclosed.

## SIXTH AFFIRMATIVE DEFENSE

The claims asserted in the Complaint are barred or fail, in whole or in part, because the information Defendants allegedly concealed was in fact already disclosed and/or was in the public domain at the time any challenged statements were made and, as such, was at all times reflected in the price of GCBC's securities.  Moreover, no person or entity may recover from Defendants to the extent such person or entity had actual or constructive knowledge of the facts alleged in the Complaint to have been concealed or misrepresented.

## SEVENTH AFFIRMATIVE DEFENSE

Assuming there was any false or misleading statement or omission as alleged in the Complaint, and Defendants deny there are any, the claims asserted in the Complaint are barred or fail, in whole or in part, because any such false or misleading statement or omission was not material.

## EIGHTH AFFIRMATIVE DEFENSE

Defendants are not liable, and a class cannot be certified, because the alleged misstatements did not have the required impact on the price of GCBC's common stock and Plaintiffs did not suffer damages as a result of any acts, omissions, or statements by Defendants.

## NINTH AFFIRMATIVE DEFENSE

The claims asserted in the Complaint are barred or fail, in whole or in part, because GCBC's SEC filings, press releases, conference calls, investor presentations, and other communications bespoke caution.

## TENTH AFFIRMATIVE DEFENSE

The claims asserted in the Complaint are barred or fail, in whole or in part, because Lead Plaintiffs assumed the risks disclosed in GCBC's SEC filings, press releases, investor presentations, conference calls, and other communications, and any losses Plaintiffs experienced were caused because some or all of those risks materialized.

## ELEVENTH AFFIRMATIVE DEFENSE

Plaintiffs' alleged damages are not recoverable from Defendants because all or part of such damages were not proximately caused by an alleged fraudulent act or omission of Defendants as alleged in the Complaint and/or resulted from causes other than any alleged fraudulent act or omission of Defendants, including but not limited to the intervening or superseding acts of third parties and/or market forces.

## TWELFTH AFFIRMATIVE DEFENSE

Defendants are not liable because the Complaint's allegations are based on alleged projections, forecasts, expectations, expressions of opinion, or predictions of future events or results which were forward-looking statements and accompanied by meaningful cautionary language and/or were not made with actual knowledge of falsity. All such statements fall within the Safe Harbor provisions of the Private Securities Litigation Reform Act of 1995, as codified at 15 U.S.C. § 78u-5(c).

## THIRTEENTH AFFIRMATIVE DEFENSE

Plaintiffs' claims are barred or fail, in whole or in part, because Defendants were not control persons within the meaning of Section 20(a) of the Exchange Act, and because they acted in good faith and did not induce any alleged violation of Section 10(b) or Rule 10b-5.

**FOURTEENTH AFFIRMATIVE DEFENSE**

Plaintiffs' claims are barred, in whole or in part, to the extent that the damages sought exceed those permitted under the Securities Exchange Act of 1934, the Private Securities Litigation Reform Act, common law, or any other applicable statute, rule or regulation.

**FIFTEENTH AFFIRMATIVE DEFENSE**

Any liability of Defendants must be reduced or eliminated under the doctrines of comparative responsibility, contribution, setoff, and/or indemnity.

**SIXTEENTH AFFIRMATIVE DEFENSE**

The Complaint is not properly maintainable as a class action.

**SEVENTEENTH AFFIRMATIVE DEFENSE**

Plaintiffs' claims are barred or fail, in whole or in part, by the truth-on-the market defense.

**EIGHTEENTH AFFIRMATIVE DEFENSE**

Defendants cannot be held liable under Section 20(a) of the Securities Exchange Act because they acted at all times in good faith and/or were not culpable participants in the act or acts about which Plaintiffs complain.

**NINTEENTH AFFIRMATIVE DEFENSE**

The Complaint fails to state a claim against Defendants upon which relief may be granted.

**TWENTIETH AFFIRMATIVE DEFENSE**

Plaintiffs' claims are barred, in whole or in part, by the applicable statute of limitations and repose.

## TWENTY-FIRST AFFIRMATIVE DEFENSE

Defendants preserve all defenses based on lack of personal jurisdiction and insufficient service of process.

## TWENTY-SECOND AFFIRMATIVE DEFENSE

To the extent Plaintiffs suffered any damages, Plaintiffs failed to mitigate those damages.

## TWENTY-THIRD AFFIRMATIVE DEFENSE

Plaintiffs' claims are premised on allegations made in foreign proceedings, which are non-final, non-binding on this Court, non-preclusive, invalid, and/or did not afford Defendants a full and fair opportunity to litigate.

## TWENTY-FOURTH AFFIRMATIVE DEFENSE

Defendants were improperly removed from their positions at GCBC and lack access to materials, documents, and information that would establish their defenses to Plaintiffs' claims.

## TWENTY-FIFTH AFFIRMATIVE DEFENSE

The Complaint fails to plead fraud with particularity as required by Rule 9(b) and the Private Securities Litigation Reform Act.

## TWENTY-SIXTH AFFIRMATIVE DEFENSE

Plaintiffs improperly seek to attribute to Defendants the conduct of GCBC, other individuals, and various officers, directors, employees, and affiliates without sufficient factual or legal basis.

## TWENTY-SEVENTH AFFIRMATIVE DEFENSE

Plaintiffs cannot establish actual reliance as against Defendants. To the extent Plaintiffs invoke any presumption of reliance, including the presumption recognized in Basic Inc. v. Levinson, such presumption is rebutted as to Defendants because no alleged statement, omission, or conduct attributable to them had any price impact on GCBC securities.

## TWENTY-EIGHTH AFFIRMATIVE DEFENSE

To the extent Defendants are found liable on any claim asserted in this action, Defendants' liability shall be limited to its proportionate share of any damages awarded, as determined pursuant to the proportionate liability provisions of the Private Securities Litigation Reform Act of 1995.

## TWENTY-NINTH AFFIRMATIVE DEFENSE

Plaintiffs' claims are barred in whole, or in part, by principles of waiver and/or estoppel, and by the doctrine of unclean hands, and/or other related equitable doctrines.

## THIRTIETH AFFIRMATIVE DEFENSE

Plaintiffs' claims are barred in whole, or in part, because the alleged conduct did not impact the price of GCBC's stock, including but not limited to because it did not trade on an efficient market.

## PRAYER FOR RELIEF

Wherefore, Defendants ask this Court to enter judgment in their favor and against Plaintiffs on all claims asserted in the Complaint, dismiss such claims with prejudice, award the Defendants its attorneys' fees and costs in this action, and grant the Defendants such other and further relief as is just and proper.

Dated: April 17, 2026

DECHERT LLP

By:    */s/ Benjamin E. Rosenberg*
        Benjamin E. Rosenberg
        May Chiang
        Amy M. ElSayed
        Dechert LLP
        1095 Avenue of the Americas
        Three Bryant Park
        New York, NY 10036
        212-698-3500
        Email: benjamin.rosenberg@dechert.com
        Email: may.chiang@dechert.com
        Email: amy.elsayed@dechert.com

        *Counsel for Defendants Ting (Tina) Zheng*
        *and Bing Chuen (Albert) Chen*

**CERTIFICATE OF SERVICE**

I, the undersigned, hereby certify that on the 17th day of April, 2026, I electronically filed this **Answer and Affirmative and Other Defenses in Response to the Amended Class Action Complaint** using the CM/ECF system, which automatically sends notice and a copy of the filing to all counsel of record.

*/s/Benjamin E. Rosenberg*
Benjamin E. Rosenberg

*Counsel for Defendants Ting (Tina) Zheng and Bing Chuen (Albert) Chen*